# EXHIBIT
# 2

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,       :

　　　　Respondent,       :          Criminal No. PJM-98-0520

　　　　v.       :          Peter J. Messitte, U.S.D.J.

DUSTIN JOHN HIGGS,       :          Greenbelt Division

　　　　Petitioner.       :

---

## PETITIONER'S MOTION FOR RELIEF PURSUANT TO
## 28 U.S.C. SECTION 2255
## OR IN THE ALTERNATIVE
## PURSUANT TO 28 U.S.C. 2241

MAUREEN KEARNY ROWLEY, ESQ.
Chief Federal Defender
By: MICHAEL WISEMAN, ESQ.
Supervisory Assistant Federal Defender
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
Michael_Wiseman@fd.org

STEPHEN H. SACHS, ESQ.
Wilmer Cutler Pickering Hale &
Dorr, LLP
c/o Sachs
5 Roland Mews
Baltimore, MD 21210
410-532-8405
Stephen.Sachs@wilmerhale.com

COUNSEL FOR PETITIONER
DUSTIN JOHN HIGGS

Dated: November 28, 2005
　　　　Greenbelt, Maryland

RECEIVED

2005 NOV 28 P 1: 04

UNITED STATES ATTORNEY
GREENBELT, MD

## PRELIMINARY STATEMENT

Petitioner was charged with the January 27, 1996 deaths of three women occurring on federal land. On October 11, 2000 Petitioner was convicted by a jury of three counts of first-degree premeditated murder (18 U.S.C.A. § 1111(a)), three counts of first-degree murder committed in the perpetration or attempted perpetration of a kidnapping (id.), three counts of kidnapping resulting in death, (18 U.S.C.A. § 1201(a)(2)), and three counts of use of a firearm (18 U.S.C. § 924(c)). Following a sentencing hearing, the jury recommended that Petitioner be sentenced to death on each of the nine death-eligible counts. On January 3, 2001 he was formally sentenced by this Court to nine death sentences and 45 years for the firearm convictions, consecutive to the death sentences.

In this Petition, Mr. Higgs demonstrates that his convictions and sentences, including each of his death sentences, were obtained in violation of the United States Constitution and federal law in multiple respects.

References to transcripts of the trial proceedings before this Court are cited as "TT" (Trial Transcript) followed by the date of the proceedings, and a page citation. Pre-trial proceedings are identified by "PTT" (Pre-Trial Transcripts), again followed by the relevant date and page citation. The two opinions of the United States Courts of Appeals rendered on direct appeal US v. Higgs, 353 F.3d 281 (4th Cir. Dec. 22, 2003) and U.S. v. Higgs, 95 Fed.Appx. 37, 2004 WL 835795 (4th Cir.(Md.) April 20, 2004)) are cited as Higgs 1 and Higgs 2, respectively. All other citations are either self-explanatory or are explained. All emphasis is provided unless otherwise noted.

# TABLE OF CONTENTS

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Grounds for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Claims for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Claim I.    Petitioner's Convictions and Sentences Were Obtained Through
the Government's Use of Scientifically Unsound Comparative
Bullet Lead Analysis. The Reliance on This Unsound Science
Violated Petitioner's Rights to Due Process of Law and Effective
Assistance of Counsel. Alternatively, the Lack of Scientific
Foundation is Newly Discovered and Petitioner is Entitled to
Relief Because of Newly Discovered Evidence . . . . . . . . . . . . . . . . . . . . . 3

A.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

B.    How CBLA was Used at Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

C.    CBLA is not Valid Science – Lundy's Opinions were Not
Supportable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

   i.    The Lead Smelting and Bullet Manufacturing Process . . . . . . . . . 9

   ii.    The Definition of "Source." . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

   iii.    The Definition of "Analytically Indistinguishable"
and the Use of Chaining . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

   iv.    The Assumptions of Uniqueness of the Source,
Homogeneity of the Source and that there Exists a
Pattern to the Geographic Distribution for Retail Sale . . . . . . . . 12

      a.    The Assumption that Each Source is Unique . . . . . . . . . 12

      b.    The Assumption That Each Source Is
Homogeneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

|   | c. | The Failure to Consider the Problem of Geographical Bullet Distribution | 16 |

v. Ms. Lundy's Theories Have Been Tested and Proven Invalid ........................................... 17

vi. Ms. Lundy's and the FBI's Theory Has Not Been Subjected to Peer Review and Publication ................. 18

vii. Ms. Lundy's Opinions Do Not Have an Acceptable Rate of Error ........................................ 18

viii. Ms. Lundy's Theory Is Not Generally Accepted Within the Relevant Scientific Community ...................... 19

ix. Use of Standard Deviations ............................. 19

D. Conclusion ....................................................... 20

Claim II. Petitioner's Trial Prosecutors Exercised Their Peremptory Challenges in a Discriminatory Manner, on the Basis of Gender in Violation of Petitioner's Rights under the Fifth and Sixth Amendments to the United States Constitution ............. 21

A. The Prosecutor's Strikes in Petitioner's Case ..................... 22

B. The Trial Prosecutors' Strikes in Other Capital Murder Cases ........ 28

C. Conclusion ....................................................... 29

Claim III. As a Result of Ineffective Assistance of Counsel, Court Error, the Government's Suppression of Exculpatory Evidence and Newly Discovered Evidence (Not Available at the Time of Petitioner's Trial), Petitioner Was Wrongly Convicted of Capital Murder; Petitioner Is Innocent of Capital Murder and Should Be Granted a New Trial ...................................... 29

A. Trial Counsel Failed to Investigate or Present Evidence of Victor Gloria's Prior Inconsistent Statements ..................... 29

B. Newly Discovered Evidence Exists Which Corroborates Gloria's Prior Statements That He Was Sleeping During the Murders and Testified Falsely at Petitioner's Trial ............................ 31

C. The Government Suppressed Information Related to

Consideration Given to Gloria in Exchange for His
Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

D.     Trial Counsel Was Ineffective for Failing to Elicit from Victor
Gloria His Possession and Use of Weapons, Including .38
Caliber Guns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

E.     Trial Counsel Ineffectively Failed to Present the Jury with
Evidence of Haynes Motive to Kill, Which was at Significant
Odds with the Government's Theory of Motive . . . . . . . . . . . . . . . . . . . 35

F.     Trial Counsel Failed to Investigate an Alleged, but Untrue,
Incident in Which Ms. Darby Testified That Petitioner
Threatened Her with a Gun; Proper Investigation Would Have
Revealed this Testimony to Be Unreliable. The Government
Suppressed Evidence That Ms. Darby Was Untruthful . . . . . . . . . . . . . . 39

G.     The Government Suppressed Evidence of Consideration Given
to Richard Diolamou and Wondwossen Kabtamu, Both
Witnesses for the Prosecution Given Favorable Treatment in
Immigration Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

H.     Trial Counsel Failed to Obtain Records Proving That Domenick
Williams Testified Falsely, since He Was Not on the Cell Block
with Petitioner at All the Relevant Times . . . . . . . . . . . . . . . . . . . . . 43

Claim IV.     Trial Counsel Ineffectively Failed to Challenge the Admissibility
of Ballistics Testimony That Was of No Probative Value and
Which Failed to Prove Any Connection Between Petitioner and
the Crimes Charged . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Claim V.     Trial Counsel Ineffectively Failed to Object to the Admission
of Evidence Concerning Co-defendant Willis Haynes'
Confessions During the Guilt Phase of Trial . . . . . . . . . . . . . . . . . . . . 47

Claim VI.     Petitioner was Denied Effective Counsel During Capital
Sentencing in Violation of the Sixth and Eighth Amendments
to the United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

A.     Introduction and Statement of the Claim . . . . . . . . . . . . . . . . . . . . . 51

B.     Counsel's Deficient Performance . . . . . . . . . . . . . . . . . . . . . . . . . . 52

i.     The Investigation Stage . . . . . . . . . . . . . . . . . . . . . . . . . . 52

|  |  | a. | The School Records .......................... 52 |

          b.      Counsel and Mr. Sickler's Abrogation of their  
                    Investigative Responsibility to Lay People ........... 55

          c.      The Failure to Interview Others Who Interacted  
                    Daily with Petitioner or Otherwise Knew of Alphonso  
                    Higgs' Life of Crime ........................... 60

          d.      Failure to Provide Any Accurate Evidence About  
                    the Emotional and Mental Health Impact Upon  
                    Petitioner of the Tragic Loss of his Mother ........... 63

          e.      The Failure to Provide Mental Health Experts with  
                    the Actual Mitigating Evidence ................... 67

      ii.      The Gutting of Petitioner's Penalty Phase, and Counsels'  
               Lack of a Response ............................. 73

   C.    Counsels' Deficient Performance Caused Petitioner Prejudice ........ 80

**Claim VII.**   The Federal Death Penalty, as Administered, Violates the  
           Fifth and Eighth Amendments, and Trial Counsel Was  
           Ineffective for Failing to Challenge the Death Penalty on this  
           Ground ...................................................... 80

**Claim VIII.**   Trial Counsel Ineffectively Failed to Object to the Admission  
           of Co-defendant Willis Haynes' Confession During the Penalty  
           Phase of Petitioner's Trial on Fifth and Sixth Amendment  
           Grounds .................................................... 83

**Claim IX.**   The Victim Impact Evidence, Argument and Instruction Allowed  
           the Sentencing Jury to Consider Victim Family Members' Views  
           as to the Appropriate Sentence, and Were Excessively Emotional  
           and Duplicative, in Violation of the Eighth Amendment ........... 85

   A.    The Victim Impact Evidence ............................... 85  
   B.    The Victim Impact Argument ............................... 89  
   C.    The Victim Impact Instructions ............................. 90  
   D.    The Constitutional Violations .............................. 91

**Claim X.**   The Submission of Mr. Higgs' Prior Conviction for Assault  
           and Reckless Endangerment as a Statutory Aggravating Factor  
           under 18 U.S.C. § 3592(c)(2) (Previous Conviction for Felony

Involving Firearm) Violated the Eighth Amendment and Due Process Clause of the Fifth Amendment, because (1) These Offenses Did Not Necessarily Involve Use of a Firearm, and (2) the Conviction for These Offenses Did Not Take Place Previous to the Instant Offense. Defense Counsel Was Ineffective at Trial and on Appeal for Not Making the Proper Objections and Arguments .................................... 92

Claim XI.     The submission of Mr. Higgs' conviction for violation of the federal drug statute in 1997 as an aggravating factor under 18 U.S.C. § 3592(c)(12) violated the Eight Amendment because this subsection only applies to federal drug convictions for which Mr. Higgs "had previously been convicted," and this language means the conviction had to have taken place prior to the instant offense, which occurred in 1996 ..................... 95

Claim XII.    The Fourth Circuit Improperly Assumed That Presentation of the Invalid "Multiple Killings" Aggravating Factor to the Jury Did Not Infect the Jury's Weighing Process, in Violation of the Eighth and Fourteenth Amendments ......................... 97

Claim XIII.   Defense Counsel were Ineffective for Failing to Interview and Call as Witnesses Gerald Vaughn and Kevin Darnell Anderson ....... 99

Claim XIV.    Petitioner's Death Sentences Violated the Fifth and Eighth Amendments Because the Government Failed to Indict Mr. Higgs for the Aggravating Factors Required for a Capital Offense, or for the Additional Non-Statutory Factors Relied Upon by the Government During the Penalty Phase ............... 100

Claim XV.     Petitioner's Death Sentences Were Obtained in Violation of the Fifth, Sixth and Eighth Amendments Because the Court Failed to Instruct the Jury That in Reaching its Penalty Verdict, it must Determine Beyond a Reasonable Doubt Whether the Aggravating Factors Outweighed Mitigating Factors, and Because Counsel Ineffectively Failed to Object to the Improper Instruction or to Propose a Constitutional Instruction .............. 101

Claim XVI.    The Trial Court Excluded from the Jury's Consideration as a Mitigating Factor the Fact That a Life Sentence Would Mean That Mr. Higgs Would Be Imprisoned till He Dies, in Violation of the Eighth Amendment; Appellate Counsel's Failure to Raise this Claim Deprived Petitioner of the Effective Assistance of Appellate Counsel ......................................... 102

Claim XVII.     The Fourth Circuit Erred in the Materiality Analysis of
                Petitioner's Claim under Brady V. Maryland .................... 104

Claim XVIII.    Testimony Regarding Petitioner's Post-Arrest Silence
                Violated Petitioner's Rights Under the Fifth and Sixth
                Amendments ............................................ 106

Claim XIX.      Petitioner's Rights Under the Fifth Amendment Were
                Violated During the Penalty Phase When the Court
                Neglected to Instruct the Jury to Draw No Adverse
                Inference from the Fact that Petitioner Did not Testify ............. 106

Claim XX.       Petitioner's Convictions Were Obtained in Violation of the
                Fifth and Sixth Amendments Because the Government Failed
                to Prove by Sufficient and Competent Evidence That the
                Offenses Occurred Within the Special Maritime and Territorial
                Jurisdiction of the United States.  Counsel Ineffectively Failed
                to Challenge the Government's Insufficient Proof And/or to
                Object to the "Expert" Opinion Testimony of a Witness Who
                Was Neither Tendered Nor Accepted as an Expert Witness ......... 107

Claim XXI.      The Trial Prosecutors Violated the Due Process Clause When
                they Failed to Provide Trial Counsel with All Witness
                Statements and Reports Generated by the Park Police and
                the FBI ............................................... 110

Claim XXII.     Petitioner is Entitled to Relief Based Upon the Cumulative
                Errors Identified Above ................................. 110

Claim XXIII.    Petitioner is Entitled to and Request that the Court Provide an
                Evidentiary Hearing on All Disputed Issues of Material Fact ........ 111

Claim XXIV.     Jurors in Petitioner's Trial Engaged in Misconduct in Violation
                of Petitioner's Rights under the Fifth, Sixth, Eighth and
                Fourteenth Amendments to the United States Constitution .......... 111

Claim XXV.      The Execution of Petitioner Though Lethal Injection Pursuant
                to the Federal Government's Execution Protocol, Maryland's
                Execution Protocol, or Any Similar Protocol, Would Violate
                the Eighth Amendment's Prohibition Against Cruel and Unusual
                Punishment ........................................... 112

Request for Relief ................................................. 122

1. This Court has jurisdiction to provide the relief requested herein pursuant to 28 U.S.C. § 2255.

## PROCEDURAL HISTORY

2. On the morning of January 27, 1996 the bodies of three women (Mishann Chinn, Tanji Jackson and Tamika Black) were found on Route 197 as it passes through the Patuxent National Wildlife Refuge in Prince George's County, Maryland. Following years of investigation, Petitioner along with Willis Haynes was charged in connection with these deaths.

3. Pre-trial hearings pertaining to Petitioner and Haynes were conducted on November 15, 1999 and February 10 & 11, 2000.

4. Petitioner and Haynes were tried separately. Haynes was convicted of murder and related counts. The jury did not sentence him to death, and accordingly, on August 24, 2000 this Court sentenced him to life imprisonment and 45 years consecutive. Mr. Haynes' conviction was affirmed by the Court of Appeals. U.S. v. Willis Mark Haynes, 26 Fed.Appx. 123, 2001 WL 1459702 (4th Cir. Nov. 19, 2001 (Md.)), cert denied, Haynes v. U.S., 535 U.S. 979 (April 1, 2002).

5. Jury selection commenced in Petitioner's case on September 5, 2000 and concluded on September 26, 2000. The empaneled jury was all male.

6. Opening statements and the taking of evidence occurred on September 26, 2000.

7. The jury returned its guilt phase verdict on October 11, 2000.

8. Petitioner's penalty hearing commenced on October 18, 2000. Evidence was taken on that date, and on October 19, 20 and 24, 2000. Counsel closed to the jury on October 25, and penalty deliberations commenced that day.

9. On October 26, 2000, the jury returned its verdict recommending death on nine counts.

10. This Court formally sentenced Mr. Higgs on January 3, 2001 to nine death sentences and 45 years imprisonment consecutive to the capital sentences.

11. Petitioner took a direct appeal of the judgments of this Court to the United States Court of Appeals for the Fourth Circuit. While prosecuting Petitioner's direct appeal, his counsel discovered what it considered to be exculpatory evidence and filed a motion in this Court seeking a new trial. This Court denied that motion, which Petitioner also appealed to the Fourth Circuit.

12. Petitioner's direct appeals of his judgments of conviction and of the denial of his motion for a new trial, were affirmed in Higgs 1 and Higgs 2, respectively on December 22, 2003 and April 20, 2004. ..

13. Timely petitions for writ of certiorari were filed in the United States Supreme Court.

14. The petitions for certiorari were denied as to each case on the same day. See Higgs v. United States, 125 S.Ct. 627 (Nov. 29, 2004) (docket #03-10498); Higgs v. United States, 125 S.Ct. 608 (Nov. 29, 2004) (docket # 04-5226).

15. Petitioner was represented at trial by Harry J. Trainor, Esq. and Timothy J. Sullivan, Esq. The Government was represented by Deborah A. Johnston, Esq., Sandra Wilkinson, Esq. and Joseph Uberman, Esq.

16. Petitioner was represented on appeal, in his motion for a new trial and in his certiorari proceedings by Mr. Sullivan and Barbara Hartung. The Government was again represented by Ms. Wilkinson and Ms. Johnston.

17. Petitioner is currently incarcerated at the United States Penitentiary in Terre Haute, Indiana (Register #31133-037).

18. Petitioner is also serving a previously imposed sentence of 212 months imposed by this Court on December 12, 1997 for violations of federal drug laws. See United States v. Higgs, 8:96-cr-00153-PJM. That judgment is not the subject of this Petition.

### GROUNDS FOR RELIEF

19. Petitioner herein alleges that his convictions and sentences, including his sentences of death, were obtained in violation of his rights under the Fifth, Sixth and Eighth Amendments to the United States Constitution. These violations relate to ineffective assistance of counsel and violations of his right to due process of law. Additionally, his judgments and convictions must be vacated in view of the newly discovered evidence discussed herein.

20. Petitioner moves for relief pursuant to 28 U.S.C. § 2255. However, should it be determined that any of Petitioner's claims are not cognizable under section 2255, he alternatively moves for relief pursuant to 28 U.S.C. § 2241 as to any claim for which section 2255 proves to be ineffective or inadequate to test the legality of his detention and sentences.

### CLAIMS FOR RELIEF

**CLAIM I.** PETITIONER'S CONVICTIONS AND SENTENCES WERE OBTAINED THROUGH THE GOVERNMENT'S USE OF SCIENTIFICALLY UNSOUND COMPARATIVE BULLET LEAD ANALYSIS. THE RELIANCE ON THIS UNSOUND SCIENCE VIOLATED PETITIONER'S RIGHTS TO DUE PROCESS OF LAW AND EFFECTIVE ASSISTANCE OF COUNSEL. ALTERNATIVELY, THE LACK OF SCIENTIFIC FOUNDATION IS NEWLY DISCOVERED AND PETITIONER IS ENTITLED TO RELIEF BECAUSE OF NEWLY DISCOVERED EVIDENCE.

**A. Introduction.**

21. Petitioner's convictions and sentences were based in large measure upon junk science. The government relied on evidence of the now-discredited Comparative Bullet Lead

3

Analysis (hereafter, "CBLA"). Since the time of Mr. Higgs' trial, it has become apparent that CBLA is not valid science. New scientific data, proving the incredibility of CBLA, is newly discovered evidence that was not available at the time of Petitioner's trial. Petitioner is entitled to relief under the governing standards addressing claims of newly discovered evidence. Alternatively, since the Government knew, or should have known, about the lack of scientific foundation during Petitioner's trial and direct appeal, the Government's use of and on-going reliance on this evidence, constitutes a violation of Petitioner's right to due process of law, secured by the Fifth Amendment. Finally, and also alternatively, to the extent that trial counsel knew or should have known through thorough investigation about the lack of scientific validity of this "science," Petitioner moves for relief based upon the denial of his right to effective assistance of counsel, secured by the Sixth Amendment.

22. The CBLA evidence was an important and critical part of the Government's case, stressed by the prosecutors in closing argument. Thus, under whichever legal theory the use of this evidence is viewed, one thing is clear: the jury's verdict was based upon demonstrably false, misleading and inaccurate "science."

**B.      How CBLA was Used at Trial.**

23. In this case, Willis Haynes shot and killed three young women. There is no allegation that Mr. Higgs fired the shots. There is no direct evidence that Mr. Higgs directed, desired, or intended the girls to be shot. Moreover, evidence had been presented that Mr. Higgs rarely stayed in the Briarwood apartment where the gun and ammunition were allegedly kept, tending to show that they did not belong to him TT 9/27/00, 167; TT 9/28/00, 129-132. It was therefore critical for the Government to prove a connection between Petitioner and the .38 caliber gun (which was never recovered) and the ammunition used to kill the victims. See TT

4

9/22/00, 119 (Government arguing that "it is absolutely critical for the government to put that .38 caliber handgun in Mr. Higgs' hands").[1]

24. In order to make this critical, yet elusive, connection the Government presented evidence showing a CBLA "match" between bullets recovered from the Briarwood apartment when it was searched in March 1996, and bullets recovered from Cherry Lane and Chaconia shootings, and the crime scene. All of this ammunition was sent to the FBI Laboratory in Washington, D.C. for CBLA analysis.

25. In order to show the CBLA match, the Government presented the expert testimony of Kathleen Lundy, who at the time had been employed by the FBI in the forensic lab elemental analysis group for approximately 15 years. TT 10/6/00, 5. She testified that she used Inductively Coupled Plasma-Optical Emission Spectroscopy (ICP-OES) to measure the presence of elements in lead samples taken from bullets from the victims in this case, as well as bullets from Cherry Lane, Chaconia, and the Briarwood apartment. TT 10/6/00, 9, 14, 21, 23.

26. Based on those measurements, Lundy – using the then-current FBI definition for "analytically indistinguishable" (which, as shown below, arbitrarily fluctuated without any scientific basis) – claimed that one bullet from Haynes' victims and a bullet recovered from Cherry Lane were analytically indistinguishable from one another. TT 10/6/00, 18. She also contended that a bullet from Chaconia was analytically indistinguishable from bullets found at the Briarwood apartment. TT 10/6/00, 27-29.

27. Lundy then concluded that because the bullets from the victim and the bullets

---

[1]Victor Gloria's testimony placing the gun in Mr. Higgs's hands on the night of the killings is also increasingly suspect in light of inconsistencies, his statement that he was sleeping at the time he said he saw Mr. Higgs hand a gun to Mr. Haynes, and the undisclosed consideration that he received in exchange for his testimony. This latter fact is addressed below in Claim III.

from the other scenes are "analytically indistinguishable," these bullets "likely originated from the same manufacturers' source (melt) of lead." TT 10/6/00, 29.

28. Mr. Higgs pled guilty to the Cherry Lane incident. However, there were two assailants and it is entirely unclear which of the assailants used a .38 caliber weapon and which used a .9 millimeter weapon. In an unabashed bootstrap, the Government used the CBLA testimony to link the Cherry Lane bullet (Bullet B2/Q6) to one bullet recovered from the homicide (Bullet MC1/Q5). TT 10/6/00, 18. Thus, the Government tried to establish that Mr. Higgs wielded the .38 caliber weapon in the Cherry Lane case, while at the same time showing that the Cherry Lane case was relevant because it showed his access to the ammunition found at the homicide scene. In any event, these specious conclusions were supported only by the invalid, unreliable and flawed CBLA matches. In fact, the Government explicitly argued this point in its closing argument.[2] TT 10/20/00, 124-26.

29. Similar linkage was attempted with regard to the Chaconia incident. Charges against Mr. Higgs in that incident were dropped as there was insufficient evidence to proceed to trial. Nonetheless, this shooting incident was introduced against Mr. Higgs in this capital trial. Flawed CBLA testimony linked a bullet found at the Chaconia incident (B3/Q206) to bullets found in the Briarwood apartment. TT 10/6/00, 28-29. This unchallenged CBLA evidence also

---

[2]In fact, the government also put on evidence that the ammunition used in both these incidents had some alleged link because both were .38 caliber bullets that were fired from a weapon that left the impression of five lands and grooves in a right twisting pattern. TT 10/5/00, 170-73. However, the probative value of this evidence is also nonexistent, as in Claim IV. The FBI ballistics examiner at trial was unable to say that the bullets were fired from the same weapon; only that they had the same general pattern. TT 10/5/00, 170-73. The fact that the bullets have similar markings is without probative value, since millions of weapons in circulation make these markings. Letter Report of William E. Conrad, dated November 17, 2005, copy contained in Petitioner's Appendix.

tended to prove a link between the Chaconia incident and the Briarwood apartment, which of course inculpated Mr. Higgs. TT 10/20/00, 126. The government specifically relied on the CBLA "science" in order to gain admission of the Chaconia event. PTT 9/22/00, 123.

30.     The Government used CBLA as the basis for this evidence of bad acts that would otherwise have not been admissible against Petitioner. In a pre-trial motion, Petitioner attempted to preclude introduction of evidence showing that he was involved in the Chaconia shooting. PTT 9/22/00, 116. Petitioner argued it should be excluded since he was not found guilty of that offense, and that its probative value was far outweighed by its prejudicial impact. Id. at 116-119. The Government responded that as part of its "critical need" to put the .38 caliber weapon in Mr. Higgs' possession, it would prove that he was involved in the Chaconia and Cherry Lane shooting through the use of CBLA. The Government contended that these bad acts were admissible in its case-in-chief in order to make the "forensic connection" between the two shootings and the ammunition taken from the Briarwood apartment. Id., at 121 (bullets match through "metal element analysis"); id. at 122-23. The Government also pressed this forensic connection in its opening statement. TT 9/26/00, 45-46 (arguing that the bullets provided links between Mr. Higgs, the Cherry Lane and Chaconia shootings).

31.     Thus, CBLA was utilized to draw a forensic link between bad acts, which were then admitted to establish the link. Had there been no comparative bullet lead analysis, there would have been a far weaker link between the bad act testimony and Petitioner, and the bad act evidence would not have been admissible.

**C.     CBLA is not Valid Science – Lundy's Opinions were Not Supportable.**

32.     The FBI Laboratory has performed CBLA for many years, but, in the face of mounting scientific criticism of this practice, it announced on September 1, 2005 that it would no

7

longer perform such analysis for any purpose. See, http://www.fbi.gov/pressrel/ pressrel05/bullet_lead_analysis.htm (visited on November 27, 2005), copy of press release contained in Petitioner's Appendix.

33. The press release admits that "neither scientists nor bullet manufacturers are able to definitively attest to the significance of an association made between bullets in the course of a bullet lead examination." Id. Letters of the FBI's discontinuation of CBLA testing were sent to approximately 300 agencies that had received lab reports indicating positive CBLA results since 1996 so that those agencies may "take whatever steps they deem appropriate." Id.

34. Nonetheless, individuals from the FBI Laboratory, including Kathleen Lundy, for years were allowed to testify at trials as to their CBLA-based opinions. The "science" underlying this "expert" testimony went unchallenged for years.

35. Over the course of the last few years the science, analysis, and premises underlying CBLA have been closely scrutinized. This scrutiny reveals that CBLA and the testimony related to it contain numerous scientific questions that make "expert" testimony as to CBLA inadmissible under Rule 702 and Rule 403.[3]

36. There are many flaws in the CBLA methodology. First, the FBI's definition of "analytically indistinguishable" and the concurrent use of "data chaining" shifted without any

---

[3]In fact, the recent scrutiny and the related pressure upon the use of this testimony resulted in the false testimony of Ms. Lundy in a state criminal prosecution that occurred after Petitioner's trial. Ms. Lundy was indicted for false swearing, to which she subsequently pled guilty. She later left the FBI and government service. This conviction not only undermines the opinions in this case, but shows that the FBI and Ms. Lundy have in at least one case admittedly resorted to perjury to justify their CBLA opinions. Therefore, this Court must carefully examine the Government's expert testimony in this case. (The record of Ms. Lundy's conviction is contained in Petitioner's Appendix)

order. At that time, they are assembled into cartridges and packaged into boxes. The date code on the box reflects only when the cartridges are packaged into boxes, not when they were manufactured.

### ii.    The Definition of "Source."

40.    In her testimony Ms. Lundy uses the term "manufacturers' source (melt) of lead." Lundy did not define that term or identify the source in this particular case. Petitioner assumes that the term refers to lead in its last molten state. Thus, "source" may refer to the melt or pour of lead at the secondary smelter from which ingots or billets are made and shipped to the manufacturer. Or "source" may refer to the remelting of ingots by the bullet manufacturer.

41.    In either event, the definition of source fails to consider the metallurgical phenomena that occur during the casting and solidification process which can lead to non-homogeneity in the billets and ingots. Tobin, ¶¶ 5, 6.

### iii.    The Definition of "Analytically Indistinguishable" and the Use of Chaining.

42.    In performing its ICP-OES measurements, the FBI took three small samples from each bullet and used the ICP-OES apparatus to measure the amounts of each of up to seven elements in each sample. The FBI then determined the mean of these measurements as to each element. The FBI categorized the bullets as "analytically indistinguishable" if the mean elemental concentrations of all of the elements measured in each bullet agreed within one or two standard deviations. Tobin, ¶ 20.

43.    However, at the time of Ms. Lundy's analysis and testimony in this case, the FBI allowed "chaining" of the data in determining compositional groups for bullets associated with the suspect (e.g. found in the suspect's possession). Chaining does not require that each bullet

10

be indistinguishable from every other bullet in the group. Instead, under the FBI practice at that time, if bullet A is indistinguishable from bullet B and bullet B is indistinguishable from bullet C, then bullet A is considered indistinguishable from bullet C even if their measurements vary by more than one or two standard deviations. This is data chaining. Tobin, ¶ 19.

44.    Ultimately, by using this method the FBI cast a wider net than was justified by the science. It then used the average value of the elements from this group to compare to the crime scene bullets. Thus, each crime scene bullet is not being compared to each individual suspect's bullet. Chaining creates artificially large compositional groups, which increases the likelihood of "matching" a crime scene bullet to the suspect's bullets. As explained by Tobin, chaining is not a generally accepted practice in the scientific community:

> For example, only through imprecise analysis and the scientifically and forensically inappropriate practice of "data chaining" could Ms. Lundy claim, as she did through Government's Exhibit CH-6 ([T]T 10/6/00 [at] 19), that bullets Q1 and Q4 "match" for all analyses. One of the elements measured – silver – could only be citedc to prove a "match" between Bullet Q1 and Bullet Q4 pursuant to the most reliable of analyses if data chaining were used. Q2 provides the closest link that arguably (depending on how many digits to the right of the decimal place one carries out the evaluation) "chains" Q1 and Q4 together in the most reliable analyses (Q1-2 and Q4-2). Only with the forensically and statistically objectionable practice of "data chaining" could Q1 and Q4 be considered a match in the most reliable of analytical runs performed. "Data chaining" was confirmed objectionable by the NRC and discontinued by the FBI Laboratory immediately upon release of the NRC report in 2004.

Tobin, ¶ 19.

45.    Furthermore, although the FBI generally measures six or seven elements, they have not shown that this number of elements is sufficient to establish that the same compositions come from a unique source. In addition, when an element is at or below the detection limit of that element in the ICP-OES apparatus, the reading is zero. The actual amount of that element is therefore unknown. This in effect results in reducing the number of elements available to be

compared in CBLA, and skews whatever limited accuracy existed in the practice.

> iv. **The Assumptions of Uniqueness of the Source, Homogeneity of the Source and that there Exists a Pattern to the Geographic Distribution for Retail Sale.**

46.     CBLA assumes that determining the elemental composition of a bullet allows the bullet to be identified with a particular and unique source of lead. This assumption underlies the conclusion that if bullets are "analytically indistinguishable" they must have come from the same lead source and were therefore produced from the same melt and purchased at the same location. The major premise at the core of CBLA's major assumption is itself based on three subsidiary assumptions, none of which have ever been proven true, and which are highly unlikely to be true. The first assumption is that each lead source has a unique elemental composition that never repeats. The second assumption is that the elemental composition of each lead melt (which on average contain 50 tons of molten lead) is homogeneous throughout. The third assumption is that there is a discernable pattern regarding the geographic distribution for retail sale of the millions of individual bullets that are manufactured from one source of lead Tobin, ¶ 11.

> a.     **The Assumption that Each Source is Unique.**

47.     Ms. Lundy failed to identify any particular unique source for the examined bullets. A review of the literature reveals no data or studies to support the assumption that any such particular unique source of lead existed.

48.     Indeed, the studies that have been done show the opposite. See, A METALLURGICAL REVIEW OF THE INTERPRETATION OF BULLET LEAD COMPOSITIONAL ANALYSIS" by authors Erik Randich, Wayne Duerfeldt, Wade McLendon, and William Tobin, published in Forensic Science International in 2002 (hereafter, "Randich"). In order to test the

premises behind CBLA,[4] the authors studied "molten source" composition data developed at two secondary lead refiners over approximately 18-month and two-year periods of time (1987-88 and 1998-2000).

49.     The *Randich* study establishes that the crucial assumption of uniqueness is invalid. Their analysis of compositional data from secondary smelters showed instances of "repeats" – **compositionally indistinguishable lots of lead made at different times**. Thus, their study shows that it is possible for bullets which are "analytically indistinguishable" to have derived from different sources or lots of lead made at different times, and from different melts.[5] Thus, the assumption of uniqueness that underlies the Government's comparative bullet lead analysis is not scientifically valid.

50.     The fact that "analytically indistinguishable" sources of lead occur even when the bullets came from different lead melts, done at different times, is also supported by the FBI's own studies. In a 1991 FBI paper published for a Bureau conference,[6] the FBI found matching bullet compositions in boxes manufactured 7 months apart by one ammunition manufacturer (Federal) and matching bullet compositions in boxes manufactured 15 months apart by another manufacturer (Winchester). In that study the FBI bought a total of only sixteen boxes of ammunition, and even in that small sample found compositional matches. These studies showed

---

[4]In the article, CBLA is called "elemental analysis comparison" (EAC).

[5]The study shows that the secondary lead refining industry aims to continually and consistently produce products of uniform composition within a relatively narrow range. Thus, it is quite logical to expect a reasonable number of compositional "repeats" in the bullet lead industry.

[6]E.R.Peele, Donald G. Havekost, Charles A. Peters, John P. Riley and R.C. Halberstam, "COMPARISON OF BULLETS USING THE ELEMENTAL COMPOSITION OF THE LEAD COMPONENT" in Proceedings of the International Symposium on the Forensic Aspects of Trace Evidence, FBI Academy, Quantico, VA, 1991.

**well before Petitioner's trial** that one of three bases for Lundy's conclusion was false. Thus, the Government had an obligation under the due process clause to advise the defense of this fact.

51. In 2002 Robert Koons and Diana Grant of the FBI at Quantico sampled wire from several different melts or "sources" cast the same day.[7] At bullet manufacturer "1," they sampled 12 total "sources" that day; six were for an alloy containing 1% antimony and six containing 2.5% antimony. The melts were cast in an alternating order, that is, one 1% melt was cast into billet molds, then a 2.5% melt was cast in the same billet molds, than another 1% melt was cast, etc.

52. Koons and Grant found that for the 1% antimony and 2.5% antimony alloys being cast that day into billets for extrusion at this manufacture, two out of the six "sources" or melts of each alloy were indistinguishable. It is, of course, impossible to determine when those "analytically indistinguishable" billets will be extruded into wire for bullets. In their article, Koons and Grant found two sets of paired indistinguishable groups. That means that 1/3 of their samples repeated in composition, when they came from different sources.

53. The FBI's attempts to establish the legitimacy of CBLA failed even when it went outside the FBI to seek validation. A team of Iowa State University statisticians, including Alicia L. Carriquiry, Associate Professor of Statistics, were funded by the FBI to examine the bullet collection data from the 1991 study as well as the collection of bullet data that the FBI has accumulated over their years of doing CBLA. The goal was to quantify the significance of finding a "match" among bullets. The ultimate conclusion was that no quantitative estimates of

---

[7]Robert D. Koons, Ph.D, and Diana M. Grant, Ph.D., "COMPOSITIONAL VARIATION IN BULLET LEAD MANUFACTURE", J. Forensic Sci. 47 (5) (2002).

the significance of a "match" could be made.[8]

54.     Thus, the studies done to date establish that there is no scientific validity to the assumption of uniqueness of the lead source and a conclusion of a common origin from a "match" in the elemental composition of bullets is simply not supported by the data. Tobin, ¶ 14.

**b.     The Assumption That Each Source Is Homogeneous.**

55.     CBLA as performed by Ms. Lundy and the FBI laboratory also assumed that the composition of each source of lead was homogeneous throughout. Therefore, it was assumed that a bullet that comes from any part of a source of lead will contain the same elements in the same proportion as a bullet originating from another part of the source. Tobin, ¶¶ 11-12.

56.     The assumption of homogeneity requires that the entire source of lead have the same elemental composition throughout. However, nothing in Lundy's testimony establishes that the lead source of the examined bullets was homogeneous. Furthermore, a review of the literature again reveals no data or studies supporting that conclusion. In fact, existing data show the opposite: lead sources – often weighing in excess of 100,000 pounds – are **not** homogeneous. Tobin ¶ 12.

57.     The *Randich* study revealed that the elemental composition of a single molten 50 ton lead source may be either homogeneous or heterogeneous. The study found that samples taken from different parts of a source of lead can be analytically distinguishable. The study notes that as molten lead begins to solidify a metallurgical phenomenon known as segregation

---

[8]Alicia L. Carriquiry, Michael Daniels, Hal S. Stern, Department of Statistics, Iowa State University and Ames Laboratory, "STATISTICAL TREATMENT OF CLASS EVIDENCE: TRACE ELEMENT CONCENTRATIONS IN BULLET LEAD" (May 4, 2000).

can occur. This results in compositionally heterogeneous ingots or billets. Tobin ¶ 12.

58. Thus, the assumption of homogeneity on which CBLA is premised is scientifically invalid.

### c. The Failure to Consider the Problem of Geographical Bullet Distribution.

59. CBLA as practiced by the FBI and testified to by Lundy, also failed to analyze or consider the impact of geographical distribution of bullets on the conclusions rendered generally and by Ms. Lundy. The Government failed to provide any information regarding how many .38 caliber bullets have been shipped to the relevant area of Maryland during any relevant period of time, from where they were melted or manufactured. Each of these factors impacts on the validity – such as it was – of Lundy's testimony.

60. In this case, the Government has provided no information as to the distribution by Remington of .38 caliber bullets in the relevant area. Moreover, since the same lead smelters supply different ammunition manufacturers and the specifications of their lead alloys overlap in compositions, distribution information would have to be considered not just as to Remington ammunition but as to all ammunition manufacturers in order to determine the relevance or probative value of the examined bullets.

61. An average source size of lead from a smelter is 100,000 pounds. From that 50 ton source, millions of .38 caliber bullets are made. It is simply unknown how many bullets from the same source are distributed in the same geographical area. The number of bullets from the same source distributed in the geographical area is important to any evaluation of the significance of finding bullets which are analytically indistinguishable in that area. Given that repeats of elemental composition can be found in sources made at different times, the number of

16

bullets produced by sources with the same elemental composition and their geographical distribution would also have to be considered. Also unknown is the likelihood that random consumers would purchase .38 caliber bullets with this compositional analysis in Maryland in the months or years before the crime. However, studies conducted by Petitioner's CBLA expert, William A. Tobin, indicate that there is a very high probability of purchase of similar composition bullets by innocent purchasers in the same local area. In one study, "all innocent purchasers in a local area during the same period of time had no choice but to purchase similar composition bullets." Tobin, ¶ 15.

62. The Government's failure to provide such information and include it in the comparative lead bullet analysis renders such analysis meaningless.

**v. Ms. Lundy's Theories Have Been Tested and Proven Invalid.**

63. There have been no scientific tests or studies to support Ms. Lundy's assumption that each source of lead has a unique elemental composition. Instead, the *Randich* study has demonstrated that the premise of uniqueness is false. A comprehensive review of the data from secondary refiners regarding the compositional qualities of molten sources of lead revealed instances of "repeats," or compositionally similar lots of lead. Studies by the FBI itself have confirmed the fact of repeats. The study of FBI data by the Iowa State statisticians has concluded that the finding of a "match" in elemental composition between bullets cannot support the conclusion that the bullets have the same origin.

64. Similarly, there have been no scientific tests or studies to support Ms. Lundy's assumption that every source of lead is homogeneous in composition. Instead, the *Randich* study based on reliable data obtained from secondary lead refiners regarding the elemental composition of molten sources of lead establishes that this premise is scientifically invalid.

17

Tobin, ¶¶ 12, 14.

65.     Because there exist no valid scientific data or empirical study by proponents of comparative bullet lead analysis to support their theories of homogeneity or uniqueness, and because other studies refute the validity of both premises, Ms. Lundy's testimony was non-scientific, was false and thus irreparably tainted Petitioner's trial proceedings.

> **vi.     Ms. Lundy's and the FBI's Theory Has Not Been Subjected to Peer Review and Publication.**

66.     Petitioner is not aware of any significant peer reviews of the principles and methodologies underlying Ms. Lundy's opinion or the FBI's theory that bullets which are "analytically indistinguishable" come from the same molten source of lead, other than by persons who are themselves advocates of the practice.

67.     It should be noted that FBI papers regarding CBLA are not published in peer reviewed journals, they are reviewed by other FBI personnel.  The whole purpose of peer review is to have other professional scientists, who have no vested interest in the technique or theory under review, either confirm or disprove another scientist's work.  The absence of any such meaningful peer review of CBLA is telling, and supports a finding that Mr. Lundy' opinions were flawed in this case.

> **vii.     Ms. Lundy's Opinions Do Not Have an Acceptable  Rate of Error.**

68.     In her testimony, Ms. Lundy did not identify the potential or actual error rate for her  opinions. This failure is itself a strong indication that the claim is not scientifically valid or reliable.

69.     The danger of unfair prejudice associated with the admission of such invalid scientific opinions is extreme.  This is especially true because this is a capital case.

70. The *Randich* and FBI studies have demonstrated that Ms. Lundy could not reliably claim that bullets which are "analytically indistinguishable" come from the same molten source of lead at the manufacturer. While an error rate has not been quantified, it clearly exists. Given the fact that the Petitioner faces the death penalty, expert testimony with such an unknown error rate is constitutionally unacceptable.

### viii. Ms. Lundy's Theory Is Not Generally Accepted Within the Relevant Scientific Community.

71. The theory or technique by which Ms. Lundy reached her conclusion that bullets which are "analytically indistinguishable" come from the same source of lead does not have general acceptance in the relevant scientific community. It is important to keep in mind that, for the purpose of determining whether there is general consensus as to a validity of a particular scientific technique or theory, members of the relevant scientific field are not limited artificially to trained practitioners in the field in question. Even presuming near-unanimous acceptance and approval among Ms. Lundy's former colleagues at the FBI, the "relevant scientific field" encompasses the much broader category of those whose scientific background and training are sufficient to allow them to comprehend and understand the process and form a judgment about it. Accordingly, the relevant scientific community in this case is not limited to the universe of the FBI's bullet lead analysis specialists, but must also include others with sufficient training and experience in relevant technical or scientific fields, including forensic sciences, metallurgy, and statistics. When one looks to these specialists, one finds only skepticism regarding the reliability and validity of Ms. Lundy's opinions.

### ix. Use of Standard Deviations.

72. In addition to the flawed nature of the CBLA science, Ms. Lundy testified falsely

about her methodology used in the instant case. Prior to 1998, the FBI lab conducting CBLA was not accredited, and did not have a written standard protocol for the use of standard deviations in determining whether elemental composition "matched." Standard deviations are important in the practice of CBLA because they are the standard by which the expert would determine if two measurements were similar enough to one another to declare a "match" in composition. Tobin, ¶ 20. Before 1998, Ms. Lundy commonly used one standard deviation to determine if two measurements were similar enough to one another to declare a "match" in composition. Ms. Lundy conducted the analysis of bullets in this case in 1996, when there was no requirement for the use of a specified standard deviation. She used one standard deviation in much of Higgs' analysis, except where necessary to vary from the practice to declare a "match." In those instances she varied from the use of one standard deviation where there was a near "match" but not an actual "match." This practice alone calls into question the validity of her analysis. However, she falsely testified at Mr. Higgs' trial that she used two standard deviations in the analysis of this case, when in fact she did not. TT 10/6/00, 30.

**D. Conclusion**

73. The jury in this case was presented with opinions cloaked as scientific. They were not even close to reliable. The Government knew or should have known this, yet it remained mute as to the flaws inherent in the science. Trial counsel did almost nothing to explore these flaws. New scientific data, proving the incredibility of CBLA, is newly discovered evidence that was not available at the time of Petitioner's trial. Given that this evidence was not available at the time of trial, it is newly discovered and Petitioner is entitled to relief under the governing standards addressing claims of newly discovered evidence.

74. Under whichever legal theory these facts are reviewed, the one clear fact remains:

the Government obtained Petitioner's conviction in large measure on the back of this junk science.[9] The Fifth and Sixth Amendments require that Petitioner's convictions and sentences be vacated.

**CLAIM II. PETITIONER'S TRIAL PROSECUTORS EXERCISED THEIR PEREMPTORY CHALLENGES IN A DISCRIMINATORY MANNER, ON THE BASIS OF GENDER IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE FIFTH AND SIXTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

75. The government prosecutors, Ms. Johnston and Ms. Wilkinson, exercised their peremptory challenges against Petitioner in a gender discriminatory manner to exclude all women from participation on the petit jury. The Government lacked legitimate gender-neutral justification for striking many of the prospective female jurors from the panel. Moreover, the Government's use of its peremptory challenges to strike female jurors in this case was part of, and entirely consistent with, a broader discriminatory policy and practice employed by Ms. Johnston and Ms. Wilkinson for other capital prosecutions since Petitioner's trial. Because of the discriminatory use of peremptory strikes in this case, Petitioner's petit jury consisted solely of men.

76. The Equal Protection Clause of the United States Constitution forbids a prosecutor from striking potential jurors on account of their gender based on the assumption that such jurors will view the case in a particular way on the basis of their gender. The harm caused by a prosecutor's gender biased use of peremptory strikes is not limited to the denial of a fair trial to the defendant. The excluded juror also is harmed and the integrity of the judicial process is tainted. The exclusion of even a single juror from the petit jury on the basis of gender

---

[9]See e.g. TT 10/10/00, 125-26 (prosecutor's closing argument showing link between the various ammunition in this case as established through CBLA).

21

violates the Equal Protection Clause of the Fifth Amendment and requires a new trial.

77. Petitioner's evidence showing gender discrimination falls into two categories that are relevant to his showing that the prosecutor discriminated in this case and over time. First, Petitioner will review the record facts of jury selection to show that the trial prosecutor engaged in discrimination. Second, he will discuss the evidence showing that Ms. Johnston and/or Ms. Wilkinson have engaged in a pattern of discrimination in capital juries.

78. This evidence will demonstrate that an Equal Protection violation occurred during Petitioner's trial, and that Petitioner is entitled to a new trial based upon these violations. At a minimum, Petitioner herein makes a *prima facie* showing of gender discrimination which entitles him to discovery and an evidentiary hearing.

## A. The Prosecutor's Strikes in Petitioner's Case.

79. The record of Petitioner's voir dire shows that prosecutors Johnston and Wilkinson struck females at a highly disproportionate rate, consistent with their broader pattern. Because this jurisdiction uses "blind striking," Petitioner must have discovery on this matter. However, even without discovery, Petitioner is able to discern that the prosecutors used at least 15 of a possible 20 peremptory strikes. Out of the prosecutors' 15 strikes that can be identified, 11 were against women. This means that for those strikes that can currently be identified, 73.3% were used against women. Thus, in a situation where women made up only 36.5% of the pool for potential strikes, the prosecutors struck them at a grossly disproportionate rate.[10]

80. Put in other terms, if the prosecution had struck women at a rate roughly

---

[10]The jury of 12 was picked from a total of 44 prospective jurors who were deemed generally qualified for jury service in this case. Of the 44 prospective jurors, 28 (or 63.5%) were men and 16 (or 36.5%) were women.

equivalent to their representation on the jury panel, the prosecution would have used approximately six of their fifteen discernable strikes against women. Instead, they used nearly double this rate – eleven of fifteen – against women. Thus, the prosecution's rate of striking women is nearly double their representation on the qualified panel.[11]

81.　This strike rate, which is grossly disproportionate to the representation of women on the venire, alone is strongly indicative of purposeful discrimination. Happenstance is unlikely to produce such a disparity, and consequently, statistical disparity such as this alone raises some debate as to whether the prosecution acted with a discriminatory purpose.

82.　In this case, because this jurisdiction uses blind striking and all the government's strikes are not discernable without discovery, it is entirely possible that the government attorneys struck five more eligible female jurors, raising their female strike rate even further.

83.　When the review of the prosecutors' peremptory jury strikes moves from the statistical realm to the actual exercise of those strikes in this case, the gender discriminatory purpose is apparent. Petitioner will next review the record facts regarding the use of those strikes to show that – on balance – the women struck by the prosecution were facially qualified and possessed characteristics that were either neutral or pro-prosecution.

84.　**First Strike.** The Government's first identifiable strike was against juror number 6, Norman Kibby Nicholson, a white male. Mr. Nicholson works in Civil Service for the U.S. Government. This juror indicated that if there was any alternative to the death penalty, he would have difficulty voting for the death penalty and stated that he had a strong moral preference

---

[11]The defense in this case used their strikes roughly equivalent to the representation of males and females on the qualified jury panel. The defense used 9 of their 16 used peremptory strikes against males, or 56.25 percent. Men comprised 63.5 percent of the panel.

against the death penalty. The Government's vigorous motion to excuse this juror for cause was denied. TT 9/5/2000, 79-102.

85.     **Second Strike.** The Government's second identifiable strike was against juror number 14, Constance Eze, an African-American woman. Ms. Eze is a bus driver for Prince George's County public schools. This juror indicated varying answers on the death penalty. At one point she stated that the murder of three persons was the type of case where she would always vote to impose death. Then, Ms. Eze stated that she would always vote for life. After this second answer, the Government made a motion to excuse Ms. Eze for cause. This motion was denied when the defense and the court agreed that the juror meant that she would always impose at least a life sentence. The juror reiterated several times her ability to impose a death sentence and the fact that signing a death verdict in open court would not cause her any hesitation. TT 9/5/2000, 123-137.

86.     **Third Strike.** Juror 19 is a white female Emergency Room nurse who stated she believed in the sanctity of life, but was willing to set those beliefs aside and follow the judge's instructions. Ms. Sylvia Pulliam Lackey repeatedly stated that she could follow the judge's instructions and could impose the death penalty where necessary. TT 9/5/00, 157-170.

87.     **Fourth Strike.** Juror number 37 is another white female juror struck by the Government. This juror, Ms. Charlene Catherine Cherry, works for the Food and Drug Administration. She stated that she had no fixed opinion about the death penalty but could impose either life or death, depending on the circumstances of the case. TT 9/6/00, 77-83.

88.     **Fifth Strike.** The Government's fifth strike was yet another female juror, Mercedes M. Pellet, number 43. She has sons employed in law enforcement and a son that is a psychologist with troubled boys. She additionally is the chief financial officer and owner of a

24

company. She was undecided about her view on the death penalty, and confident she would make a decision based on facts, not emotions. She confirmed that she could vote for the death penalty or a life sentence, depending on the circumstances. TT 9/6/00, 137-143.

89. **Sixth Strike.** The sixth identifiable strike was against an African-American male, juror Charles Quint Keye, number 57. This juror indicated he was "iffy" on the death penalty, but was open-minded. He expressed that he **could** impose the death penalty, but might not. He initially stated that he might always vote to impose a life sentence for a premeditated, deliberate, unprovoked triple murder without considering other circumstances. He went on to clarify that he would always consider other circumstances, and would consider all mitigators and aggravators. A Government motion for further questioning of the juror on his eligibility was granted, but the juror merely stated further that he could vote for either life or death, depending on the circumstances. TT 9/6/00, 234-247.

90. **Seventh Strike.** The Government's seventh identifiable strike was used to strike juror number 64, Felicia Ann Peppins. Ms. Peppins is a Management Analyst with the U.S. EPA. She is an African-American woman with a nephew that had been convicted of manslaughter in Prince George's County. She did not believe that her nephew should have been convicted, though he received 10-20 years. However, she also stated that she had a cousin that was murdered, and she was able to view both sides of such cases. She did not believe these matters would make her biased. In fact, Ms. Peppins stated that she believed in some cases the death penalty **should** be applied. She affirmed that she could vote for either life or death, depending on the circumstances, and would always consider all the circumstances. TT 9/7/00, 15-25.

91. **Eighth Strike.** The Government's eighth strike was of another white female,

Karen Marie Warhurst. Ms. Warhurst has an older brother that is a Prince George's County Police officer. She stated that she might be willing to give more credence to the testimony of a police officer, but it would depend on the circumstances. Mr. Trainor revealed that he knows her brother well, as he defended him in a police brutality trial. However, he did not know this juror and this juror had not even realized that her brother had been charged with a crime. This juror stated that she was not opposed to the death penalty and could impose death after considering all circumstances of a case. TT 9/7/00, 45-59.

92. **Ninth Strike**. The Government's ninth strike was against a white male. Mr. Arthur Hugo Bennett was a management analyst with the U.S. Office of Government Ethics. He stated that he was undecided about whether he was for or against the death penalty. He was familiar with recent presidential campaign issues involving discussion of the death penalty in Texas. He stated that he could vote for the death penalty in an appropriate case after considering all circumstances. TT 9/8/00, 2-9.

93. **Tenth Strike.** The prosecution's tenth strike was against Sandra Michele Lee, an African-American female. Ms. Lee was a Station Manager for a mass transit station in Washington, D.C. She stated that at times she thinks the death penalty is warranted and at other times she thinks it is "just a little too harsh." However, she stated that she did not have strong feelings about the death penalty and might always vote for the death penalty for the murder of a child. She affirmed repeatedly that she could vote for the death penalty in an appropriate case. TT 9/8/00, 9-19.

94. **Eleventh Strike**. The Government's eleventh strike was of a white female named Jeannette R. Delawter. Ms. Delawter is a Program Specialist with NIH where she had worked for 32 years. She initially stated that she did not believe in the death penalty, but that

26

she could set aside her views and they would not interfere with her following the Court's instructions. She said the she could vote for a death sentence in an appropriate case, affirming that she would not always choose to impose a life sentence. TT 9/7/00, 159-176.

95. **Twelfth Strike**. The twelfth prosecution strike was of another white female Heidi M. Schrecengost. She is a Pension Analyst. She stated that she felt very strongly that she could vote for a death sentence where one were judged guilty beyond a reasonable doubt. While she would not vote for death in every case, she did state she might always vote death in some cases. She stated that there were no kinds of cases in which she would never vote for the death penalty. TT 9/7/00, 198-204.

96. **Thirteenth Strike**. The Government exercised its thirteenth peremptory challenge to strike an African-American female. Orletta J. Harley had a cousin charged with a drug offense, and her father.had been charged with a crime in the past. Ms. Harley did not have any knowledge or involvement in either of those cases. Her husband was in the Marines and a cousin is a detective with the District of Columbia police. She stated that she believed that some people are deserving of the death penalty. She stated that she could impose the death penalty. TT 9/8/00, 38-49; 116-17; 125-32.

97. **Fourteenth Strike**. The Government used their fourteenth peremptory challenge to strike Ms. Terri Lynn Tubergen, a white female. Ms. Tubergen is a framer at Ben Franklin crafts store. Ms. Tubergen stated that she has always been "for the death penalty." She stated that she could follow the judge's instructions and impose a life or death sentence in an appropriate case. TT 9/18/00, 197-202.

98. **Fifteenth Strike**. The Government's fifteenth and final identifiable strike was against an African-American male, Don Vere Deabreu. He is an electrician with Montgomery

27

College. Mr. Deabreu had a planned nonrefundable vacation scheduled in October to Orlando. However, because he made these reservations after receiving his summons, he was not excused for hardship. This potential juror stated that he had no opinion either for or against the death penalty but could vote to impose the death sentence or a life sentence. He repeatedly stated that he might vote for the death penalty where the evidence was strong, but also indicated he could consider mitigating and aggravating circumstances. TT 9/18/00 223-31.

99. Prosecutors Johnston and Wilkinson's exercise of peremptory challenges to exclude all female jurors from the petit jury in Petitioner's case establishes a violation of Equal Protection of law.

100. Here, there is no question but that Petitioner has raised a *prima facie* case requiring the prosecutors to provide explanations for their strikes. Had trial counsel raised this constitutional claim at the time of jury selection, there would be a greater likelihood of receiving accurate responses. Trial counsel ineffectively failed to raise this claim. There was no conceivable tactic or strategy for failing to raise this claim and to permit an all male jury to sit in this case. Similarly, appellate counsel ineffectively failed to raise this claim on direct appeal.

**B.    The Trial Prosecutors' Strikes in Other Capital Murder Cases.**

101. Upon information and belief, Ms. Johnston and Ms. Wilkinson have engaged in a pattern and practice of gender discriminatory peremptory strikes which has continued. In the recent capital prosecution of *U.S.A v. Lighty, et al*, PJM-03-00457 (D. Md.) tried by the same prosecutors, only 12 of the prosecution's possible 20 peremptory strikes are identifiable without discovery. This case was also subject to blind striking as exercised in this jurisdiction. Of the twelve identifiable strikes exercised by prosecutors Johnston and Wilkinson, 10 of those strikes were exercised against women. Thus, the prosecution used 83.33 percent of their identifiable

28

strikes against women. The final jury in the *Lighty* case was comprised of eleven men and only one woman. The fact that Ms. Johnston and Ms. Wilkinson have engaged in a similar practice of gender biased striking in at least one other case implies that this is fitting with a larger pattern and practice of striking women from capital juries. Petitioner requests discovery and a hearing on this practice.

### C. Conclusion.

102. Petitioner was tried by a jury selected in violation of the Equal Protection clause. The evidence relating to the Government's gender discrimination in jury selection is significant and should have been explored by trial counsel. It merits exploration by this Court in the form of discovery and an evidentiary hearing.

**CLAIM III. AS A RESULT OF INEFFECTIVE ASSISTANCE OF COUNSEL, COURT ERROR, THE GOVERNMENT'S SUPPRESSION OF EXCULPATORY EVIDENCE AND NEWLY DISCOVERED EVIDENCE (NOT AVAILABLE AT THE TIME OF PETITIONER'S TRIAL), PETITIONER WAS WRONGLY CONVICTED OF CAPITAL MURDER; PETITIONER IS INNOCENT OF CAPITAL MURDER AND SHOULD BE GRANTED A NEW TRIAL.**

103. Willis Haynes shot and killed three young women. There is no allegation that Mr. Higgs fired the shots. There is no direct evidence that Mr. Higgs directed, desired, or intended the girls to be shot. The government insisted that "Mr. Higgs counseled, commanded, induced, procured, willfully caused or aided and abetted Willis Mark Haynes to kill the victims." TT 10/20/00, 92. Any evidence of Mr. Higgs' intent for the victims to die was very weak at the time of trial, and can now be shown to be even weaker. In fact, Mr. Higgs had no intent for the three victims to die. To the contrary, Mr. Higgs had no motive to kill the victims and no control over Mr. Haynes. Mr. Higgs is innocent of capital murder.

### A. Trial Counsel Failed to Investigate or Present Evidence of Victor Gloria's Prior Inconsistent Statements.

29

104. Codefendant and informant, Victor Gloria, was the centerpiece of the Government's proof that Petitioner orchestrated the killings. Gloria stated that Petitioner provided a gun to Haynes immediately before the shootings and he saw them talking as the car rolled toward the Wildlife Refuge. Gloria had previously stated that he had been asleep or passed out in the back of the vehicle during the relevant time period and thus had no information about Mr. Higgs' role. See FBI 302 interview of Gloria dated 10/6/98, included in Petitioner's Appendix. Gloria was not adequately cross examined on this initial statement.

105. However, Gloria told a number of witnesses that he had been asleep during the time he testified that Petitioner handed a gun to Haynes. These statements would have been admissible to impeach Gloria's testimony, yet trial counsel failed to present the jury with this critical information.

106. Trial counsel's investigator, Sharon F. Weidenfeld, interviewed Katrina Havenner and produced a report dated 9/27/00. Ms. Havenner and Mr. Gloria have a child together and were on good terms, though no longer romantically involved. Gloria told Ms. Havenner that he had been drunk and unconscious when the three women were killed, and had only been awakened by the sound of the gunshots. According to this statement, Gloria could not have seen Petitioner handing a gun to Haynes. Trial counsel was ineffective for failing to subpoena Ms. Havenner to testify and present Gloria's prior inconsistent statement to the jury.

107. In addition, Keon Dacosta has provided counsel with a declaration indicating that Gloria admitted to him that he was asleep and did not see any of the things he testified about that occurred in the vehicle. A copy of Dacosta's Declaration is contained in Petitioner's Appendix. Counsel failed to interview him with regard to Gloria's admissions. Yet, counsel should have

30

interviewed him, because he was a witness (noted in police paperwork) to the alleged incident in which Petitioner held a gun to the head of Ednisia Darby. Had trial counsel interviewed Mr. Dacosta, they would have learned that Gloria also gave this prior inconsistent statement to Mr. Dacosta, indicating that he was asleep during the car ride and the homicides. Trial counsel was ineffective for failing to interview Mr. Dacosta and elicit this information.

**B.** **Newly Discovered Evidence Exists Which Corroborates Gloria's Prior Statements That He Was Sleeping During the Murders and Testified Falsely at Petitioner's Trial.**

108. Newly discovered evidence exists that corroborates Victor Gloria's statements to Havenner and Dacosta that he was sleeping in the van. Gloria's own statements to Robert Durand, an investigator working for undersigned counsel, confirm that Gloria was asleep and **did not see** Petitioner hand any gun to Haynes prior to the murders.

109. This evidence is newly discovered evidence that was not available at the time of Petitioner's trial, but seriously undermines any confidence in the verdict against Petitioner.

**C.** **The Government Suppressed Information Related to Consideration Given to Gloria in Exchange for His Testimony.**

110. Victor Gloria has a significant criminal history. His criminal history, including a number of pending charges, was properly revealed to the jury. Also revealed was the fact that Gloria was facing a maximum of 15 years for accessory after the fact in this case, and that he had pled guilty. The jury was also advised that he faced up to 30 years incarceration on other federal drug charges before this Court; and up to 10 years on State drug charges. See, U.S. v. Gloria, PJM-98-482 (Md.D.) 98-CR; U.S. v. Gloria, PJM-98-0435 (Md. D.); and Maryland v. Gloria, CT981978X (Prince George's County Circuit Court, MD).

111. The only agreement with any prosecutor that was revealed to the jury in this case,

31

was that the Government agreed with Gloria that it would seek a lighter sentence for his involvement as an accessory after the fact in exchange for his satisfactory cooperation. In fact, only weeks after Petitioner's trial was completed Gloria was sentenced to only 7 years of time for accessory after the fact, with a recommendation that he be place in a bootcamp facility. This favorable treatment was primarily due to the Government's oral motion at sentencing that he receive a downward departure of two offense levels. Sentencing transcript in U.S. v. Gloria, PJM-98-482 (Md.D.), dated 11/22/00, 3.

112. However, the charges against Gloria in both other pending drug cases were also resolved in a highly favorably manner – a manner which was not disclosed to the jury. Though Gloria was facing up to 30 years in prison on these charges, Prosecutor Johnston dismissed the federal drug charges against Gloria on December 7, 2000. U.S. V. Gloria, PJM-98-0435 (Md.D.) Due to the extraordinarily favorable outcome of this case, it is apparent that this was additional consideration given to Mr. Gloria, that was not revealed at the time of Petitioner's trial.

113. In addition, Gloria received another extraordinarily favorable outcome in the state drug charges pending. In that case, Gloria was facing up to ten years in prison, due to a prior drug conviction. However, Gloria - unrepresented by counsel - was allowed to enter an Alford plea and given one year to serve on conspiracy to distribute cocaine, concurrent with the time he was already serving in federal prison. Maryland v. Gloria, CT981978X (Prince George's County Circuit Court, MD). The remaining charges were nolle prossed. Id.

114. The favorable disposition of the two other charges strongly suggests that there was undisclosed consideration offered to Gloria in exchange for his testimony, in violation of the due process clause.

32

115. Through a combination of prosecutorial misconduct and/or ineffective assistance of trial counsel, the jury also did not learn that Gloria also had open charges, and an open bench warrant, in Virginia. GC93-001182-01 (Smyth County General District Court, Virginia). Gloria was, and is to this day, a "fugitive" from Smyth County, Virginia. Id. It is particularly revealing that, although Gloria had numerous arrests and was facing numerous charges, and was in significant ongoing contact with law enforcement officers, a detainer was never placed on him and Virginia authorities were never notified that Mr. Gloria was in their custody. This is additional undisclosed consideration that was not revealed by the Government and which trial counsel failed to discover or elicit.

116. Finally, Gloria was a suspect, but never charged, in an unrelated homicide in Baltimore, Maryland. He was never charged with this homicide in an effort to preserve his status as a testifying witness in this federal capital triple homicide case. Thus, he received further consideration in the form of charges that were never brought against him. The Government's failure to disclose this consideration also violated due process, and counsels' failure to discover it on their own was ineffective.

**D. Trial Counsel Was Ineffective for Failing to Elicit from Victor Gloria His Possession and Use of Weapons, Including .38 Caliber Guns.**

115. Trial counsel ineffectively failed to cross examine Victor Gloria with his own possession and use of firearms. Gloria was familiar with .38 caliber weapons, and used and fired them in the past. As a participant in the murders, who certainly distanced himself from the use or possession of the murder weapon, this would have been impeaching evidence that Gloria himself may have had a bigger role in the murders than the one he admitted. Trial counsel had access to this information, and was ineffective in failing to present it to the jury.

33

116. Gloria testified at Willis Haynes' trial, which took place five months prior to Petitioner's. At Haynes' trial, Gloria testified that he had some familiarity with guns. U.S.A. v. Willis Mark Haynes, PJM-98-0520 (D. Md.), TT 5/10/00, 789. Gloria admitted that he himself had previously fired .38 caliber revolvers. Id. at 790.

117. Trial counsel had access to the transcript of Victor Gloria's testimony at the Haynes trial. However, trial counsel failed to elicit this information from Gloria during Petitioner's trial.

118. Trial counsel did elicit the fact that Gloria had a number of prior charges in his lengthy criminal record. However, trial counsel failed to cross examine Mr. Gloria on the fact that at least two of those charges involved possession of a handgun – at least one of which was a .38 caliber weapon. Mr. Gloria himself had access to and possession of guns like that used in these homicides. This impeaching evidence calls into further question Gloria's veracity in placing the possession and ownership of the .38 caliber murder weapon squarely in Petitioner's hands.

119. Trial counsel failed in this regard because they never independently sought Gloria's criminal conviction records. Trial counsel relied on Gloria's criminal history **as supplied by the Government**. Had trial counsel merely used the information provided by the Government to request the court files on Gloria's prior charges – as undersigned counsel have – they would have discovered the gun evidence.

120. The court file on Victor Gloria's Howard County drug charges reveals that Gloria's apartment was searched on February 11, 1995. Drugs and drug paraphernalia were seized and Gloria was ultimately charged with possession with intent to distribute, possession of cocaine, possession of marijuana, and two counts of possession of drug paraphernalia. The court

34

records additionally reveal that a "black handgun" was found during the search of the apartment, though Gloria was not charged with its possession. See, Maryland v. Victor Gloria, CR V31034 (Howard County, Md.).

121. Gloria was also charged in July 1994 with possession of a handgun in a vehicle on a public road or lot. These charges were ultimately nolle prossed in 1995, but the fact that Gloria possessed this gun would have been a permitted line of questioning. See, Maryland v. Victor Gloria, CR 62895 (Anne Arundel County, Md.) After receiving information that these charges to possession of a handgun existed, the natural next step would have been for trial counsel to request the police records on these charges, which undersigned counsel has done. The police report on this case shows not that Gloria was arrested for driving a vehicle without license plates, in which there was found a loaded blue steel .380 caliber semi-auto handgun, which was loaded. Anne Arundel County Police Department narrative report for case no 94-721801 dated 6/13/94, contained in Petitioner's Appendix.

122. Trial counsel could have indisputably placed firearms, including a .38 caliber loaded weapon, in Gloria's hands. Trial counsel failed to investigate or pursue this information, despite that Gloria's experience with firing .38 caliber weapons was brought out in Haynes' trial. Yet, in a case where evidence that Petitioner intended the killings and supplied the murder weapon was almost solely dependent on Gloria's testimony, the failure to investigate and present this evidence was egregious. After all, if Petitioner's possession of a .38 revolver was probative for the Government, then Gloria's possession of a .38 weapon was equally probative.

**E.  Trial Counsel Ineffectively Failed to Present the Jury with Evidence of Haynes Motive to Kill, Which was at Significant Odds with the Government's Theory of Motive.**

123. The Government's trial theory was that the three women were killed as a result of

35

an argument one of them had with Petitioner. Petitioner, so the Government proposed, then became alarmed because he happened to see one of the victims writing down his tag numbers, and feared that she would retaliate against him. As motives go for killing three human beings, this one was rather concrete, simplistic, and frankly, did not make a lot of sense.

124. Trial counsel ineffectively failed to investigate and present significant evidence that Haynes had a real motive to kill. The failure to conduct investigation is always egregious, but in this case, it was particularly so, as the Government had conducted most of the investigation that would have benefitted the defense, and the alternative motive evidence was largely available to counsel, but untapped.

125. Mishann Chinn, one of the three victims, was reported to have stolen money from "Black" a notorious drug dealer just weeks before her death. 000019-20 USPP report of 1/27/96 interview of Nikkia Skyria Jackson.[12] In addition, Black had threatened to kill Ms. Chinn with a gun several days after this threat, but Ms. Jackson's mother interceded and Black left the area. Id. Black's real name is Benny Cephus. 000029 USPP report of of 1/28/96 call from Sheena Chinn. Even Ms. Chinn's own parents confirmed that Mishann had been dating Black for several months prior to her death. 000052 USPP report of 1/29/96 conversation with Ms. Chinn's parents.

126. Ms. Jackson, another of the victims, was dating Chico, an associate of Black's. The four of them frequented hotel rooms together and were reportedly involved in numerous nefarious activities, including running drugs, selling drugs, prostitution, and check scams. In addition to Ms. Chinn having stolen money from Black, Ms. Jackson was blamed by Chico for

---

[12]"USPP" is an abbreviation for the United States Park Police.

his arrest in a hotel room when she let him in.   000025 USPP report of 1/27/96 interview of Derwana Mikiya Black.

127.   A confidential informant, who had never provided false information in six years, additionally stated that Chico and Black killed the women in retaliation for Mishann's having stolen money from Black while he was passed out.  000107 USPP report of information related 2/2/96 by a confidential informant.  Numerous other reports corroborate that Ms. Chinn and Ms. Jackson were dating Chico and Black, and had recently had a dispute with them at a hotel in Silver Spring, Maryland.  000071 USPP report of 1/30/96 interview of Patricia Boswell; 000079 USPP report of 1/31/96 call from Kim Garey; 000095 USPP report of 1/31/96 investigative activity including registration records from Days Inn in Silver Spring, Maryland; 000151 partially redacted USPP report of 2/7/96 interview of unnamed source.

128.   Yet another confidential source confirmed Ms. Chinn's theft, and stated that the "...girls were killed because one of them ripped off a drug dealer of $60,000 in drugs."  This source stated that Tanji Jackson stole the money and the "fat girl" was a drug carrier.   000074-75 USPP report of activities.

129.   A third confidential source stated that women were drug couriers and were killed because one had stolen $60,000 worth of drugs from a dealer who then threatened to kill her. 000265 USPP report, 2/27/96, of 2/23/96 contact with a CI.  Ms. Tamika Black, also was used to transport narcotics to New York City by an drug dealer known as Black.  Tamika had confided in her friend that she owed a large amount of money to the drug trade and Black had stated he was going to kill her.  000049 USPP report of 1/29/96 call from Jermaine Shaw.

130.   Thus, a motive existed – all three of the women were linked to money owed to drug dealers – for the killing of these women that had nothing at all to do with the alleged

37

argument with Petitioner. Indeed, these other motives were far more powerful than the one proposed by the Government and made a lot more sense.

131. However, there is more. Additional Park Police reports link **Willis Haynes, the actual killer of the three victims, to this same drug rip-off motive**. These sources state that **Haynes killed the victims over money**. 000461-462 USPP report of 5/29/96 interview with Sheree Marjorie Blake. This information was from Robert Henderson, Willis Haynes' brother. Both Ms. Sheree Blake and Ms. Patrice Birdine were present when Robert Henderson made these statements. Id. Ms. Blake and Ms. Birdine were interviewed separately and each confirmed that Henderson told them that Haynes had killed the three women over a theft of some money. 000459 USPP report of 5/29/96.

132. But, there is still more that ties Haynes to a motive that was quite different than the Government's "argument" motive. Haynes was reported to have been the "muscle" for a drug operation. 000557 report. **Haynes was the "muscle" for Black and Chico, to whom the victims owed a great debt.** Haynes carried out the murders of the three victims on his own account, and because of money stolen from himself, Black and Chico.

133. Despite the availability of this theory, as it was handed to counsel in discovery documents, trial counsel failed to investigate or pursue this theory. Instead, trial counsel had no theory of the crime, other than to generally dispute that Petitioner directed the killings. Yet, in a case in which there evidence that Petitioner ordered the killings was based almost entirely on the testimony of Victor Gloria – who as indicated above testified for significant consideration and told others that he was asleep during the relevant portions of the events – counsels' failure to exploit the available and far more plausible motive was ineffective.

134. At a minimum, trial counsel should have interviewed and assessed the credibility

of these witnesses. To failure to even investigate cannot be excused as a tactical decision. Patrice Birdine, who apparently testified before the grand jury, but was not called to testify at Petitioner's trial, was not interviewed by trial counsel or an investigator for trial counsel. Declaration of Patrice Birdine, ¶ 6, included in Petitioner's Appendix. If she had been contacted she would have testified that Robert Henderson, Willis Haynes' brother, stated to her that Haynes had shot the women over money that was stolen by them, which they kept in a safe. Birdine, ¶ 4.

135. The failure to pursue the fact that Haynes had a far more plausible motive to kill obviously prejudiced Petitioner. This evidence is exonerating of Petitioner, as he had no intent or motive to kill the victims.

136. In assessing counsels' ineffectiveness in this regard, Petitioner has utilized only the documents provided to trial counsel by the Government, and the leads that flow from them. Further discovery is required, and Petitioner will move for it in the very near future. Without such discovery, Petitioner cannot now be certain that he has uncovered the full extent of the alternative motive for the killings.

**F.**   **Trial Counsel Failed to Investigate an Alleged, but Untrue, Incident in Which Ms. Darby Testified That Petitioner Threatened Her with a Gun; Proper Investigation Would Have Revealed this Testimony to Be Unreliable. The Government Suppressed Evidence That Ms. Darby Was Untruthful.**

137. Enidsia Darby was called as a witness to testify for the Government during the guilt phase of Petitioner's trial. Ms. Darby testified that she dated Petitioner and lived with him, eventually giving birth to his child. TT 9/29/00, 117. She described an incident in which she discovered that Petitioner was dating another woman and she and Petitioner had an argument and fight. TT 9/29/00, 133-34. At trial, Ms. Darby stated that Petitioner "stuck a gun up to my

39

head," and stated that he would kill her. TT 9/29/00,134-35. Ms. Darby additionally testified that Petitioner threatened to kill Ms. Andrea Waters if Ms. Waters were to call the police about an alleged check fraud scheme. TT 9/29/00, 157. Both of these points were obviously very damaging and it was incumbent upon defense counsel to investigate them. They did not.

138. On cross-examination, Ms. Darby did agree that in the first incident, there was some mutual fighting involved. TT 9/29/00, 175. Trial counsel's cross examination even pointed out that the police, who were called in response to this incident, were unable to find a gun. TT 9/29/00, 178. However, trial counsel failed to make known to the jury other critical facts about the police involvement in this incident. The police statement from this incident indicates that the parties, Ms. Darby and Mr. Higgs, were "mutual combatants." According to the police report, made contemporaneously with the alleged event on September 13, 1995, there were no threats made to Ms. Darby and no allegation that Mr. Higgs held a gun to her head. See, Prince George's County Incident Report, 9/13/95, included as part of Petitioner's Appendix.

139. The police report also indicates that Ms. Darby told the police at that time that Petitioner "was in possession of a handgun" but does not indicate any threats or threatening behavior with the gun. Id. The obvious, but missing, cross examination of Ms. Darby would have been that the police report made at the time of the incident fails to indicate that Ms. Darby claimed the alleged violence at that time. This would have constituted powerful impeachment of her trial testimony – impeachment that did not occur because counsel did not have the statement.

140. Trial counsel did not make any attempts to interview Ms. Darby prior to her testimony against Petitioner. This failure was egregious. Undersigned counsel's representative has since interviewed Ms. Darby and confronted her with just this information - that she failed to allege that Petitioner had threatened her at the time of the September 13, 1995 dispute. In

40

Petitioner did not threaten Ms. Darby or hold a gun to her head. Declaration of Dacosta, ¶ 5. He also could have testified that Ms. Darby **did not** report to the police at the time that Mr. Higgs had threatened her with a gun. Id. Instead, Mr. Dacosta states that Ms. Darby attacked Mr. Higgs and he "put his hands up to protect his face, but he didn't hit back or grab her."[14] Id. ¶ 4. Because trial counsel failed to explore this allegation, they were unable to present the jury with this critical information.

143. Finally, Ms. Darby's close friend Shanta Doby was not interviewed by trial counsel. Had Ms. Doby been interviewed, she would have confirmed that Darby told her all about the incident with Higgs, but never stated that Petitioner pulled a gun on her, threatened her or hurt her in any way. Declaration of Shanta Doby, ¶ 7, included in Petitioner's Appendix. Ms. Doby was certain that she and Ms. Darby were so close that Ms. Darby would have told her about this incident if it had happened. Id. The failure to interview Ms. Doby and present this, yet another prior inconsistent statement about this incident, was ineffective assistance of counsel.

144. Ms. Doby also states that she was interviewed by the U.S. Park Police, and told them what Ms. Darby did and did not say to her about the incident with Mr. Higgs. Id. The government has never revealed to the defense that fact that Ms. Darby told Ms. Doby about this incident, but failed to allege to her close friend that she had been threatened by Petitioner. This

---

[14]If trial counsel had interviewed Mr. Dacosta, they would have uncovered additional information helpful to Petitioner's case in both the guilt and penalty phases. In fact, the government's most critical witness, Victor Gloria, admitted to Mr. Dacosta that his statements against Petitioner were untrue and he was asleep or passed out during the entire incident. Mr. Gloria admitted to Dacosta that he did not see Higgs pass any gun to Haynes, as he testified during Petitioner's trial. Dacosta, ¶7.

Mr. Dacosta additionally could have testified to Haynes's violent nature. He states that Willis wasn't afraid of anyone, including Mr. Higgs. ¶ 8.

prior inconsistent statement by Ms. Darby to Ms. Doby is important impeachment evidence suppressed by the Government. Petitioner should be given access to this information immediately. See Claim XXI below, addressing Government's failure to comply with their Brady obligations with regard to law enforcement statements.

### G. The Government Suppressed Evidence of Consideration Given to Richard Diolamou and Wondwossen Kabtamu, Both Witnesses for the Prosecution Given Favorable Treatment in Immigration Proceedings.

145. The government provided assistance to Richard Diolamou and/or Wondwossen Kabtamu in exchange for their testimony. Both of these witnesses received assistance with immigration matters in exchange for their providing testimony against Petitioner. Petitioner believes that Diolamou was actively in deportation proceedings at the time he testified against Petitioner at trial. However, both Mr. Kabtamu and Mr. Diolamou remain in this country legally.

### H. Trial Counsel Failed to Obtain Records Proving That Domenick Williams Testified Falsely, since He Was Not on the Cell Block with Petitioner at All the Relevant Times.

146. Domenick Williams is a jailhouse informant called to testify about incriminating statements that Petitioner allegedly made to him while in jail. TT 10/4/00, 21-114. Mr. Williams's statements cannot be completely true because Petitioner was not even housed in the same area as Mr. Williams during a portion of the time he allegedly made these incriminating remarks. Trial counsel was ineffective for failing to subpoena District of Columbia jail records to prove this point. The government suppressed this information. Petitioner must now have discovery and a hearing by which to prove that Mr. Williams was not on the cell block with Petitioner at all relevant times.

CLAIM IV. TRIAL COUNSEL INEFFECTIVELY FAILED TO CHALLENGE THE ADMISSIBILITY

147.     Much like the CBLA testimony, the ballistics testimony in this case was used to try and prove a link between Petitioner, the .38 caliber gun (which was never recovered) and the ammunition used to kill the victims. In order to make this critical, yet elusive connection, the Government presented ballistics evidence showing that the bullets fired at the murder scene by Willis Haynes, the bullet retrieved from the Chaconia shooting, and the bullet recovered from the Cherry Lane shooting had some common features. All of this ammunition was sent to the FBI Laboratory in Washington, D.C. for CBLA analysis.

148.     FBI ballistics examiner Carlo Rosati testified that he conducted a comparison of the fired bullets submitted in this case and came to "no conclusion," indicating that there were not sufficient microscopic markings to draw a conclusion that these bullets were fired from the same weapon. TT 10/5/00, 169. Despite the fact that Mr. Rosati's results were inconclusive, the prosecution pressed further. Mr. Rosati testified that the bullets examined all have the impression of five lands and grooves with a right twist, and thus were "consistent with the same class of weapon." Id. at 172.

149.     On cross examination, Mr. Rosati stated that he did not know how many .38 caliber firearms there are with these specific rifling characteristics, of five lands and grooves with a right twist, but conceded that it could be more than 1.5 million weapons. Id. at 175. Despite its lack of probative value, defense counsel did not challenge the admissibility of this evidence and did not hire an expert to evaluate the ballistics evidence in this case.

150.     In addition, trial counsel did not cross examine Mr. Rosati with the fact that at least two different calibers of weapons (.38 Special and .357 Magnum) and eleven different

44

manufacturers of revolvers, would produce the same class characteristics found on the bullets. This failure occurred even though this information was found in the FBI ballistics report generated by Mr. Rosati and the Prince George's County laboratory report. In addition, these reports indicate that Smith & Wesson produced nineteen different models in two calibers that could have created these impressions. Mr. Rosati was not cross examined with this information.

151. This evidence was particularly damaging to Petitioner. It was stressed in closing arguments by the Government. TT 10/20/00, 127, 191. Despite that FBI examiner Rosati specifically stated that no conclusion could be drawn as to whether these bullets were fired from the same weapon, prosecutor Wilkinson specifically stated that based on this evidence the jury should draw the conclusion that the same gun was used in all three incidents. Id. at 127. Prosecutor Johnston again stressed this evidence to the jury, stating that "everything they are capable to looking at says that these weapons [sic], these bullets were fired from the same weapon." Id. at 191. The Court of Appeals also cited this unreliable evidence when it affirmed Petitioner's conviction in this case, without understanding the lack of probative value the lands and grooves testimony was able to offer. Higgs 1, at 293.

152. Undersigned counsel has since retained an expert, William E. Conrad, to consider the relative probative value of the fact that these bullets all were judged to have five lands and grooves with a right twist as general rifling characteristics. Letter report of William E. Conrad. Mr. Conrad has determined that of the nineteen models of weapons in two calibers that Smith & Wesson has manufactured that could have created these markings, there are over **two million** such weapons produced in the past twenty years alone. Id. This accounts only for the weapons produced in the past twenty years, though many weapons manufactured by Smith & Wesson prior to World War II could also create these impressions and are still in circulation and are

45

functional. Id. This also accounts for only one of the eleven manufacturers that create weapons that could have made these markings. Id.

153.    Thus, Mr. Rosati's testimony that there are likely more than 1.5 million weapons that could have made these markings is a gross understatement that is misleading and inaccurate. To the contrary, Smith & Wesson has singly manufactured more than this number of weapons in the past twenty years alone.

154.    Mr. Conrad's letter, and the testimony he could have provided at trial, put the lie to the Government's ballistics evidence and the inferences it wished the jury to draw:

> Based upon the above information one cannot reasonably infer that these submitted bullets were in fact fired from the same barrel. The fact that the class characteristics (5 land and grooves right twist) are one of the most common sets of class characteristics within the 38 caliber class would make this dangerous at best. . . Anyone who implies or infers more than what has been previously stated has left the area of science and entered into mere speculation.

Letter Report of William E. Conrad. The government's closing argument was then "mere speculation" not based on any science or evidence before the jury. Trial counsel was ineffective for failing to object to this argument, and for failing to put this alternative explanation of the lack of probative value before the jury.

155.    Had defense counsel obtained the services of a forensic ballistics expert, that expert could have provided testimony such as that given now by Mr. Conrad. Thus, defense counsel could have moved to preclude the testimony of FBI examiner Rosati for its lack of probative value, and prevented the government from implying that these bullets were fired from the same weapon. There is simply no evidence to support this claim. Defense counsel was ineffective for failing to hire a defense expert, for failing to object to the admissibility to Rosati's testimony, and for failing to object to the government's closing arguments.

159. The Court's instruction to the jury that the content of the newspaper article "was not offered for the truth of anything stated in the article," (TT 10/10/00, 38), in no way mitigates the Sixth Amendment violation in this case. Such Sixth Amendment violations cannot by their nature be remedied by a mere instruction. Though the Court gave a limiting instruction concerning the *Washington Post* article, the effect is the same as if there had been no instruction at all.

160. For a number of reasons, the admission of evidence of Mr. Haynes' confession was particularly prejudicial. First, the United States attached great significance to the *Washington Post* article and relied on it extensively throughout the trial, including during its opening and closing arguments. See TT 9/26/00, 51; TT 10/10/00, 136, 199. The United States went so far as to argue during its closing argument in the guilt phase: "Again, I refer you back to Transcript Number 1b, the conversation with Melvin Grayson, where he is read the newspaper article, learning about his co-defendant's conviction and **clear statements incriminating Mr. Higgs . . .** " TT 10/10/00, 136. Indeed, due to the powerfully incriminating nature of the co-defendant's statement against Petitioner, Petitioner's counsel was forced to discuss this evidence and the Government's closing argument regarding it. In counsel's opening statement, he admonished the jury to "consider the complete conversation," TT 9/26/00, 72.[15] The prosecution's repeated references to the article during the most critical parts of Petitioner's trial demonstrate that the United States considered it to be one of its most important pieces of evidence.

---

[15]In admonishing the jury to "consider the complete conversation," Petitioner's counsel was clearly adverting to the Fifth Amendment admission-by-silence issue, and was, equally clearly, oblivious to the serious Confrontation Clause violation.

161. Second, jurors generally place special emphasis on confessions. Jurors rely on confessions inordinately and place particular stock in what is said. For that reason, the introduction of a confession, and especially the confession of a non-testifying co-defendant, should be undertaken only with particular care.

162. Third, the article's substantive content is particularly prejudicial. In the article, co-defendant Haynes accuses Petitioner of "trigger[ing] . . . the slayings." Given that Petitioner's role, if any, was the central issue throughout the guilt and penalty phases of trial, the prejudicial effect of this evidence, which accused Petitioner of instigating the murders, cannot be overstated. Mr. Haynes' statement lent critical weight to the Government's theory that Petitioner instigated and commanded Haynes to commit the killings.

163. At the time of Petitioner's trial in 2000, clearly established law barred the admission of a co-defendant's out-of-court statement, especially where, as here, the co-defendant's statement shifted or spread the blame. Because co-defendant Haynes' confession clearly inculpated Petitioner, trial counsel had no reasonable or strategic basis for failing to object to the admission of the tape-recorded conversation on Sixth Amendment grounds. This is particularly so given that counsel tried hard to keep the article out of evidence on Fifth Amendment grounds.

164. Counsel's failure to litigate these claims fully and appropriately at trial and on appeal constitutes deficient performance.[16] The deficiency in counsel's performance is

---

[16]Petitioner's appellate counsel made a fleeting reference to this claim on direct appeal, devoting to it a mere seven lines of their 189-page opening brief. The claim was also discussed in somewhat greater detail in Petitioner's reply brief. These passing mentions were insufficient to invoke appellate review, however. Appellate counsel's failure to frame or develop the Confrontation Clause challenge in Petitioner's opening brief precluded appellate review.

(continued...)

especially grave since, as noted above, counsel considered this evidence closely and discussed the *Washington Post* article at great length, but neither perceived nor identified the clear constitutional basis for objection — the Confrontation Clause of the Sixth Amendment. TT 10/10/00, 8-25.

165. Counsel's deficient performance undermines confidence in the outcome of both the guilt and penalty phases of trial. Had trial counsel raised the appropriate objection, there is a reasonable probability that, pursuant to clearly established law of the Supreme Court, the *Washington Post* article would not have been admitted into evidence or the offending portion would have been redacted. Had that happened, there is a reasonable probability that the result of the guilt phase would have been different. With respect to the sentencing phase, had the article been excluded or redacted so as to remove the offending Sixth Amendment error, one or more jurors likely would have concluded that Petitioner's relative role in the killings was such that he did not deserve death. After so finding, one or more jurors likely would have voted against Petitioner's death sentence. In addition, had appellate counsel adequately presented these issues on direct appeal, there is a reasonable probability that Petitioner's guilt and/or death sentence would have been vacated. Trial and appellate counsel were ineffective, in violation of the Sixth Amendment.

**CLAIM VI. PETITIONER WAS DENIED EFFECTIVE COUNSEL DURING CAPITAL SENTENCING IN VIOLATION OF THE SIXTH AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

---

[16](...continued)
Moreover, the discussion of the already-waived claim in Petitioner's reply brief was of no moment. Because Petitioner's Confrontation Clause claim was not properly before the Court of Appeals, the Fourth Circuit's determination that "[w]e find no error in the district court's decision to admit the recorded telephone conversation between Higgs and Grayson," Higgs 1, at 310, in no way addresses or resolves Petitioner's instant Sixth Amendment challenge.

### A. Introduction and Statement of the Claim.

166. During her penalty phase closing argument, prosecutor Wilkinson challenged the lack of mitigating evidence in Petitioner's penalty phase presentation:

> Then he [defense counsel] stood before you just a couple of weeks ago . . . and he said to you we have been working to gain insight into Mr. Higgs. We are going to present that insight to you. **Where, ladies and gentlemen is the insight?** Were in the world is there any evidence that they have presented to you that says this man deserves a lesser sentence? What is it they have told you about this man that says he should be treated less harshly than where these aggravators put him? Where is it? That his mother died when he was ten, his caring loving mother, that his Aunt Connie is a caring, loving woman so that justifies what he did here? . . . He should be punished more harshly because this young man had people who loved him. He was raised by individuals who loved and cared and took care of him. He wasn't deprived as a child. He wasn't subject to child abuse. . . If anything, that fact of his background justifies more the reason for the ultimate penalty in this case.

TT 10/25/00, 76-77. Although prosecutor Wilkinson engaged in some oratorical flare – there was after all some mitigating evidence presented – her essential points were correct. The Eighth Amendment requires capital counsel to provide in the penalty phase "insight" into why their client killed, and these attorneys failed to do so. Regrettably, Prosecutor Wilkinson's critique of defense counsel was right on the money. Defense counsels' penalty phase presentation stopped far short of presenting the insight required by the Eighth Amendment.

167. Indeed, overall, the penalty phase did Petitioner far more harm than good. But, this did not have to be. A compelling case for life existed – it was there for the picking. However, counsel failed to thoroughly investigate Petitioner's life history and background. The failure to investigate was exacerbated by other errors committed by capital counsel. Consequently, the jury was not provided with a true, accurate and complete picture of Petitioner's life, upbringing and mental health deficits, even though such an accurate and complete picture is required by the Eighth Amendment to the United States Constitution.

51

Counsel performed deficiently, and that performance cost Petitioner dearly. Examples of counsels' gross mishandling of the penalty phase abound. Prosecutor Wilkinson's challenge went unmet – counsel failed miserably to provide the jury with any insight into why their client was before the Court having been convicted of a premeditated triple killing.

168. Counsels' errors and omissions are clear. They failed to tap the existing mitigation. Instead, they presented a slap-dash penalty hearing. On the very day that they appeared to present penalty phase evidence, almost one half of their mitigating factors were struck by this Court. An agreement that they had made with the Government, which they thought would lead to the exclusion of a variety of bad acts, evaporated, and Petitioner was confronted with a cavalcade of bad act evidence. Yet, counsel – who was not expecting it to come in – was unprepared to counter this evidence. At the end of the day, Petitioner never had a chance.

**B.     Counsel's Deficient Performance.**

169. Petitioner will now demonstrate the errors made, and opportunities missed. This is a compelling record, and counsels' errors are disturbing.

**i.     The Investigation Stage.**

170. Counsels' errors started with the penalty investigation of this case. Counsel hired a so-called "mitigation specialist/social historian" (Joel Sickler) and essentially turned over the penalty phase investigation to him.

**a.     The School Records.**

171. Mr. Sickler testified that he was unable to locate Petitioner's elementary or middle school records and received only a two page transcript of Petitioner's high school records. TT 10/19/00, 176. Based upon this transcript he testified that Petitioner "did fairly

well" in school and was an "**average to fairly good student** and seemed to have the **aptitude for school.**" Id. at 170, 176.

172. Nothing could have been further from the truth. Current counsel requested Petitioner's school records and received in excess of 300 pages. (These records are contained in Petitioner's Appendix). These records show that far from being an "average to fairly good student," Petitioner was diagnosed as learning disabled from an early age, was provided with an IEP (an Individual Education Plan, required by Federal law for disabled or handicapped students) and struggled simply to pass even his special education classes. These records also contain psychological reports showing that Petitioner was emotionally disturbed and depressed when he was just a young boy.

173. Counsel, themselves, did nothing to try to obtain the school records, which were obviously available. Had counsel tried to do so, they would have learned that their mitigation specialist failed to request them from the proper source and in the proper manner. Once Mr. Sickler received a letter from the authorities indicating that all records except for the two page transcript had been destroyed, he failed to follow up in any way. Counsel also failed to probe the alleged – and ultimately incorrect – assertion that these valuable records were destroyed. Consequently, Mr. Sickler received a two page transcript instead of the 300 plus pages post-conviction counsel have secured.

174. Mr. Sickler and trial counsels' errors in this regard, i.e. their deficient failure to secure one of the most basic building blocks of any capital mitigation investigation, is explained in a declaration from Joseph Gordon, Director of Guidance for the Hyde Park School District. As Mr. Gordon explains, New York State Department of Education policy dictates the maintenance of the School District's records, and its procedure for responding to requests for

53

them:

> I am employed by the Hyde Park Central School District (HPCSD) in Hyde Park, New York, at the Franklin Delano Roosevelt High School (FDR). I am the Director of Guidance for HPCSD. I have been with the District for 14 years.
>
> I have been asked by counsel for Dustin J. Higgs, a former student enrolled in our District, to explain our policies regarding the retention of school records, and responses to requests for such records.
>
> The New York State Education Department policy regarding the retention of student records is as follows: after a student would have normally graduated high school, the district must maintain his or her cumulative records for six (6) years. HPCSD follows this policy. The cumulative record includes report cards, progress reports, disciplinary information and any information regarding psychological adjustments and/or problems. At the end of that six-year period, the pupil's file is destroyed, and only the Permanent Record is retained. The Permanent Record consists only of a High School transcript, class rank and state-wide (Regents) testing information. The exception to this is when a student has been involved with Special Education. Special Education records are kept indefinitely and are maintained by the Administrative Office of the HPCSD.
>
> Requests sent to the High School for student records are processed by our secretary. If the student has been out of the HPCSD for more than six (6) years, we forward the requester the student's Permanent Record, as described above, with a note that the full cumulative records are no longer available.
>
> On the other hand, if a requester specifies that the student was involved in Special Education, or specifically asks for Special Education records, we forward the request to our Administrative Office for processing. The Administrative Office then forwards the student's Special Education records to the requester.
>
> However, unless the requester specifically requests Special Education records, we do not forward the request to our Administrative Office, where those records are maintained. Such a non-specific request will be responded to by only sending the Permanent Record.
>
> I have reviewed the file of Dustin Higgs, who was also known by his guardian's last name McKinnon during his time in the HPCSD. Mr. Higgs graduated from FDR in 1991. It appears that our office received a request from Brian Moon[17] at the National Center on Institutions and Alternatives (NCIA) on February 1, 1999. The request was directed to the Guidance Department at FDR High School. The request did not state that Mr. Higgs had been in Special Education, nor did it request Special Education records. Therefore, we only sent Mr. Moon a copy of Mr. Higgs' High School transcript. Because

---

[17]Mr. Moon assisted Mr. Sickler in his mitigation investigation.

54

Mr. Moon did not specify that Mr. Higgs had been in Special Education, nor ask for Special Education records, we did not forward the request to our Administrative Office, and accordingly, Mr. Moon was not provided with Mr. Higgs' Special Education records.

Mr. Higgs' file also reveals that on April 5, 2004 the HPCSD received a request from Katherine Suter at the Federal Court Division, Defender Association of Philadelphia, for Mr. Higgs' records. Ms. Suter's request specifically asks for Special Education records; as such, Ms. Joan Powers in our Administrative Office forwarded to Ms. Suter a complete copy of Mr. Higgs' Special Education records, along with a copy of his High School transcript. These included more than 300 pages of detailed records of Mr. Higgs' Special Education diagnoses, course work, reports, and other records. These records were available in 1999.

Declaration of Joseph Gordon, paragraphs 1-8, paragraph numbers deleted, copy contained in Petitioner's Appendix.

### b. Counsel and Mr. Sickler's Abrogation of their Investigative Responsibility to Lay People.

175. Regrettably, the failure to secure Petitioner school records was not Mr. Sickler's, or trial counsels' only error. Mr. Sickler testified at trial that he was unable to contact Petitioner's father, despite his efforts to do so. However, **he never himself tried to find Petitioner's father**, but instead enlisted the assistance of untrained laymen to find this critical witness. As he testified, his efforts to find Petitioner's father, Alphonso Higgs, "proved not to be successful. He does have two other children from a relationship with another woman. We did make contact with both of those young men. . . . We used Alexa [Cave] at one point as an intermediary . . . Dustin's cousin and sister. Mr. Higgs, from what we understand, wanted no involvement and was unwilling to speak with us, which wasn't surprising." TT, 10/19/00, 166-67. Obviously, his "understanding" came from these deputized investigators, and not from any contact that Mr. Sickler had with Alphonso Higgs, Senior. Thus, Mr. Sickler and counsel abrogated this critical task of finding and speaking with Petitioner's father to a cousin and half brothers of Petitioner – they never established or tried to establish contact themselves.

55

176. Mr. Sickler, however, did not have to go through Mr. Higgs' children or relatives. Although Mr. Higgs had a history of drug use and dealing, at the time of Petitioner's trial and for years before, Alphonso Higgs, Senior was living in the Poughkeepsie community, was readily accessible and willing to testify on his son's behalf – his post-conviction declaration says so:

> I did not know that Dustin was in trouble with the law at the time of his trial in Maryland in 2000. Nobody ever contacted me about it. I understand that somebody claims to have contacted my other sons to see if I'd get involved in his defense. But that is not true. I was not contacted by anybody, including my family, to let me know that my help was needed. Given how I had turned my life around by that time, I would have done all that I could to help my son to whom I did so much harm.

Declaration of Alphonso Higgs, Senior, paragraph 9, copy contained in Petitioner's Appendix.

177. Not having spoken to this highly relevant mitigation witness, Mr. Sickler again presented inaccurate and not particularly helpful testimony regarding Alphonso Higgs' impact on the life of his son. He testified that Petitioner and his dad, "never had a relationship" and that the contact between them was limited to "a couple of visits with Dustin when he was a small boy . . . [but] otherwise was completely absent from his life." TT, 10/19/00, 165-66. Thus, Mr. Sickler's testimony implied that Alphonso Higgs' impact on his son's life was notable only for his absence.

178. Again, Mr. Sickler's testimony was far from the truth. As Alphonso Higgs' post-conviction declaration indicates, he had a dramatic impact on his young son – an impact that would leave durable psychological scars:

> My name is Alphonso Higgs, Sr. I am 63 years old (d.o.b. 9/10/42) and I am the natural father of Dustin J. Higgs. I have been told that he is on death row and I am giving this statement at the request of his current lawyers.
>
> I met Dustin's mother, Marilyn Bennett about two years before Dustin was born in 1972. At the time that we met, and for many years afterward, I was a drug user and small time drug dealer in Poughkeepsie, New York. At the time that Dustin was born, I lived across the street from Marilyn, in Poughkeepsie. It was from that location that I ran my drug

56

business. At that time I was also living with and seeing many other women. During the time between Dustin's birth, and Marilyn's death, I sold and used many different drugs, including heroin, cocaine, marijuana, and PCP.

During this time period I would sell my drugs usually on the street. I would hang on the corner, usually getting high, and selling to people who'd drive or walk up to me. I sometimes would sell out of my house. Selling drugs was a hard business, and you had to be tough to survive. I usually carried a weapon of some sort, and when I didn't have one, I acted as though I did. I developed a reputation as a tough guy.

I was arrested a number of times. I had two felony convictions in Dutchess County, New York. In the first I was busted for selling heroin and coke to an undercover state trooper in June, 1981. I took a felony conviction, but did one year of county time. The second time, I was busted for selling coke to a Poughkeepsie cop. I was sent to state prison for 2-4 years. This last arrest was in 1983. In addition, I was arrested for a number of assaults, fights and larcenies.

While I was living this life I would do a lot of my own drugs. I also drank. When I was high, I would act crazy. I was abusive to whatever women were in my life at the time. I would use them for my own needs, and when they complained I would beat them. I would yell and scream insults at them, and usually my yelling turned to hitting. It was no different with Marilyn Bennett. I would go over to her place for sex and food. If things weren't just the way I wanted them, and sometimes even if they were, I would go off and start yelling, throwing stuff and hitting her. I did this while Dustin was a child, and he often got into the middle of it. I am ashamed to say that I even laid my hands on that young child.

I did not have any real relationship with Dustin. I didn't do any father-son type of activities with him, and I am sure that I showed him no love or affection. I would see him on the street, while I was earning my living. Sometimes I'd say hi and other times I wouldn't. I would beat his mother, and sometimes him. He'd get it the worst when he got older and tried to protect his mother from my beatings. I'd be in such a rage, that I'd just swat or smack him.

I know that Marilyn got sick in around 1980 and she died in 1982. She had cancer. I was arrested in 1981, and so I was in jail when she was at the worst of her illness. I provided no emotional or financial support to her or Dustin during that time. Her family hated me, as I was not much of a father or boyfriend. I cannot blame them for disliking me, but as a result I had little contact with Dustin after Marilyn's death. He moved away and his aunt Connie would never let me near him. I only saw him a couple times while he was a teenager.

Since 1993 my life changed. I found Jesus Christ and devoted my life to Him. I am a regular church-goer and I am very active within my church. I have been a sober, righteous and law abiding person ever since. When I look back at my life I am ashamed

| | |
|---|---|
| Higgs: | You got no problem, I live at 33, second floor on the right hand side. I always come right down and look for . . . . . . . . . . . Terry, he claims he just bought one from me right, and then he claims he lost it. He ain't lost it, heck. |
| Third person (unidentified): | He ain't lost shit. He always trying to . . . . . . he always beat somebody. |
| Informant: | Let me get a dime. |
| Higgs: | And he always . . . . . . . . . . . . . trying to earn from somebody. |
| Informant: | Yeah, what you got? Dimes or twenties? |
| **Higgs:** | **I got dimes.** |
| Informant: | Come on, give me one dime. |
| Higgs: | Mumbles inaudible sentence. |
| Informant: | It's good? |
| **Higgs:** | **It's good. No doubt about it, it's good. You know where I live, you know where I am, there goes somebody right there, right here.** |
| Informant: | What's going on man? |
| Fourth person (unidentified): | What's up? |
| Higgs: | Ask him if it's good. |
| Fourth person: | It's alright. |
| Third person: | I ask you is that coke good. |
| Fourth person: | This mother fucker don't give it back though. |
| Informant: | If it's good I'll be back. |
| Higgs: | I'll be up here. |
| Higgs: | Anytime you want to feel good . . . . . . . . . . . I'm waiting on my man out here, but he ain't, he ain't ahh, ahh, don't waste it man. |
| Informant: | No, I ain't gonna waste it man, I ain't gonna waste it. |
| Higgs: | You ain't gotta open it up. I do you right, ain't no problem with it. |
| Informant: | Yeah, it's all right there. |
| Higgs: | You ain't got to worry bout liking that. |
| Informant: | Smells good. |
| **Higgs:** | **I'm telling you it's good, I leave it like that.** |
| Informant: | Yes Sir. |
| **Higgs:** | **I don't tramp it, I just, ha, ha, ha, one and a half or two, I could fuck you. I put one in. That way people will come to you direct. They like it. They'll find ya, and alright people. I used old Paulette, she bought a dime, that bitch came back begging. I know it was smokin then. I ain't even worried now. Keep it like that and you're alright.** |
| Informant: | Yeah. |
| Higgs: | I been working for a number of mother fuckers and I don't like it, I like . . . . . . . . . I don't care if I gotta pay one hundred dollars. I don't make eighty or seventy-five. I want the people to like it that I give. Anyway, they gonna come to me first. Coke ain't anything like the sickness. I'll wait two or three hours knowing I'm gonna get something good, before I go back out there. You know especially if I know somethings gonna hit. |

59

| | |
|---|---|
| Informant: | Yeah. |
| Higgs: | You know I get that . . . . . good, make you feel good. I wait for it. Knowing somebody else has something better that me. . . . . . . . . Can't see it. Got a smoke man? |
| Third person: | Stay down there all day. |
| **Higgs:** | **Especially you know he's coming, coke, you don't get sick behind coke, you just want it. Ain't nothing you wake up hurting and your sick . . . . . . . . . . . . you know, I ain't like that but I don't like mother fucking shit like dope man. You got to try and cop some somewhere feelin bad. But like coke you ain't going nowhere.** |
| Person Yelling up the Street: | Alphonso!! |
| Higgs: | Yeah!! |
| Informant: | I'll see you later man. |
| Higgs: | Okay man, I'll be out here. |
| Informant: | Alright. |

**Informant leaves immediate area but is stopped enroute back to officers location. Following conversation ensues:**

| | |
|---|---|
| Informant: | What's going on man. Yeah. What's going on with your case man. |
| Other Person: | I gotta go back next week, she's gonna decide whether she's going to dismiss it or not. |
| Informant: | Hillary? |
| Other Person: | Yeah. |
| Informant: | I'm going to tell you one thing man, a lot of people think that she's right, she goes by the book, man. |
| Other Person: | Got a dollar Joe? |
| Informant: | No man, no, no, no, I don't fuck with that man. |
| Other Person: | Alright, I hear ya. |
| Informant: | Alright, take care man. |

**Informant completes return to officers location and enters police vehicle.**

Transcript of drug sale contained in court file <u>People v. Alphonso Higgs</u>, Indictment # 212/83

County Court, Dutchess County, New York, contained in Petitioner's Appendix.

> **c.      The Failure to Interview Others Who Interacted Daily with Petitioner or Otherwise Knew of Alphonso Higgs' Life of Crime.**

180.    Even if Alphonso Higgs could not be located – a highly dubious proposition –

there were others who knew the story, and could have provided gripping accounts of how

Alphonso Higgs was a gun-toting thug, who beat and abused Petitioner and his mother. Nancy

Riley was Petitioner's aunt, and the younger sister of his mother. She lived **one floor above**

**Petitioner and his mother and saw them on a daily basis before her sister's death.** She

recounts that Alphonso Higgs indeed had a "relationship" with Dustin Higgs and his mother – a

relationship of abuse and trauma:

> My name is Nancy Lee Riley and I am the younger sister of Marilyn Bennett. Marilyn died of cancer in 1982. If she were still alive she would have been 60 years old this year. I am currently 55.
>
> Marilyn moved to 350 Mansion Street in Poughkeepsie in around 1970 – before Dustin Higgs was born.[18] At that time I lived at 172 Winnikee Avenue, which was another part of the same building. She began to see Alphonso Higgs, Senior and became romantically involved with him.
>
> At the time that my sister began to date Alphonso Higgs, I knew of his reputation in the neighborhood as being a drug user and dealer. He was not a working man, but made his living selling drugs. When he was not selling drugs, he was using them. He spent his days on the corner engaged in his business, or else he was in a bar drinking. Marilyn was also aware of his background, but she believed that she could change him. Anybody walking on the street would be able to look at Alphonso and see him engaged in selling and using drugs.
>
> As her sister, I had daily contact with her. I was able to see that from the beginning of the relationship, Alphonso was abusive towards her verbally and physically. He would argue and abuse her over a number of issues, including his involvement with other women and with drugs.
>
> Marilyn moved from 350 Mansion to 168 Winnikee when Dustin was about 7 years old. This was again in the same building in which I lived and I continued to have daily interaction with Marilyn and Dustin.
>
> Throughout the course of her relationship with Alphonso, he engaged in abusive conduct toward Marilyn and Dustin. I recall one instance when I heard a commotion going on in

---

[18]Alphonso Higgs' other drug arrest occurred for a sale that occurred at 339 Mansion Street in Poughkeepsie, across the street from 350 Mansion Street, where Petitioner resided with his mother.

Marilyn's apartment. I could hear Alphonso screaming. I ran down to her apartment (I lived one floor above) to find that she was bleeding from the head and she told me that Alphonzo had hit her with a pot. Alphonso was still present, and I found Dustin in the same room crying his eyes out. He was obviously very scared and upset. I stayed with Dustin while Marilyn went to the hospital. It took quite a while to calm him down and I sent him to bed.

I personally witnessed Alphonso being verbally and physically abusive toward Marilyn. Although his abusive conduct was never directed toward Dustin, Dustin was very protective of his mother, and he would try to get between Alphonso and his mother. During these occasions Alphonso – who was in a rage – would push or slap Dustin to get him to back away.

Alphonso's drug use was consistent throughout the time that Marilyn was alive. He used heroin, free-based cocaine, smoked marijuana and drank. He was very erratic and was seldom sober. The more drugs he used, the more abusive he was toward his wife and child.

Alphonso was living with two different women during the time that he was also seeing my sister. His carrying on with other women was often the spark for his abusive behavior. I saw him being physically abusive to Novalene Johnson (one of his live in girlfriends) on many occasions. I can only assume that young Dustin was also able to witness this conduct, which was happening in public view.

Dustin never received anything from his "father." He only got the bad and abusive conduct. Alphonso never took Dustin anywhere or did anything with him. He barely acknowledged him as his child, and showed him no love or affection, or even any attention.

Declaration of Nancy Lee Riley, paragraphs 1-8, 10, & 12, contained in Petitioner's Appendix.

181. Another sibling of Petitioner's mother, Richard Bennett, also knew about

Alphonso's life of crime. He too was never interviewed:

My name is Richard Bennett and I am the older brother of Marilyn Bennett. Marilyn died of cancer in 1982. I am currently 66 years old, and I was six years older than Marilyn.

I worked for years as a bartender at the Paradise Grill in Poughkeepsie. It was located in the same neighborhood in which Marilyn and Alphonso Higgs lived in the 1970s and early 1980s. As a result of this job in a local bar, I ran into Alphonso Higgs, Sr. on many occasions. It was well-known in the neighborhood that Alphonso was a drug dealer. I knew this to be the case as I saw him selling drugs as cars would pull up to him on the corner, and things would be exchanged. He had no "regular" job, always had lots of

cash, and was living the life of a person in the drug scene. I personally had to run him out of the bar, because he was trying to sell drugs there. People in the neighborhood were afraid of him, and I knew that he carried a gun. His drug business was carried on in plain view in the neighborhood on an on-going basis.

My view of Dustin's life is that he had no stability. He was the child of a single mother. His natural father provided no role model, and the only role that he modeled was that of a drug dealing, gun toting thug. He was a horribly violent man, who was known to be the neighborhood smack dealer. Marilyn's death shattered what stability there was in Dustin's life. When he went to live with Constance, he was put into an environment which went between strict discipline and regimentation to hanging out and getting high with his cousins. In sum, Dustin did not have a childhood that even came close to normal.

Declaration of Richard Bennett, paragraphs 1, 2 & 8, contained in Petitioner's Appendix.

### d. Failure to Provide Any Accurate Evidence About the Emotional and Mental Health Impact Upon Petitioner of the Tragic Loss of his Mother.

182. Counsel also had Mr. Sickler testify about Petitioner's tragic loss of his mother when he was just age 10, and how he had cared for her in the last months of his life. Yet, even this testimony fell far short of providing the gripping details of the emotional impact of this death on a ten year old and the durable scars it would leave.

183. After providing some historical information about Petitioner's mother, Marilyn Bennett, TT 10/19/00, 167-68, he provided further information about her illness and subsequent death. Id., at 172. He described what he learned about Marilyn's fears and concern for what would happen to her son. Id., at 173. He described where Petitioner went to live following his mother's passing. Id., at 173-74. However, neither Mr. Sickler, nor any other witness called by counsel, provided testimony regarding the psychological and emotional impact on Petitioner of his mother's death.

184. Although Constance McKinnon testified, she was asked little about the impact of his mother's death upon Petitioner, and what little she said on the topic was simply belied by the

school records that trial counsel never obtained. Ms. McKinnon testified that she was Petitioner's aunt and his mother's eldest sister, with whom Petitioner went to live following his mother's death. In response to a question about how Petitioner reacted to his mother's death and moving in with the McKinnon family, aunt Constance testified that she "thought that he had adjusted well. . ." TT 10/20/00, 56.

185. In reality, the school records contain stark evidence to the contrary. Petitioner had not "adjusted well." Rather, the records show the profound impact that his mother's death had on his psychological development and his inability to achieve in school. His emotional disturbance over the loss of his mother, and his continuing inability to perform his school work were noted in a variety of Child Study Team Reports. On December 2, 1982 (about 9 months after his mother's death), the evaluator noted that he has "low functioning in classroom, poor reading skills, poor small muscle coordination (handwriting) . . . poor language skills, limited vocabulary, difficulty expressing himself in writing cannot construct more than simple sentences. Poor speller." At the time he was noted to be reading at the second grade level, which was two grades below his then-current placement. In regard to his "social functioning," it was noted that Petitioner "tends to be a loner, quiet-withdrawn."

186. In a Confidential Psychological Evaluation conducted on March 29, 1983 (age 11 years – about 1 year after his mother's death) by School Psychologist James E. Lennon, Petitioner's difficulties with learning were well-documented. In particular, the evaluator sought to explain why he had a significant drop in recent testing, and offered two potential explanations, including that:

> Dustin has had significant losses over the last few years of his life . . . He reports that his dad doesn't visit him at the present time. Secondly, his mother's death in May 1983

64

[sic][19] has left him as an only child in the care of his aunt. While Dustin feels particularly comfortable and secure in the care of his aunt, a woman who has four children of her own older than Dustin and who has succeeded in making Dustin feel a part of her family. **Nevertheless, these events have important implications on Dustin's social/emotional development and quite possibly on his overall cognitive development.**

Dr. Lennon concluded that Petitioner was in need of counseling "in order to help him deal with some of the tragic events that have occurred in his life."

187. In another Child Study Team Report generated on September 20, 1983 the reporter noted that Mr. Higgs "presently seems to be depressed but that seems to be separate from his basic learning problems." In the section calling for "Specific problems to be addressed" the evaluator noted that assistance was needed in three areas: "1) Disability in expressive language, both verbal and written, 2) Poor reading skills [and] 3) emotional problems following family disintegration **(related counseling services)**." Another portion of this document states that Petitioner's "language deprivation is extremely evident. He has trouble expressing thoughts orally and written [sic]. Appears as if their [sic] may be a visual perception problem."

188. Petitioner's apparent need for counseling (addressed in both the March 1983 and September 1983 documents) was again addressed in a note written on March 28, 1984. The note is from "Don" to "Sandy" and it reads:

> In a meeting with Arlene and Ruth, Arlene raised a question about counseling for Dustin – feeling that we should have some counseling contacts. Have you kept in touch with Dustin in any way? Should we consider him for counseling? Maybe in a group? Let me know what you think.

In a handwritten response written on April 4, 1984 Sandy rejected the counseling option:

> Don- Re: Dustin Higgs. He doesn't seem to need counseling more than twenty other

---

[19]Ms. Bennett died in May, 1982.

students I could name. . . .He might at sometime benefit from some counseling to work thru the feelings that must have come with his mother's death – but that's not really a school job and it certainly is not a crisis situation. Sandy

189. Because Petitioner did not present as a "crisis," he did not receive the supportive counseling that was recommended by the school psychologist, or the Child Study Team. He received it neither from or through the school system, nor through his family. His mental health needs were left unattended, with a resultant deterioration in all spheres.

190. Even without the school records, his aunt Nancy Riley and uncle Richard Bennett, who as noted above, Mr. Sickler never spoke with, provided graphic descriptions of the impact of his mother's death on Petitioner. Ms. Riley recounts:

> Marilyn eventually became ill with cancer and she quickly deteriorated and died. During this time Dustin was a great help to his mother. Although he tried to put up a brave front, it was clear that he was overwhelmed by his mother's condition. He loved his mother dearly and he would cry all of the time about her illness. He was present when she passed, and he saw them place her body in a "body bag." He literally was present to hear her body fall to the bottom of the bag. I was also present and could see that this caused a physical reaction in Dustin. He was out of control and upset on that day, and he took her death very hard. He became withdrawn from the world. I would see him weekly in church after he went to live with Constance McKinnon, and it was clear to me that he never recovered emotionally from watching his mother die. Before her death, he was an outgoing and fun-loving youngster. After her death, he was never the same.

Declaration of Nancy Lee Riley, paragraph 13.

191. Uncle Richard Bennett had similar observations of this impact of this event:

> When my sister became ill with cancer, I was working nights for the post-office. As a result, I was responsible for taking her to many of her doctor appointments. As she became more sick over time, I was able to see the impact of her illness and eventual death on the young Dustin Higgs. At the same time that he tried to shoulder the burden of being the "man of the house," I could see that it was having a significant impact on him emotionally. Dustin simply shut down verbally. He became non-responsive when I would try to speak with him. Marilyn's death hit Dustin very hard. He literally picked out the dress that she was buried in, and insisted that her eyeglasses be placed on her coffin.

> Marilyn's death shattered what stability there was in Dustin's life.

66

Declaration of Richard Bennett, paragraphs 3 & 8.

### e. The Failure to Provide Mental Health Experts with the Actual Mitigating Evidence.

192. Despite having deficiently failed to locate the school records, or interview critical witnesses about Petitioner's traumatic childhood and mental health and emotional deficits, counsel could still have meet their constitutional obligations to conduct a thorough mitigation investigation by enlisting the aid of mental health experts. Counsel took a step in that direction, however, as events unfolded, it is clear that counsel aborted that journey before following it to its logical conclusion.

193. During their pre-trial preparation, trial counsel retained two mental health experts, Lawrence Donner, Ph.D and Susan Fiester, M.D. Despite having taken this step in the right direction, counsel again failed in their constitutional duty to provide these experts with access to relevant records or lay witnesses who could have provided the needed information. As each expert has declared, they were provided with no collateral records outlining Petitioner's childhood history:

> I was contacted by Harry Trainor, Esq. in February, 2000 about consulting in the case of United States of America v. Dustin John Higgs. I understood from Mr. Trainor that this was triple homicide being prosecuted by the United States Attorney in the Federal Court in Greenbelt, Maryland. I was made aware that this was a capital prosecution. Accordingly, Mr. Trainor requested that I conduct a psychological evaluation of Mr. Higgs. I particularly understood that I was to focus on whether there was any psychological or neuropsychological mitigating evidence that could be useful in a capital sentencing phase. As I always do with such referrals, I was looking to unearth evidence of childhood trauma, abuse, neglect, family dysfunction or major mental illness. I was also concerned with determining whether there were any psychological dynamics present in Mr. Higgs' history that could be used as mitigating evidence at his sentencing hearing.
>
> As is my custom, at the time of the referral from Mr. Trainor, I requested **all records that counsel had or could obtain relevant to the subject's childhood and upbringing**. Typically, such records include school records, incarceration records, medical records and any other record of mental health or medical treatments. These records are critical in

a forensic setting, because a practitioner cannot rely on the memory or honesty of the subjects of such evaluations. For the same reasons, I typically request either access to family and friends who knew the subject as a child or young person, or else summaries of such contacts generated by a social historian. **In this instance, I received very limited, and in my view, inadequate records.** I received the federal indictment against Mr. Higgs; a pre-sentence report generated in regard to a then-recent federal drug charge and a Memorandum written by Brian Moon dated February 28, 2000 entitled "Preliminary Investigation United States v. Dustin Higgs." According to my records it took me only 30 minutes to review these rather limited and rudimentary sources.

Declaration of Lawrence Donner, Ph.D., paragraphs 3-4, contained in Petitioner's Appendix.

Dr. Fiester has provided a similar declaration:

In early 1999, I was retained by attorney Harry Trainor to conduct an evaluation of Dustin Higgs in preparation for a capital murder trial. I conducted a forensic psychiatric exam of Mr. Higgs at the D.C. jail on March 19, 1999. I was not asked to review or obtain any records, nor was I asked to conduct any further evaluation of Mr. Higgs or conduct any collateral interviews.

Declaration of Susan Fiester, M.D., paragraph 2, contained in Petitioner's Appendix.

194. Thus, neither expert was ever provided by counsel with Petitioner's school records.

195. Despite having been provided with inadequate records, each mental health expert conducted a forensic evaluation of Petitioner. Dr. Donner evaluated Petitioner for about 8 hours on March 7, 2000. He administered a series of neuropsychological and psychological tests and conducted a clinical interview. Based upon this evaluation, Dr. Donner strongly suspected the presence of mental health mitigating evidence:

I saw Mr. Higgs for my evaluation on March 7, 2000 at the Supermax facility in Baltimore. The evaluation lasted from 9:00 a.m. until 5:00 p.m. Based upon my overall evaluation (which included my testing, clinical interview and review of the sparse documents presented to me), I learned a number of things about Mr. Higgs, his neuropsychological makeup and his history that could be mitigating. I will summarize those findings below. However, in the absence of additional records about Mr. Higgs, I was unable to formulate opinions about Mr. Higgs to a reasonable degree of psychological certainty.

First, it was apparent to me from my observations of Mr. Higgs and from the validity scales contained within some of the testing that I administered, that Mr. Higgs tried to do his best on the tests. He did not exaggerate his mental health pathology. In fact, some of the testing and interview responses showed him to be masking pathology. In short, he was not malingering in his responses in order to "look bad." Therefore, I considered my testing of him to be valid.

I administered a standardized IQ test (the WAIS–III) to Mr. Higgs. He scored a full scale IQ of 91, which places him in the 27th percentile of the population or, in other words, in the low-average range of intellectual functioning. The WAIS–III is comprised of two parts: the Verbal and Performance Subtests. The WAIS–III contains thirteen subtests. It is expected that a subject's subtest scores will be roughly equivalent to the full scale IQ, and that the scores on each of the subtests will be more or less equivalent. This was not the case with Mr. Higgs. In the Verbal Scale his subtest scores ranged from a high of a scaled score of 12 (on the Similarities and Comprehension subtests, which is the equivalent to an IQ score of about 112) to a low of a scaled score of 2 on digit span (equivalent to an IQ of about 54). This degree of difference, sometimes referred to as "scatter" is a red flag for brain dysfunction. Similar scatter was also seen on the Performance Scale, where his scaled scores ranged from a high of 11 (in Digit Symbol and Matrix Reasoning) to a low of 7 in Picture Arrangement. Again, this level of disparity between subtests on the same scale raises concern and suspicions that the subject may be organically impaired, emotionally disturbed or both. At the time of my evaluation, I believed that both might be causes of Mr. Higgs' uneven performance.

Similar anomalies occurred with regard to his score on an achievement test that I administered (the WRAT-3). All things being equal, one would expect a person with a full scale IQ of 91 to score in the mid-percentiles (e.g. 40-50th percentile) on the WRAT-3. That did not occur with Mr. Higgs. He was in the 8th percentile in reading, 10th percentile in spelling and 7th percentile in arithmetic. These scores correspond to 7th, 6th and 5th grade levels, respectively. In the presence of proper corroborative documentation – which I did not have at the time of my evaluation – these scores would establish that Mr. Higgs suffers from a learning disability (defined as two or more grade levels below the last grade completed, which in Mr. Higgs case was a year or two of community college). Moreover, such a discrepancy between performance on an achievement test and one's IQ score shows that Mr. Higgs had either an emotional, organic or combined deficit that effected his achievement.

I administered the Bender Gestalt test. This test requires a subject to reproduce nine designs that are placed before him, and then requires him to again reproduce the designs after periods of delay, but without the stimuli cards in view. In assessing performance on this test, one looks at the number of designs that are recalled, the accuracy of the reproductions, and the manner in which the designs are placed on the page. The results can provide insight into a number of areas, including memory, concentration, organicity, and psychological and personality traits. Overall, Mr. Higgs' responses on this test showed him to be easily frustrated, have problems with impulse control and to have

69

difficulties with some aspects of his working memory.

I administered the Booklet Categories Test. This test is particularly sensitive to the presence of organic brain damage, and in particular frontal lobe damage. The frontal lobes are responsible for executive functioning, and impairment in that area can result in significant emotional and impulse dyscontrol. Mr. Higgs scored in the impaired range (59 errors) on this test. This result also supports a conclusion that Mr. Higgs suffers from organic impairments.

I administered the Reitan Aphasia Screening Test to Mr. Higgs who showed "nervousness" in taking the test, and difficulty with simple math problems. This nervousness is consistent with some aspects of his personality and the difficulty he appeared to have is consistent with his lack of achievement on the WRAT–3.

Psychological testing that I administered showed that Mr. Higgs' emotional development was arrested at about age 10, which I understand to have been the time that his mother passed away. He sees the world in a rather simple and child-like way. He does not see complexity, and combined with his learning disability, he has a difficult time in navigating his way. Testing also shows that he experiences a degree of suspiciousness and paranoia in his dealings with others.

I administered the MMPI–II, which is a widely administered and reliable psychological test. The MMPI–II contains a set of validity scales which indicate whether the subject is responding accurately, or is trying to fake to look either mentally ill or mentally healthy. As noted above, the validity scales did not show that Mr. Higgs was faking, but that his responses were valid. The most significant result from this test for purposes of a capital penalty phase, showed that Mr. Higgs did not score a typical psychopathic profile. In other words, this test did not show Mr. Higgs to be a sociopath. This finding is important as it relates to the question of his "future dangerousness" which can be an issue in a capital case.

Based upon my evaluation and the sparse documents that were provided to me by Mr. Trainor, I had several suspicions about Mr. Higgs and about the mitigating evidence that could have been presented at his trial. I suspected that he was learning disabled and likely suffering from organic brain damage. I also suspected that he was suffering from the lasting psychological effects of losing his mother at a tender age after having been her caregiver for the last months of her life. As a result, I also believed that he suffered from impulse control problems and judgment. I could not offer opinions to a reasonable degree of certainty at that time because I had no corroboration of my suspicions.

Declaration of Dr. Lawrence Donner, paragraphs 4-13. As noted, Dr. Donner could not provide

opinions to a reasonable degree of certainty at that time, because he did not have corroborative

data.

196.   Dr. Fiester also found valuable and compelling mitigating evidence based upon

her evaluation:

> The results of my evaluation show that Dustin Higgs likely suffered from a Learning Disability and childhood trauma (related to his mother's illness and death from cancer) which may have precipitated Posttraumatic Stress Disorder; from Pathological Gambling, Alcohol Dependence, and Substance Abuse. In addition, Mr. Higgs also expressed significant remorse about the fact that the victims in the January 27, 1996 incident died. These disorders are long-standing, significant, and can substantially affect cognitive and emotional functioning.

> *   *   *

> Mr. Higgs reported to me that he had graduated from high school and attended approximately two years of Community College. He did reveal that he had been in special education and was diagnosed with a Learning Disability, which he thought was because he was not reading "up to speed."

> *   *   *

> Mr. Higgs' mother died when he was age 10 after a long illness with breast cancer. His mother suffered a protracted period of illness that lingered for over a year before her death. She was debilitated and bed-ridden at home for long periods. During this time, Mr. Higgs was at home with her, caring for her and attending to her as she gradually deteriorated. This would have been extremely traumatic for a child of ten. Mr. Higgs was fearful and recognized that his mother was sick, however, he did not know that she was dying. Her death came as a shock. Since he was not told that his mother was dying and had no idea of what to expect, her illness was even more frightening. When his mother's hair fell out, presumably a result of chemotherapy treatments, he knew that this was not "normal" and became very fearful.

> Mr. Higgs reported enuresis with an onset at age 10, approximately at the time of his mother's death. The enuresis was present for three years. Bedwetting at this delayed age can be precipitated by psychosocial stress. The onset of enuresis coinciding with the death of Mr. Higgs' mother further suggests that her death was an enormously traumatic event for him.

> Mr. Higgs additionally described having witnessed a death in 1993 at the age of 19 that was traumatic for him. This death prompted the onset of his escalating use of alcohol, drugs and gambling. While he did not admit to experiencing symptoms of PTSD as a response to witnessing this death, his alcohol and drug use may have masked the presentation of these symptoms, as the significant escalation of alcohol and marijuana use coincides with witnessing this death. If a person has experienced a significant trauma in their past, related to illness or death, a later trauma, such as witnessing another death,

71

may prompt the reemergence of the emotional pain from the previous event.

\*       \*       \*

Finally, my evaluation of Mr. Higgs revealed the existence of several additional mitigating circumstances in this case in addition to the mitigating diagnoses discussed above.

During Mr. Higgs' mother's protracted illness, Mr. Higgs recalled spending evenings after school sitting on her bed, caring for her, and helping to take care of her while she was experiencing increasingly poor health. Mr. Higgs was a "parentified" child, who took on responsibilities of caregiving for his own caregiver. The role reversal that took place robbed Mr. Higgs of his own childhood. Because he was in the role of caregiver between the ages of 8 and 10, he was unable to be a child himself. His role of caregiver resulted in feelings of guilt regarding his mother's pain and suffering, as he felt responsible for her but was unable to relieve her pain and suffering.

In addition to the significant trauma of his mother's illness, Mr. Higgs' father was an "absent" father figure/parent. His father did not show interest or take an active role in parenting Mr. Higgs, being present only intermittently. Further, Mr. Higgs recalled seeing his father being violently abusive toward his mother to the extent he inflicted lacerations. When his father beat his mother, Mr. Higgs recalled crying hysterically, feeling that he was unable to protect his mother. Mr. Higgs continues to experience a sense of loss over the fact that his father showed no interest in his life. Having a father who is an intermittent presence in one's life, who is unable to provide emotional love, affection or even attend to Mr. Higgs, can be more stressful that the total absence of a father. Mr. Higgs' father's substance abuse problems may have played a role in his inability/unwillingness to provide constant contact and appropriate parenting for Mr. Higgs.

Declaration of Fiester, M.D., paragraphs 4, 6, 10-12, 15-17.

197. However, like Dr. Donner, Dr. Fiester was unable to provide certainty about her impressions because she was never provided with the required corroborative data.

198. Trial counsel met with both Dr. Fiester and Dr. Donner on April 11, 2000 – about six months before trial. In that meeting the doctors shared their initial findings with counsel. See Declaration of Dr. Donner at ¶ 14; Declaration of Dr. Fiester at ¶ 3. As set forth above in each of their declarations, each expert told counsel that there was mitigating evidence that could be presented. However, neither mental health expert was called to testify.

72

### ii. The Gutting of Petitioner's Penalty Phase, and Counsels' Lack of a Response.

199. As the following account of the events leading up to the penalty phase show, the Government had its way with defense counsel. Petitioner's lawyers relied on the Government's dropping the future dangerousness aggravating factor and tailored their presentation so as not to open doors to bad act evidence, while all the time being apprised that virtually anything they presented would open those doors. At the same time, the Government succeeded in having most of Petitioner's mitigating factors struck. What followed was a last minute attempt to salvage something from the penalty phase. The proceedings from Petitioner's perspective were not pretty.

200. The Government provided pre-trial notice that it intended to seek the death penalty based upon, among other factors, that Petitioner would remain a future danger if sentenced to life imprisonment. See *Government's Notice of Intention to Seek Death Penalty as to Defendant Dustin Higgs*, filed on or about October 23, 1999, at pages 4-5. Whether the Government would be permitted to argue the future dangerousness circumstance, and what evidence it could present in support of it, was the subject of extensive pre-trial argument. PTT 2/10/00, 133-186. This Court held that the Government would be permitted to present evidence to support that circumstance, and would be permitted to argue it to the jury.

201. However, in a letter dated October 10, 2000 the Government memorialized an earlier conversation with counsel indicating that it would not present pursue the future dangerousness factor, or present evidence of it. A copy of this letter is contained in Petitioner's Appendix.

202. It was obvious why the Government decided to drop the future dangerousness

circumstance, and it was not out of beneficence!  The Government had a plan: by offering to drop the future dangerousness factor, they hoped to limit Petitioner's penalty presentation, all the while ready with even more bad act evidence to charge through any doors opened by defense counsel. The Government had already presented many of Petitioner's bad acts that would have come in under the future dangerousness factor to the jury in the guilt phase of trial (e.g., the Chaconia and Cherry Lane shootings; the bad check schemes; threatening of witnesses; the incident in which Petitioner allegedly put a gun to Enidsia Darby's head), and the remaining bad acts that they had in store for Petitioner could come in under the obstruction of justice factor (e.g. intimidation of Mr. Dialomou in connection with the Chaconia shooting) and in rebuttal to the slim penalty presentation that defense counsel had in mind.

203.    There is significant evidence that the Government's strategy worked.  Following the delivery of the jury's verdict on the guilt phase, the Court and parties discussed the upcoming penalty hearing.  The Government placed on the record that it would not seek to present evidence on, or argument about, the future dangerousness circumstance (TT 10/11/00, 15-16), indicated that it had notified counsel of this the preceding Friday (October 6, 2000), and followed up with the October 10, 2000 letter.  Counsel took the bait: they indicated that in view of this development, "we are rethinking our whole case because of the government's decision to withdraw the statutory aggravator of future dangerousness." Id., at 19.

204.    While the Government's plan was creative and effective, it was far from a secret plan.  Indeed, the record is replete with warnings from the prosecution and the Court that various presentations from Petitioner would open doors to the bad act rebuttal.  This can be seen, for instance, in the argument that ensued on the day the penalty hearing was to commence. Following the guilt phase verdict, on October 14, 2000 defense counsel filed a motion styled:

74

*Defendant's Motion to Limit Argument by the Government During the Penalty Phase and for*

*Other Appropriate Relief.* In this *Motion*, counsel pointed out that in view of the Government's

dismissal of the future danger factor, Petitioner was entitled to a limitation on the Government's

evidentiary presentation and argument, so as not to permit the introduction of this factor through

other aggravating factors. The defense articulated their concern as follows:

> The very real danger for Dustin Higgs is that the government, having dismissed the future dangerousness aggravating circumstance will nevertheless try to convince the sentencing jury that Dustin Higgs would be a continuing threat to the lives and safety of others, or has demonstrated a lack of remorse because of information that the government presents in support of another aggravating circumstance alleged in the death notice, such as obstruction of justice.

*Motion* at 3-4. Accordingly, Petitioner's counsel requested that limits be placed on the

Government's ability to present argument and/or evidence in support of aggravating

circumstances that **were not** withdrawn that might have a bearing on future dangerousness.

Petitioner's counsel further argued that the Government should be precluded from introducing

evidence or making argument that the "defendant has engaged in a continuing pattern of violent

conduct, including but not limited to one or more of the" eight acts that the Government had

alleged were evidence of Petitioner's future dangerousness.

205. The Government answered this *Motion*, in a pleading styled: *Government's*

*Response to Defendant's Motion to Limit Argument by the Government During the Penalty*

*Phase* (filed on or about October 17, 2000). In this *Response*, the Government reiterated that it

did not intend to pursue the future dangerousness factor, including the related points regarding

Petitioner's "low rehabilitative potential" or his "demonstrated lack of remorse." *Response* at 1-

2. The Government also stated that it did not intend to introduce in its case-in-chief evidence of

7 of the 8 acts that it had alleged constituted the evidence supporting future dangerousness, but

75

10/18/00, 37. Petitioner's counsel voluntarily withdrews circumstance number eight because of fears that it would open the door to bad act evidence.[20] This left Petitioner with precious little to offer, and nothing related to the real mitigating evidence extant in Petitioner's background.

209.    After the Government's motion to strike, Petitioner was left with only 6 factors, only one of which was related to Petitioner's childhood upbringing and background:

1.    An equally culpable defendant in this case received a life sentence;

2.    Petitioner was not the sole proximate cause of the victims' deaths;

7.    Petitioner was intoxicated at the time of the offense;

9.    Petitioner's family history, including the loss of his mother at an early age and abandonment by his father, influenced the direction of his life;

10.    A sentence of death will have an adverse impact on Dustin's son.

11.    There are other factors in Petitioner's background that mitigate against a death sentence.

In view of counsels' deficient penalty investigation, it is no surprise that only one of the eleven proposed mitigating factors related to Petitioner's background and history.

210.    With that, the Court returned to a discussion of what mitigating factors the defense would produce and argue. When the defense indicated that it might offer evidence that Petitioner's life in prison would have value, for instance, because of an on-going relationship with his son, the Court noted that such a presentation could be "risky" and would likely open the door to bad act rebuttal:

---

[20]The mitigating circumstances that the Government successfully had stricken were: 3) that death would be arbitrary because Petitioner did not know he was on federal land; 4) life without parole was a fitting punishment; 5) life without parole will mean that Petitioner would die in prison; and 6) execution of Petitioner would not act as a deterrent to others. Number 8, which was withdrawn, was that there was potential value in the remainder of Petitioner's life.

I mean, you propose it and there's still got to be a historical predicate for saying that there is anything positive about this man's relationship. You have to say something about good things he's done in the past, or positive things, to be able to argue that.

Id. at 35. The Government agreed with the Court's assessment:

[I]f counsel is going to argue or present as a mitigator that there is potential value in the remainder of Dustin Higgs' life as a federal prisoner, we are entitled to show why there is not value, and the best way to do that is to show how he has behaved as a prisoner in facilities in the past.

Id. The Court reiterated its agreement with the Government's position: "I don't know how you escape it . . . I don't know how you keep it out." id. at 36. Accordingly, defense counsel withdrew the mitigating circumstance regarding the value of Petitioner's life in prison. Id., 37. But, the Court still wanted to address what other mitigating factors would be presented, and whether they would open any doors to a Government rebuttal. Id.

211. The parties did not dispute that the Government would be permitted to introduce evidence regarding the Cherry Lane shooting. Id., at 40. However, there was argument regarding whether evidence could be introduced regarding Petitioner's alleged intimidation of Mr. Diolamou in regard to the Chaconia shooting, as it related to Petitioner's obstruction of justice. The Court permitted introduction of this evidence. Id., at 41-50.

212. The Court next addressed Petitioner's motion seeking an instruction that he was not a future danger, and that he did have rehabilitative potential and was remorseful. Id. at 51-2. The Court correctly noted that such an instruction would be premature because "I don't know where you are going to go in your case." Id., at 52.

213. Thus, through the Government's proffers and arguments, and the Court's repeated warnings about how Petitioner's presentation could open doors to damaging rebuttal evidence, defense counsel persisted in their hope that they could keep out the damaging evidence while

78

salvaging something of a presentation. Petitioner's counsel had made "decisions" based upon the Government's withdrawal of future dangerousness, yet, as it turned out, those decisions were mere hollow wishes.

214.    Following Petitioner's presentation, the Government was prepared to begin its rebuttal case. Counsel attempted to preclude the introduction of certain bad act evidence, which counsel believed was not to be introduced because it was relevant only to future dangerousness. TT 10/24/00, 7 ("What they are seeking to do is to introduce everything that they had in support of future dangerousness now as rebuttal. It puts us in an impossible situation to rebut that"). Counsel argued that since their mitigation presentation only addressed Petitioner's life from before the age of 18, that somehow, this limited the Government's right of rebuttal. This was correctly rejected by the Court. Instead, the Court summarized the mitigation presentation, and showed how the Government's proposed rebuttal case was relevant and proper:

> When you put on your case about who he was, I got the impression, and fairly from the way you put it on, that he had this childhood, that there was some trouble that he went through with loss of figures close to him, that he has a child that he cares about. I mean all these sort of positive things about who Higgs is, Mr. Higgs is you went through. The government only wants to show that is not who Higgs is. Now, you call it future dangerousness.

Id., at 8-9. As the argument proceeded, defense counsel admitted that perhaps they had opened the door to the Government's rebuttal. Id., at 11 ("maybe perhaps we have opened the door to rebuttal evidence").

215.    In the final analysis, the Government was able to introduce all of the evidence that they had noticed in the their death notice related to future dangerousness, along with many other bad acts that occurred while Petitioner was incarcerated. TT 10/25/00, 83-102. Defense counsel was utterly and deficiently unprepared to deal with what had occurred. They presented

79

little by way of mitigating evidence, and they did not have any mental health evidence available to counter the Government's rebuttal case.

### C. Counsels' Deficient Performance Caused Petitioner Prejudice.

216. There are two clear measures of the prejudice caused by counsels' deficient performance. First, counsel's closing argument in penalty covered almost nothing about mitigating factor nine (which had been renumbered as **four** on the verdict sheet: that Petitioner's family history and loss of his mother at an early age and abandonment by his father, influenced the direction of his life). Instead, closing argument consisted almost entirely of generalized appeals against capital punishment and arguments that Willis Haynes was equally culpable and did not receive a death sentence. That counsel did not address Petitioner's background and history comes as no surprise – there was nothing to talk about since counsel failed to prove much if anything in this regard. The second measure is that not one juror found mitigating factor number **four**: that Petitioner' early life experiences "influenced the direction of his life." TT 10/26/00, 9-10.

217. In assessing prejudice, this Court need only keep in mind the powerful unpresented mitigation discussed herein, and ask whether there was a reasonable probability (defined as less than a preponderance of the evidence) that even one juror would have been persuaded to vote for life had the unpresented mitigation been shared with the juror.

218. The answer to this question is a resounding "yes." Petitioner's penalty phase was far from constitutionally adequate and the reason for that rests with trial counsel.

CLAIM VII. THE FEDERAL DEATH PENALTY, AS ADMINISTERED, VIOLATES THE FIFTH AND EIGHTH AMENDMENTS, AND TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO CHALLENGE THE DEATH PENALTY ON THIS GROUND.

219. Some twenty years ago, the federal death penalty was reintroduced; since then it

has been used as a tool of federal law enforcement with escalating frequency. Statistics maintained by the Federal Death Penalty Resource Counsel (FDPRC) as a part of its mandate to facilitate the effective defense of federal capital cases demonstrate that the authorization process by which the Department of Justice (DOJ) selects those defendants who will face the death penalty, and subsequent Government decision-making regarding whether to accept pleas to sentences less than death, are impermissibly influenced by the defendant's race, in violation of equal protection and the Eighth Amendment. The statistics maintained by FDPRC as of the time of Petitioner's prosecution, indicate the following:

- Of the one hundred and ninety-nine (199) individuals against whom the DOJ has authorized or directed local authorities to seek the death penalty, seventy-six percent (76%) are non-white and fifty-two percent (52%) are black;

- The death penalty is authorized by the DOJ more than three times as often against non-whites as against whites; the death penalty is authorized by the DOJ more than twice as often against blacks as against whites;

- Of those cases for which DOJ has authorized the death penalty to be sought, 47.5% of all white defendants obtain a plea resulting in a sentence less than death, while only 27.2% of all blacks are permitted to plead to sentences less than death and only 29.1% of non-whites as a whole are permitted to plead guilty in exchange for a sentence less than death;

- White defendants thus receive non-death sentences in exchange for pleas at 1.7 times the rate of black defendants and 1.65 times the rate of non-white defendants as a whole;

- There are three times as many blacks, and four times as many non-whites, as whites among the condemned on the federal death row.

220. Current statistics from the FDPRC show that matters have not changed for the better. As of November 15, 2005 of the 362 people for whom the DOJ authorized a capital prosecution, 52% are African American, 17% are Latino, while only 26% are Caucasian. Thus, of the 392 prosecutions, 69% were against people of color.

221. These statistics create a startlingly strong inference that Government decisions regarding who will face the death penalty – at both the selection stage and the plea bargaining stage – are impermissibly influenced by the race of the defendant. The disparate impact of these decisions is clear – despite the fact that whites are arrested for homicide in roughly the same numbers as blacks, they occupy only twenty percent of those condemned to die under federal law, while blacks account for sixty percent of federal death row.

222. The information cited above was available to trial counsel from the Federal Death Penalty Resource Counsel by or before the time of trial. Trial counsel's failure to obtain the information and pursue a viable pre-trial challenge to the Government's racially discriminatory actions was deficient performance. Had counsel performed effectively, it is reasonably likely that the Government would have been precluded from seeking death.

223. Alternatively, the current statistics regarding the application of the federal death penalty constitute new evidence that warrants review of this claim. Although a racially disproportionate pattern of capital charging, standing alone, may be insufficient to demonstrate purposeful discrimination on the basis of race, the numbers here warrant discovery and an evidentiary hearing concerning the Government's authorization process and plea bargaining decisions. Accordingly, Petitioner will pursue both remedies in a to-be-filed motion.

224. Petitioner has proffered evidence that shows that the racial discrepancy present in the administration of the Federal Death Penalty Act, is the work of a single decision maker, i.e. the DOJ. This fact renders the numbers revealed by the attached statistics all the more probative of discrimination. The Court should grant relief from Mr. Higgs' death sentence because the Government's charging and plea practices are influenced by the race of defendants and victims, in violation of the Fifth, Eighth, and Fourteenth Amendments.

82

**CLAIM VIII. TRIAL COUNSEL INEFFECTIVELY FAILED TO OBJECT TO THE ADMISSION OF CO-DEFENDANT WILLIS HAYNES' CONFESSION DURING THE PENALTY PHASE OF PETITIONER'S TRIAL ON FIFTH AND SIXTH AMENDMENT GROUNDS.**

225. Trial counsel failed to object properly during the penalty phase of trial to the admission of statements of co-defendant Willis Haynes, admitted through the testimony of Captain Robert Rule of the United States Park Police. Captain Robert Rule testified that, according to co-defendant Willis Haynes: "After they returned to Mr. Higgs' apartment at the end of the evening . . . they went into the apartment, began cleaning up the apartment and throwing out various items" TT 10/18/00, 150. As to the "murder weapon . . . Mr. Higgs drove the van down to Anticostia [sic] Park and pulled over on a spot on Anticostia [sic] Drive not far from the Anticostia [sic] Rec Center pool, and [Mr. Haynes] ran and threw the gun into the river." Id. at 150-51. Captain Rule thus supplied critical evidence concerning the obstruction of justice aggravating circumstance, eventually found and weighed by the jury.

226. Mr. Haynes' statements were made to a law enforcement officer in the midst of a custodial interrogation. TT 10/18/00, 149-50. They therefore fall within the core class of statements deemed testimonial by the Supreme Court. Petitioner had no opportunity to cross-examine Mr. Haynes. Accordingly, the admission of Mr. Haynes' statements violated Petitioner's right to Confrontation under the Sixth Amendment of the United States Constitution. id. at 68-69. Moreover, since Haynes – as any codefendant – had a strong motive to place blame on his codefendant and to curry favor with law enforcement, that portion of his confession which implicated Petitioner is presumptively unreliable.

227. Though the rules of evidence do not apply at sentencing, see 18 U.S.C. § 3593(c), it did not — and does not — follow that the Confrontation Clause does not apply. It does apply, and prohibits the introduction of a co-defendant's confession during sentencing in a capital case,

83

especially where that confession inculpates the defendant. This is particularly so, since such evidence is presumptively unreliable. Evidence too unreliable to be considered during a guilt phase proceeding, cannot be constitutionally considered during a penalty hearing, when the need for reliable decision making is at its apex. The admission of co-defendant Haynes' presumptively unreliable confession during the penalty phase of Petitioner's trial violated Petitioner's Sixth Amendment right to Confrontation.

228. The introduction of Mr. Haynes' presumptively unreliable confession during sentencing also violated Petitioner's Due Process right under the Fifth Amendment to be sentenced on the basis of reliable information.

229. At the time of Petitioner's trial, clearly established law barred the admission of presumptively unreliable evidence during the penalty phase of a capital case. Because Mr. Haynes' confession clearly inculpated Petitioner and was an important piece of evidence establishing the obstruction of justice aggravating circumstance, trial counsel had no reasonable basis for failing to object to the admission of Captain Rule's testimony on Fifth and especially Sixth Amendment grounds.

230. The deficiency in counsel's performance is especially pronounced because counsel raised other objections to the admission of this evidence. TT 10/18/00, 149 (objecting that the admission of Willis Haynes' statement is "more prejudicial than probative"). Counsel thus considered this evidence, recognized its substantial prejudicial effect, and sought to prevent its admission. Yet counsel failed to articulate a Fifth and/or Sixth Amendment basis for the objection. Counsel's failure, especially considered alongside counsel's unreasonable failure to object to the admission of Mr. Haynes' confession during the guilt phase of the trial, constitutes constitutionally deficient performance.

84

231. Petitioner acknowledges that the Fourth Circuit considered his Sixth Amendment claim on direct appeal. However, because trial counsel never raised the Fifth and/or Sixth Amendment grounds, those arguments were waived in the Court of Appeals. Thus, the Court's review was conducted under the more rigorous plain error doctrine. Since one of the trial counsel also represented Petitioner on direct appeal, he was precluded from raising his own ineffective failure to raise this claim under the proper legal theory. Now that Petitioner can and is raising this claim as one of ineffectiveness, *de novo* review of the Fourth Circuit's ruling is required. Counsels' failure to raise the correct objection, alone or in combination with other of counsels' errors, was ineffective, and the death sentences must be vacated.

**CLAIM IX.   THE VICTIM IMPACT EVIDENCE, ARGUMENT AND INSTRUCTION ALLOWED THE SENTENCING JURY TO CONSIDER VICTIM FAMILY MEMBERS' VIEWS AS TO THE APPROPRIATE SENTENCE, AND WERE EXCESSIVELY EMOTIONAL AND DUPLICATIVE, IN VIOLATION OF THE EIGHTH AMENDMENT.**

**A.   The Victim Impact Evidence.**

232. The Government presented six victim impact witnesses at the penalty phase of the trial – Tamika Black's mother, Joyce Gaston, and paternal grandfather, Robert Black; Tanji Jackson's mother, Denise Thompson, and aunt, Deborah Blue; and Mishann Chinn's parents, Krishana and Michael Chinn. The testimony of these witnesses consumed sixty-seven (67) pages of transcript and involved introduction of videotapes and photographs of the victims and their families, as well as writings by the victims. See TT 10/19/00, 81-148.

233. Taken together, the evidence presented by these witnesses interjected a constitutionally intolerable level of emotion into the sentencing proceeding and created a corresponding risk that Mr. Higgs' sentence was the product of emotion overwhelming reason.

234. No reasonable person could fail to be affected by the emotional impact of this

testimony, which focused primarily on describing in detail the many good qualities of the victims, and the suffering their family members had endured since each victim's death.

a. **Joyce Gaston** read a lengthy prepared statement. The entire statement is highly emotional; on several occasions, Ms. Gaston had to pause while reading it to control her own emotions. In her statement, Ms. Gaston told the jury that, as a child, Tamika played with stuffed animals and called them "her good students, " TT 10/19/00, 83; that she "loved kids" and "wanted to be a child psychologist," id. at 84; that Tamika's brother, Sterling, "till this day would not talk about what happened to his sister to me," id. at 85-86; that she had been "saying my daughter was murdered for four years," but that the "pain hurts me like it was yesterday." Id. at 86. Ms Gaston also talked at length about her phobia concerning the color yellow and the yellow jacket Tamika was wearing the night she was killed, id. at 88; described how "when the detective told me what happened I fell to the ground and I screamed," id. at 89; and concluded, "I'm looking for the day when our hearts have some joy, not despair." Id. at 90.

b. **Robert Black** gave additional details about the emotional effect of Ms. Black's death on her extended family. He told the jury that Ms. Black's father had been unable to attend the trial because "he just couldn't handle it, it is too much of a hurt." TT 10/19/00, 93. He also told the jury about the "big sister" role Tamika played with her younger siblings and cousins. Id. at 95-96. He talked about Tamika's work as a teacher's aide, saying, "It was what she was put on this earth for, to help others, and children was really her dream." Id. at 97-98. He introduced and read excerpts from a package of letters from fourth grade children at the school where she worked, id. at 98-100, and a letter of commendation from her supervisor. Id. at 102. Mr. Black also introduced and described video and still photographs of Tamika and her extended family. Id. at 104-06. Mr. Black read an obituary notice prepared by the family. Id. at

86

106-08. Finally, he told the jury that the entire family "will never be the same because of this terrible loss." Id. at 109.

      c.     **Denise Thompson** introduced a videotape of Tanji Jackson with family members, TT 10/19/00, 112-13, and read a statement. Id. at 114-15. In the statement, Ms. Thompson described how she "had to identify [Tanji's body] by her thumb because she sucked her thumb as a child"; described how after Tanji's death she "became dehydrated" and "ended up in the hospital" because she "had stopped enjoying life, stopped doing things"; and concluded:

> Right now I feel like a mother not only with a child that is dead, but also missing. She had no face for me to place with her body. I have yet to say good-bye.
>
> I am not ready to deal with this reality yet. I cannot at this time deal with the hurt. I do not want to think about the fear and pain yet.

Id. at 115.

      d.     **Deborah Blue** described the closeness of Tanji's extended family. In particular, she described that her husband was "like a father" to Tanji, and how Tanji took care of him when he was dying of cancer. TT 10/19/00, 118. She also told the jury that Tanji and her mother, Denise, had an argument the night Tanji was killed, "and this time they didn't have that chance to make up. My sister, from then on, she stopped doing everything." Id. at 120. Ms. Blue described how Tanji's sister Nikki "right to this day is still devastated over the loss of her sister." Id. Ms. Blue introduced photographs of Tanji and family members, and read the obituary composed by Tanji's family. Id. at 121-22. Finally, Ms. Blue read a religious poem written by Tanji. Id. at 123-24.

      e.     **Krishana Chinn** described her daughter's many good qualities: "family-oriented"; "trusting"; her love for children and senior citizens; how she helped with her

grandmother who had Alzheimer's. TT 10/19/00, 127-28. After Mishann was killed, Krishana

"couldn't take care of myself" or her own mother, and therefore:

> [H]ad to do what I always thought in my life was unspeakable. I had to put my mother in
> a nursing home. That's the second hardest thing I ever had to do in my life, the first one
> being having to bury my child.
>
> But I put my mother in a nursing home. Alzheimer's and all, from time to time
> when I visit her, she is still asking me about Mishann. Where is Mishann? It
> used to really, really emotionally just disturb me.

Id. at 129.

Krishana further described how devastated she was personally by Mishann's death, and

how her "marriage almost didn't survive," because her husband Michael "had no tolerance" for

their younger daughter, Sheena, since "he couldn't make her be Mishann." TT 10/19/00, 130.

As a result, she described their house as "like a morgue, ... just like a constant wake." Sheena

moved away because "it was overwhelming for her." Id. at 130-31. After moving out, Sheena

would bring her son over, but still "can't spend any significant time in the house." Id. at 131.

Krishana blames herself for having rebuked Sheena for signing Christmas cards "from Sheena

and Mishann in spirit," and "cannot stand Mother's Day." Id. at 132.

Krishana introduced a videotape and photographs of Mishann and other family members.

Id. at 134-36. She read an obituary notice that emphasized Mishann's many good qualities. Id.

at 136-38. Finally, she read a poem in Mishann's handwriting, about love. Id. at 138-40.

      f.     **Michael Chinn** told the jury that the words "always loving, always

caring" on Mishann's grave summed up her life. TT 10/19/00, 142. He described Mishann as

"the one that pulled everybody together" when there was conflict in the family. Id. at 143. He

told the jury that Mishann was his friend as well as his daughter, and that she was getting her life

together at the time she was killed. Id. at 145. He finished by telling the jury that even when she

was angry at him, she slipped him a card telling him how much she loved him.  Id.

**B.     The Victim Impact Argument.**

235.     Emotional features of the victim impact evidence were the centerpiece of the

Government's argument for death.  Prosecutor Wilkinson introduced the topic as follows:

> Mr. Chinn told you how he lost a friend and Mrs. Chinn a daughter, Mr. Black a
> granddaughter, and they tried to be as honest and forthcoming as they were,
> knowing that their hearts had been blown away and they were living in hell as a
> result of this man's actions.
>
> How do I get you to take that back, that **feeling** back into the jury room with you
> so you can **weigh** it?  I can't put an exhibit sticker on Mrs. Chinn's heart.  I can't
> put an exhibit sticker on Mrs. Gaston's pain or Mrs. Thompson's guilt.  How can
> you weigh, how does one weigh the impact of a child's death upon a parent and
> the other siblings?
>
> When I was driving to work all I could think of was this analogy, that this is what
> these family members are carrying around with them.[21]  This, this is the weight
> of the death of those families because of this man's actions.  This is what you
> must carry back with you to the jury room.  You might as well put this on a chain
> around Mrs. Chinn's neck for the rest of her life.  The guilt and the pain is so
> heavy, we cannot imagine that.

TT 10/25/00, 15.

> 236.     After a brief digression, Ms. Wilkinson returned to this theme:
>
> And you are entitled under the law to weigh that, the impact of that.  You are
> entitled to take this rock with you back there and **feel what these families are
> going through now** five years after these girls are dead **and relive it**, seeing the
> autopsy pictures, seeing the clothing, having to describe going to the morgue and
> identifying your daughter by her thumb because she has no face.  You are entitled
> to take that back with you to your jury deliberations.

TT 10/25/00, 16.

237.     The Government then used the victim impact evidence to denigrate the mitigating

---

[21]At this point, Ms. Wilkinson apparently brought out a heavy rock.  See TT 10/25/00, 16 ("You
are entitled to take this rock with you back [to the jury room]").

evidence offered by Petitioner. For example, Ms. Wilkinson argued that the proffered mitigating factor that Mr. Higgs was not the sole proximate cause of the victims' death "doesn't mitigate, doesn't make less what happened, doesn't chip one little bit off of this rock." TT 10/25/00, 18. She told the jury that the mitigating circumstance that Mr. Higgs' mother died when he was ten was a "cowardly mitigating circumstance." Id. at 19. And she told the jury that the impact of Mr. Higgs' execution on his own son was irrelevant because Mr. Higgs "ripped the right of these three young women to have children." Id. at 21. Finally, Ms. Wilkinson argued that the proffered statutory mitigating circumstance that Petitioner's equally culpable co-defendant received a life sentence should not be considered because it "does not do justice" to the victims. Id. at 24.

238. The Government returned even more egregiously to its theme of victim impact in its rebuttal argument. There, the prosecution strongly implied that the family members wanted Mr. Higgs to be executed, thus tying together all of the emotional testimony and evidence that preceded it in one unifying plea for death:

> [The defense] says [life imprisonment is] punishment....
>
> You ask each one of the family members here what they wouldn't give for their daughters to be in Lewisburg Penitentiary rather than where they are.

TT 10/25/00, 73.

**C.      The Victim Impact Instructions.**

239. This Court instructed the jury as follows concerning the victim impact aggravating factor:

> The defendant, it is alleged, caused injury, harm or loss to the victim and the victim's family because of the effect of the offense on the victim, the victim's personal characteristics as an individual human being, and the impact of the death upon the victim and the victim's family....

*     *     *

> To establish this factor, the government must prove that the defendant caused injury, harm and loss to the victim and the victim's family as a result of killing the victim.
>
> The effect of the offense on the victim means the specifically (sic) harm to the victim caused by the defendant.
>
> The victim's personal characteristics as an individual human being means who the victim was in life and those aspects of the victim's character and personality that her family would miss the most.
>
> The impact of the death upon the victim and the victim's family means the extent and scope of the injury and loss suffered by the victim and the victim's family.

TT 10/25/00, 168-70.

### D.     The Constitutional Violations.

240.    Based on the evidence presented, the Government's arguments, and the jury court's instructions, the jurors unanimously found the victim impact aggravating factor and weighed it against the mitigating factors. Relying in part on the victim impact aggravating factor, the jury unanimously imposed nine death sentences on Petitioner (three for each victim). See Higgs-1, 353 F.3d at 295. The victim impact aggravating factor was constitutionally invalid, for several reasons.

241.    First, the level of emotion presented by the impact evidence violated the Eighth Amendment. While such evidence is not precluded by the Eighth Amendment, the prohibition against cruel and unusual punishment still requires that the capital jury return a reliable and individualized sentence. That function was impeded by the highly emotional presentation.

242.    Second, the prosecutors' closing argument in effect told the jury to impose a death sentence because that is what was desired by the victims' families. That sort of an appeal is also precluded by the Eighth Amendment.

91

243. Third, under the Eighth Amendment, an aggravating factor is invalid if it fails to guide the sentencing jury's discretion. Here, both the victim impact aggravating factor itself, and the instructions provided by the trial court, gave the jury no guidance whatsoever as to how to apply the victim impact factor.

244. Not only does the victim impact aggravating factor, as described by the trial court – a showing that "the defendant caused injury, harm and loss to the victim and victim's family as a result of killing the victim," TT 10/25/00, 170 – obviously apply in every case of murder, but that factor was also portrayed by the Government as an enormous rock that per se outweighed any mitigation that the defense had produced or could produce. The result was that the tail wagged the dog – the fact that Mr. Higgs committed a murder virtually required that the death sentence be imposed, according to the Government. This Court gave the jury no instruction to guide it or mitigate the impact of the Government's argument. The resulting death sentence violates the Eighth Amendment.

245. Finally, trial and appellate counsel were ineffective for failing to object to the introduction of the evidence and testimony, for failing to object to the arguments and for failing to object to this Court's instructions on the victim impact evidence.

**CLAIM X.** **THE SUBMISSION OF MR. HIGGS' PRIOR CONVICTION FOR ASSAULT AND RECKLESS ENDANGERMENT AS A STATUTORY AGGRAVATING FACTOR UNDER 18 U.S.C. § 3592(C)(2) (PREVIOUS CONVICTION FOR FELONY INVOLVING FIREARM) VIOLATED THE EIGHTH AMENDMENT AND DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT, BECAUSE (1) THESE OFFENSES DID NOT NECESSARILY INVOLVE USE OF A FIREARM, AND (2) THE CONVICTION FOR THESE OFFENSES DID NOT TAKE PLACE PREVIOUS TO THE INSTANT OFFENSE. DEFENSE COUNSEL WAS INEFFECTIVE AT TRIAL AND ON APPEAL FOR NOT MAKING THE PROPER OBJECTIONS AND ARGUMENTS.**

246. During the penalty phase, the Government was permitted to submit as an aggravating factor Mr. Higgs' prior conviction for assault and reckless endangerment arising

92

from an incident at Cherry Lane in Laurel, Maryland, on December 10, 1995, for which Mr. Higgs was convicted in April, 1997. TT 2/10/00, 10-35; 10/24/00, 157. The Government submitted this conviction as a statutory aggravating factor under 18 U.S.C. § 3592(c)(2), which applies if the defendant "has previously been convicted of [a felony offense] involving the use or attempted or threatened use of a firearm . . . against another person."

247.    The use of this prior conviction as a statutory aggravating factor violated the Fifth and Eighth Amendments for two reasons. First, the state charges of assault and reckless endangerment do not necessarily involve use of a gun. The guilty plea therefore did not constitute a conclusive judicial determination that a gun was "involved." Indeed, Mr. Higgs denied he possessed a .38 caliber gun during the guilty plea colloquy, and then stated, "It was the other way around." TT 10/04/00, 178. The state court judge never addressed or clarified Mr. Higgs' denial of the possession of the gun, and thus this factual dispute was not resolved. Second, this conviction was not previous to the instant offense.

248.    Regarding the first reason, both this Court and Court of Appeals did not apply a "categorical approach," for determining whether this prior conviction involved the use of a firearm. Under this approach, the court should look only to the elements of the offense of conviction to determine whether the fact in question – in this case use of a firearm – was necessarily found by the fact-finder. In the context of a guilty plea, the court can also consider the statement of the factual basis for the plea, to the extent that the defendant admitted or adopted those factual allegations in admitting to the elements of the offense. The court should not rely on other allegations in the record that were not judicially determined to be true.

249.    The Court of Appeals rejected the application of the categorical approach on the ground that this approach is not required for § 3592(c)(2) since this section applies to prior

93

convictions "**involving** the use or attempted use or threatened use of a firearm." The Court of Appeals concluded that the use of the word "involve[s]" requires the court to look beyond the elements of the offense to the offense conduct itself. Higgs -1, at 316.

250. But in a recent published opinion, the Court of Appeals has taken a contrary position. In United States v. Washington, 404 F.3d 834 (4th Cir. 2005), the Fourth Circuit recognized that the categorical approach is of "Sixth Amendment significance," and held that it applies even when the word "involves" is used. Id. at 840-41. The Court ruled that, for purposes of enhancement under the federal sentencing guidelines, the categorical approach applies to the determination of whether the defendant has a conviction for an offense which "otherwise *involves* conduct that presents a serious potential risk of physical injury to another." USSG § 4B1.2(a)(2), Washington, 404 F.3d at 842.

251. The Fourth Circuit's ruling in Washington applies to the federal death penalty statute and constitutes an intervening change in the law cognizable on a § 2255 motion. This ruling compels the conclusion that the offenses of assault and reckless endangerment do not necessarily involve the use of a firearm, and that therefore Mr. Higgs' conviction for these offenses should not have been presented to the jury as an aggravating factor under 18 U.S.C. § 3592(c)(2). Given Washington's clear application to the statutory language involved here, moreover, the failure to apply this ruling would render the death penalty in this case arbitrary and capricious in violation of the Eighth Amendment.

252. Thus the jury's finding and weighing of this statutory aggravating factor violates the Eighth Amendment. In a weighing death penalty statute, such as the FDPA, statutory aggravating factors play two roles: 1) they limit the universe of those eligible for death; and 2) they are weighed against mitigating factors to determine death-selection. When the scope of an

aggravating factor is expanded beyond its plain meaning, as the factor was in this case, both roles are arbitrarily compromised. The jury's finding and weighing of the factor, thus violates the Eighth Amendment.

253. Although counsel did object to this factor and argued that the categorical approach applied, to the extent that counsel did not also argue in the district court and on appeal that Mr. Higgs' Sixth Amendment rights were violated by consideration of this prior conviction as a statutory aggravator, counsel was ineffective.

254. The second reason for which the assault and reckless endangerment conviction should not have been submitted as an aggravating factor is that Mr. Higgs did not receive this conviction **previous to** the instant offenses. The word "previously" as used in the statute can only be understood as meaning "previous to" the "offense" for which death is sought, since this "offense" is the only other event referred to in § 3592(c)(2) and § 3592(c). Moreover, to interpret this term as requiring only that the conviction be previous to the instant penalty phase hearing would be to reduce the word "previously" to mere surplusage. When the scope of an aggravating factor is expanded beyond its plain meaning, as the factor was in this case, both roles that the factor plays are arbitrarily compromised. The jury's finding and weighing of the factor, thus violates the Eighth Amendment.

255. Counsel was ineffective for failing to raise these arguments either before this Court or in the Court of Appeals.

**Claim XI.** **THE SUBMISSION OF MR. HIGGS' CONVICTION FOR VIOLATION OF THE FEDERAL DRUG STATUTE IN 1997 AS AN AGGRAVATING FACTOR UNDER 18 U.S.C. § 3592(C)(12) VIOLATED THE EIGHT AMENDMENT BECAUSE THIS SUBSECTION ONLY APPLIES TO FEDERAL DRUG CONVICTIONS FOR WHICH MR. HIGGS "HAD PREVIOUSLY BEEN CONVICTED," AND THIS LANGUAGE MEANS THE CONVICTION HAD TO HAVE TAKEN PLACE PRIOR TO THE INSTANT OFFENSE, WHICH OCCURRED IN 1996.**

95

256. The homicides in this case occurred on January 27, 1996. Mr. Higgs was subsequently convicted of violating the federal drug statutes for conduct that post-dated January 27, 1996. On May 12, 1997, Mr. Higgs pleaded guilty to these federal drug offenses, and the judgment was entered on December 9, 1997. The Government was allowed to submit this conviction as a statutory aggravating factor under 18 U.S.C. § 3592(c)(12), which applies only if the defendant "had **previously** been convicted of" a federal drug offense for which the sentence could be five or more years in prison. TT 2/10/00 78-104; 10/24/00 157-58. Under the plain language of the statute and a recent decision of the Court of Appeals for the Fourth Circuit, this conviction should not have been permitted as a statutory aggravating factor because it did not occur prior to the instant offense.

257. Counsel raised this issue in the district court and the Court of Appeals, arguing that under a plain reading of the statute, the phrase "had previously" must be interpreted as requiring that the federal drug conviction have been entered prior to the commission of the instant offense. Any other interpretation renders these words mere surplusage. The Court of Appeals rejected this argument, reasoning that this provision applies to all federal drug offenses occurring prior to sentencing. Higgs -1, at 317-18.

258. More recently, however, the Fourth Circuit has taken a contrary position with regard to the similar recidivist enhancement language in the Armed Career Criminal Act, 18 U.S.C. § 924(e)(1). In United States v. Pressley, 359 F.3d 347 (4th Cir. 2004), the court ruled that the phrase "three previous convictions," which triggers a 15 year mandatory minimum sentence for a § 922(g) violation, must be read as requiring that the three convictions be *previous to* the § 922(g) violation, since this is the only event mentioned in the statute that the word "previous" could refer to. Moreover, as the court explained, any other interpretation would

render the word "previous" mere surplusage. Id. at 350.

259.    There is no principled reason that Pressley's reasoning and interpretation of the word "previous" should not be equally applicable to § 3592(c)(12). The words "had previously been convicted of" can only be read as being in reference to the instant "offense" mentioned in § 3592(c), for which a sentence of death is justified by the enumerated factors, including § 3592(c)(12). The drug felony conviction thus must be **previous to** the instant "offense" for which death is sought. As in Pressley, any other interpretation would render the words "had previously" mere surplusage.

260.    The jury's finding and weighing of this statutory aggravating factor violates the Eighth Amendment. In a weighing death penalty statute, such as the FDPA, statutory aggravating factors play two roles: 1) they limit the universe of those eligible for death; and 2) they are weighed against mitigating factors to determine death-selection. When the scope of an aggravating factor is expanded beyond its plain meaning, as the factor was in this case, both roles are arbitrarily compromised and this element of arbitrariness violates the Eighth Amendment.

261.    Moreover, Pressley constitutes an intervening change in the law cognizable in a § 2255 motion. Given Pressley's clear application to the statutory language involved here, the failure to apply this ruling would also render the death penalty in this case arbitrary and capricious in violation of the Eighth Amendment.

**CLAIM XII.    THE FOURTH CIRCUIT IMPROPERLY ASSUMED THAT PRESENTATION OF THE INVALID "MULTIPLE KILLINGS" AGGRAVATING FACTOR TO THE JURY DID NOT INFECT THE JURY'S WEIGHING PROCESS, IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS.**

262.    The Fourth Circuit found that the "'multiple killings' aggravator was improperly

submitted to the jury as a statutory aggravating factor." <u>Higgs 1</u>, at 319. The Fourth Circuit held, however, that the error was harmless because the jury also found <u>other</u> statutory aggravating factors. <u>Id.</u> (citing and quoting <u>Zant v. Stephens</u>, 462 U.S. 862, 884 (1983)). In so ruling, the Fourth Circuit committed Eighth Amendment error.

263. The Federal Death Penalty Act is a weighing statute. In contrast, Georgia's sentencing statute, the application of which was reviewed in <u>Zant</u>, is a non-weighing statute. The difference is critical. In a weighing jurisdiction, the sentencer must weigh the aggravating factor or factors against the mitigating evidence, while in a non-weighing state such as Georgia, the factfinder takes into consideration all circumstances before it from both the guilt-innocence and the sentence phases of the trial.

264. Here, the Fourth Circuit incorrectly applied <u>Zant</u> to support its conclusion that no harm was caused by the weighing of an invalid aggravating factor. In other words, the Fourth Circuit held that presentation of an invalid statutory aggravating factor did not affect the sentencing decision, given the presence of other valid statutory aggravating factors. While such an assumption is permissible in a non-weighing state, it violates the Eighth Amendment in a weighing state.

265. Here, the Fourth Circuit simply assumed that the invalid "multiple killings" aggravating factor would not have made a difference in the weighing process. Such an assumption violates the Eighth Amendment in a weighing scheme like the Federal Death Penalty Act.

266. Since this error was committed by the Court of Appeals on direct review, Petitioner could obviously not raise it on direct appeal. He did, however, raise this in his *Petition for Rehearing and Suggestion for Rehearing En Banc* at 12-13. He also raised it in his

98

*Petition for Certiorari to the United States Supreme Court* at 28-31. However, since both rehearing and rehearing en banc, and a petition for certiorari, are highly discretionary, this is the first opportunity for Petitioner to present this plain legal error for review.

**CLAIM XIII. DEFENSE COUNSEL WERE INEFFECTIVE FOR FAILING TO INTERVIEW AND CALL AS WITNESSES GERALD VAUGHN AND KEVIN DARNELL ANDERSON.**

267.    Willis Haynes was tried before Mr. Higgs, and during the Haynes trial the government identified two witnesses, Gerald Vaughn and Kevin Darnell Anderson, who had been incarcerated with Haynes at the Charles County Detention Center. Both Vaughn and Anderson told the government that they had conversations with Haynes about the murders. Defense counsel were ineffective for failing to interview and call these two witnesses.

268.    Vaughn, who was called as a witness at the Haynes trial, testified that shortly after Haynes's arrest in the fall of 1998, Haynes told Vaughn that he had tricked the three women into getting into Higgs's van, and that Haynes had used a .38 caliber gun to kill them. United States v. Haynes, 26 Fed. Appx. 123, 128 (4th Cir. 2001) (unpublished opinion). Vaughn has also stated to Robert Durand, an investigator for counsel on the instant § 2255 motion, that Haynes never said that he had been ordered or forced to kill the women by someone else. Vaughn said Haynes bragged about the murders and said, "Them bitches ain't shit." Recalling a book which both Vaughn and Haynes had read in which a female character cheated on her boyfriend, Haynes told Vaughn, "That's exactly why I killed those bitches."

269.    Kevin Anderson was not called as a witness at the Haynes trial, but notes of his statements to government attorneys were submitted to the court under seal. According to these notes, Anderson told the prosecutors that he had seen a confrontation between Haynes and another inmate over use of a telephone. In response to the inmate's comment that "you think

[you're] big stuff because you killed [three] women," Haynes replied, "I'll kill whoever the f— I want to kill." Anderson also said that Haynes told him "he had to kill" one of the women because she may have "set him up." <u>Higgs -2</u>, at 6.

270. The testimony of Vaughn and Anderson would have been exculpatory at the guilt phase of Petitioner's trial because it would have supported the defense theory that Haynes, the actual triggerman, was acting for his own reasons and of his own accord in shooting the three women, and not at the behest of Petitioner. The testimony of these two witnesses would have similarly been mitigating during the penalty phase of Mr. Higgs's trial because it would have shown that Haynes was more culpable than Mr. Higgs, or at least that they were equally culpable. Their testimony thus would have been powerful support for the mitigating factor advanced by the defense that an equally culpable co-defendant had received a life sentence, and it would have helped to diminish Petitioner's overall level of culpability. In either event, these witnesses would have provided mitigating evidence.

271. Given the exculpatory and mitigating nature of these witnesses, counsel were ineffective under the Sixth Amendment for failing to interview and call them at either phase of trial.

**CLAIM XIV. PETITIONER'S DEATH SENTENCES VIOLATED THE FIFTH AND EIGHTH AMENDMENTS BECAUSE THE GOVERNMENT FAILED TO INDICT MR. HIGGS FOR THE AGGRAVATING FACTORS REQUIRED FOR A CAPITAL OFFENSE, OR FOR THE ADDITIONAL NON-STATUTORY FACTORS RELIED UPON BY THE GOVERNMENT DURING THE PENALTY PHASE.**

272. The indictment in this case made no mention of the federal death penalty and did not charge the aggravating factors required for a capital offense under 18 U.S.C. § 3592(c) or any of the additional non-statutory aggravating factors relied upon by the government during the penalty phase. This violated the Fifth and Eighth Amendments to the Constitution because any

100

facts that increase the penalty for a crime beyond the prescribed statutory maximum must also be charged in an indictment. The failure of the government to allege the aggravating factors in the indictment renders the death penalty in this case unconstitutional.

**CLAIM XV.** **PETITIONER'S DEATH SENTENCES WERE OBTAINED IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS BECAUSE THE COURT FAILED TO INSTRUCT THE JURY THAT IN REACHING ITS PENALTY VERDICT, IT MUST DETERMINE BEYOND A REASONABLE DOUBT WHETHER THE AGGRAVATING FACTORS OUTWEIGHED MITIGATING FACTORS, AND BECAUSE COUNSEL INEFFECTIVELY FAILED TO OBJECT TO THE IMPROPER INSTRUCTION OR TO PROPOSE A CONSTITUTIONAL INSTRUCTION.**

273. Although this Court instructed the jury that it must determine whether the government has proven the aggravating factors beyond a reasonable doubt, the court failed to instruct the jury that this reasonable doubt standard must also apply to the weighing of the aggravating and mitigating factors. The jury was provided with the following penalty phase instruction regarding the weighing process:

> You must decide in regard to each capital offense for which you have found the defendant guilty whether the aggravating factor or factors which have been found to exist for that offense sufficiently outweigh the mitigating factor or factors found to exist for that offense so as to justify imposing a sentence of death on the defendant for that offense; or in the absence of any mitigating factor or factors, whether the aggravating factors alone **are sufficient to justify** imposing a sentence of death on the defendant for that offense.

TT 10/24/00, 148. Further on, the jury was similarly instructed as follows:

> After you have decided upon the aggravating and mitigating factors that are present as to the defendant with regard to each offense, the law then requires you to weigh those factors and to decide whether you are unanimously persuaded that the aggravating factors sufficiently outweigh any mitigating factors to justify imposing a sentence of death.
>
> Even if you determine that no mitigating factors have been proven to exist, you must consider whether the aggravating factors that have been proven are themselves sufficient to justify imposing a sentence of death.

\*                                        \*                                        \*

> This is not a mechanical process. You should not simply count the number of aggravating and mitigating factors and reach a decision based upon which number is greater. Instead, you must consider the weight and value of each factor in making your decision.

TT 10/24/00, 176-77.

274. The failure to instruct the jury that it must determine beyond a reasonable doubt whether the aggravating factors sufficiently outweighed any mitigating factors, violated Mr. Higgs' Fifth Amendment right to due process and his Eighth Amendment right to be free of the arbitrary and capricious imposition of the death penalty. Before a statutory sentence enhancement can be imposed, the jury is required to have made all findings necessary for that enhancement beyond a reasonable doubt. Under the federal death penalty statute, no death penalty can be imposed unless the jury first finds that the aggravating factors "sufficiently outweigh" any mitigating factors. See 18 U.S.C. § 3593(e). Thus, since this weighing determination is one that triggers the enhanced penalty of death, it is a determination that must be made beyond a reasonable doubt.

275. Defense counsel for Mr. Higgs were ineffective for failing to object to this Court's weighing instruction, and for failing to propose a correct instruction requiring that this determination be made under the reasonable doubt standard.

276. Additionally, to the extent that the Court's instructions mirrored the Federal Death Penalty Act (see 18 U.S.C. § 3593(e)(3)) (requiring only that the aggravating factors "found to exist sufficiently outweigh" mitigating factors that are found), the FDPA unconstitutionally diminishes the Government's penalty phase burden and thus violates the Fifth and Eighth Amendments.

**CLAIM XVI. THE TRIAL COURT EXCLUDED FROM THE JURY'S CONSIDERATION AS A MITIGATING FACTOR THE FACT THAT A LIFE SENTENCE WOULD MEAN THAT**

**MR. HIGGS WOULD BE IMPRISONED TILL HE DIES, IN VIOLATION OF THE EIGHTH AMENDMENT; APPELLATE COUNSEL'S FAILURE TO RAISE THIS CLAIM DEPRIVED PETITIONER OF THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL.**

277. Under the Eighth Amendment, a capital sentencing jury may not be precluded from considering and giving effect to all relevant mitigating evidence.

278. The defense requested that the jury be instructed that it could consider the fact that Mr. Higgs, if sentenced to life in prison, would be imprisoned in a federal penitentiary until the day he dies. TT 10/18/00 at 19-20. The trial court declined to provide the requested instruction. Id. at 29.

279. A capital defendant's ineligiblity for parole is in itself a mitigating factor. Moreover, the reasonable inference that a life sentenced defendant would not pose a future danger to society is mitigating in the sense that it might serve as a basis for a sentence less than death. Therefore, evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered mitigating.

280. The trial court's refusal to instruct the jury that Petitioner's ineligibility for parole could be considered as a mitigating factor prevented the jury from considering and giving effect to relevant mitigating evidence, in violation of the Eighth Amendment.

281. The trial court's error was preserved and available to be raised on appeal. Appellate counsel, however, ineffectively failed to raise it.

282. Appellate counsel had no reasonable basis for failing to raise this obvious Eighth Amendment error. The Eighth Amendment requirement that the jury not be precluded from considering and giving effect to all relevant mitigating evidence was long-standing at the time of Petitioner's trial.

103

283.     Petitioner was prejudiced by appellate counsel's failure to raise this claim. Had appellate counsel raised the claim, it is reasonably likely that Petitioner's death sentence would have been vacated on direct appeal. Appellate counsel's ineffective failure to raise the claim deprived Petitioner of his due process right to the effective assistance of appellate counsel. Petitioner's death sentence should be vacated.

### CLAIM XVII. THE FOURTH CIRCUIT ERRED IN THE MATERIALITY ANALYSIS OF PETITIONER'S CLAIM UNDER BRADY V. MARYLAND.

284.     In the course of preparing his direct appeal to the Fourth Circuit, appellate counsel became aware of two witnesses – undisclosed by the Government to trial counsel – who had heard Petitioner's co-defendant Haynes make statements that cast Haynes' participation in the offense in a more culpable light than did the testimony of key Government witness Victor Gloria. Upon learning of these witnesses' statements, appellate counsel moved for a new trial and new sentencing hearing, alleging that the Government's failure to disclose the statements violated Brady v. Maryland, 373 U.S. 83 (1963). See Higgs-2, at 40-41. The trial court denied the motion, and the Fourth Circuit affirmed. Id. at 44.

285.     With respect to Petitioner's sentencing claim, the Fourth Circuit ruled that Petitioner was required to make the following showing as to materiality:

> [T]o establish materiality, Higgs was required to demonstrate a reasonable probability that the evidence would have persuaded a juror to reach the conclusion that Haynes was "equally culpable" to Higgs in the murders, *and* that this mitigating factor, combined with the others, would have tipped the balance and led the juror to also conclude that the mitigating factors outweighed the aggravating factors so as to foreclose the sentence of death.

Higgs-2, 95 Fed. Appx. at 43 (emphasis in original). The Fourth Circuit found that Petitioner could not meet that standard, and affirmed the district court's denial of relief on that basis. Id. at 44.

286. The standard applied by the Fourth Circuit, however, is incorrect. <u>Brady</u> materiality analysis does require a showing that it is reasonably probable that the result of the proceeding would have been different, had the evidence been disclosed to the defense.

287. In order to obtain a different result at sentencing, moreoever, Petitioner would not have been required to convince a juror "that the mitigating factors **outweighed** the aggravating factors so as to **foreclose** the sentence of death." Rather, as the trial court properly instructed the jury, any juror could have voted for life (requiring the imposition of a life sentence) if **not** "persuaded that the aggravating factors **sufficiently outweigh** any mitigating factors **to justify** imposing a sentence of death." TT 10/25/00, 176.

288. This is not a matter of mere semantics; how the inquiry is phrased is critically important, given the nature of the mitigating circumstance at issue – that Mr. Haynes and Mr. Higgs were equally culpable, but Mr. Haynes had received a life sentence. That mitigating circumstance – if established, as it likely would have been had the evidence been disclosed – does not in itself diminish the defendant's culpability. Rather, it shows that, despite the defendant's culpability, imposing death on him would be unfair – and therefore unjustified – given the more lenient treatment afforded his equally culpable co-defendant. Thus, its effect is at least as much on the justification for the death sentence as on the relative weight of the aggravating and mitigating factors.

289. Here, the Fourth Circuit opined that establishing the equal culpability mitigating factor would not have been sufficient to outweigh the aggravating factors. Assuming *arguendo* that is true, however, it is still reasonably likely that showing the equal culpability of Mr. Haynes would have convinced at least one juror that imposing a death sentence on Mr. Higgs was not

justified. On that basis, Petitioner has established materiality as to the sentencing hearing. Mr. Higgs is entitled to a new sentencing proceeding.

**CLAIM XVIII.** **TESTIMONY REGARDING PETITIONER'S POST-ARREST SILENCE VIOLATED PETITIONER'S RIGHTS UNDER THE FIFTH AND SIXTH AMENDMENTS.**

290. Dominic Williams was incarcerated with Petitioner during a portion of his pre-trial proceedings. He testified to various conversations between himself and Petitioner during which Petitioner's allegedly made admissions. TT 10/4/00, 29-53. One such conversation, however, implicated Petitioner's right to remain silent and his right to counsel.

291. Mr. Williams testified that Petitioner told him that he was visited by officers who wanted to see if he would cooperate against his co-defendant. According to Williams, Petitioner told him that he did not speak with the officers because he did not wish to. Id., at 42-43.

292. Petitioner had a Fifth Amendment right to remain silent at the time of this visit from law enforcement officials and he had a right to counsel under the Sixth Amendment. Accordingly, his rights under each were violated when Williams testified to his refusal to speak with them.

293. Trial and appellate counsel both failed to raise this claim either by objecting at trial or by raising it on direct appeal. There could have been no tactic or strategy for failing to object and/or raise this claim on appeal.

**CLAIM XIX.** **PETITIONER'S RIGHTS UNDER THE FIFTH AMENDMENT WERE VIOLATED DURING THE PENALTY PHASE WHEN THE COURT NEGLECTED TO INSTRUCT THE JURY TO DRAW NO ADVERSE INFERENCE FROM THE FACT THAT PETITIONER DID NOT TESTIFY.**

294. Petitioner did not testify at either the guilt or penalty phase of trial. During its guilt phase instruction, this Court told the jury to draw no adverse inference against Petitioner from the fact that he did not testify. TT 10/10/00, 44. This instruction was particularly

appropriate in view of the testimony and instructions that the Court gave in regard to adverse inferences that the jury could draw from Petitioner's silence during his conversation with Grayson. See TT 10/5/00, 49.

295. Counsel apparently did not see fit to request the same adverse inference instruction in the penalty phase. Petitioner's right to remain silent still applies in the sentencing phase of a capital prosecution. However, since the Court instructed the jury not to draw such an inference in the guilt phase, there was a constitutionally unacceptable risk that the jury would have found that the lack of such instruction meant that it **could** draw an adverse inference against Petitioner in the penalty phase.

296. Counsels' failure to request this instruction was ineffective, as there could be no sound tactic or strategy for not requesting this instruction in the second phase of trial after having requested it in the first. Again, counsels' failure in this regard was particularly egregious in view of the guilt phase instruction that the jury could draw such an adverse inference in regard to the Grayson conversation.

297. To the extent that Appellate counsel could raise trial counsels' ineffectiveness in view Mr. Sullivan's on-going representation of Petitioner on direct appeal, appellate counsel ineffectively failed to raise this claim on direct appeal as either one of ineffectiveness or for review as plain error.

**CLAIM XX. PETITIONER'S CONVICTIONS WERE OBTAINED IN VIOLATION OF THE FIFTH AND SIXTH AMENDMENTS BECAUSE THE GOVERNMENT FAILED TO PROVE BY SUFFICIENT AND COMPETENT EVIDENCE THAT THE OFFENSES OCCURRED WITHIN THE SPECIAL MARITIME AND TERRITORIAL JURISDICTION OF THE UNITED STATES. COUNSEL INEFFECTIVELY FAILED TO CHALLENGE THE GOVERNMENT'S INSUFFICIENT PROOF AND/OR TO OBJECT TO THE "EXPERT" OPINION TESTIMONY OF A WITNESS WHO WAS NEITHER TENDERED NOR ACCEPTED AS AN EXPERT WITNESS.**

298. As this Court is well aware, the killings of the three women took place in the Patuxent Wildlife Refuge. Equally clear, the defense did not concede the Government's jurisdiction over these offenses, but instead put the Government to its proof.

299. Federal jurisdiction over an offense is an element of a federal offense that must be proven beyond a reasonable doubt. Like any other element, jurisdiction must be proven by sufficient evidence. Here, there was a dearth of competent evidence proving the jurisdictional element.

300. The only proof of jurisdiction was introduced through the testimony of Douglas Vandergraft, who at the time of his testimony was the Chief Cartographer for the United States Fish and Wildlife Service. He had been in that position for less than one year at the time of his testimony. TT 10/5/00, 2. In response to a Government question as to whether he oversees the production of the Government's maps, he explained his duties as such:

> I am actually a one person section. The mapping is done by different regional offices. There are several of those throughout the United States and they send their maps into me and I maintain them in a National Status Atlas so that anytime we can look up the current land ownership of a particular holding by the Fish and Wildlife Service and **hopefully** that map will be current and up-to-date.

Id., at 3. Thus, at most – and assuming as Mr. Vandergraft "hoped" – the maps provided an up-to-date and current recording of who "owned" the land in question.

301. After reviewing the maps introduced by the Government (id., at 4-5), Mr. Vandergraft testified that they accurately reflected the "ownership and jurisdiction" of the United States over the lands in question in this case. Id., at 5. In response to a question as to whether a state easement for Route 197 "changed ownership or jurisdiction" Mr. Vandershaft opined that it did not. Id., at 7. He also testified to his opinion that the fact that the State of Maryland maintains the roadbed of Route 197 does not "effect" jurisdiction. Id.

108

302. He provided further opinions about the significance of the date that certain lands were acquired. Those acquired by the Federal Government before 1940 (such allegedly as the land in issue in this case) were subject to the exclusive jurisdiction of the United States and those after, were subject only to proprietary jurisdiction. Id., at 8. Finally, he was asked whether the maps he reviewed would reflect if the land under Route 197 was owned by the State of Maryland, and he testified that in his opinion, the maps "probably" would reflect that ownership. On redirect examination, he testified to a further opinion, that the fact that the State of Maryland has a "right of access" has nothing to do with "ownership or jurisdiction."

303. Several glaring flaws leap from Mr. Vandergraft's testimony. First, he was never qualified as an expert witness, and therefore his opinions about land ownership and jurisdiction, and changes thereto, were incompetent. Second, whether the United States has jurisdiction over a piece of land is a legal conclusion. While such conclusions are permitted under Fed.R.Evid. 704, they can only be admitted by a duly qualified expert. Third, Mr. Vandergraft's opinions were based upon hearsay. Admittedly, they were theoretically admissible under the exception to the hearsay rule embodied in Fed.R.Evid. 803. However, in this instance, the requirements of Rule 803 were not met because Mr. Vandergraft failed to testify that the records were accurate. In this respect, it must be recalled that his testimony was that "hopefully" the maps were accurate and that the potential ownership of the State of Maryland would "probably" be reflected on the maps admitted by the Government.

304. Counsel ineffectively failed to object to these flaws and simply permitted him to go forward with his incompetent testimony. Had counsel challenged him or moved for dismissal at the conclusion of the Government's case, the motion would have had to have been granted. Hence, counsels' deficient performance caused Petitioner prejudice.

109

305. Matters were not helped by the fact that this Court's instructions to the jury on the element of jurisdiction were not consistent. In various points of the charge, the Court instructed the jury that it must find that the offenses occurred within the special maritime and territorial jurisdiction of the United States. See e.g. TT 10/11/00, 65. However, at other points the Court told the jury that it could find jurisdiction if it found that the offense were committed within the Wildlife Refuge. See e.g., id..

306. Trial counsel ineffectively failed to object to the confusion engendered by these instructions. Appellate counsel ineffectively failed to raise this claim on direct appeal. Neither could have possessed tactical or strategic reasons for not raising these claims.

**CLAIM XXI. THE TRIAL PROSECUTORS VIOLATED THE DUE PROCESS CLAUSE WHEN THEY FAILED TO PROVIDE TRIAL COUNSEL WITH ALL WITNESS STATEMENTS AND REPORTS GENERATED BY THE PARK POLICE AND THE FBI.**

307. The due process clause of the Fifth Amendment requires the prosecution to provide to the defense with all evidence that is exculpatory as to guilt or that mitigates punishment. Undersigned counsel believes that trial counsel was not provided with all such exculpatory material in the hands of the Government. Petitioner will move for such discovery, but for now alleges that the Government has not met this due process requirement.

308. Undersigned counsels' belief is based in part on the above-described violations of Petitioner's due process rights.

**CLAIM XXII. PETITIONER IS ENTITLED TO RELIEF BASED UPON THE CUMULATIVE ERRORS IDENTIFIED ABOVE.**

309. Claims of constitutional error are to be considered cumulatively as well as individually, and that cumulative error or prejudice may provide a basis for relief whether or not the effect of individual deficiencies warrants relief. The circumstances of this case demonstrate

the cumulative effect of counsel's serious and inexplicable failures, and the other constitutional errors by the Court and prosecutors, so undermined the fairness of the trial and sentencing proceedings that Petitioner's convictions and sentences must be vacated. Given the magnitude and quantity of errors described above, there can be no doubt that Petitioner was prejudiced at both phases of trial.

**Claim XXIII. PETITIONER IS ENTITLED TO AND REQUEST THAT THE COURT PROVIDE AN EVIDENTIARY HEARING ON ALL DISPUTED ISSUES OF MATERIAL FACT.**

310. A post-conviction court is vested with wide discretion to conduct evidentiary hearings with regard to dispute material facts in a section 2255 or habeas corpus proceeding. When a petition pleads facts which would entitle him to relief if they are established, the court should conduct such a hearing. As demonstrated above, Petitioner has alleged a multitude of facts which, if proven, would require relief. Therefore, he is entitled to an opportunity to prove them, and hereby requests that the Court provide him with that chance.

**CLAIM XXIV. JURORS IN PETITIONER'S TRIAL ENGAGED IN MISCONDUCT IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

311. Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated by misconduct involving the jury. Such misconduct included, but was not limited to, improper consideration of matters extraneous to the trial, improper exposure to publicity and community sentiment, improper exposure to witnesses and others who claimed to have knowledge or opinions about Petitioner and the case, false or misleading responses of jurors on voir dire, improper biases which infected the jury's deliberations, improper exposure to the prejudicial opinions of third parties, improper communications with third parties, and/or the trial judge, and improperly prejudging the

111

guilt/innocence and penalty phases of Petitioner's trial.

312. Petitioner's rights to a fair trial and to due process were violated when the jury was not sequestered in such a way as to avoid contact with prejudicial publicity and hostility to the defendant, and to avoid contact and communications with third parties, in contravention of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

313. The Sixth and Fourteenth Amendments to the United States Constitution require that a defendant be tried by an impartial jury that is free from any extraneous influences that could subvert the fact finding process. Where jurors consult information that was not introduced during the course of the trial or that conflicts with the trial judge's instructions, the jurors become unsworn witnesses against the defendant in violation of the Sixth Amendment. Petitioner had no opportunity to confront the extraneous information to which the jurors were exposed, denying Petitioner her Sixth and Fourteenth Amendment rights to a fair trial and due process.

314. The introduction of extraneous materials or evidence has consistently been held to mandate a new trial. Petitioner should be granted a new trial which can be conducted free of extraneous and prejudicial influences.

315. Counsel provided ineffective assistance in failing to litigate this issue in the trial court and by failing to raise it on direct appeal, to Petitioner's prejudice. Counsel's ineffective assistance resulted in the deprivation of Petitioner's rights under the Sixth, Eighth and Fourteenth Amendments. Relief is appropriate.

**CLAIM XXV. THE EXECUTION OF PETITIONER THOUGH LETHAL INJECTION PURSUANT TO THE FEDERAL GOVERNMENT'S EXECUTION PROTOCOL, MARYLAND'S EXECUTION PROTOCOL, OR ANY SIMILAR PROTOCOL, WOULD VIOLATE THE EIGHTH AMENDMENT'S PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT.**

316. The United States proposes to execute Petitioner by lethal injection. The United States Government's Execution Protocol promulgated by the Bureau of Prisons ("Protocol" copy contained in Petitioner's Appendix), which sets forth the Government's lethal injection procedures, creates a substantial and unreasonable risk Petitioner will consciously suffer excruciating and unnecessary pain. Because the Government Protocol inflicts foreseeable and gratuitous suffering, lethal injection pursuant to that protocol, or any similar protocol, violates the Eighth Amendment.

317. Upon information and belief, the Government Protocol relies on the injection of three chemicals: sodium pentothal (also known as "thiopental" and "sodium thiopental") (an ultra short-acting barbiturate); pancuronium bromide or "Pavulon" (a curare-derived agent which paralyzes all skeletal or voluntary muscles, but which has no effect whatsoever on awareness, cognition or sensation); and potassium chloride (an extraordinarily painful chemical which activates the nerve fibers lining the condemned prisoner's veins and which can interfere with the rhythmic contractions of the heart and cause cardiac arrest).[22]

318. This particular combination of chemicals creates a substantial risk that Petitioner will consciously suffer an excruciatingly painful death. The procedure adopted by the Government, which defines the manner in which the chemicals are administered, significantly increases that risk.

319. The first chemical, sodium pentothal, is an ultra short-acting barbiturate which is

---

[22]What follows is drawn from the declaration of Dr. Mark Heath, as well as an independent review of the execution protocols promulgated by the United States Bureau of Prisons and the State of Maryland (copies of which are contained in Petitioner's Appendix). Counsel does not yet have access to the current protocols in unredacted form. This challenge therefore relies only on information that is publicly available.

ordinarily used to render a surgical patient unconscious for mere minutes, only in the induction phase of anesthesia, specifically so that the patient may re-awaken and breathe on his own power if any complications arise from the insertion of a breathing tube prior to the surgery. Because of its brief duration, sodium pentothal likely does not provide a sedative effect throughout the entire execution process. In addition, if sodium pentothal mixes with Pavulon in the intravenous tubing, the sodium pentothal will precipitate out of the solution and become inactivated.

320. The second chemical, pancuronium bromide, or "Pavulon," acts as a neuromuscular blocking agent. Though Pavulon paralyzes skeletal muscles, including the diaphragm, it has no effect on consciousness or the perception of pain or suffering. Rather, in the lethal injection context, the function of pancuronium bromide is primarily cosmetic. It causes the muscles to become relaxed and thereby generates an impression of tranquility. The prisoner's muscles cannot move or contract to show pain, suffering, or emotion.

321. The third chemical, potassium chloride, is intended to cause death by stopping the heart from beating. Potassium chloride affects the nerve fibers lining the prisoner's veins and, to a person who is conscious, causes an extraordinarily painful burning sensation, akin to the sensation of a hot poker being inserted into and up the arm and then the chest. For a person who has regained consciousness but is paralyzed and hence unable to communicate, it is, simply put, torture.

322. If sodium pentothal is given in insufficient quantity, is given using procedures that do not deliver the complete dose, wears off, is neutralized by the Pavulon, or otherwise is ineffective, the Pavulon will completely mask the fact that Petitioner has regained consciousness and feeling. Petitioner will be unable to communicate the fact that he is conscious, and the executioners and witnesses will be unable to observe any signs of consciousness, distress, or

114

agony.

323. It is likely that an insufficient quantity of sodium pentothal will be administered. Although the Protocol is not entirely clear, it appears that 5,000 mg (5 grams) of sodium pentothal, in a powdered form, are mixed with 50 cc's of sterile water. Then, it appears that a mere 10 cc's of the pentothal/water mixture are administered to the condemned prisoner, delivering to the prisoner a mere 1 gram of pentothal. That meager dose creates a high risk that the prisoner will not be rendered unconscious for the duration of the execution and will instead experience the excruciating agony of intravenous concentrated potassium chloride administration. To the best of counsel's knowledge and belief, this dose of sodium pentothal is the lowest administered anywhere in the United States in the course of execution by lethal injection.

324. From post-mortem autopsies, there is reason to believe that a number of condemned prisoners have received doses of sodium pentothal inadequate to produce unconsciousness, even after being administered more pentothal than apparently called for under the Government Protocol.

325. As noted, the procedure adopted by the Government, which defines the manner in which the chemicals are administered, substantially exacerbates the risk that Petitioner will suffer an agonizing death. Upon information and belief, the Government's procedures do not include safeguards regarding the manner in which the execution is to be carried out, do not establish the minimum qualifications and expertise required of the personnel performing the critical tasks in the lethal injection procedure, do not establish appropriate criteria and standards that these personnel must rely upon in exercising their discretion, and do not provide for any contingencies related to the difficulties of administering drugs intravenously. There is, in fact,

115

no indication or reason to believe that qualified and trained personnel capable of handling the risks of intravenous drug administration are present for the execution.

326. The fact that sodium thiopental is dispensed as a powder that must be mixed with water increases the risk for human error. Drug mixing errors are common in IV therapy. Errors are especially likely if the mixing is done by personnel without adequate training and experience.

327. Problems are also likely because the Government intends to administer one or more of these chemicals without considering any individualized factors that affect the appropriate dosage. These factors include, but are not limited to, Petitioner's body weight, gender, age, previous drug use, and/or individual sensitivity to or tolerance of these chemicals. Individual sensitivity to sodium pentothal varies widely. Some individuals, particularly those who have been taking anti-anxiety medication, are particularly resistant to sodium pentothal.

328. The Government Protocol further compounds the risk of inflicting unnecessary pain and suffering upon Petitioner because it requires that the IV lines be flushed between doses of drugs with a saline fluid altered with food coloring. *See* BOP Chemical Substances Preparation (step 4) (copy contained in Petitioner's Appendix). A saline flush is an advisable process, intended to prevent adverse drug interactions. It is usually accomplished by simply flushing the lines with saline fluid. Yet for unexplained reasons, the Protocol states that the saline flush shall be laced with food coloring. Food coloring, contaminated with a variety of additives, is not approved for intravenous processes.

329. It is impossible to predict how the contaminated saline will affect the flushing process or interact with the drugs already introduced through the IV lines. Moreover, the Government's reliance on food coloring indicates that its personnel need a visual aid to know when a line is flushed, which suggests that they lack adequate training and expertise.

116

330.    Because of legal, moral, and ethical restrictions on human euthanasia, the best model and most reliable source of information about humane protocols for extinguishing life is studies of methods for euthanasia of animals.

331.    Many states, including Maryland, have banned the usage of curariform drugs such as pancuronium bromide or "Pavulon" in the euthanasia of animals. *See* Md. Crim. Law § 10-611(a) (stating that "a person may not kill or allow a dog or cat to be killed by use of (1) a decompression chamber; (2) carbon monoxide gas; or (3) curariform drugs").

332.    The American Veterinary Medical Association Panel on Euthanasia continually studies various protocols for the euthanasia of animals to determine whether they are humane. It periodically issues a report identifying acceptable and unacceptable protocols for euthanasia. Its most recent report explicitly forbids the use of a neuromuscular blocking agent in combination with a sedative because this protocol is deemed inhumane. *See* 2000 Report of the AVMA Panel on Euthanasia, Vol. 218, No. 5 at 680 (2001) ("A combination of pentobarbital with a neuromuscular blocking agent is not an acceptable euthanasia agent.") (copy contained in Petitioner's Appendix); *see also* Humane Society of the United States, General Statement Regarding Euthanasia Methods for Cats and Dogs (1999) ("The methods that The HSUS considers inhumane, disapproves of, and campaigns against include . . . any combination of pentobarbital with a neuromuscular blocking agent.") (copy contained in Petitioner's Appendix). In addition, the AVMA's report states: "It is of utmost importance that personnel performing this [injection] technique are trained and knowledgeable in anesthetic techniques, and are competent in assessing anesthetic depth appropriate for administration of potassium chloride intravenously." AVMA Report at 681. In contrast, the Government Protocol does not require qualified and trained personnel capable of handling the risks of intravenous drug administration

117

to be present for the execution. Using methods, techniques, or chemicals to execute human beings which have been banned for use in euthanizing animals violates contemporary standards of decency and therefore the Eighth Amendment.

333. The Government Protocol should also be invalidated because it is an administrative action in excess of statutory right. Title 18 U.S.C. § 3596(a) requires that a federal sentence of death be carried out in the manner prescribed by the state in which the sentence of death is imposed. It states:

> A person who has been sentenced to death pursuant to this chapter shall be committed to the custody of the Attorney General until exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentence. When the sentence is to be implemented, the Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise implementation of the sentence in the *manner prescribed by the law of the State in which the sentence is imposed*. If the law of the State does not provide for implementation of a sentence of death, the court shall designate another State, the law of which does provide for the implementation of a sentence of death, and the sentence shall be implemented in the latter State in the manner prescribed by such law.

18 U.S.C. § 3596(a).

334. The Department of Justice has violated § 3596(a) by delegating to the Director of the Bureau of Prisons the responsibility to promulgate its own Protocol for the execution of federal prisoners, rather than relying on the protocol in place in the State in which the federal prisoner is sentenced. *See* 28 C.F.R. § 26.3(a)(4). Section 3596(a) does not empower the Federal Bureau of Prisons to enact an execution Protocol or prescribe the precise means of death. Instead, it unequivocally requires that the sentence be implemented in the "manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. § 3596(a). Maryland, the state in which Petitioner was sentenced to death, has its own Execution Procedures, and these Procedures vary from the Government Protocol in significant respects (although, for reasons

118

explained below, also violate the Eighth Amendment).

335. Tellingly, Congress considered legislation which would have amended § 3596(a) to vest the Bureau of Prisons **with** such authority. Specifically, Representative McCollum of Florida introduced H.R. 2359, which would have amended 18 U.S.C. § 3596 to provide that "the Attorney General will prescribe by regulation a uniform method of execution for any person sentenced to death in federal court." Congressional Testimony, Subcommittee on Crime of the House Committee on the Judiciary, September 28, 1995. This legislation was not enacted, however. *See* H.R. Rep. 104-879 at 204 (1997). Rep. McCollum introduced a similar bill in the following Congress, H.R. 1087, which met the same fate. The failure to enact legislation to grant the Bureau of Prisons with specific authority to regulate the means of death is powerful evidence that the Bureau of Prisons currently lacks such authority.

336. Because Congress has not given the Bureau of Prisons the power it seeks to exercise in executing Petitioner, its exercise of such power is *ultra vires*. The Bureau of Prisons' promulgation of an execution protocol in contravention of 18 U.S.C. § 3596(a) violates Petitioner's substantial rights.

337. The Government Protocol constitutes a "rule" subject to the notice and comment provisions of the Administrative Procures Act ("APA"). Because the Protocol was promulgated without notice-and-comment, the Protocol violates the APA. See 5 U.S.C. § 553.

338. To the extent the Maryland Execution Procedures ("Maryland Protocol"), rather than the Government Protocol, will regulate Petitioner's precise means of execution, the Maryland Protocol suffers from many of the same disabilities as does its federal counterpart. Like the Government Protocol, the Maryland Protocol violates the Eighth Amendment of the United States Constitution.

119

339. Upon information and belief, the State of Maryland also uses sodium pentothal in powdered form, Pavulon, and potassium chloride. All of the problems associated with the use of those chemicals, as described above, apply with equal force. Accordingly the above described problems with the sue of these agents are repeated and realleged as if fully set forth herein.

340. The Maryland Protocol calls for the administration of only 2 grams of sodium thiopental, by way of a single injection from a single syringe. This dose is considerably lower than that administered in many states. This relatively low dose of thiopental elevates the risk that the condemned prisoner will suffer in excruciating pain masked by the Pavulon.

341. Like the Government Protocol, the Maryland Protocol also fails to include safeguards regarding the manner in which the execution is to be carried out and fails to establish the minimum qualifications and expertise required of the personnel performing the critical tasks in the lethal injection procedure. Consequently, the above paragraphs discussing the deficenices in the Government Protocol are realleged as if set forth entirely herein.

342. Maryland's failure to enlist adequately trained personnel was on gruesome display during the execution of Maryland prisoner Tyrone X. Gilliam in 1998. During that execution, fluid from Mr. Gilliam's IV ran down the exterior surface of the IV line, and by the time of Mr. Gilliam's death, a puddle of liquid had formed on the floor of the lethal injection chamber immediately below where the IV line was located. The State later conceded that "the IV in fact was maladministered and dripped." Oken v. Sizer, 321 F. Supp. 2d 658, 667 n.7 (D. Md. 2004). Because Mr. Gilliam's IV leaked, he did not receive full doses of the pentothal, Pavulon, and/or potassium chloride. There is therefore reason to believe Mr. Gilliam experienced a cruel and agonizing death.

343. The Maryland Protocol is itself inconsistent with the Maryland statute, which

regulates the means of death. The relevant Maryland provision is Md. Corr. Serv. § 3-905. This

statute provides:

> (a) The manner of inflicting the punishment of death shall be the continuous intravenous administration of a lethal quantity of an ultrashort-acting barbiturate or other similar drug in combination with a chemical paralytic agent until a licensed physician pronounces death according to accepted standards of medical practice.

This statute thus requires the "continuous intravenous administration" of an "ultrashort-acting

barbituate." The requirement of "continuous . . . administration" is essential to ensure continued

and sustained unconsciousness during the administration of Pavulon and potassium chloride. In

clear violation of this statute, however, the Maryland Protocol calls for the administration of a

single injection of a 2 gram dose of sodium thiopental from a single syringe. In addition,

Maryland administers three drugs, rather than two, as mandated by § 3-905.

The Eighth Amendment prohibits punishments that involve the unnecessary and wanton

infliction of pain, that involve torture or a lingering death, that do not accord with the dignity of

man, or fail to comport with evolving standards of decency. Both the Government Protocol, as

promulgated by the Bureau of Prisons, and the Maryland Protocol, as promulgated by the State

of Maryland, risk the infliction of excruciating pain and suffering and fail to comport with

evolving standards of decency. They are therefore facially unconstitutional. Accordingly, the

execution of Petitioner pursuant to either protocol, or any similar protocol, would violate the

Eighth Amendment of the Constitution of the United States.[23]

---

[23]Although Petitioner raises a facial objection to lethal injection in this 2255 motion, Petitioner submits that an as-applied challenge under Title 42, section 1983 of the United States Code is also appropriate. Petitioner reserves his right to raise such a challenge in a later civil proceeding. Petitioner moreover recognizes that this Court may decline to reach the merits of this claim in the present proceeding as it is not yet ripe, and may not become ripe. Petitioner is raising this challenge now to ensure that it is preserved if the challenge should ever become ripe.

## REQUEST FOR RELIEF

Based upon all of the above allegations and the entire record of this prosecution,

Petitioner respectfully requests that the Court provide the following relief:

A. That Petitioner be permitted to file a Brief in Support of this Petition within 90 days;

B. That the Government be required to answer this Petition and file a responsive Brief;

C. That the Court permit such discovery as will be requested in Petitioner's to-be-filed Motion for Discovery;

D. That upon such discovery litigation, that Petitioner be permitted to Amend this Petition;

E. That the Court conduct an evidentiary hearing addressing all material and disputed issues of fact;

F. That the Court permit oral argument as appropriate and required;

G. That at the conclusion of the proceedings that the Court vacate Petitioner's convictions and sentences, including his sentences of death and order that appropriate retrial and/or new sentencing hearings be conducted.

Respectfully Submitted,

Michael Wiseman, Esq.
Signing for All Counsel

Dated: November 28, 2005
Greenbelt, Maryland

122

**CERTIFICATE OF SERVICE**

I, Michael Wiseman, hereby certify that on this 28th day of November, 2005 I served two copies of the foregoing upon the following person by hand delivery:

Deborah A. Johnston
Assistant United States Attorneys
Office of the United States Attorney
6500 Cherrywood Lane, Suite 400
Greenbelt, MD 20770-1249

Michael Wiseman

## VERIFICATION

I verify and declare under penalty of perjury that the facts, allegations and statements contained in the foregoing Motion Under 28 U.S.C. § 2255 are true and correct.

/s/
Dustin John Higgs

Dated: 4/28/05

# EXHIBIT 3

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

H

United States District Court,
D. Maryland.
Dustin John HIGGS, Petitioner,
v.
UNITED STATES of America, Respondent.
**Civil No. PJM 05-3180.**
**Criminal No. PJM 98-0520.**

April 6, 2010.

**Background:** Defendant was convicted in the United States District Court for the District of Maryland, Peter J. Messitte, J., of first-degree premeditated murder and kidnapping resulting in death, among other crimes, and he appealed. The Court of Appeals, Traxler, Circuit Judge, 353 F.3d 281, affirmed, and defendant moved to vacate, set aside, or correct his sentence.

**Holdings:** The District Court held that:

(1) government did not violate *Brady* in failing to disclose internal studies concerning reliability of comparative bullet lead analysis;

(2) defendant's *Batson* claim was procedurally defaulted;

(3) defendant failed to demonstrate that government engaged in purposeful discrimination in allegedly using its peremptory challenges against prospective female jurors; and

(4) trial counsel did not render ineffective assistance in failing to present defendant's school records as mitigation evidence at sentencing.

Motion denied.

West Headnotes

[1] Criminal Law 110 🗝 1995

110 Criminal Law

110XXXI Counsel
110XXXI(D) Duties and Obligations of Prosecuting Attorneys
110XXXI(D)2 Disclosure of Information
110k1993 Particular Types of Information Subject to Disclosure
110k1995 k. Diligence on part of accused; availability of information. Most Cited Cases
Government did not violate *Brady* in failing to disclose internal studies conducted by FBI and state university concerning reliability of comparative bullet lead analysis in prosecution for first-degree premeditated murder; studies' strongest critiques of comparative bullet lead analysis were available in at least one publicly accessible study, and thus defendant could have obtained identical or nearly identical information through exercise of reasonable diligence. U.S.C.A. Const.Amend. 5.

[2] Constitutional Law 92 🗝 4594(1)

92 Constitutional Law
92XXVII Due Process
92XXVII(H) Criminal Law
92XXVII(H)4 Proceedings and Trial
92k4592 Disclosure and Discovery
92k4594 Evidence
92k4594(1) k. In general. Most Cited Cases
Under *Brady*, the suppression by the prosecution of evidence favorable to the accused violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecutor. U.S.C.A. Const.Amends. 5, 14.

[3] Criminal Law 110 🗝 2004

110 Criminal Law
110XXXI Counsel
110XXXI(D) Duties and Obligations of Prosecuting Attorneys
110XXXI(D)2 Disclosure of Information
110k2002 Information Within Knowledge of Prosecution

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

110k2004 k. Duty to locate information. Most Cited Cases

**Criminal Law 110**    **2005**

110 Criminal Law
   110XXXI Counsel
      110XXXI(D) Duties and Obligations of Prosecuting Attorneys
         110XXXI(D)2 Disclosure of Information
            110k2002 Information Within Knowledge of Prosecution
               110k2005 k. Responsibility of and for police and other agencies. Most Cited Cases
The duty of disclosure under *Brady* applies not only to evidence actually known to the trial prosecutor, but also evidence known to those acting on the government's behalf. U.S.C.A. Const.Amends. 5, 14.

**[4] Criminal Law 110**    **1992**

110 Criminal Law
   110XXXI Counsel
      110XXXI(D) Duties and Obligations of Prosecuting Attorneys
         110XXXI(D)2 Disclosure of Information
            110k1992 k. Materiality and probable effect of information in general. Most Cited Cases
The mere possibility that an item of undisclosed information might have helped the defense does not establish materiality in the constitutional sense for purposes of a *Brady* claim. U.S.C.A. Const.Amends. 5, 14.

**[5] Constitutional Law 92**    **4594(1)**

92 Constitutional Law
   92XXVII Due Process
      92XXVII(H) Criminal Law
         92XXVII(H)4 Proceedings and Trial
            92k4592 Disclosure and Discovery
               92k4594 Evidence
                  92k4594(1) k. In general. Most Cited Cases
Under *Brady*, the prosecution's failure to disclose evidence gives rise to a due process violation only where the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. U.S.C.A. Const.Amends. 5, 14.

**[6] Constitutional Law 92**    **4594(1)**

92 Constitutional Law
   92XXVII Due Process
      92XXVII(H) Criminal Law
         92XXVII(H)4 Proceedings and Trial
             92k4592 Disclosure and Discovery
               92k4594 Evidence
                  92k4594(1) k. In general. Most Cited Cases
Where a defendant could have obtained the same information through the exercise of reasonable diligence, the prosecution's failure to disclose does not violate due process under *Brady*. U.S.C.A. Const.Amends. 5, 14.

**[7] Criminal Law 110**    **1457**

110 Criminal Law
   110XXX Post-Conviction Relief
      110XXX(B) Grounds for Relief
         110k1457 k. Criminal liability; innocence. Most Cited Cases
Even assuming actual innocence was valid basis for post-conviction relief, defendant failed to demonstrate that he was actually innocent of first-degree premeditated murder based on discovery of allegedly new evidence concerning unreliability of comparative bullet lead analysis; evidence of defendant's guilt was overwhelming, including witness's detailed account of murders. 28 U.S.C.A. § 2255.

**[8] Criminal Law 110**    **1536**

110 Criminal Law
   110XXX Post-Conviction Relief
      110XXX(B) Grounds for Relief
         110k1536 k. Newly discovered evidence. Most Cited Cases
Newly discovered evidence may open the door to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

post-conviction relief if it can form the basis of an actual innocence claim. 28 U.S.C.A. § 2255.

[9] Criminal Law 110 ☞ 1931

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1921 Introduction of and Objections to Evidence at Trial
                    110k1931 k. Experts; opinion testimony. Most Cited Cases
Trial counsel's failure to offer studies or experts to question reliability of comparative bullet lead analysis in prosecution for first-degree premeditated murder did not prejudice defendant, and thus could not amount to ineffective assistance; evidence adduced at trial overwhelmingly pointed to defendant's guilt. U.S.C.A. Const.Amend. 6.

[10] Criminal Law 110 ☞ 1590

110 Criminal Law
    110XXX Post-Conviction Relief
        110XXX(C) Proceedings
            110XXX(C)1 In General
                110k1590 k. Discovery and disclosure. Most Cited Cases
Defendant was not entitled to discovery of FBI reports concerning its decision to discontinue use of comparative bullet lead analysis in seeking to vacate, set aside, or correct his sentence for first-degree premeditated murder; additional discovery would not demonstrate defendant's entitlement to relief on claim that trial counsel rendered ineffective assistance in failing to offer experts to question reliability of analysis. U.S.C.A. Const.Amend. 6.

[11] Criminal Law 110 ☞ 1429(2)

110 Criminal Law
    110XXX Post-Conviction Relief
        110XXX(A) In General
            110k1428 Presentation of Issue in Prior Proceedings
            110k1429 In General
                110k1429(2) k. Post-conviction proceeding not a substitute for appeal. Most Cited Cases
Defendant's *Batson* claim, challenging government's use of peremptory strikes against prospective female jurors in prosecution for first-degree premeditated murder, was procedurally defaulted on his motion to vacate, set aside, or correct his sentence; defendant failed to raise claim before seeking post-conviction relief. U.S.C.A. Const.Amend. 5.

[12] Jury 230 ☞ 33(5.15)

230 Jury
    230II Right to Trial by Jury
        230k30 Denial or Infringement of Right
            230k33 Constitution and Selection of Jury
                230k33(5) Challenges and Objections
                    230k33(5.15) k. Peremptory challenges. Most Cited Cases
A *Batson* challenge requires a three-step inquiry: (1) the court first determines whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race or gender; (2) the prosecutor must then present a gender-neutral explanation for striking the juror in question; and (3) the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. U.S.C.A. Const.Amends. 5, 14.

[13] Jury 230 ☞ 33(5.15)

230 Jury
    230II Right to Trial by Jury
        230k30 Denial or Infringement of Right
            230k33 Constitution and Selection of Jury
                230k33(5) Challenges and Objections
                    230k33(5.15) k. Peremptory challenges. Most Cited Cases
A defendant may satisfy his initial burden of demonstrating a prima facie case of discrimination on a *Batson* claim by showing that: (1) the defendant was a member of a cognizable group; (2) the prosecution exercised peremptory challenges to remove from the venire members of defendant's race or gender; and (3)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

other relevant facts and circumstances give rise to an inference of discrimination. U.S.C.A. Const.Amends. 5, 14.

[14] Jury 230 ⬦ 33(5.15)

230 Jury
    230II Right to Trial by Jury
        230k30 Denial or Infringement of Right
            230k33 Constitution and Selection of Jury
                230k33(5) Challenges and Objections
                    230k33(5.15) k. Peremptory challenges. Most Cited Cases
Defendant failed to demonstrate that government engaged in purposeful discrimination in allegedly using its peremptory challenges against prospective female jurors in prosecution for first-degree premeditated murder, as required to prevail on his *Batson* claim; there was no evidence that government treated potential male and female jurors differently, and lack of women on jury was partly due to strikes made by defendant. U.S.C.A. Const.Amend. 5.

[15] Criminal Law 110 ⬦ 1890

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1890 k. In general. Most Cited Cases
Where an objection to evidence would have been futile, counsel is not constitutionally ineffective for failing to make it. U.S.C.A. Const.Amend. 6.

[16] Criminal Law 110 ⬦ 1992

110 Criminal Law
    110XXXI Counsel
        110XXXI(D) Duties and Obligations of Prosecuting Attorneys
            110XXXI(D)2 Disclosure of Information
                110k1992 k. Materiality and probable effect of information in general. Most Cited Cases
Promises made by the government in consideration for testimony may be material under *Brady* if they create a reasonable probability of a different outcome at trial. U.S.C.A. Const.Amends. 5, 14.

[17] Criminal Law 110 ⬦ 1999

110 Criminal Law
    110XXXI Counsel
        110XXXI(D) Duties and Obligations of Prosecuting Attorneys
            110XXXI(D)2 Disclosure of Information
                110k1993 Particular Types of Information Subject to Disclosure
                    110k1999 k. Impeaching evidence. Most Cited Cases
Defendant's conclusory allegation that government offered to dismiss unrelated drug charges against co-defendant in exchange for his testimony in prosecution for first-degree premeditated murder was insufficient to establish *Brady* violation based on government's alleged failure to disclose its offer prior to trial; there was no evidence that government ever offered to dismiss co-defendant's drug charges. U.S.C.A. Const.Amend. 5.

[18] Criminal Law 110 ⬦ 1999

110 Criminal Law
    110XXXI Counsel
        110XXXI(D) Duties and Obligations of Prosecuting Attorneys
            110XXXI(D)2 Disclosure of Information
                110k1993 Particular Types of Information Subject to Disclosure
                    110k1999 k. Impeaching evidence. Most Cited Cases
Government did not violate *Brady* in failing to disclose alleged alias used by witness that was tied to criminal charges pending against him at time he testified in prosecution for first-degree premeditated murder; witness's criminal conduct was fully apparent to jury during his testimony, and thus there was no reasonable probability of different outcome at trial. U.S.C.A. Const.Amend. 5.

[19] Criminal Law 110 ⬦ 1935

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1921 Introduction of and Objections to
Evidence at Trial
                    110k1935 k. Impeachment or
contradiction of witnesses. Most Cited Cases
Trial counsel's failure to call witnesses to testify that
co-defendant told them he was asleep at time of murder in
effort to impeach his testimony that he saw defendant give
murder weapon to another co-defendant did not prejudice
defendant, and thus could not amount to ineffective
assistance in prosecution for first-degree premeditated
murder; counsel effectively cross-examined co-defendant
with his prior inconsistent statements. U.S.C.A.
Const.Amend. 6.

**[20] Criminal Law 110 ☞ 1871**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)1 In General
                110k1871 k. Presumptions and burden of
proof in general. Most Cited Cases
In assessing an ineffectiveness of counsel claim, the court
presumes counsel's conduct was within the range of
reasonable professional assistance. U.S.C.A.
Const.Amend. 6.

**[21] Criminal Law 110 ☞ 1923**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1921 Introduction of and Objections to
Evidence at Trial
                    110k1923 k. Investigating, locating, and
interviewing witnesses or others. Most Cited Cases
Claims of ineffective assistance of counsel based on
failure to investigate potential witness testimony must
show that the witness would have been willing to testify

and that the testimony would have created reasonable
doubt as to the defendant's guilt. U.S.C.A. Const.Amend.
6.

**[22] Criminal Law 110 ☞ 1923**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1921 Introduction of and Objections to
Evidence at Trial
                    110k1923 k. Investigating, locating, and
interviewing witnesses or others. Most Cited Cases
Failure to investigate a crucial witness may suggest
ineffectiveness of counsel, but failure to investigate every
single person mentioned by the defendant is not
tantamount to ineffective assistance. U.S.C.A.
Const.Amend. 6.

**[23] Criminal Law 110 ☞ 1923**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1921 Introduction of and Objections to
Evidence at Trial
                    110k1923 k. Investigating, locating, and
interviewing witnesses or others. Most Cited Cases
Trial counsel's alleged failure to investigate co-defendant's
prior unrelated gun charges in prosecution for first-degree
premeditated murder did not prejudice defendant, and thus
could not amount to ineffective assistance; co-defendant's
unrelated gun charges were not exculpatory evidence in
defendant's case. U.S.C.A. Const.Amend. 6.

**[24] Criminal Law 110 ☞ 1923**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1921 Introduction of and Objections to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

Evidence at Trial

110k1923 k. Investigating, locating, and interviewing witnesses or others. Most Cited Cases

Trial counsel did not render ineffective assistance in failing to interview government witness prior to trial in prosecution for first-degree premeditated murder concerning her claim that defendant violently assaulted her several years prior to trial; during cross-examination, witness conceded that her altercation with defendant was mutual, and there was no evidence that pre-trial interview would have caused witness to say anything different from what she said at trial. U.S.C.A. Const.Amend. 6.

[25] Criminal Law 110 ☞ 1457

110 Criminal Law
   110XXX Post-Conviction Relief
      110XXX(B) Grounds for Relief
         110k1457 k. Criminal liability; innocence. Most Cited Cases

Even assuming actual innocence was valid basis for post-conviction relief, defendant failed to demonstrate that he was actually innocent of first-degree premeditated murder based on co-defendant's post-trial recantation of his testimony that he witnessed defendant give murder weapon to another co-defendant; evidence of defendant's guilt was overwhelming, including witness's detailed account of murders. 28 U.S.C.A. § 2255.

[26] Criminal Law 110 ☞ 1880

110 Criminal Law
   110XXXI Counsel
      110XXXI(C) Adequacy of Representation
         110XXXI(C)1 In General
            110k1879 Standard of Effective Assistance in General
               110k1880 k. In general. Most Cited Cases

On a claim of ineffective assistance of counsel, the question is not what the best lawyer would have done or even what most good lawyers would have done, but merely whether a reasonable lawyer could have made the same decision under the circumstances. U.S.C.A. Const.Amend. 6.

[27] Criminal Law 110 ☞ 1931

110 Criminal Law
   110XXXI Counsel
      110XXXI(C) Adequacy of Representation
         110XXXI(C)2 Particular Cases and Issues
            110k1921 Introduction of and Objections to Evidence at Trial
               110k1931 k. Experts; opinion testimony. Most Cited Cases

Trial counsel's decision not to further cross-examine government's ballistics expert after he conceded that 1.5 million firearms could have produced the markings on bullets found at crime scene was reasonable trial strategy, and thus was not ineffective assistance in prosecution for first-degree premeditated murder; expert's concession was highly important to counsel's defense, and counsel reasonably decided not to spend more time questioning expert. U.S.C.A. Const.Amend. 6.

[28] Criminal Law 110 ☞ 1931

110 Criminal Law
   110XXXI Counsel
      110XXXI(C) Adequacy of Representation
         110XXXI(C)2 Particular Cases and Issues
            110k1921 Introduction of and Objections to Evidence at Trial
               110k1931 k. Experts; opinion testimony. Most Cited Cases

Trial counsel did not render ineffective assistance in prosecution for first-degree premeditated murder by failing to call expert witness to estimate higher number of firearms that could have produced the markings on bullets found at crime scene after government's ballistics expert conceded that 1.5 million firearms could have made the markings; impact of such testimony would have been minimal. U.S.C.A. Const.Amend. 6.

[29] Criminal Law 110 ☞ 1939

110 Criminal Law
   110XXXI Counsel
      110XXXI(C) Adequacy of Representation
         110XXXI(C)2 Particular Cases and Issues

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

110k1939 k. Confrontation. Most Cited Cases

Trial counsel did not render ineffective assistance in failing to object on confrontation grounds to introduction of tape-recorded telephone conversation during which defendant remained silent after news article was read to him stating that co-defendant admitted that murder took place at defendant's apartment; there was ample legal basis for counsel to believe that introduction of defendant's adoptive admission would not violate Confrontation Clause, and thus counsel's decision not to raise Sixth Amendment objection was reasonable. U.S.C.A. Const.Amend. 6.

[30] Criminal Law 110 &⟶ 1961

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1958 Death Penalty
                    110k1961 k. Presentation of evidence in sentencing phase. Most Cited Cases

Trial counsel did not render ineffective assistance in failing to present school records describing defendant's learning disabilities and emotional issues as mitigation evidence at sentencing in capital murder prosecution; counsel requested defendant's school records but only received transcript from school system indicating that his records had been purged, and counsel had no reason to know that school system actually retained special education records indefinitely. U.S.C.A. Const.Amend. 6.

[31] Criminal Law 110 &⟶ 1961

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1958 Death Penalty
                    110k1961 k. Presentation of evidence in sentencing phase. Most Cited Cases

Trial counsel was not deficient in failing to obtain testimony from defendant's father about his abusive conduct toward defendant during childhood as mitigation evidence at sentencing in capital murder prosecution, as

element of claim of ineffective assistance; counsel's mitigation specialist testified that he attempted to reach defendant's father prior to trial but received information that he did not want to participate in his son's defense. U.S.C.A. Const.Amend. 6.

[32] Criminal Law 110 &⟶ 1961

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1958 Death Penalty
                    110k1961 k. Presentation of evidence in sentencing phase. Most Cited Cases

Trial counsel's failure to obtain testimony from defendant's father about his abusive conduct toward defendant during childhood as mitigation evidence at sentencing in capital murder prosecution did not prejudice defendant, and thus could not amount to ineffective assistance; father's credibility would have been challengeable based on his relationship with defendant and his criminal history, and jury considered fact that father was absentee parent who had drug problem. U.S.C.A. Const.Amend. 6.

[33] Criminal Law 110 &⟶ 1961

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1958 Death Penalty
                    110k1961 k. Presentation of evidence in sentencing phase. Most Cited Cases

Trial counsel was not deficient in failing to obtain testimony from defendant's maternal aunt to corroborate other testimony concerning defendant's abusive childhood as mitigation evidence at sentencing in capital murder prosecution, as element of claim of ineffective assistance; counsel was never made aware that aunt possessed information concerning defendant's childhood. U.S.C.A. Const.Amend. 6.

[34] Criminal Law 110 &⟶ 1961

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

110 Criminal Law
   110XXXI Counsel
      110XXXI(C) Adequacy of Representation
         110XXXI(C)2 Particular Cases and Issues
            110k1958 Death Penalty
               110k1961 k. Presentation of evidence in sentencing phase. Most Cited Cases
Trial counsel's failure to obtain testimony from defendant's maternal aunt to corroborate other testimony concerning defendant's abusive childhood as mitigation evidence at sentencing in capital murder prosecution did not prejudice defendant, and thus could not amount to ineffective assistance; aunt would have offered no more than generalizations about defendant's abusive childhood, and her credibility was open to question. U.S.C.A. Const.Amend. 6.

[35] Criminal Law 110 &#x1F511; 1961

110 Criminal Law
   110XXXI Counsel
      110XXXI(C) Adequacy of Representation
         110XXXI(C)2 Particular Cases and Issues
            110k1958 Death Penalty
               110k1961 k. Presentation of evidence in sentencing phase. Most Cited Cases
Trial counsel's decision to limit mitigation evidence to events that occurred before defendant's eighteenth birthday, at sentencing in capital murder prosecution, was reasonable trial strategy, and thus was not ineffective assistance; counsel fairly decided to minimize emphasis on defendant's multiple bad acts in adulthood. U.S.C.A. Const.Amend. 6.

[36] Criminal Law 110 &#x1F511; 1962

110 Criminal Law
   110XXXI Counsel
      110XXXI(C) Adequacy of Representation
         110XXXI(C)2 Particular Cases and Issues
            110k1958 Death Penalty
               110k1962 k. Argument and comments. Most Cited Cases
Trial counsel did not render ineffective assistance in failing to raise equal protection and Eighth Amendment challenges to government's decision to pursue death penalty in prosecution for first-degree premeditated murder; there was no evidence that government decided to pursue death penalty because defendant was African American. U.S.C.A. Const.Amends. 5, 6, 8.

[37] Criminal Law 110 &#x1F511; 1963

110 Criminal Law
   110XXXI Counsel
      110XXXI(C) Adequacy of Representation
         110XXXI(C)2 Particular Cases and Issues
            110k1958 Death Penalty
               110k1963 k. Other particular issues in death penalty cases. Most Cited Cases
Trial counsel did not render ineffective assistance in failing to object on confrontation grounds to introduction of police captain's testimony during sentencing in capital murder prosecution that co-defendant told him defendant drove murder weapon to park and threw it into river; state of law was unclear as to whether Confrontation Clause applied to capital sentencing proceedings at time of defendant's trial. U.S.C.A. Const.Amend. 6.

[38] Criminal Law 110 &#x1F511; 1882

110 Criminal Law
   110XXXI Counsel
      110XXXI(C) Adequacy of Representation
         110XXXI(C)1 In General
            110k1879 Standard of Effective Assistance in General
            110k1882 k. Deficient representation in general. Most Cited Cases
In evaluating a claim of ineffective assistance of counsel, the court judges the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. U.S.C.A. Const.Amend. 6.

[39] Criminal Law 110 &#x1F511; 1961

110 Criminal Law
   110XXXI Counsel
      110XXXI(C) Adequacy of Representation

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

110XXXI(C)2 Particular Cases and Issues
  110k1958 Death Penalty
   110k1961 k. Presentation of evidence in sentencing phase. Most Cited Cases

Trial counsel's decision to limit mitigation evidence in response to government's decision to drop future dangerousness as aggravating circumstance at sentencing in capital murder prosecution was reasonable trial strategy, and thus was not ineffective assistance of counsel; counsel made decision so as not to open door to bad act rebuttal evidence. U.S.C.A. Const.Amend. 6.

[40] Sentencing and Punishment 350H ☞ 1763

350H Sentencing and Punishment
 350HVIII The Death Penalty
  350HVIII(G) Proceedings
   350HVIII(G)2 Evidence
    350Hk1755 Admissibility
     350Hk1763 k. Victim impact. Most Cited Cases

The Eighth Amendment does not prohibit prosecutorial argument on the subject of victim impact evidence in capital proceedings. U.S.C.A. Const.Amend. 8.

[41] Constitutional Law 92 ☞ 4744(2)

92 Constitutional Law
 92XXVII Due Process
  92XXVII(H) Criminal Law
   92XXVII(H)6 Judgment and Sentence
    92k4741 Capital Punishment; Death Penalty
     92k4744 Matters Considered
      92k4744(2) k. Evidence and witnesses. Most Cited Cases

Only where victim impact evidence would be so unduly prejudicial as to render the defendant's trial unfair does due process mandate its exclusion in capital proceedings. U.S.C.A. Const.Amends. 5, 14.

[42] Constitutional Law 92 ☞ 4744(2)

92 Constitutional Law
 92XXVII Due Process

92XXVII(H) Criminal Law
 92XXVII(H)6 Judgment and Sentence
  92k4741 Capital Punishment; Death Penalty
   92k4744 Matters Considered
    92k4744(2) k. Evidence and witnesses. Most Cited Cases

Sentencing and Punishment 350H ☞ 1763

350H Sentencing and Punishment
 350HVIII The Death Penalty
  350HVIII(G) Proceedings
   350HVIII(G)2 Evidence
    350Hk1755 Admissibility
     350Hk1763 k. Victim impact. Most Cited Cases

Victim impact evidence, including mother's testimony that her marriage nearly dissolved in wake of her daughter's murder and videotapes chronicling victims' lives, did not render capital defendant's trial fundamentally unfair in violation of due process. U.S.C.A. Const.Amend. 5.

[43] Courts 106 ☞ 100(1)

106 Courts
 106II Establishment, Organization, and Procedure
  106II(H) Effect of Reversal or Overruling
   106k100 In General
    106k100(1) k. In general; retroactive or prospective operation. Most Cited Cases

Rule announced in *United States v. Washington,* which held that judges must apply categorical approach in determining whether defendant's prior conviction satisfied requirements for sentence enhancement, was not watershed rule, and thus did not fall within exception to *Teague* rule barring retroactive application of new rules of criminal procedure.

[44] Courts 106 ☞ 100(1)

106 Courts
 106II Establishment, Organization, and Procedure
  106II(H) Effect of Reversal or Overruling
   106k100 In General

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

106k100(1) k. In general; retroactive or prospective operation. Most Cited Cases

Courts employ a three-step analysis to determine whether a new rule of criminal procedure should apply retroactively under *Teague*: first, the conviction for which the defendant filed a motion to vacate his sentence must have been final when the new law was enunciated; second, the new law must in fact be new; and third, the new rule must be of watershed magnitude.

[45] Courts 106 ⚷ 100(1)

106 Courts
    106II Establishment, Organization, and Procedure
        106II(H) Effect of Reversal or Overruling
            106k100 In General
                106k100(1) k. In general; retroactive or prospective operation. Most Cited Cases

To qualify as a watershed rule for purposes of *Teague* retroactivity analysis, a new rule of criminal procedure must seriously diminish the likelihood of obtaining an accurate conviction and must alter one's understanding of the bedrock procedural elements essential to the fairness of a proceeding.

[46] Criminal Law 110 ⚷ 1961

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1958 Death Penalty
                    110k1961 k. Presentation of evidence in sentencing phase. Most Cited Cases

Trial counsel did not render ineffective assistance in failing to object when government submitted defendant's previous firearm conviction as aggravating factor at sentencing in capital murder prosecution based on fact that defendant was not convicted of firearm offense until after he committed murders; state of law was unclear whether word "previous" in statute allowing jury to consider previous convictions as aggravating factor referred only to convictions occurring prior to subject offense or to all previous convictions. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. § 3592(c)(2).

[47] Sentencing and Punishment 350H ⚷ 1788(10)

350H Sentencing and Punishment
    350HVIII The Death Penalty
        350HVIII(G) Proceedings
            350HVIII(G)4 Determination and Disposition
                350Hk1788 Review of Death Sentence
                    350Hk1788(10) k. Harmless and reversible error. Most Cited Cases

Jury's consideration of invalid aggravating factor, specifically defendant's involvement in multiple killings, in sentencing him for capital murder did not invalidate his death sentence, where jury's consideration of victim impact aggravating factor allowed it to give weight to same facts and circumstances as invalid multiple killings factor. 18 U.S.C.A. § 3592(c)(16).

[48] Criminal Law 110 ⚷ 1433(2)

110 Criminal Law
    110XXX Post-Conviction Relief
        110XXX(A) In General
            110k1433 Matters Already Adjudicated
                110k1433(2) k. Affirmance of conviction. Most Cited Cases

Defendant was procedurally barred from arguing that trial counsel rendered ineffective assistance in failing to interview inmates that were incarcerated with co-defendant concerning co-defendant's alleged admissions of guilt to murders in seeking to vacate, set aside, or correct his sentence for capital murder; defendant already litigated issue in context of *Brady* violation on direct appeal of his conviction. U.S.C.A. Const.Amends. 5, 6.

[49] Criminal Law 110 ⚷ 1433(2)

110 Criminal Law
    110XXX Post-Conviction Relief
        110XXX(A) In General
            110k1433 Matters Already Adjudicated
                110k1433(2) k. Affirmance of conviction. Most Cited Cases

In seeking to vacate, set aside, or correct his sentence for capital murder, defendant was procedurally barred from

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

arguing that his conviction should be retroactively invalidated under *Blakely* on ground that his indictment failed to allege any of aggravating factors considered during sentencing; defendant previously litigated issue on direct appeal of his conviction. 28 U.S.C.A. § 2255.

**[50] Criminal Law 110** 1963

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1958 Death Penalty
                    110k1963 k. Other particular issues in death penalty cases. Most Cited Cases
Trial counsel did not render ineffective assistance in failing to seek instruction at penalty phase of capital murder prosecution that jury could only recommend death sentence if it found aggravating factors outweighed mitigating factors beyond reasonable doubt; court was not required to give reasonable doubt instruction at penalty phase of capital trial, and thus counsel was reasonable in not requesting instruction. U.S.C.A. Const.Amend. 6.

**[51] Criminal Law 110** 1429(2)

110 Criminal Law
    110XXX Post-Conviction Relief
        110XXX(A) In General
            110k1428 Presentation of Issue in Prior Proceedings
                110k1429 In General
                    110k1429(2) k. Post-conviction proceeding not a substitute for appeal. Most Cited Cases
Defendant was procedurally barred from arguing that trial court violated his Eighth Amendment right to have jury consider all mitigation evidence by failing to instruct jury that he was ineligible for parole, in seeking to vacate, set aside, or correct his sentence for capital murder; defendant failed to raise issue on appeal from his conviction. U.S.C.A. Const.Amend. 8; 28 U.S.C.A. § 2255.

**[52] Sentencing and Punishment 350H** 1780(3)

350H Sentencing and Punishment
    350HVIII The Death Penalty
        350HVIII(G) Proceedings
            350HVIII(G)3 Hearing
                350Hk1780 Conduct of Hearing
                    350Hk1780(3) k. Instructions. Most Cited Cases
Trial court's failure to instruct jury that defendant was ineligible for parole did not violate his Eighth Amendment right to have jury consider all mitigation evidence in sentencing him for capital murder; parole ineligibility did not meet criteria for being mitigating factor, since it related neither to defendant's character or record. U.S.C.A. Const.Amend. 8.

**[53] Sentencing and Punishment 350H** 1653

350H Sentencing and Punishment
    350HVIII The Death Penalty
        350HVIII(C) Factors Affecting Imposition in General
            350Hk1653 k. Mitigating circumstances in general. Most Cited Cases
A capital sentencing jury must unquestionably give effect to all relevant mitigating evidence, as required by the Eighth Amendment. U.S.C.A. Const.Amend. 8.

**[54] Criminal Law 110** 412.1(2)

110 Criminal Law
    110XVII Evidence
        110XVII(M) Declarations
            110k411 Declarations by Accused
                110k412.1 Voluntary Character of Statement
                    110k412.1(2) k. Statements while in custody; persons to whom made. Most Cited Cases
Defendant was not in custody for *Miranda* purposes when he told another inmate that he remained silent when police officers approached him to cooperate against co-defendant, and thus inmate's testimony at defendant's capital murder trial recounting what defendant told him did not violate defendant's right to remain silent; police officers were not using inmate to elicit incriminating responses from defendant. U.S.C.A. Const.Amend. 5.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

**[55] Sentencing and Punishment 350H ☞ 1780(3)**

350H Sentencing and Punishment
    350HVIII The Death Penalty
        350HVIII(G) Proceedings
            350HVIII(G)3 Hearing
                350Hk1780 Conduct of Hearing
                    350Hk1780(3) k. Instructions. Most Cited
Cases
Defendant was not entitled to instruction at penalty phase of capital murder prosecution that jurors were not permitted to draw adverse inference of guilt from defendant's decision not to testify; defendant never requested instruction and court gave same instruction at guilt phase of trial. U.S.C.A. Const.Amend. 5.

**[56] Criminal Law 110 ☞ 1159.2(7)**

110 Criminal Law
    110XXIV Review
        110XXIV(P) Verdicts
            110k1159 Conclusiveness of Verdict
                110k1159.2 Weight of Evidence in General
                    110k1159.2(7) k. Reasonable doubt. Most
Cited Cases
A court considering the sufficiency of evidence underlying a conviction will uphold a guilty verdict and deny post-conviction relief if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

**[57] Criminal Law 110 ☞ 465**

110 Criminal Law
    110XVII Evidence
        110XVII(R) Opinion Evidence
            110k449 Witnesses in General
                110k465 k. Facts forming basis of opinion.
Most Cited Cases
A lay witness may testify about information from records of which he has personal knowledge and over which he maintains personal control.

**[58] Criminal Law 110 ☞ 1580(9)**

110 Criminal Law
    110XXX Post-Conviction Relief
        110XXX(C) Proceedings
            110XXX(C)1 In General
                110k1574 Petition or Motion
                  110k1580 Particular Issues
                    110k1580(9) k. Argument and
conduct of prosecutor. Most Cited Cases
Postconviction petitioner's conclusory allegation that government withheld evidence in form of witness statements and police reports was insufficient to demonstrate *Brady* violation in prosecution for first-degree premeditated murder. U.S.C.A. Const.Amend. 5.

**[59] Criminal Law 110 ☞ 1575**

110 Criminal Law
    110XXX Post-Conviction Relief
        110XXX(C) Proceedings
            110XXX(C)1 In General
                110k1574 Petition or Motion
                110k1575 k. In general. Most Cited Cases

A defendant seeking to vacate, set aside, or correct his sentence must set forth specific facts in support of each ground of relief asserted. 28 U.S.C.A. § 2255.

**[60] Criminal Law 110 ☞ 1652**

110 Criminal Law
    110XXX Post-Conviction Relief
        110XXX(C) Proceedings
            110XXX(C)3 Hearing and Determination
                110k1651 Necessity for Hearing
                110k1652 k. In general. Most Cited Cases

A court may grant an evidentiary hearing to a defendant seeking post-conviction relief when the defendant has pled facts that, if established, entitle him to relief, and there is a material dispute regarding those facts. 28 U.S.C.A. § 2255.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

**[61] Criminal Law 110 ☞ 1618(8)**

110 Criminal Law
    110XXX Post-Conviction Relief
      110XXX(C) Proceedings
        110XXX(C)2 Affidavits and Evidence
          110k1616 Sufficiency
            110k1618 Particular Issues
              110k1618(8) k. Conduct of trial. Most Cited Cases
Defendant could not obtain post-conviction relief from his capital murder conviction based on his conclusory allegation that jurors engaged in misconduct by considering matters extraneous to trial; defendant failed to substantiate his misconduct allegation. 28 U.S.C.A. § 2255.

**[62] Criminal Law 110 ☞ 1557(2)**

110 Criminal Law
    110XXX Post-Conviction Relief
      110XXX(B) Grounds for Relief
        110k1557 Matters Arising After Sentencing or Conviction
          110k1557(2) k. Execution of sentence. Most Cited Cases
Defendant's motion to vacate, set aside, or correct his sentence for capital murder was improper vehicle to challenge use of lethal injection under Eighth Amendment; defendant was not contesting validity of his conviction or sentence, but rather method of imposing his sentence. U.S.C.A. Const.Amend. 8; 28 U.S.C.A. § 2255.

\*486 Michael Wiseman, Federal Defender of Philadelphia, Capital Habeas Corpus Unit, Federal Court Division, Philadelphia, PA, Stephen H. Sachs, Wilmer Cutler Pickering Hale and Dorr LLP, Baltimore, MD, for Petitioner.

Deborah A. Johnston, Office of the US Attorney, Greenbelt, MD, Sandra Wilkinson, Office of the US Attorney, Baltimore, MD, Jeffrey B. Kahan, Department of Justice, Capital Case Unit, Washington, DC, for Respondent.

***OPINION***

PETER J. MESSITTE, District Judge.

After finding Dustin Higgs guilty of the kidnapping and murder of Tamika Black, Mishann Chinn, and Tanji Jackson, a jury determined that he should receive the death penalty. The Court thereafter entered judgment on the verdict and Higgs appealed to the United States Court of \*487 Appeals for the Fourth Circuit, which affirmed the conviction and sentence. *See United States v. Higgs,* 353 F.3d 281 (4th Cir.2003) ("*Higgs I*"). The Supreme Court denied Higgs' petition for writ of certiorari. *Higgs v. United States,* 543 U.S. 999, 125 S.Ct. 627, 160 L.Ed.2d 456 (2004).

During the pendency of his appeal, Higgs filed a Motion for a New Trial, which this Court denied, a decision which the Fourth Circuit also affirmed. *See United States v. Higgs,* 95 Fed.Appx. 37 (4th Cir.2004), *cert. denied, Higgs v. United States,* 543 U.S. 1004, 125 S.Ct. 608, 160 L.Ed.2d 465 (2004) ("*Higgs II*"). Higgs has now filed a Motion for Relief Pursuant to 28 U.S.C. § 2255 or in the Alternative Pursuant to 28 U.S.C. § 2241, asserting twenty-five claims of error. This filing is accompanied by a motion seeking additional discovery as to certain issues. The Court considers the pending motions.

**I.**

**Background**

The relevant facts, as set forth by the Fourth Circuit in *Higgs I,* are as follows:

**A. The Murders**

On Friday evening, January 26, 1996, Higgs, Willis Mark Haynes and Victor Gloria drove from Higgs's apartment at 13801 Briarwood Drive in Laurel, Maryland, to Washington D.C. to pick up Tanji Jackson, Tamika Black, and Mishann Chinn. Higgs knew Jackson and they had arranged dates for Haynes

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

and Gloria with Black and Chinn. They were traveling in Higgs's blue Mazda MPV van. After stopping at a liquor store, the three couples returned to Higgs's apartment to drink alcohol and listen to music. While there, the men also smoked marijuana.[FN1]

> FN1. After he was arrested in the fall of 1998 on federal charges of illegal distribution of crack cocaine, Victor Gloria agreed to cooperate with the government in the murder case against Higgs and Haynes. Most of the facts surrounding the murders of the three women were obtained from his eyewitness testimony. However, Gloria's testimony was partially corroborated by a friend of the Jackson family and Chinn's mother, both of whom observed the girls being picked up by a man or men in a blue Mazda MPV van. Gloria ultimately pled guilty to being an accessory after the fact to the murders and was sentenced to eighty-four months incarceration with three years supervised release.

At some point during the early morning hours of January 27, Higgs and Jackson began to argue. Jackson retrieved a knife from the kitchen and Haynes, who had been in the bedroom with Black, heard the commotion and came out to break up the fight. Haynes talked to Jackson and got the knife away from her. However, Jackson was still angry and the three women left the apartment. According to Gloria, as Jackson was walking out, "she stopped at the door and said something like I am going to get you all f---ed up or robbed" or made "some kind of threat." J.A. 473. In response, Higgs commented to the other two men that Jackson "do know a lot of n-s." J.A. 474. As Higgs was watching the women leave, he saw Jackson stop and appear to write down the license plate number of his van. This angered Higgs, who commented to Haynes and Gloria that Jackson was "writing down [his] sh-." J.A. 474. Gloria interpreted Higgs's comments as concern that Jackson intended to retaliate against Higgs.

At that point, "Higgs said f that, and grabbed his coat and said come on." J.A. 474. He also retrieved a silver .38 caliber firearm from the end table drawer and put it in his pocket. The three *488 men got into Higgs's van,

with Higgs driving, Haynes in the front passenger seat, and Gloria sitting behind Higgs. Higgs drove the van to where the three women were walking on the side of the road and told Haynes to get them in the vehicle. After Haynes spoke to them, the three women got into the back seat of the vehicle and Higgs started driving towards Washington, D.C. Neighbors in the area heard and saw the three girls laughing and talking around 3:30 that morning.

According to Gloria, while en route to Washington, D.C., Higgs and Haynes leaned towards each other and engaged in a quiet conversation that Gloria could not hear. The women were whispering in the back of the van and apparently believed they were being taken home. Higgs, however, drove past the Baltimore-Washington Parkway exit, which would have taken them directly into Washington, D.C., and instead drove the van into the Patuxent National Wildlife Refuge, a federal property within the jurisdiction of the United States Park Police. Eventually, Higgs pulled over at a secluded location. One of the girls asked if they were trying to "make [them] walk from there," and Higgs responded, "something like that." J.A. 482. After the women got out of the van, Higgs pulled out the pistol and handed it to Haynes, who put it behind his back and also exited the van. Within moments, Gloria heard a gunshot and wiped the mist off the back window in time to see Haynes shoot one of the women in the chest. Gloria turned to ask Higgs what he was doing, but saw Higgs holding the steering wheel and watching the shootings from the rearview mirror. Gloria put his head down, heard more shots, and heard a woman screaming.

After firing a few more shots, Haynes got into the van and closed the door. According to Gloria, either Higgs or Haynes then commented that they had to "get rid of the gun," J.A. 485, and Higgs drove to the Anacostia River where, according to Gloria, either Higgs or Haynes got out and threw the gun into the water. Higgs then drove back to his apartment where the three men began to clean up. Among other things, they wiped down the patio doors and "everything else, the bathroom, the doorknobs, the stereo," and threw away any items the women might have touched, such as liquor bottles, CDs, and rented videotapes. J.A. 487. The men then left the apartment and dropped the trash by a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

dumpster. Higgs and Haynes dropped Gloria off at a fast food restaurant, where he was told by Higgs to "keep [his] mouth shut." J.A. 489.

At about 4:30 a.m., a motorist found the bodies of the three women strewn about the roadway and contacted the Park Police. Jackson's day planner was found at the scene with Higgs's nickname-"Bones"-and telephone number recorded in it. On another page was written "13801 'MAZDA' 769GRY"-Higgs's address number on Briarwood Drive and the tag number for his Mazda van. A .38 caliber wadcutter bullet was also found there. According to the medical examiner, Jackson and Black had each been shot once in the chest and once in the back. Chinn had been shot once in the back of the head.

**B. The Investigation**

Although Higgs was almost immediately a suspect, the investigation into the murders continued for nearly three years before an arrest was made. On March 21, 1996, Park Police officers first interviewed Higgs at his apartment. At that time, Higgs acknowledged that he knew *489 Jackson and that he may have talked to her the night before she died, but he denied that she had ever been in his apartment. Higgs told the officers that he first heard about the murders while watching the ten o'clock news on Saturday, January 27, while attending a party at the home of Phyllis Smith, who was his girlfriend at the time. Higgs also told the officers that he had immediately commented to a party guest that he thought he knew "that Tanji girl." J.A. 672. According to the chief investigator, however, the names and photographs of the three victims were not released to the media until January 28.

After the interview of Higgs was concluded, the officers executed an arrest and search warrant arising from Higgs's suspected involvement in unrelated bank fraud violations. In addition to a variety of documents and cash bundles, the officers seized crack cocaine, a .380 semiautomatic firearm, and boxes of ammunition for .380, .45 and .38 caliber weapons. Higgs was arrested on federal drug charges and, on May 12, 1997, pled guilty to possession with intent to distribute cocaine base. He was ultimately sentenced to seventeen years imprisonment for the charge. Higgs has remained in the custody of either state or federal law enforcement officials since that arrest.

After Higgs was interviewed and arrested, the Park Police turned their attention to Phyllis Smith. Smith initially provided a false alibi for Higgs on the night of the murders. She claimed that Higgs had been with her and her family members the entire night of January 26, helping her clean her home in preparation for the party that was to be held the following night. She also instructed her family members to confirm the alibi. In April 1996, however, Smith testified before the grand jury that Higgs was only with her at 5 a.m. on January 27.

Ultimately, Smith recanted both accounts. She testified that Higgs called her when he was arrested in March 1996 and asked her to tell officials that he had been with her the entire night of January 26. She did as she was instructed, but believed at the time that she was being interviewed in connection with the drug charges that had been filed against Higgs. When Smith later learned that the questions pertained to the triple murder investigation, Higgs told her that he did not know the murdered women, but that Haynes had known them. When Smith was called before the grand jury in late 1998, she admitted her earlier lies about Higgs's whereabouts that night. Although she and several of her family members had been cleaning her home on the evening of January 26, Higgs was not with them. Nor was Higgs at her house in the early morning hours of January 27. At trial, Smith again testified that Higgs had not helped her prepare for the party that night and was not with her when she went to bed at 1:30 a.m. on January 27. Nor was he in her home when she awoke, as she routinely did, at 5 a.m. to care for her disabled son. Smith returned to bed shortly thereafter and awoke at 10:00 a.m., when she first found Higgs and Haynes present in her home. Thus, Higgs must have arrived at Smith's home sometime between 5 a.m. and 10 a.m. on the morning of January 27. Smith did confirm that Higgs and Haynes were at her house that night for the party and that the television was on during the party.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

Officers also interviewed Enidsia Darby, a former girlfriend of Higgs and the mother of his son, Daquon. Darby testified that Higgs contacted her by telephone after his March 1996 arrest and *490 told her that he had been arrested for drugs. Darby, however, had seen news reports of Higgs's arrest that contained photographs of the three murdered women and she asked Higgs about them. In response, Higgs asked Darby if she remembered that he had been with her at the hospital on the night of the murders, which was not true. When Darby visited Higgs in jail, Higgs admitted that he had been present when Haynes shot the women. He told Darby that Jackson had been invited over to his house to smoke and drink because she had been "snitching on one of them." J.A. 759. He told her that he did not know the other two girls; "they were just for his friends." J.A. 761.

In addition to her testimony regarding Higgs's drug activities, Darby offered testimony regarding a bank fraud scheme and credit card scheme that she and Higgs had conducted in the fall of 1995. Higgs deposited checks into accounts that had been opened by Darby and Andrea Waters, one of Darby's friends. The women, in turn, would withdraw the cash and give it to Higgs. Waters was paid a portion of the money withdrawn from her account, but when the checks deposited in her account bounced and Higgs refused to return the money, she threatened to go to the police. Higgs responded with a threat to kill her. Darby also testified that, while employed in the electronics department of a retail department store, she charged merchandise for Higgs to a credit card number Higgs had given her. Months later, when Darby was contacted by the police about the matter, Higgs threatened to kill her if she identified him from the surveillance photographs.

The investigation into Higgs's possible involvement in the murders also uncovered his participation in two prior shooting incidents involving a .38 caliber weapon. The incidents were significant because the same caliber weapon had been used to murder the three women.

The first incident occurred on November 20, 1995, approximately two months before the murders. Higgs got into an argument outside the Chaconia Nightclub in Washington, D. C., and shot out the windows of a vehicle in a drive-by shooting. After Higgs's arrest on the federal drug charges and while the murder investigation was still underway, the vehicle was searched and the police recovered a .38 caliber bullet. Wondwossen Kabtamu, who was with Higgs at the time of the Chaconia shooting, testified that he drove Higgs's Mazda MPV van while Higgs did the shooting. Kabtamu threw the gun out the window after the shooting, but they returned to get it at Higgs's insistence.

Higgs was ultimately charged with the Chaconia shooting in the D.C. Superior Court. In late 1998, while housed at a D.C. jail, Higgs had a number of discussions about the Chaconia charges with Domenick Williams, a fellow inmate and "jailhouse lawyer." Higgs never admitted involvement in the Chaconia shooting to Williams, but he did tell Williams "that he didn't want to plead guilty because they would try to use the gun in another case." J.A. 975. After Williams learned through a press report that Higgs was being indicted for the murders of the three women, Higgs commented to Williams, "you see why I can't plead guilty to that charge?" J.A. 979. Higgs also advised Williams that he had rebuffed the authorities' attempts to strike a deal with him to cooperate against his codefendant Haynes. When Williams advised Higgs that the authorities would likely offer Haynes a deal to cooperate if Higgs refused, Higgs told Williams "that his *491 youngan would hold up," J.A. 984, and "that the government wouldn't offer a deal to the trigger man," J.A. 985.

Williams also testified that Higgs asked him what the chances would be "if the witness after the fact wasn't there," J.A. 982, referring to Gloria. Williams told him that "his chances would be good." J.A. 983. Higgs later "explained to [Williams] that he wasn't worrying about the [murder] case because Mel and T would be out there." J.A. 987. Melvin Grayson and "T" were former inmates at the jail where Williams and Higgs were incarcerated. Higgs told Williams "that Mel would be out there to handle anything that he needed and that he could rely on him." J.A. 992.

Williams later notified the authorities of his conversations with Higgs and produced letters that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

Higgs had written to him in which Higgs reported that the Chaconia case had been dismissed, that Higgs had not heard from "T", but that "Mel has been in my corner." J.A. 1011. Through visitation records, authorities learned that Melvin Grayson had visited *Higgs* In the D.C. jail in February 1999 and again in March 1999. The Chaconia charges against Higgs were dismissed in D.C. Superior Court in May 1999.

The second shooting incident occurred on December 10, 1995, approximately a month after the Chaconia nightclub shooting. Haynes went to the home of Rodney Simms on Cherry Lane in Laurel, Maryland, and argued with Simms about a woman. During the argument, Haynes took out a 9mm handgun and began shooting. Higgs came out from a nearby shed and also began firing shots. Haynes and Higgs were charged in Maryland state court for the shooting. Police recovered 9mm and .38 caliber bullets and bullet casings from the Cherry Lane crime scene. Forensic evidence revealed that the .38 caliber bullets fired from the weapons at the Cherry Lane and Chaconia sites had five "lands and grooves," with a right twist.[FN2] Although forensics could not definitively conclude that the bullets had been fired from the same weapon, the .38 caliber bullets recovered from the Patuxent murder scene and the murder victims were also .38 caliber bullets shot from a gun with five lands and grooves with a right twist.

> FN2. According to the testimony, "lands and grooves" refer to the rifling marks that are "pressed onto a bullet when it travels down a barrel of a firearm." J.A. 1137. Because "different manufacturers will have different numbers of lands and grooves, different directions of twist, right or left, and different sizes," J.A. 1123-24, the marks allow forensic investigators to compare firearms with fired bullets and cartridge cases, and to compare fired bullets and cartridge cases from different crime scenes to one another.

In April 1997, Higgs pled guilty to the Cherry Lane shooting and was sentenced to 18 months imprisonment. During the plea hearing, the prosecutor stated that Haynes had fired the 9mm handgun and that Higgs had fired the .38 caliber handgun. Higgs offered no contest to the facts underlying the Cherry Lane shooting, with the single exception of gratuitously asserting that he "didn't have a .38. It was the other way around." J.A. 1104.

## C. The Indictment

On December 21, 1998, Higgs and Haynes were indicted for three counts each of first-degree premeditated murder, see 18 U.S.C.A. § 1111(a), first-degree murder committed in the perpetration or attempted perpetration of a kidnapping, see id, kidnapping resulting in death, see 18 U.S.C.A. § 1201(a), and using a firearm in the commission of a crime of violence, see *492 18 U.S.C. § 924(c). On October 22, 1999, the government filed the statutorily-required notice of its intent to seek a death sentence for the murder and kidnapping charges. See 18 U.S.C.A. § 3593(a). On December 20, 1999, the grand jury returned a second superseding indictment, and the government filed an amended death notice on February 8, 2000.[FN3]

> FN3. All references made to the indictment or death notice hereafter refer to the amended documents.

The cases were severed for trial. Haynes was tried first and convicted of first-degree murder, kidnapping, and use of a firearm during a crime of violence. During the penalty phase of Haynes's trial for the murder and kidnapping counts, however, the jury was unable to reach a unanimous verdict on the death sentence. Accordingly, on August 24, 2000, the district court sentenced Haynes to concurrent life terms for the first-degree murder and kidnapping counts and to a forty-five year consecutive sentence for the firearm offenses. His convictions and sentences were affirmed on appeal. *See United States v. Haynes*, 26 Fed.Appx. 123 (4th Cir.2001), *cert. denied*, 535 U.S. 979, 122 S.Ct. 1455, 152 L.Ed.2d 396 (2002).

## D. The Trial

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

Jury selection in Higgs's trial began on September 5, 2000, and the jury returned guilty verdicts on all charges on October 11, 2000. The case then proceeded to the penalty phase. On October 26, 2000, after hearing evidence on aggravating and mitigating factors, the jury returned a sentence of death for each of the murder and kidnapping counts.

In order to impose a sentence of death under the FDPA, a jury is required to find at least one "intent" factor enumerated by Congress, see 18 U.S.C.A. § 3591(a)(2), and at least one statutory "aggravating" factor, see 18 U.S.C.A. § 3592(c). Once the jury finds the requisite intent and statutory aggravating factors, the crime is death-eligible. The jury must then determine the existence of any nonstatutory aggravating factors submitted to it for consideration, provided the government has given the appropriate notice of its intent to submit such additional factors, see 18 U.S.C.A. § 3592(c), as well as any mitigating factors, see 18 U.S.C.A. § 3592(a), and "consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death," 18 U.S.C.A. § 3593(e).

As to all victims and offenses, the jury in Higgs's case determined that the government had proven two intent factors beyond a reasonable doubt: (1) that Higgs had "intentionally participated in ... acts, contemplating that the [lives] of [the victims] would be taken or intending that lethal force would be used in connection with [the victims]"; and (2) that Higgs had "intentionally and specifically engaged in ... acts of violence, knowing that the acts created a grave risk of death to the [victims]." See 18 U.S.C.A. § 3591(a)(2)(C) & (D).

The jury also found that the government had proven beyond a reasonable doubt four statutory aggravating factors: (1) that the deaths occurred during the commission of another crime (kidnapping), for the first-degree murder counts only, see 18 U.S.C.A. § 3592(c)(1); (2) that Higgs had a previous conviction of a *493 violent felony involving a firearm, based on Higgs's guilty plea to assault and reckless endangerment for his participation in the Cherry Lane shooting, see 18

U.S.C.A. § 3592(c)(2); (3) that Higgs had a previous conviction for a serious federal drug offense, based on Higgs's March 1996 arrest and subsequent conviction for possession with intent to distribute cocaine base, see 18 U.S.C.A. § 3592(c)(12); and (4) that the crime for which he was on trial involved multiple killings in a single criminal episode, see 18 U.S.C.A. § 3592(c)(16). The jury found that the government had also proven two nonstatutory aggravating factors beyond a reasonable doubt: (1) that Higgs had caused harm and loss to each victim and their families, based on the effect of the offense on the victims, their personal characteristics as individual human beings, and the impact of the death upon the victims and their families ("victim impact"); and (2) that Higgs obstructed the investigation into the kidnappings and murders by tampering or attempting to tamper with evidence and witnesses ("obstruction of justice").

Members of the jury also found three mitigating factors by a preponderance of the evidence: (1) that Higgs was not the sole proximate cause of the victims' deaths (12 jurors); (2) that Higgs was impaired by alcohol and marijuana at the time of the murders (2 jurors); and (3) that a sentence of death would have an adverse impact on Higgs's son (4 jurors). See 18 U.S.C.A. § 3592(a). However, the jury unanimously rejected three additional mitigating factors: (1) that Haynes was an equally culpable defendant who had not been sentenced to death for the murders; (2) that Higgs's family history, including the abandonment by his father and the death of his mother at a young age, influenced the direction his life had taken; and (3) that other factors in Higgs's background, record, or character or other circumstances of the offense mitigated against imposition of the death sentence.

Ultimately, the jury recommended that Higgs be sentenced to death for each death-eligible conviction and, on January 3, 2001, the district court imposed nine death sentences. The district court also imposed sentences of five years, twenty years, and twenty years for the three § 924(c) convictions, respectively, directing that the sentences be served consecutively. Additionally, the court imposed a three-year term of supervised release and directed Higgs to pay restitution of $ 13,687.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

*United States v. Higgs*, 353 F.3d 281, 289-295 (4th Cir.2003).

## II.

### Claim 1: Comparative Bullet Lead Analysis

One item of evidence not discussed in the Fourth Circuit's recitation of the facts in *Higgs I* was the Comparative Bullet Lead Analysis (CBLA) which the Government offered at trial to suggest that bullets found at the crime scene and at Higgs's home could be linked to bullets Higgs fired during the Cherry Lane and Chaconia Nightclub shootings. Higgs claims that he is entitled to a new trial or sentencing because the CBLA was a discredited scientific analysis which, since the trial, the FBI has in fact abandoned.

CBLA is a process that measures the elemental composition of the lead found in one bullet and compares it to that of the lead found in another bullet. *See* Edward J. Imwinkelried & William A. Tobin, *Comparative Bullet Lead Analysis (CBLA) Evidence: Valid Inference or Ipse Dixit?*, 28 OKLA. CITY U.L.REV. 43, 44-45 (2003). *494 Pursuant to CBLA, two bullets with statistically significant similarities in their elemental composition may be declared "analytically indistinguishable," the implication being that they were manufactured during a single process by a single manufacturer and thereafter found their way into the same box of bullets purchased by a person who, inferentially, fired both.[FN4] *See* Imwinkelried & Tobin, *supra*, at 47; *see also Ragland v. Commonwealth*, 191 S.W.3d 569, 576 (Ky.2006).

> FN4. The typical inference is that two "analytically indistinguishable" bullets originated from the same source or melt of lead at a manufacturing plant.

At Higgs' trial, Kathleen Lundy of the FBI Laboratory's Elemental Analysis Group testified that a bullet recovered from Mishann Chinn's head and a bullet recovered from

the Cherry Lane shooting scene were "analytically indistinguishable." TT. Oct. 6, 2000 at 32. She also testified that a bullet recovered from the Chaconia nightclub shooting was indistinguishable from 18 bullets found at Higgs' Briarwood apartment. *Id.* at 33.

More than three years after the trial in this case, the National Research Council of the National Academy of Sciences released the results of a study criticizing the reliability of CBLA. Committee on Scientific Assessment of Bullet Lead, National Research Council, *Forensic Analysis: Weighing Bullet Lead Evidence* (2004). The study, which had been commissioned by the FBI in 2002, led to the FBI's September 1, 2005, announcement that it had discontinued the use of CBLA. *See* FBI, Press Release (Sept. 1, 2005), http:// www. fbi. gov/ pressrel/ pressrel 05/ bullet_ lead_ analysis. htm. In its September 1, 2005, announcement, the FBI admitted that "neither scientists nor bullet manufacturers are able to definitively attest to the significance of an association made between bullets in the course of a bullet lead examination." *Id.*

Citing the FBI's decision to abandon CBLA as well as other scholarly papers challenging the reliability of the analysis, Higgs argues that CBLA was "inadmissible [as] junk science." This proposition is the launching point for three arguments that his constitutional rights were violated: (A) the Government's failure to disclose evidence of CBLA's unreliability violated the Due Process Clause of the Fifth Amendment; (B) defense counsel's failure to challenge the CBLA evidence amounted to Sixth Amendment ineffective assistance of counsel; and (C) recent revelations about CBLA's unreliability amount to new evidence entitling Higgs to relief under 28 U.S.C. § 2255 or 28 U.S.C. § 2241. The Court addresses these arguments in turn.

### A. *Brady v. Maryland*

[1] Higgs' first CBLA argument is that the prosecution violated *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) when it failed to apprise him of two studies available to the FBI but not to the public that could have been used to impeach Lundy's CBLA testimony-one study conducted by the FBI in 1991 ("FBI Study"),[FN5] and a second conducted by Iowa State

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

University researchers at the request of the FBI in 2000 ("Iowa State Study"). [FN6] The Court will discuss*495 the findings of these studies presently, but the threshold question is whether an internal law enforcement study of the general reliability of a forensic tool (in contrast to the tool's reliability *vel non* in a particular defendant's case) can ever be deemed *Brady* material. The Court concludes that it can.

> FN5. E.R. Peele, D.G. Havekost, R.C. Halberstam, R.D. Koons, C.A. Peters, and J.P. Riley, *Comparison of Bullets Using the Elemental Composition of the Lead Component*, PROCEEDINGS OF THE INT'L SYMPOSIUM ON THE FORENSIC ASPECTS OF TRACE EVIDENCE (1991).

> FN6. Alicia Carriquiry, Michael Daniels, and Hal S. Stern, *Statistical Treatment of Class Evidence: Trace Element Concentrations in Bullet Lead* (May 4, 2000) (unpublished study, Iowa State University) (on file with Ames Laboratory, Iowa State University).

[2][3] Under *Brady,* the suppression by the prosecution of evidence favorable to the accused "violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. 1194. The duty of disclosure applies not only to evidence actually known to the trial prosecutor, but also evidence known to those acting on the Government's behalf. *See Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (holding that the "individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"); *see also United States v. Munson,* No. 03-1153, 2004 WL 1672880, at *2, 2004 U.S. Dist. LEXIS 15465, at *7-*8 (N.D.Ill. Aug. 5, 2004) ("As a general rule, the government's *Brady* obligation extends to all members of the prosecution's team, which may include the DEA, police, or other agencies, such as the FDA or Postal Service."), *accord United States v. Pelullo,* 399 F.3d 197, 218 (3d Cir.2005) *and United States v. Chalmers,* 410 F.Supp.2d 278, 290 (S.D.N.Y.2006).

[4][5][6] However, "the mere possibility that an item of undisclosed information might have helped the defense ... does not establish 'materiality' in the constitutional sense." *United States v. Agurs,* 427 U.S. 97, 109-110, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). The prosecution's failure to disclose gives rise to a due process violation only where "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles,* 514 U.S. at 435, 115 S.Ct. 1555. Moreover, where the defendant could have obtained the same information through the exercise of reasonable diligence, the prosecution's failure to disclose does not violate due process. *See Hoke v. Netherland,* 92 F.3d 1350, 1356 (4th Cir.1996) (citing *United States v. Meros,* 866 F.2d 1304, 1308 (11th Cir.1989) ("[t]o establish a *Brady* violation a defendant must prove ... that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence....")).

The Court accepts that certain internal studies and reports generally relevant to the reliability of evidence introduced against an accused may be material to guilt or innocence. For example, in *United States v. Wood,* the Ninth Circuit determined that Investigational New Drug applications ("INDs") [FN7] released by the Federal Drug Administration ("FDA") "were *Brady* material, which the government had a duty to disclose...." 57 F.3d 733, 737 (9th Cir.1995). In that case, Wood had been convicted of distributing gamma hydroxybutrate and gamma hydroxybutyric acid sodium salt (collectively *496 "GHB") in violation of 18 U.S.C. § 371-defrauding the FDA by obstructing its function of ensuring that prescription drugs are safe and effective and dispensed pursuant to a prescription from a practitioner licensed by law to administer such drugs. *Id.* at 735.

> FN7. The FDA's website describes INDs as follows:

> Current Federal law requires that a drug be the subject of an approved marketing application before it is transported or distributed across state lines. Because a sponsor will probably want to ship the investigational drug to clinical investigators in many states, it must seek an exemption from that legal requirement. The

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

IND is the means through which the sponsor technically obtains this exemption from the FDA.

United States Food and Drug Administration, Center for Food Drug Evaluation and Research, htt p:// www. fda. gov/ Cder/ regulatory/ applications/ ind_ page_ 1. htm.

At trial, controversy arose over whether GHB could be considered a prescription drug, a point that turned on whether it could be deemed dangerous to humans. Subsequent to trial, Wood learned that INDs had been filed with the FDA that included "a fair amount of ... material ... [showing] ... that GHB, if properly taken by humans, was not dangerous to them." _Id._ The appellate court concluded that those INDs would have been useful in impeaching the Government's expert's testimony on GHB's dangerousness, and accordingly remanded the case to the district court to determine whether the INDs were "material" under _Brady. Id._ at 738-39. The district court's determination that the INDs were not material was later overturned in an unpublished Ninth Circuit opinion. _See United States v. Wood,_ 1997 WL 207973, 1997 U.S. App. LEXIS 9077 (9th Cir. Apr. 25, 1997).

_Wood_ thus stands for the proposition that studies or reports available to an agency involved in a prosecution and useful to a defendant may be _Brady_ material. That said, such information is not always _Brady_ material. For example, in _United States v. Bhutani,_ 175 F.3d 572 (7th Cir.1999), the Seventh Circuit rejected the materiality of data numerous drug manufacturing companies had submitted to the FDA. There, husband and wife defendants, the Bhutanis, manufactured a generic form of Lactulose, a prescription drug used to combat advanced liver disease. The court described the relevant attributes of Lactulose as follows.

One way of testing the stability of Lactulose is to measure its pH level. The pH scale measures the acidity or baseness of a chemical on a scale of 0 to 14. A chemical with a pH below 7 is an acid, while one with a pH above 7 is a base. At the time of the trial, the accepted pH range in which Lactulose was considered

most effective, as set forth by the U.S. Pharmacopeia ("U.S.P."), also known as the "bible" of the pharmaceutical industry, was 3.0 to 7.0. The U.S.P. based this determination on stability data provided by various drug manufacturers to the FDA. As Lactulose ages and begins to degrade, it becomes more acidic, i.e. its pH drops. Thus, the older Lactulose gets, the lower its pH reading will become. If the pH level becomes too low, the drug will no longer be effective to fight the liver disease.

_Id._ at 575. The jury found that the Bhutanis were "spiking" their Lactulose "with the foreign substance sodium hydroxide in order to conceal [its] age. Sodium hydroxide is a base, and, when combined with a more acidic substance, will raise its pH level." _Id._

Following their conviction, the Bhutanis filed a motion for a new trial based on the following alleged _Brady_ violation:

They claimed that the government, at the time of the trial, had in its possession stability data from numerous drug manufacturing companies that showed that the effective range for Lactulose was not in fact 3.0 to 7.0, and that Lactulose was still perfectly effective with a pH level as low as 2.5. Furthermore, they asserted that the U.S.P. released a proposal [following the trial] to change the effective pH range for Lactulose from 3.0 to 7.0 to 2.5 to 6.5.

_Id._ at 575-76. This drug company data, the Bhutanis argued, could have been used at trial to show that they had no reason to spike the Lactulose because the drug was effective at its pH level prior to the alleged spike (4.6). _Id._ at 576.

*497 The court concluded that the data in the FDA's possession was not material under _Brady,_ reasoning that the FDA did not know that the U.S. Pharmacopeia would alter the effective range for Lactulose.

The real evidence that the defendants rely on in their motion is the eventual publication of the U.S.P.'s

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

proposal to lower the effective range of Lactulose. This was not published until well after the trial had ended. Simply because the FDA had stability data from other pharmaceutical companies does not mean that they had any knowledge that the U.S.P. was going to recommend the proposed change in Lactulose's effective pH range. The government cannot be held responsible for failing to disclose merely speculative evidence.

*Id.* at 577. In short, the Seventh Circuit found that the data in the Government's possession was too speculative to be deemed material.[FN8]

> FN8. Notably, the U.S.P.'s reevaluation of the effective range of Lactulose occurred after the trial and, therefore, could not have been *Brady* material. Had this policy change occurred prior to the Bhutanis' convictions and not been produced, the Seventh Circuit could conceivably have found a violation.

As *Bhutani* suggests, not every shred of general scientific information available to the prosecution constitutes *Brady* evidence. Indeed, the Court is mindful that a rule requiring the disclosure of all studies, reports, data, or communications in any way related, no matter how tangentially, to the reliability of forensic procedure would be overly burdensome, if not totally impractical. Instead, the Court must remain focused on scientific evidence that is truly material, and therefore capable of undermining confidence in the verdict. Determining materiality will often require evaluating the reliability and level of scientific refinement of the evidence as well as the strength of other evidence offered at trial,[FN9] among other considerations. A stray remark by a government scientist, for example,*498 will presumably carry less weight than the printed results of a study or a marked change in agency policy. Similarly, raw data such as that in *Bhutani* is less likely to potentially undermine the government's case than the studies available to the prosecution in *Wood*.

> FN9. On the issue of the strength of the evidence, *see United States v. Mitchell*, 365 F.3d 215, 254-57 (3d Cir.2004). There, the Third Circuit considered the application of *Brady* to the

Government's solicitation of studies on the reliability of the fingerprint identification analysis used to inculpate the defendant. At trial, Mitchell had challenged the admissibility of the Government's evidence linking him to fingerprints obtained from the gear shift of the getaway car that he had been accused of driving from the scene of an armored car robbery. Subsequent to his conviction, Mitchell learned of a research proposal solicitation released by the National Institute of Justice (an arm of the United States Department of Justice) entitled "Forensic Friction Ridge (Fingerprint) Examination Validation Studies" (the "solicitation"). *Id.* at 232. "The solicitation sought proposals for research studies on 'validation of the basis for friction ridge individualization [the process used to match the fingerprints on the gear shift to Mitchell's fingerprints on file with law enforcement] and standardization of comparison criteria.' Creation of the solicitation had been underway before Mitchell's trial, but the solicitation was not released until March 2000-after Mitchell's trial had concluded." *Id.* Certain evidence suggested, however, that the NIJ had delayed the solicitation's release until after Mitchell's conviction.

> Mitchell first raised the issue of the solicitation's discovery in a Motion for a New Trial, which the district court denied following a four day hearing. Mitchell again raised the issue on appeal in the context of a *Brady* claim, but the Third Circuit deferred to the District Court's finding on materiality.

> In ruling on Mitchell's Rule 33 motion, the District Court credited "the testimony of the Government's witnesses at the Solicitation Hearing that the Solicitation does not change their testimony regarding fingerprint technology." In other words, the District Court discounted the impeachment value of the solicitation even after having seen Mitchell's actual cross-examination of the government's experts both with the solicitation (at the new

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

trial hearing) and without it (at trial). The District Court had the best vantage point, at both proceedings, to assess the government's witnesses ... and we defer to its finding.

*Id.* at 257 (citations omitted). In deferring to the district court, the Third Circuit concluded that the impeachment value of the solicitation was simply not strong enough to undermine confidence in the verdict and, thus, could not signal a *Brady* violation.

Against this background, the Court turns to Higgs' case. Higgs' *Brady* claim derives from the prosecution's failure to divulge the FBI study and the Iowa State study, which he claims contained information that would have helped him impeach the Government's expert testimony with respect to CBLA. While the Court accepts that these studies raise questions as to the validity of CBLA, it concludes that they were not required to be disclosed. The Court reasons thus: (1) the studies' strongest critiques of CBLA were available in at least one published study which was publicly available at the time of Higgs' trial, strongly suggesting that, through the exercise of reasonable diligence, Higgs could have obtained identical or nearly identical information; (2) the studies' remaining critiques do not consist of strong, definitive conclusions, but at most suggest areas for possible additional study; (3) by his own admission, Higgs could have called live witnesses capable of offering conclusions nearly identical to those offered in the Government's studies; and (4) other evidence presented at trial provided a firm link between Higgs and the bullets found at the murder scene.

**1. The availability of CBLA critiques offered by the FBI and Iowa State studies.**

A review of both Government studies reveals that their critiques of CBLA fall into two general categories: (1) challenges based upon bullet manufacturing and distribution processes, suggesting the possibility that bullets from the same lead source could make their way into separate boxes and ultimately into the possession of different individuals; and (2) challenges to the validity of the chemical and statistical analyses used to determine if two bullets-*e.g.*, a bullet found at a crime scene and a

bullet found in a suspect's possession-are "analytically indistinguishable."

The Court finds that the critiques based upon the bullet manufacturing and distribution processes, *i.e.* those in the first category, were accessible in at least one published study available at the time of Higgs' trial, strongly suggesting that, through the exercise of reasonable diligence, Higgs could have obtained identical or nearly identical information. As the FBI Study and the Iowa State Study both note, bullets from a single source of lead can-while being sorted, packaged, and distributed downstream to parties in the supply chain-end up in separate boxes and, quite possibly, the possession of different buyers. *See* Peele et al. at 57; Carriquiry et al. at 30. As a result, per that study, even where a bullet from a crime scene is analytically indistinguishable from another bullet found in the possession of a suspect, one may not be able to conclude that the suspect ever possessed, let alone fired, the bullet involved in the crime.

Nevertheless, this finding does not constitute an automatic *Brady* violation. The Court, based on its own search, was able to *499 locate at least one publicly available study-published in September 1999, well before Higgs' trial-that offered essentially the same conclusion: "The extent of each particular source (i.e., the number of identical boxes by each manufacturer) and the bullets available in a particular geographic area at a particular time are all unknown factors. As a result, bullet lead analysis ... *does not generate individualizing information*." R.O. Keto, *Analysis and Comparison of Bullet Leads by Inductively Coupled Plasma Mass Spectrometry*, 44 J. FORENSIC SCI. 1020, 1026 (1999) (emphasis added). Given the availability of a critique such as this,[FN10] the Court finds that the nonproduction of the FBI and Iowa State studies did not amount to a *Brady* violation. *See Hoke v. Netherland*, 92 F.3d 1350, 1356 (4th Cir.1996); *United States v. Orzechowski*, 547 F.2d 978, 985 (7th Cir.1976) (no *Brady* violation where information in unproduced DEA studies on what tests should be performed to determine if a substance is a cocaine isomer was available to defense in other forms and used during cross-examination of government expert).

FN10. Arguably the 1991 FBI Study itself was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

publicly available at the time of Higgs' trial. Although the Court need not reach a conclusion as to that, it does note that the publicly-available *Journal of Forensic Sciences* article cited the FBI Study, a fact which appears to weaken Higgs's claim that the FBI Study was not reasonably available at the time of his trial. *See* Keto at 1026 n. 16. Moreover, the Court notes that the FBI Study had been assigned an International Standard Book Number (ISBN) by 1999, *id.*, a fact which further erodes Higgs's contention that it was not externally available by the time of trial in 2000.

## 2. Uncertainty of studies with respect to chemical and statistical analysis per CBLA.

The Court further finds that the critiques which fall into the second category-challenges to the validity of the chemical and statistical processes that comprise the essence of comparative bullet lead analysis-involve no strong, material conclusions but at best suggest areas for possible additional study. The 1991 FBI Study, for example, actually did more to confirm the validity of CBLA processes than to discredit them, finding that "[a]ccurate, reproducible elemental concentration determinations in bullet leads can be obtained using both [Neutron Activation Analysis] and [Inductively Coupled Plasma-Atomic Emission Spectrometry] methods." Peele et al. at 65. At the same time, the Iowa State study never actually concluded that CBLA's chemical or statistical processes were invalid, finding instead that the two methods the researchers employed to assess the quality of bullet lead evidence produced indeterminate results, in large part because of limited data availability. *See* Carriquiry et al. at 30. These less than ringing conclusions do not suffice to undermine confidence in the outcome of Higgs' trial. They appear instead to be comparable to the speculative information available in *Bhutani, supra.* The Court concludes that the two Studies' findings did not constitute favorable evidence that "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles, 514 U.S. at 435, 115 S.Ct. 1555.*

## 3. Availability of expert witnesses.

It is also noteworthy that Higgs, by his own admission, could have called witnesses capable of stating conclusions nearly identical to those he characterizes as present in the Government's studies. His petition, for instance, notes that, "[a]s early as 1970, metallurgists began writing about the techniques the FBI was using to compare *500 the elemental composition of bullets. Analysis of these techniques began to appear in published case law well before Petitioner's trial in 2000." Indeed, such critiques were also making their way into court proceedings as early as 1981. Higgs himself cites a 1981 dissent by Justice Hunter of the Indiana Supreme Court arguing that a CBLA technique similar to the technique relied upon in Higgs' case was unreliable and inadmissible. *See Jones v. State, 425 N.E.2d 128, 134-37 (Ind.1981)* (Hunter, J., dissenting). Ultimately, then, Higgs concedes that "any competent metallurgist in 2000 could have made many of the points made by [William A.] Tobin," the former employee of the FBI Laboratory whose affidavit Higgs has filed with the Court, who characterizes Government witness Lundy's conclusions as "unsupported by scientific foundation" and "not reliable." In light of these concessions, the Court finds unpersuasive Higgs' claim that the Government studies contained information not reasonably available elsewhere.

## 4. Other bullet-related evidence.

Finally, the Court notes that the FBI's CBLA analysis was not the only evidence that served to establish a link between Higgs and the .38 caliber bullets retrieved from the crime scene. In addition to the CBLA analysis, the Government presented: (1) eyewitness testimony linking Higgs to the firing of a .38 caliber weapon outside the Chaconia Nightclub in 1995; (2) ballistics evidence showing forensic similarities between a bullet recovered from the Chaconia Nightclub shooting and bullets recovered from the bodies of the murder victims in the present case; (3) statements by Higgs implying that he owned the .38 caliber weapon used in the Chaconia shooting; (4) the .38 caliber bullets found in Higgs's apartment upon execution of a search warrant; (5) evidence showing that a .38 caliber weapon was used in the Cherry Lane shooting, a crime to which Higgs pleaded guilty; and (6) the eyewitness testimony of Victor Gloria, who testified that Higgs owned a .38 caliber handgun which Higgs retrieved from a drawer on the night of the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

murders and later handed to Haynes, who used it to kill the three victims. In light of this substantial evidence linking Higgs and a .38 caliber weapon, the Court concludes that the largely inconclusive information relative to CBLA offered in the Government studies, whether or not otherwise reasonably available at the time of the trial, did not comprise evidence that "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435, 115 S.Ct. 1555.

### B. Newly Discovered Evidence

[7] Higgs's *Brady* argument is but the first of three arising from admission of the CBLA evidence at trial. The second is that the discovery of "new evidence" about the reliability of CBLA, including the National Research Counsel study that led to the FBI's abandonment of the practice, entitles him to a new trial. The Court disagrees.

[8] Newly discovered evidence may open the door to habeas corpus relief if it can form the basis of an actual innocence claim. *Herrera v. Collins*, 506 U.S. 390, 404, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) (" 'Actual innocence' is ... a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits."); *Schlup v. Delo*, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995); *see also Buckner v. Polk*, 453 F.3d 195, 199-200 (4th Cir.2006). While it is not entirely clear whether Higgs' actual innocence claim is brought as a means to reach a procedurally barred constitutional claim under *Schlup*, or *501 whether he intends it as a "free-standing" claim of innocence which purportedly entitles him to relief under *Herrera*, it appears that he is alleging his actual innocence, in and of itself, as the basis for collateral relief. That is to say, he would like the Court to overturn his conviction because he submits he is actually innocent, on the grounds that pivotal evidence adduced against him at trial was unreliable.

The Supreme Court has never squarely held that actual innocence is a viable independent collateral claim. *See Herrera*, 506 U.S. at 417, 113 S.Ct. 853 ("We may assume, for the sake of argument in deciding this case, that

in a capital case a truly persuasive demonstration of "actual innocence" made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim."). But if such a claim exists, the Court has said, the threshold showing would "necessarily be extraordinarily high." *Id.* Higgs' showing in this case falls far short of such a high threshold. The evidence adduced against him at trial was extensive and strong. First and foremost, Victor Gloria provided a detailed account of the murders and Higgs' role in them, testimony which in large part was corroborated by the testimony of several other witnesses as well as physical evidence. In addition to Gloria's testimony, highly damaging evidence included:

1. Enidsia Darby's statement that Higgs told her that the victims were killed because Tanji Jackson was "snitching on one of them [Higgs or Haynes]." TT. Sept. 29, 2000 [Paper No. 355], at 33-35;

2. Higgs' attempt to manufacture alibis for himself by urging Phyllis Smith and Enidsia Darby to lie to investigators as to his whereabouts at the time of the murder, *Id.* at 31; TT. Sept. 29, 2000 [Paper No. 426], at 31-37;

3. Higgs' statement to Dominick Williams that he could not plead guilty to the Chaconia Nightclub shooting because he feared that the bullets found at that crime scene could be linked to those used to kill Black, Chinn, and Jackson-a statement tantamount to a confession, TT. Oct. 4, 2000, at 34;

4. Higgs' admission to Williams that the women were killed because they were "tripping," TT. Oct. 4, 2000, at 44-46;

5. Higgs's suggestion to Williams that his friends would stop Gloria from testifying, presumably by intimidating or killing him, *Id.* at 44, 49; and

6. Testimony from various witnesses that Higgs owned

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

and had previously fired a .38 caliber gun, the same caliber used in the murders.

This evidence, the Court finds, effectively demolishes Higgs' claim of actual innocence. In light of this evidence, Higgs also fails to meet what appears to be the less restrictive standard for actual innocence suggested in *Schlup*, 513 U.S. at 327-28, 115 S.Ct. 851 (holding that in order to demonstrate actual innocence, a movant must establish that based on the evidence, "it is more likely than not that *no reasonable juror* would have convicted him") (emphasis added).

### C. Ineffective Assistance of Counsel

[9] Higgs' third CBLA argument is that defense counsel was ineffective for failing to offer available studies or experts critical of CBLA.

Claims of ineffective assistance of counsel are governed by the two-part test outlined in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which requires a showing (1) "that counsel's performance was deficient," and; *502 (2) "that the deficient performance prejudiced the defense." *Id.* at 687, 104 S.Ct. 2052. Representation is deficient if it "falls below an objective standard of reasonableness," *Id.* at 688, 104 S.Ct. 2052. A showing of prejudice requires "that counsel's errors were so serious as to deprive the defendant of a fair trial ... whose result is reliable," *id.* at 687, 104 S.Ct. 2052, and that there was a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. Put differently, "[t]he benchmark of an ineffective assistance claim must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686, 104 S.Ct. 2052. *See also, Roach v. Martin*, 757 F.2d 1463 (4th Cir.1985) (adopting the *Strickland* test for the Fourth Circuit).

Passing the question of deficiency *vel non* of counsel's performance, the Court concludes that there was no reasonable probability that, absent counsel's alleged errors, the result of the proceeding would have been different. The multiplicity and the strength of the evidence previously catalogued establish that proposition beyond peradventure.

### D. Motion for Discovery

[10] For the same reason, the Court finds Higgs' discovery request for any FBI reports, studies, and scientific data related to the validity of CBLA or the FBI's decision to discontinue its use on September 1, 2005 without merit. Discovery in connection with a habeas petition may be given only upon a showing of "good cause." *See* RULES GOVERNING SECTION 2255 PROCEEDINGS FOR THE UNITED STATES DISTRICT COURTS 6(a). "Good cause" exists when there is "reason to believe that [the defendant] may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 908-09, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997). As discussed, there is no reason to believe that such additional facts as Higgs might hope to mine during discovery would demonstrate his entitlement to relief at this juncture.

### III.

### Claim 2: Peremptory Challenges

In his second claim, Higgs argues his entitlement to a new trial because of the allegedly discriminatory manner in which the prosecution exercised its peremptory strikes against women. This, he says, violated the Equal Protection Clause of the Fifth Amendment. He cites *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), in which the Supreme Court held that litigants may not use peremptory challenges "solely on account of race," a holding extended to gender-based challenges in *J.E.B. v. Alabama*, 511 U.S. 127, 128-29, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). As evidence of gender discrimination, Higgs submits that, despite the fact that over one-third of the jury pool was comprised of women, the final jury contained only men.[FN11] He further submits that the actions of the prosecutors in this case were part of a pattern of discriminatory behavior, as

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

evidenced by their elimination of a disproportionate number of women in another death penalty case heard by this Court following Higgs' trial.[FN12] Because of this jurisdiction's practice *503 of "blind striking" the jury, [FN13] Higgs says he has been unable to ascertain the exact number of strikes the Government exercised against potential female jurors.[FN14] He therefore argues that evidence relating to the Government's gender discrimination justifies discovery and an evidentiary hearing. He further complains that he was deprived of effective assistance when counsel failed to object to the prosecution's supposed gender bias in exercising its peremptory challenges.

FN11. The jury of 12 was picked from a total of 44 prospective jurors. Of the 44 prospective jurors, 28 (63.5%) were men and 16 (36.5%) were women.

FN12. *See United States v. Lighty,* PJM-03-00457 (D.Md.)

FN13. Under this practice, after the Court conducts voir dire, each side is given a clean juror list with all strikes for cause noted. Counsel then make their peremptory strikes from their respective lists, without seeing which jurors are being struck by the opposing side. The Courtroom Deputy (CRD) then takes up the lists from counsel and prepares a master list incorporating both sides' strikes. Counsel are advised by the Court that, starting from the top of the list, the CRD will call into the jury box the first 12 unstruck names (or more, depending on the number of alternates to be chosen). After the prospective jurors are called into the jury box, counsel are given a final opportunity to object before the jury is sworn.

FN14. While the prosecution and defense have not seen each others' strikes, they should be able to reconstruct those strikes by noting which of the first 28 names on the list (10 defense strikes and 6 prosecution strikes and 12 remaining jurors) have or have not been struck.

The Government argues that Higgs' claim is procedurally defaulted, but submits that even on the merits, he is unable to establish a *prima facie* case of discrimination or rebut the Government's legitimate, non-discriminatory reasons for its strikes. Because the underlying claim would have been futile, says the Government, the Sixth Amendment claim of ineffective assistance also fails.

**A.**

[11] The Court agrees that this claim is procedurally defaulted. Before now, Higgs has never argued that the prosecution exercised its peremptory strikes in violation of the Equal Protection Clause. Though a procedural default will be excused upon a demonstration of cause and prejudice, *see Massaro v. United States,* 538 U.S. 500, 504, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003), and while it may be assumed *arguendo* that Higgs has shown "cause," *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986) (noting that ineffective assistance of counsel is "cause" for a procedural default), he has not shown "prejudice." The Court explains.

**B.**

[12] A *Batson- J.E.B.* challenge requires a three-step inquiry: (1) the court first determines whether the defendant has made a *prima facie* showing that the prosecutor exercised a peremptory challenge on the basis of-in this case-gender, (2) the prosecutor must then present a gender-neutral explanation for striking the juror in question, and (3) the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. *Rice v. Collins,* 546 U.S. 333, 338, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006).

**1.**

[13] *Batson* provides that a defendant may satisfy his initial burden of demonstrating a *prima facie* case of discrimination by showing that: (1) the defendant was a member of a cognizable group, (2) the prosecution

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

exercised peremptory challenges to remove from the venire members of defendant's gender, and (3) other relevant facts and circumstances give rise to an inference of discrimination. *504 *Batson*, 476 U.S. at 96, 106 S.Ct. 1712; *J.E.B.*, 511 U.S. at 144-45, 114 S.Ct. 1419 (suggesting that analysis of gender-based discrimination claims should follow the approach outlined in *Batson* ). While *Batson-J.E.B.* challenges were originally limited to discrimination claims regarding one's own race or gender, this has since been expanded to allow defendants who are of a different cognizable group than the stricken jurors to establish a *prima facie* case. See *Powers v. Ohio*, 499 U.S. 400, 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (holding that racial identity between the objecting defendant and the excluded jurors does not constitute a relevant precondition for a *Batson* challenge). Because Higgs does not allege that members of his own gender, *i.e.* men, were improperly stricken from his jury, he must show that other relevant facts and circumstances give rise to an inference of discrimination involving women. *United States v. Joe*, 928 F.2d 99, 102 (4th Cir.1991) (citing *Batson*, 476 U.S. at 96, 106 S.Ct. 1712). He embarks upon a tortuous, ultimately unsuccessful course in his effort to do so.

Higgs begins by presenting statistics which he believes evidence discrimination by the prosecution during jury selection. He argues, from the limited information available to him, that it "appears" that the prosecution exercised eleven of its fifteen peremptory strikes, or 73.3%, to eliminate prospective female jurors, whereas women made up only 36.5% of the venire.[FN15]

> FN15. Of at least 15 strikes Higgs believes were used, he has determined that 11 of them were used against women.

The Government submits that these statistics are speculative and cannot suffice to establish a *prima facie* case of discrimination. See *United States v. Tipton*, 90 F.3d 861, 881 & n. 11 (4th Cir.1996) (rejecting a gender-discrimination claim where the defendants produced no evidence to support their argument other than "raw figures" of two men versus eight women stricken). It notes that four female jurors who were not excluded by the Government would have been seated if they had not been

stricken by Higgs' own counsel.

The Court is not prepared to say that statistics alone can never suffice to establish a *prima facie Batson* violation. See, e.g., *Howard v. Moore*, 131 F.3d 399, 407 (4th Cir.1997) (*en banc* ) (concluding that "prosecutor's striking of six out of the seven black prospective jurors"-without more-"constituted a *prima facie* case of discrimination"); see also *Allen v. Lee*, 366 F.3d 319, 359 (4th Cir.2004) ("When determining whether a *prima facie* case of discrimination has been shown, the district court may consider the proportion of black jurors stricken compared with the composition of the venire."). On the other hand, neither is it necessarily suspect that the prosecution exercised 73.3% of its strikes against women, when women constituted 36.5% of the venire. But assuming without deciding that such numbers could form the basis for a *prima facie* case of discrimination, Higgs nonetheless has failed to rebut the Government's proffered neutral, non-discriminatory reasons for its strikes.

2.

The Supreme Court has made clear that the prosecution's burden of establishing a legitimate reason for its strikes is not heavy. See *Rice*, 546 U.S. at 338, 126 S.Ct. 969 ("[a]lthough the prosecutor must present a comprehensible reason, the second step of this process does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices") (internal citations and quotations omitted). *505 To satisfy this burden, the prosecutors may provide a variety of reasons for their strikes, including among others the prospective juror's prior criminal jury service, the fact of the prospective juror having relatives who have served prison time, business concerns, and relationships between the prospective juror's relatives and trial counsel. Given this lenient standard, the prosecution easily satisfies its burden in this case.[FN16] See *Rice*, 546 U.S. at 338, 126 S.Ct. 969.

> FN16. The Government has explained that female Jurors 19, 43, 64, 69, 100, 112, and 124 were stricken for neutral reasons justifying their exclusion-separate and apart from their death

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

penalty views. Jurors 19 and 112 were stricken as a result of their prior criminal jury service. Juror 43 was stricken due to her concerns about her business, which was going public, where she was the chief financial officer. Juror 64 had a nephew whom she believed had been wrongly convicted of manslaughter and who had received a 10-to-20 year prison sentence. Juror 124 had a cousin who was currently being prosecuted for drug offenses in Maryland and a father who had served time in federal prison. Juror 69's brother was a police officer who was successfully defended against criminal charges by Harry Trainor, Esquire, Higgs' trial counsel. At the time of trial, Trainor still had a professional relationship with the juror's brother. Juror 100 failed to establish eye contact during voir dire and also had a 22-year-old son, which the Government believed might make her unduly sympathetic to the similarly-aged defendant. Juror 100 also stated, without explanation, that she would not apply the death penalty in some cases.

[14] Once a non-discriminatory reason is offered, step three of a *Batson* inquiry requires the trial court to determine whether the defendant has rebutted the stated rationales in order to prove intentional discrimination. *Batson,* 476 U.S. at 98, 106 S.Ct. 1712.

A variety of circumstances may be considered in determining whether the prosecution discriminated in its jury selection. In *Miller-El II,* the Supreme Court was persuaded by six indicia of discrimination where prosecutors: (1) struck a high percentage of veniremen on the basis of their being part of a cognizable group; (2) proffered reasons for striking the members of the cognizable group that applied equally to veniremen who were not members of the cognizable group; (3) repeatedly "shuffled" potential jurors when confronted with eligible veniremen who were part of the cognizable group; (4) used different scripts depending on whether the veniremen were part of the cognizable group; (5) made written notes about the veniremen being part of the cognizable group; and (6) were part of an office with a systematic policy of discrimination. *Miller-El II,* 545 U.S. at 239-66, 125 S.Ct. 2317.

The present case stands in marked contrast to *Miller-El II.* The percentage of strikes against women here, arguably high enough to make a *prima facie* case, ultimately does not persuade the Court that the prosecution engaged in intentional discrimination, particularly given that the lack of women on the jury was due at least in part to strikes made by the defense.[FN17] Furthermore, unlike in *Miller-El II,* the "shuffling" of jurors and the asking of different questions of male and female jurors did not occur here. There is no indication that the prosecution in its voir dire treated potential male and female jurors differently.

> FN17. The prosecution in *Miller-El II* struck 91% of the black veniremen, *id.* at 2325, while the prosecution in this case struck only 75% of the females on the venire.

Still, Higgs argues that under *Miller-El v. Cockrell,* a petitioner claiming discrimination in jury selection may prove that the prosecutor has engaged in systematic discrimination against a particular group of venire members as part of a "culture" of *506 discrimination. 537 U.S. 322, 347, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (*Miller-El I* ); *see also Miller-El v. Dretke,* 545 U.S. 231, 240, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) (*Miller-El II* ). A "culture" of discrimination can be established by a showing that the prosecutor discriminated "in case after case." *Swain v. Alabama,* 380 U.S. 202, 224, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). Higgs alleges such a culture was in place here because his prosecutors, five years after his trial, tried another capital case together, *United States v. Lighty,* PJM-03-00457 (D.Md.2006), in which they purportedly exercised 10 of their 12 identifiable peremptory strikes against women.

Higgs also fails in his attempt to rely on *Swain.* As indicated, under *Swain* "an inference of purposeful discrimination would be raised on evidence that a prosecutor, 'in case after case' ... is responsible for the removal" of women who have been selected as potentially qualified jurors. *Batson,* 476 U.S. at 91-99, 106 S.Ct. 1712 (citing *Swain,* 380 U.S. at 224, 85 S.Ct. 824). Jury statistics from the *Lighty* case alone, which was tried five years after Higgs, whatever they might show, fall far short

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

of demonstrating a pattern of discrimination in "case after case." [FN18]

FN18. For what it is worth, the Court notes that the two prosecutors charged with discriminating against females in their jury selection in this case and the *Lighty* case are themselves female.

### C.

Higgs' proposal that discovery be allowed and an evidentiary hearing held to explore his claim of gender discrimination in jury selection is rejected.

The Court finds no "good cause" to engage in discovery or hold a hearing based on the highly speculative ruminations Higgs has engaged in. A defendant may not use discovery to go on a "fishing expedition" through the Government's files in search of evidence to support an imagined and fanciful claim. *See United States v. Wilson,* 901 F.2d 378, 381 (4th Cir.1990).

### D.

Higgs' argument that trial counsel's failure to raise the *Batson* challenge in response to the prosecution's purported gender discrimination violated his Sixth Amendment right to effective assistance necessarily falls.

[15] Where an objection to evidence would have been futile, counsel is not constitutionally ineffective for failing to make it. *See Harris v. United States,* 204 F.3d 681, 683 (6th Cir.2000). Since counsel's decision to raise a constitutional challenge based on gender discrimination would have been futile, their failure to do so did not violate Higgs' Sixth Amendment right to effective assistance.

### IV.

**Claim 3: Brady Issues as to Witness Testimony;**

**Ineffective Assistance as to Witnesses; and Investigation**

Higgs asserts that the Government failed to disclose certain evidence, denying him his Fifth Amendment Due Process rights and that trial counsel were ineffective in failing to call certain witnesses, denying him his Sixth Amendment right to counsel. He also believes, based on newly discovered evidence, that he should be exonerated of the charges against him.

The testimony of several trial witnesses is relevant to these claims.

Victor Gloria gave eyewitness testimony with respect to the murders. He stated that, on the night of the murders, he rode *507 in the backseat of Higgs' vehicle while Higgs drove and Haynes sat in the passenger seat. He testified that he saw Higgs hand a gun to Haynes while whispering something to Haynes. At the same time, Gloria conceded he had initially told investigators and several witnesses that he had been asleep immediately prior to the murders, later explaining he had lied about being asleep. During cross-examination at trial, Higgs' counsel attacked Gloria's credibility, eliciting statements about his criminal past (including his use and sale of drugs and his violation of probation), as well as his willingness to lie to authorities.

Two other witnesses, Wondwossen Kabtamu and Richard Diolamou, testified as to the November 1995 incident that occurred outside the Chaconia Nightclub where Higgs shot out the windows of a vehicle in a drive-by shooting while Kabtamu drove. This testimony was used to demonstrate Higgs' participation in one of two prior shooting incidents involving a .38 caliber weapon.

Domenick Williams testified as to a discussion he had with Higgs while they were housed in the same block in D.C. jail (Northwest 1.).[FN19] Specifically, Williams stated that, while Higgs did not expressly admit his involvement in the Chaconia shooting, he told Williams he did not want to plead guilty to it "because they would try to use the gun in another case." According to Williams, Higgs also asked him what his chances would be if "the witness after the fact [Gloria] wasn't there." The Government offered this

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

testimony to demonstrate one of several acts evincing "consciousness of guilt" on Higgs' part.

> FN19. Williams was later moved to the sentencing block (Southwest 2).

The Court concludes that the Government did not withhold material evidence that would have had a reasonable probability of affecting the outcome of the trial. Moreover, Higgs' trial counsel engaged in a thorough investigation and presentation of this evidence such that any claim of ineffective assistance of counsel is unwarranted. Finally, there is no new evidence that would justify overturning Higgs' conviction.

### A. Suppression of Evidence and Due Process

Higgs claims that the Government withheld evidence with respect to benefits it purportedly offered to Victor Gloria, Enidsia Darby, Richard Diolamou, Wondwossen Kabtamu and Domenick Williams in exchange for their testimony. This non-disclosure, he argues, violated his Fifth Amendment Due Process rights.

[16] As previously stated, in order for the prosecution's suppression of evidence to violate a defendant's due process rights, the evidence must be material. *Brady*, 373 U.S. at 87, 83 S.Ct. 1194. To be "material," evidence must be such as would create a "reasonable probability" of a different outcome at trial. *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Promises made by the Government in consideration for testimony can be material if they meet this "reasonable probability" standard. *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Prosecutors therefore have a duty to disclose any consideration offered to a witness where the witness' credibility is crucial to the case. *Id.* at 154-55, 92 S.Ct. 763.

### 1. Gloria

[17] Higgs claims the Government failed to disclose

extensive information it had regarding its dealings with Gloria both in Maryland and other jurisdictions. He acknowledges that the jury knew Gloria faced 15 years in prison for his involvement*508 in the present case, plus 30 years on other federal drug charges and up to 10 years on State drug charges, and that it also knew that the Government had offered Gloria a lighter sentence for his role in this case in exchange for his cooperation. But Higgs argues that the jury never understood that Gloria might actually receive a lower sentence. As the Government correctly points out, however, the record squarely refutes this contention. Gloria himself testified that he could receive a sentence as low as 7 years, the sentence he in fact ultimately received based on the Government's motion at his sentencing that he receive a downward departure of two offense levels for substantial assistance under the sentencing guidelines. But Higgs says the jury did not know of additional consideration being offered to Gloria, i.e. that the charges he faced in connection with other federal drug violations would be dismissed and that, as to the state drug charges, he would only receive a sentence of one year concurrent with the time he was already serving in federal prison.

All this said, assuming Gloria actually received these benefits, there is no evidence that the Government offered any of the benefits to Gloria before he testified at the Higgs trial. That charges in a separate federal case against Gloria may have been dismissed 5 years after Higgs' trial in the present case in no sense establishes that the Government had determined not to pursue those charges at the time of Higgs' trial or that it had agreed with Gloria that it would do so. At the time of Higgs' trial, to the extent other federal claims may have been pending against Gloria, the Government may have had no intention whatsoever of dropping those charges, while 5 years later it may well have decided to drop the charges for wholly unrelated reasons. In short, Higgs has no basis, other than sheer speculation, for suggesting that the Government's dismissal of drug charges against Gloria, if indeed that is what happened, had any connection with Higgs' conviction and sentence. *See U.S. v. Roane*, 378 F.3d 382, 400-401 (2004) (finding that "airy generalities [and] conclusory assertions" are not sufficient to meet the defendant's burden in a § 2255 claim).

Higgs also claims that the Government offered Gloria

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

benefits in relation to state charges pending against him in Virginia as well as charges he potentially faced in Baltimore. Specifically, he submits that Virginia officials were never notified of Gloria's whereabouts during the Higgs prosecution, when presumably they should have been, and that state charges were never brought against Gloria for a homicide in Baltimore. Again, pure speculation about supposed benefits cannot substitute for hard facts. See *Roane,* 378 F.3d at 401. Higgs, quite simply, has failed to demonstrate any causal connection between Gloria's testimony in this federal case and whatever treatment he may have received in the state jurisdictions.

Even were the Court to find that the prosecution failed to turn over any of this evidence, and again assuming the factual accuracy of the supposed benefits, Higgs has not demonstrated its materiality. Gloria's credibility as a witness was thoroughly explored and impugned by Higgs' counsel through vigorous cross-examination. Gloria openly confessed to an extensive criminal history, going so far as to state that "if it is going to help Victor Gloria, Victor Gloria will do whatever he has to do." Unquestionably counsel established that Gloria was a witness of dubious reliability, whose testimony the jury could weigh accordingly. In other words, any evidence that Gloria may have received consideration for his testimony beyond that disclosed by the Government could **\*509** not have further undermined his already low credibility, nor would it have created a "reasonable probability" of a more favorable verdict. See *Kyles,* 514 U.S. at 434, 115 S.Ct. 1555 (quoting *United States v. Bagley,* 473 U.S. at 678, 105 S.Ct. 3375).

### 2. Others

Higgs' contentions that the Government failed to disclose information relating to consideration offered to Diolamou, Kabtamu and Williams in exchange for testimony are similarly infirm.

Factual claims must be established by a preponderance of the evidence. *Miller v. United States,* 261 F.2d 546, 547 (4th Cir.1958); *Martin v. United States,* 395 F.Supp.2d 326, 328 (D.S.C.2005). Higgs surmises, but presents no

hard evidence, to support his claim that Diolamou and Kabtamu received favorable treatment in immigration proceedings in exchange for their testimony in this case. His claim of Government nondisclosure of benefits as to Diolamou rests on the fact that Diolamou was involved in deportation proceedings at the same time as Higgs' trial. But the mere fact that these legal proceedings were occurring simultaneously does not show that Diolamou received benefits in one in exchange for testimony given in the other. There is no evidence in the record that Diolamou was in fact facing deportation or that he understood that he would be receiving any sort of immigration benefits in exchange for his cooperation here, or indeed that he actually received any benefits. As to Kabtamu, Higgs offers nothing more than an unfounded assertion that Kabtamu received an immigration benefit.

[18] As to Williams, Higgs claims the Government violated his due process rights when it failed to disclose evidence of an alias used by Williams that was tied to charges pending against him at the time he testified, or that there was an open bench warrant for Williams as to those charges, or that Williams and Higgs in fact did not share the same cellblock at the time of the incident about which Williams testified.

But assuming the existence of these facts or that the Government knew of them-which Higgs has by no means demonstrated-there is no reason to conclude that these facts established a "reasonable probability" of a different outcome at trial. Williams' criminal ways were fully apparent to the jury at all times, as evidenced by the fact that Williams spoke of being in jail with Higgs. Even then, the suggestion that Williams and Higgs may have been housed in different sections of jail at the time the conversation about which Williams testified took place is of negligible consequence. The records show that defense counsel were well aware of the times Williams and Higgs were housed together on the Northwest cellblock and when Williams was moved to the Southwest block. Since counsel knew there were times when Higgs and Williams were housed together and when they were in different locations, it is not clear how the records of their precise locations within the jail would have helped Higgs' case at all, much less that their production would have been reasonably probable to affect the outcome of the proceeding. See *Fullwood v. Lee,* 290 F.3d 663, 685-87

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

(4th Cir.2002) (finding that a defendant's claim of suppression cannot stand when the information is known to the defendant).

**B. Ineffectiveness of Counsel**

Higgs faults counsel for allegedly failing to investigate or present evidence regarding: (1) inconsistencies in Gloria's statements as to whether he was asleep at the time of the murders, including additional witnesses who could have testified to this issue; (2) Gloria's prior use and possession *510 of a. 38 caliber pistol; (3) Haynes' motive for the murders in this case other than the one the Government ascribed to him; (4) Higgs' supposed violent assault on Enidsia Darby; and (5) custodial records from the DC jail to impeach Williams' testimony and the supposed undisclosed benefits the Government offered to Williams. The Court agrees with the Government and rejects all these claims.

Per *Strickland,* counsel not only acted reasonably in regard to each of these claims, such that the claims for ineffective assistance of counsel fail; the Court finds no prejudice with respect to any of them.

**1.**

[19] Higgs alleges that two possible witnesses, Keon Dacosta and Katrina Havenner, the mother of Higgs' child, should have been called to impeach Gloria's testimony that Higgs put the murder weapon in Haynes' hands, because Gloria purportedly made statements to both Dacosta and Havenner that he was asleep during the murders. Dacosta has submitted a declaration stating that Gloria told him he was "asleep, or passed out" during the murders.

Higgs does not, however, suggest that his counsel knew about Dacosta. What he says is that Dacosta had witnessed an incident in which Higgs allegedly held a gun to the head of his former girlfriend Enidsia Darby. Higgs claims that counsel had a duty to interview Dacosta regarding that incident, and that if they had done so, counsel would have learned that Dacosta also had a connection with Gloria which, in turn, would have led to Dacosta's testimony that

Gloria told him he had been asleep at the time of the murders.

As for Havenner, she supposedly told a defense investigator that Gloria also told her he was unconscious at the time of the murders.

Higgs claims that had the statements of these witnesses been introduced, Gloria's credibility as a witness would have been further weakened. Although he acknowledges that his counsel were able to use Gloria's prior inconsistent statements to the police (i.e. that he was asleep during the murders) on cross-examination, he submits that counsel were ineffective for failing to establish a pattern of inconsistency in Gloria's statements. The Court finds none of these arguments persuasive.

[20][21][22] In assessing an ineffectiveness of counsel claim, the court presumes counsel's conduct was "within the range of reasonable professional assistance." *See Rose v. Lee,* 252 F.3d 676, 693 (4th Cir.2001) (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052). Counsel's decision not to embark on certain investigations is "assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. Claims of ineffective assistance of counsel based on failure to investigate potential witness testimony must show that the witness would have been willing to testify and that the testimony would have created "reasonable doubt" as to the defendant's guilt. *Spencer v. Murray,* 18 F.3d 229, 233-34 (4th Cir.1994). Failure to investigate a "crucial" witness may suggest ineffectiveness of counsel, but failure to investigate every single person mentioned by the defendant is not tantamount to ineffective assistance. *Huffington v. Nuth,* 140 F.3d 572, 580 (4th Cir.1998) (quoting *Gray v. Lucas,* 677 F.2d 1086, 1093 n. 5 (5th Cir.1982)).

Assuming *arguendo* that counsel ought to have interviewed Dacosta because he had been a witness to Higgs' assault on Darby, it is difficult to see how or why counsel would have had reason to know of Dacosta's relationship with Gloria. And if *511 counsel had no reason to know that one witness had a connection with

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

another witness, they can hardly be faulted for failing to learn about the second witness because they failed to ask the first witness about the second. *See Ames v. Endell,* 856 F.2d 1441, 1444-45 (9th Cir.1988) (finding that counsel had no duty to investigate "what hypothetically might have happened"); *see also Alcala v. Woodford,* 334 F.3d 862, 893 (9th Cir.2003).

Ultimately, however, with respect to counsel's failure to call these various witnesses, Higgs must still show that their testimony would have been likely to alter the outcome of the trial. *See Strickland,* 466 U.S. at 694, 104 S.Ct. 2052 (1984). This he has not done. While the testimony of Dacosta and Havenner may have further impeached Gloria, as previously noted, defense counsel did a very effective job undermining Gloria's credibility; they even got Gloria to impeach himself when he admitted he had lied in his initial statements that he was sleeping at the time of the murders. Counsel also had Gloria lay out before the jury his "history of deception and criminality." The testimony of Dacosta and Havenner would have been of marginal significance. Counsel were not remiss in failing to interview them or call them to the stand.

### 2.

[23] Higgs next claims that counsel ought to have investigated Gloria's prior possession and use of .38 caliber pistols because this would have suggested that Gloria had a more prominent role in the murders in this case. Specifically, prior to the murders in this case, Gloria faced charges in two incidents involving handguns: In July 1994, he was charged with possession of a .38 caliber handgun in a vehicle and, in February 1995, during a search of his apartment for drugs and drug paraphernalia, the Howard County authorities discovered a handgun in the apartment (although Gloria was not charged with possession of the weapon.) Higgs also notes that Gloria had admitted to having fired .38 caliber pistols.

The Court finds that these facts would have contributed virtually nothing to Higgs' defense. Mere familiarity with the type of weapon used in the murders would not necessarily have increased the likelihood that it was Gloria who used the weapon in this case nor would it have affected his credibility. Although counsel have a duty to

conduct a reasonable investigation, Higgs must show that counsel's failure to perform an appropriate investigation led to a failure to present exculpatory evidence. *See Spencer,* 18 F.3d at 233. In the July 1994 situation, although Gloria was charged with possession of the weapon, it was the other individual in the vehicle who ultimately claimed ownership of the weapon. Nor, again, was Gloria charged with possession of the weapon in the 1995 incident. In sum, Gloria's potential association with a .38 caliber weapon, attenuated as it was, was hardly exculpatory evidence as far as Higgs was concerned.

### 3.

Higgs claims counsel were ineffective for failing to investigate evidence of motives that Haynes or other individuals may have had to murder the women in this case. He suggests that the victims owed money to two drug dealers, Cephus and Chico, which gave those two men a motive to kill them. Higgs then argues that Haynes had a strong motive to kill the women because Haynes was serving as the "muscle" for Cephus and Chico. In support of this theory, Higgs proffers a declaration from Patrice Birdine claiming that Haynes' brother told her that Haynes shot the women over money. These proffers, however, do nothing to assist Higgs. Anything Birdine says is rank hearsay, and the *512 same appears be true of the statement of Haynes' brother, since the brother does not say he heard Haynes make what at best might have been a declaration against penal interest. *See* Fed.R.Evid. 803(8)(B). Haynes' supposed motive to commit the murders in this case is speculation of the highest order. More to the point, there is no basis for concluding that the existence of this recently proffered motive on the part of Haynes should have occurred to Higgs' counsel at the time of trial.

### 4.

[24] Higgs also faults counsel for failing to investigate Enidsia Darby's claims that Higgs violently assaulted her in 1995. In testifying about the incident, Darby initially claimed Higgs put a gun in her face and threatened to kill her. During trial counsel's cross-examination, however, Darby conceded that the altercation had been mutual. Defense counsel also established that the police failed to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

find a gun when they responded to the incident. But Higgs claims that the police report regarding the assault would have further impeached Darby's testimony, particularly because, at the time of the event, Darby made no mention of Higgs being violent. Higgs claims counsel ought to have interviewed Darby before trial because, having recanted her testimony since trial, she was presumably lying at trial.

The police report itself, of course, is inadmissible hearsay evidence. *See* Fed.R.Evid. 803(8)(B). In addition, there is no basis for concluding that a pre-trial interview of Darby would have caused her to say anything different from what she said at trial, notwithstanding what she apparently says today. Darby's current credibility is highly doubtful. Her most recent statement that she lied at trial because she believed the Government would give her benefits strongly suggests that even if she had been lying at trial, it is unlikely she would have sacrificed the hoped-for benefits she was lying for, simply because Higgs' counsel might have contacted her. Counsel's decision not to investigate Darby's claims did not amount to ineffective assistance.

### 5.

Higgs also contends that trial counsel failed to investigate Williams' precise location in the D.C. jail, the outstanding charges against him, or the outstanding warrant against him in Philadelphia. For the same reasons Higgs fails to prevail on his claim that the Government failed to disclose this evidence, there is no merit to his claim that counsel failed to investigate the matters. Counsel's performance was not deficient and nothing they did or did not do in this regard prejudiced the defense.

### C. New Evidence

[25] Finally, Higgs asserts his innocence based on alleged new evidence, *viz.*, the post-trial recantation of Victor Gloria with respect to his trial testimony that Higgs handed Haynes the murder weapon, supposedly reviving Gloria's one-time claim that he slept through the moments before the murder, as he originally told police.[FN20] Higgs asserts that § 2255 relief is required because Gloria's recantation exonerates him and demonstrates that his

conviction amounts to a fundamental miscarriage of justice. The Court is unpersuaded.

> FN20. Gloria is said to have made this recantation in a discussion with Robert Durand, an investigator working for Higgs' habeas counsel.

A claim of actual innocence standing alone has never been deemed to present a constitutional issue justifying habeas relief, although the Supreme Court has acknowledged the theoretical possibility of such a *513 claim. *See Herrera,* 506 U.S. at 417, 113 S.Ct. 853. Clearly, however, a petitioner may assert a claim of actual innocence based on newly discovered evidence in an attempt to rescue an otherwise procedurally defaulted constitutional claim. *Id.* at 404, 113 S.Ct. 853 (" 'Actual innocence' is not itself a constitutional claim ... but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits."); *see also* Randy Hertz & James Liebman, *Federal Habeas Corpus Practice and Procedure* § 2.5 (5th ed., Vol. 1 1998).

If a petitioner seeks to use newly discovered evidence as a gateway to revive a defaulted claim, he still must prove "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup,* 513 U.S. at 327, 115 S.Ct. 851. But in the present case Higgs does not appear to cite Gloria's purported recantation in an effort to revive an otherwise procedurally defaulted constitutional claim. He appears to offer it to demonstrate his actual innocence, on the basis of which he seeks to have his guilty verdict overturned. But having not yet held that a free-standing innocence claim is sufficient in a habeas proceeding, as the Supreme Court itself nevertheless noted in *House v. Bell,* 547 U.S. 518, 555, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006), the "threshold for any hypothetical freestanding innocence claim" would be "extraordinarily high".

Here it makes little difference whether Higgs must meet the "extraordinarily high" standard alluded to in *House* or the "no reasonable juror would have convicted him" standard of *Schlup.* True, a declaration has been filed

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

stating that the conversation between Gloria and a defense investigator took place.[FN21] But, generally speaking, recantations are highly suspect: they are not subject to cross-examination, they are generally offered years after the crime and the trial, and witnesses offering recantations are often facing radically different pressures than they were at the time of the initial trial. *See United States v. Johnson,* 487 F.2d 1278, 1279 (4th Cir.1973) (finding that recantations are viewed with great skepticism). The Government has outlined several incriminating actions Higgs took following the murders which were totally independent of what Gloria had to say (*e.g.* Higgs "sanitized his apartment, lied to police, attempted to create a false alibi, tried to silence Gloria"), all of which militate strongly against Higgs' claim of innocence based on a recantation made years after the crimes he was convicted of took place. His claim of actual innocence is totally unconvincing; the evidence of his guilt remains overwhelmingly strong. He has failed to meet either the *House* or *Schlup* standards.

> FN21. Initially, Higgs simply relied on the mere assertion in his briefing that such a recantation had taken place. After the Government filed its response noting the lack of a declaration, Higgs filed the Declaration of Robert Durand in which Durand deposes that "Mr. Gloria stated that he had been imprisoned 'for nothing,' because he had been asleep in the van when the murders were committed." (Durand Aff. ¶ 3; 2d Supplemental App. to Pet'r's Mot. for Relief)

**Claim 4: Ballistics Testimony**

Higgs next contends that trial counsel rendered ineffective assistance by failing to challenge the Government's ballistics testimony.

At trial, FBI ballistics examiner Carlo Rosati testified that the microscopic markings on the bullets fired by Willis Haynes at the murder scene, those found at the Chaconia shooting, and those found at the *514 Cherry Lane shooting shared common features, specifically five right-hand twisting lands and grooves. Rosati testified that the bullets were fired from the same class of weapon, but conceded that he could not determine whether or not the bullets were fired from the same gun. When cross-examined by defense counsel, Rosati conceded that more than 1.5 million weapons could have left the same microscopic markings found on each of the bullets. Even so, this testimony was used by the Government to argue that the bullets were fired from the same weapon used in all three shootings, a conclusion which, *inter alia,* was cited by the Fourth Circuit in affirming the conviction.

Higgs argues that his counsel were ineffective for failing to cross-examine Rosati based on information in the FBI ballistics report generated by Rosati himself and by the Prince George's County crime laboratory. The report, Higgs says, indicated that at least two different calibers of weapons produced by eleven different revolver manufacturers would produce the same markings as those found on the bullets in question and that a single manufacturer, Smith & Wesson, produced 19 different models in two calibers that could have created the same impressions. Use of such information on cross-examination, Higgs continues, would have discredited Rosati's testimony.

Higgs also contends that counsel were ineffective for failing to hire a defense expert to evaluate and challenge the ballistics evidence and Rosati's testimony. In fact, he says, the purported ballistics expert retained by Higgs' current counsel, William Conrad, has provided a letter stating that Smith & Wesson alone, one of the eleven potential firearms manufacturers, produced over two million weapons that could have created the markings on the bullets in question. Higgs argues that an expert such as Conrad could have been called at trial to show that Rosati's testimony underestimated the number of possible firearms that could have left the markings on the bullets.

Higgs also argues that counsel were ineffective for failing to contest the admissibility of Rosati's testimony. The testimony, in Higgs' view, lacked probative value because it shed no light on the allegations in the case and was not determinative as to whether or not the various bullets examined were fired from the same weapon.

Finally, Higgs argues that counsel were ineffective for

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

failing to object to the prosecution's misleading characterizations of Rosati's testimony during closing argument, specifically the statement that "[Higgs and Haynes] had done a shooting before.... [Higgs] knew Mr. Haynes would get out of that car and use that gun. Doesn't that make him more responsible for what happened that night?" TT 10/25/00, 23. These statements, according to Higgs, misled the jury and prevented them from fairly deciding the issue of his guilt or innocence.

### A.

[26] Again, to prevail on an ineffective assistance claim, Higgs must establish that counsel's performance "fell below an objective standard of reasonableness," that prejudiced his defense. *See Strickland,* 466 U.S. at 687-88, 104 S.Ct. 2052 (1984). The Court presumes "that counsel's conduct [fell] within the wide range of reasonable professional assistance." *Rose,* 252 F.3d at 693. The question is not "what the best lawyer would have done or even what most good lawyers would have done," but merely whether a reasonable lawyer could have made the same decision under the circumstances. *See Gilbert v. Moore,* 134 F.3d 642, 655 (4th Cir.1998) (citing *Waters v. Thomas,* 46 F.3d 1506, 1512 (11th Cir.1995) (en banc)). "There are countless *515 ways to provide assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. Under the second prong of *Strickland,* the petitioner must demonstrate that counsel's alleged substandard performance actually prejudiced the outcome of the case.

### B.

### 1.

[27] The claim of ineffective assistance with respect to counsel's failure to cross-examine Rosati is without merit.

Counsel had in hand the FBI ballistics report which clearly stated that at least two different calibers of weapons produced by eleven different revolver manufacturers would have produced the same markings found on the bullets, and that Smith & Wesson alone produced 19 different models in two calibers that could have created these impressions. In consequence, defense counsel, on cross-examination, got Rosati to concede that more than 1.5 million firearms could have produced the markings on the bullets. TT 10/5/00, 175. This was a highly important concession. The extensive numerical possibilities gave counsel wide latitude to argue to the jury that, based on the microscopic markings, it was not reasonable to infer that all the bullets came from the same weapon. It is difficult to envision how a more extensive cross-examination of Rosati could have benefitted the defense. Defense counsel constantly must decide what questions to ask and how much time to spend on a particular witness. These are precisely the types of tactical decisions a court is not supposed to second guess. *Byram v. Ozmint,* 339 F.3d 203, 209 (4th Cir.2003) (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052) (The Fourth Circuit has been "highly deferential" to strategy decisions of lawyers, and there is a presumption that "counsel's conduct falls within the wide range of reasonable professional assistance."). Given the extraordinarily meaningful concessions counsel did elicit, they were not ineffective for their strategic decision not to further cross-examine Rosati with information from the FBI ballistics report.

### 2.

[28] The claim of counsel's alleged failure to engage an expert to estimate an even higher number of potential weapons that could have made the markings found on the bullets in question suffers a similar fate. As an initial matter, the letter Higgs offers authored by his recently retained "expert" is of questionable admissibility because Higgs has failed to establish the expert's qualifications. *See generally Miller v. United States,* 261 F.2d 546, 547 (4th Cir.1958) (reciting a collateral attacker's evidentiary burden). But even if a qualified expert on Higgs' behalf had been called to make a higher estimate of possible weapons than Rosati did, the impact of such testimony would have been minimal. Conrad's estimate that at least 2 million guns could have made the markings, as compared to Rosati's estimate of 1.5 million, could hardly have made a difference with respect to the jury's evaluation of the likelihood that the same gun was used in all three shootings.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

Higgs' trial counsel, in fact, had designated a firearms expert for possible use at trial. The decision whether or not to rely on testimony adduced from Rosati as opposed to calling the defense's own firearms examiner was a reasonable tactical decision. Counsel apparently decided that it would be more compelling to elicit damaging evidence from the prosecution's witness himself rather than from an expert brought in by the defense to contradict *516 him, where the expert's motives and expertise could be challenged. There is no basis to find ineffective assistance with respect to counsel's failure to call a firearms expert.

### 3.

Higgs' claim that counsel rendered ineffective assistance for failing to object to the admission of Rosati's testimony also fails. As just discussed, Rosati's testimony permitted the defense to affirmatively demonstrate, without calling an expert of its own, that a substantial number of guns could have produced the markings on the bullets. *Byram, 339 F.3d at 209.* That alone was a sufficient tactical reason not to seek exclusion of the testimony.

### 4.

Finally, Higgs claims that trial counsel were ineffective for failing to object to the Government's closing argument that the same gun was used in all three incidents. But while Rosati's testimony may have permitted the Government to make this argument, it simultaneously gave the defense ample leeway to refute the argument. Beyond this, the Court specifically instructed the jury that its findings had to be based on an evaluation of the *evidence* presented and that "the arguments of the attorneys and the comments and rulings of the Court are not evidence." TT 10/24/2000, 142. Counsel's failure to object to this argument by the Government did not prevent the jury from fairly deciding the similarity *vel non* of the bullets and the weapon in this case and on other occasions. The absence of an objection by counsel was not unreasonable under the circumstances.

### C.

Beyond this, Higgs has not shown that any of the claimed errors would have created a reasonable likelihood of acquittal. *See Spencer v. Murray, 18 F.3d 229, 233 (4th Cir.1994).* His own conduct, particularly his statement to jailhouse informant Domenick Williams that he refused to plead guilty to another case "because [the Government] would try to use the gun in another case," did far more to support the inference that the same weapon had fired all the pertinent bullets than did Rosati's testimony. This evidence fairly permitted the prosecution to argue and the jury to conclude that Higgs had committed several crimes, including the three murders in this case, using a single .38 caliber firearm. In addition, counsel's cross-examination of Rosati potentially neutralized any suggestion that only a handful of weapons could have fired the bullets. No reasonable probability exists that the defense counsel would have secured a more favorable verdict had they performed in the manner Higgs now promotes.

### Claim 5: Admissibility of Co-Defendant Haynes' Confessions During Guilt Phase

Higgs contends that both trial and appellate counsel provided ineffective assistance by failing to raise a Sixth Amendment Confrontation Clause objection when the Government introduced evidence of Co-Defendant Haynes' confessions pertaining to the slayings.

During the guilt phase of Higgs' trial, the Government offered into evidence a tape-recorded telephone conversation in which Melvin Grayson, who was incarcerated with Higgs, read to Higgs the contents of a *Washington Post* article that recounted the statements made by Haynes. The article stated: "[A]ccording to testimony and Haynes' confessions to U.S. Park Police and FBI agents, the slayings were triggered by an argument between Higgs and Jackson during a party at Higgs' Laurel apartment just before the attack." In response to Grayson's reading,*517 Higgs remained silent. The Government argued that this silence constituted Higgs' recognition of the accuracy of Haynes' confessions. Higgs' trial counsel objected to admission of the reference to Haynes' confessions on Fifth Amendment grounds but did not raise an objection on Sixth Amendment Confrontation Clause grounds. The Court overruled the Fifth Amendment objection, admitting the recorded conversation as a potential adoptive admission. *See Fed.R.Evid.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

801(d)(2)(B).

Nonetheless, in their opening brief on appeal Higgs' counsel raised not only the Fifth Amendment objection, but the Sixth Amendment Confrontation Clause objection as well, developing the Sixth Amendment argument in detail in their reply brief. The Fourth Circuit affirmed this Court's decision to admit the recorded telephone conversation. *See Higgs I,* 353 F.3d at 310 (holding that this Court did not err in admitting the telephone conversation between Grayson and Higgs).

Higgs now submits that trial counsel's failure to object to the recorded conversation on Confrontation Clause grounds constituted ineffective assistance. He argues that the admission of the recording violated his right to confrontation because Haynes' confessions were testimonial in nature and Higgs never had the opportunity to cross-examine him. *See Crawford v. Washington,* 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (holding that testimonial statements made out of court are barred unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness). Higgs says counsel had no reasonable or strategic basis for failing to object on Sixth Amendment grounds when clearly established law barred the admission of a co-defendant's out-of-court testimony. *See Bruton v. United States,* 391 U.S. 123, 126, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (holding that the admission of a co-defendant's confession implicating the defendant violates the latter's Sixth Amendment right to cross-examination). Counsels' deficient performance, he says, "had substantial and injurious effect or influence in determining the jury's verdict" because the Government heavily relied on the recorded conversation throughout trial since the conversation implicated Higgs as the individual who "triggered" the killings, a central issue in the case. *Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (citing *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)) (holding that the standard for determining habeas relief is whether the error had "substantial and injurious effect or influence in determining the jury's verdict"). Though the Court instructed the jury that the newspaper article was not offered for the truth of its substance, Higgs argues that this instruction did not cure the Sixth Amendment violation. *See Bruton,* 391 U.S. at 137, 88 S.Ct. 1620 (ruling that limiting jury instructions are not an adequate substitute for petitioner's constitutional right of cross-examination).

As for appellate counsel, Higgs argues that their fleeting reference to the Confrontation Clause issue in their opening brief, despite their more extensive development in the reply brief, was insufficient to invoke adequate appellate review. Higgs contends that, had appellate counsel adequately presented this issue on direct appeal, there would have been a reasonable probability that his guilt and/or death sentence would have been vacated.

The Government continues to maintain that Higgs' silence in the face of an incriminating statement constituted an adoptive admission. Fed.R.Evid. 801(d)(2)(B); *see United States v. Duval,* 496 F.3d 64, 76 (1st Cir.2007) (holding that adoptive admissions,*518 including admissions by silence or acquiescence, are admissible pursuant to Federal Rules of Evidence). Because, at the time of Higgs' trial, there was legal support for admitting a defendant's adoptive admissions irrespective of the Confrontation Clause, *see, e.g., United States v. Allen,* 10 F.3d 405, 413 (7th Cir.1993), the Government contends that Higgs' counsel reasonably have decided to abstain from objecting and therefore did not render ineffective assistance by failing to do so.

**A.**

As before, the Court considers (1) whether counsels' "representation fell below an objective standard of reasonableness," considering all the circumstances, and (2) whether the deficiencies in counsels' performance were prejudicial. *See Strickland,* 466 U.S. at 688, 692, 104 S.Ct. 2052. The Court finds that Higgs has failed to satisfy the first prong with respect to the performance of both trial and appellate counsel, mooting the second prong analysis.

**B.**

[29] The Sixth Amendment protects a defendant's right to confront the witnesses against him. U.S. Const. amend. VI. In 2004, four years after the trial in this case, *Crawford*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

held that defendants have the right to confront third parties who make out-of-court statements that are testimonial in nature. 541 U.S. at 68, 124 S.Ct. 1354. What effect, if any, does *Crawford* have in the present case?

To begin, the Supreme Court has held that *Crawford* does not apply retroactively to cases that were final when the decision issued. *Whorton v. Bockting,* 549 U.S. 406, 417-21, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007). Since *Crawford* was decided in March 2004, and the Supreme Court did not deny Higgs' petition for certiorari until November 2004, *Crawford* remains in play for him. That said, it was and remains unclear whether and how *Crawford* might affect adoptive admissions because the Supreme Court explicitly left "for another day any effort to spell out a comprehensive definition of 'testimonial.'" 541 U.S. at 68, 124 S.Ct. 1354.

But whatever *Crawford's* impact may ultimately have on the use of adoptive admissions against defendants, at the time of Higgs' trial there was ample legal basis for Higgs' attorneys to believe that introducing an adoptive admission would not violate the Confrontation Clause. Both the Sixth and the Seventh Circuits had expressly found that admitting a defendant's adoptive admission did not violate the Confrontation Clause. *See Neuman v. Rivers,* 125 F.3d 315, 320 (6th Cir.1997) (finding no Confrontation Clause violation when party adopted incriminating statement); *United States v. Allen,* 10 F.3d 405, 413 (7th Cir.1993) (holding defendant has no right to confrontation with respect to an adoptive admission because it is "a statement that the defendant has adopted as his own" and therefore the defendant is effectively the witness against himself). *But see United States v. Monks,* 774 F.2d 945, 952 (9th Cir.1985) (stating that "adoptive admissions do not automatically satisfy the Confrontation Clause, at least where the third party statements alleged to have been adopted have probative value independent of the fact that they may have been adopted by the defendant"). Because case law at the time of trial supported the proposition that adoptive admissions do not violate the Confrontation Clause, counsel's decision not to raise a Sixth Amendment objection to the admission Higgs' response to the reading of the *Washington Post* article was not unreasonable.

### *519 C.

Similarly, appellate counsel's performance did not fall "below an objective standard of reasonableness." *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. As noted on direct appeal, counsel in fact raised the Sixth Amendment Confrontation Clause objection in their opening brief, developing the claim more fully in their reply brief. Although Higgs contends that counsel's failure to extensively develop the issue in the opening brief precluded appellate review, the Fourth Circuit had no trouble finding that "the recording demonstrates that Higgs not only heard and understood the statements made by Grayson, but commented upon them to some extent." *Higgs I,* 353 F.3d at 310. Thus, the Fourth Circuit was able to conclude that "the district court did not abuse its discretion in admitting the [recorded telephone conversation between Higgs and Grayson] and charging the jury that Higgs' silence could be considered an admission." *Id.* In other words, appellate counsel's Sixth Amendment argument on direct appeal, which the Fourth Circuit was certainly aware of, gave it no pause and presented no obstacle.

Even if appellate counsel failed to adequately raise the Sixth Amendment objection, their performance would still have been reasonable. As of the time of Higgs' direct appeal in 2003, there was clear legal support for the admission of the recording as an adoptive admission because, not long before, the Fourth Circuit had ruled that "a party may manifest adoption of a statement in any number of ways, including [through] words, conduct, or silence." *United States v. Robinson,* 275 F.3d 371, 383 (4th Cir.2001) (citing *Marshall v. Young,* 833 F.2d 709, 716 n. 3 (7th Cir.1987)). Furthermore, as just observed in the context of trial counsel's failure to raise a Sixth Amendment objection, case law suggested that, when a statement forms the basis for an adoptive admission, the defendant has no claim under the Confrontation Clause. Accordingly, any further argument by appellate counsel would in all likelihood have been similarly futile. Appellate counsel could have reasonably decided to forego any further Sixth Amendment objection in this case. *See Harris v. United States,* 204 F.3d 681, 683 (6th Cir.2000) (holding that failure to make a futile objection does not amount to ineffective assistance).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

Because both trial and appellate counsel did not perform deficiently in respect of Confrontation Clause and due process issues, there was no prejudice to Higgs as to the probable outcome of his case.

### Claim 6: Denial of Effective Assistance of Counsel at Sentencing

Higgs next argues his trial attorneys rendered ineffective assistance at sentencing by failing to: 1) obtain his school records, which would have illustrated that he was diagnosed as learning disabled from an early age and was emotionally disturbed and depressed due at least in part to his mother's death; 2) obtain a pre-sentence report from a criminal fraud proceeding against Higgs that was prepared in 1996; 3) secure the testimony and criminal records of Higgs' father, Alphonso Higgs, who would have admitted that he was an absentee father with serious drug addictions, who would have testified that he verbally and physically abused both Higgs' mother and Higgs himself; 4) locate and present testimony of Higgs' mother's younger sister, Nancy Lee Riley, and her older brother, Richard Bennett, who would have corroborated the testimony regarding Alphonso Higgs' abuse, and who would have testified to the impact Higgs' mother's death had on 10-year-old Higgs; and 5) provide the defense's retained mental health experts with mitigating *520 evidence in the form of Higgs' school records and testimony from Higgs' father, aunt, and uncle detailing Higgs' abusive upbringing. Higgs also argues that his trial attorneys rendered ineffective assistance during the penalty phase by deciding to limit mitigating evidence when the Government decided to drop a claim of future dangerousness from its presentation of aggravating circumstances. Specifically, he says trial counsel's decision to limit evidence of his personal history to events before he was 18, in order to avoid opening the door to bad acts evidence in rebuttal, was strategically unsound because evidence of his past bad acts had already been introduced during the guilt phase and already suggested through evidence of other aggravators, and because the decision was the result of a less than thorough investigation.

The Government argues that Higgs has failed to demonstrate that counsel erred or that he was in any way prejudiced by counsel's acts or omissions.

#### A.

Higgs must establish that counsel's performance "fell below an objective standard of reasonableness" and that in the absence of counsel's errors a reasonable probability exists that "the result of the proceeding would have been different." *See Strickland,* 466 U.S. at 687-88, 104 S.Ct. 2052. Again, when analyzing the unreasonableness prong, the Court must defer to counsel's decisions and tactical judgments made after full investigation, though to be sure the Court need not defer when such decisions and judgments are based upon less than a full investigation. *Wiggins v. Smith,* 539 U.S. 510, 522, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). As for prejudice, Higgs must show a reasonable probability that, but for counsel's allegedly deficient performance, the outcome of the case would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. The Court weighs the totality of reasonably available mitigation evidence presented at trial against the totality of evidence presented in aggravation. *Williams v. Taylor,* 529 U.S. 362, 397-98, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

#### B.

The Court considers the various ways in which counsel's investigation for and presentation at sentencing were allegedly deficient.

#### 1.

[30] Higgs argues first that counsel failed to obtain certain school records, which would have demonstrated his troubled childhood and youth.

Higgs is correct that an attorney representing a capital defendant has a constitutionally-mandated duty to conduct a thorough investigation of any potential mitigation evidence in preparation for a capital sentence proceeding. *Id.* at 415, 120 S.Ct. 1495 (O'Connor, J., concurring). A "thorough investigation" requires diligent "efforts to discover *all reasonably available* mitigating evidence."

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

*Wiggins,* 539 U.S. at 524, 123 S.Ct. 2527 (emphasis in *Wiggins;* citation omitted). However, the duty only arises where an attorney has information suggesting that such investigation is necessary. *See Ames v. Endell,* 856 F.2d 1441, 1444-45 (9th Cir.1988) (failure to investigate a plausible scenario in defense of client when attorney and client agreed the scenario had not happened was not ineffective); *see also Hedrick v. True,* 443 F.3d 342, 350 (4th Cir.2006) (failure to investigate potentially mitigating evidence at sentencing regarding defendant's difficult childhood after a psychological expert did not suggest that further exploration was warranted was not ineffective); *521 *Bacon v. Lee,* 225 F.3d 470, 481 (4th Cir.2000) (failure to fully investigate defendant's difficult childhood was not ineffective because counsel could have reasonably concluded that the evidence presented was sufficient).

Here, counsel in fact pursued Higgs' school records, but had no reason to believe further investigation was necessary. Higgs does not dispute that when counsel requested the records, the school system provided only a transcript indicating that it purged "full cumulative" student records six years after high-school graduation, the implication being that Higgs' records had been purged. Though in fact it appears the school system retained special education records indefinitely, counsel had no reason to know or suspect that. Indeed, even if counsel had researched the district's policies, there is no reason to suppose they would have found any basis for contradicting the school system's stated policy that the record-retention schedule required only a six-year retention of special education records. Nor would counsel's knowledge that Higgs was a special education student have necessarily prompted further investigation. The school system's response regarding "full cumulative" records and its stated policy led counsel to reasonably believe that Higgs' records had been destroyed. It was not, therefore, unreasonable for counsel to fail to search further.

In any event, Higgs cannot show prejudice. Though the school records might have provided additional information indicating Higgs' struggles passing his courses as well as instances of emotional disturbance and depression, they also demonstrated that he consistently rejected efforts to assist him to grow into responsible adulthood. No reasonable probability exists that the jury would have returned a more favorable verdict had the special

education records been discovered. *Williams v. Taylor,* 529 U.S. 362, 397-98, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

**2.**

In his Brief, Higgs also faults counsel for failing to obtain a pre-sentence investigation report prepared by the Maryland Department of Parole and Probation in connection with 1996 fraud charges. Here Higgs defeats his own argument that counsel's omission-assuming it occurred-was constitutionally deficient, since he concedes that the report "would have confirmed and corroborated [his] history of drug and alcohol abuse." Petitioner's Brief at 75. In other words, the evidence in the report would simply have tracked other evidence already in the case, hardly a compelling argument that counsel's performance should be judged to be constitutionally sub-standard.

**3.**

[31] Higgs' next claim relates to counsel's failure to secure testimony and criminal records of Higgs' father.

Here, too, Higgs fails to demonstrate that counsel's performance "fell below an objective standard of reasonableness." *See Strickland,* 466 U.S. at 687-88, 104 S.Ct. 2052. Though Alphonso Higgs now claims that he would have offered testimony on behalf of his son, the defense's mitigation/specialist, Joel Sickler, testified that he had attempted to reach Alphonso Higgs prior to the trial, but received information from two of Alphonso Higgs' children that he did not want to participate in his son's defense. Higgs fails to acknowledge his own investigator's unsuccessful attempts to contact Alphonso Higgs directly.

[32] Higgs also fails to demonstrate that he was prejudiced by the absence of his father's testimony. Alphonso Higgs' credibility would certainly have been challengeable, not only because of his relationship*522 to Defendant Higgs, but also because he was a convicted felon who admitted he was abusing drugs during the time period to which he would testify. In any event, the jury considered the fact

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

that Higgs' father was an absentee parent who had a drug problem. Investigator Sickler testified that Alphonso Higgs had problems with a narcotics addiction, had a substantial criminal history including time in jail for trafficking a controlled substance, and had provided little financial or emotional support to his son. There is no reason to believe that Alphonso Higgs' verbally recounted recollections of physical abuse he was responsible for would have significantly changed the jury's verdict in this case.

4.

[33] Higgs claims that counsel provided ineffective counsel by failing to present the testimony of Nancy Lee Riley (his mother's sister) and Richard Bennett (his mother's brother).

There is, however, no evidence that Higgs' lawyers were ever made aware of any particular information that these witnesses possessed that should have led the lawyers to further investigation. Beyond stating in general terms that Alphonso Higgs on occasion abused Marilyn Bennett in Defendant Higgs' presence, the witnesses' declarations would have offered no new concrete facts or specific incidents relevant to Defendant Higgs' background. Their purported testimony would have essentially tracked that of Investigator Sickler. The cases Higgs cites-which have found counsel ineffective where reasonable diligence would have *added* relevant undiscovered mitigating evidence-are distinguishable because here the additional evidence would either have been irrelevant or substantially similar to that already introduced. *See Williams,* 529 U.S. at 391-99, 120 S.Ct. 1495; *Wiggins,* 539 U.S. at 510, 123 S.Ct. 2527; *Rompilla v. Beard,* 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005).

[34] Not only has Higgs failed to demonstrate that his counsel's performance was deficient, he again fails to demonstrate prejudice. No reasonable probability exists that inclusion of the Riley-Bennett testimony would have altered the jury's understanding of Higgs' upbringing or how it may have affected his actions on the night of the murders, such that a more favorable penalty-phase verdict would have resulted. *See Williams,* 529 U.S. at 397-98, 120 S.Ct. 1495. Riley and Bennett offer at best

generalizations, not specific instances of abuse. Moreover, the credibility of both is open to question, given that only now, years after trial, have they come forward with statements. Finally, the jury heard testimony regarding the heavy impact Higgs' mother's death had on Higgs. Constance McKinnon, who lived with Higgs after his mother's death, specifically testified regarding the emotional impact on Higgs.

No ineffective assistance was rendered when counsel did not pursue or present the testimony of Alphonso Higgs, Nancy Lee Riley, or Richard Bennett.

5.

Higgs' argument regarding mental health experts Lawrence Donner, Ph.D. and Susan Feister, M.D. is somewhat hard to follow.

In his opening Motion, Higgs argues that counsel were deficient because they failed to "[enlist] the aid" of these experts. Petitioner's Motion at 67. But counsel did in fact consult these experts, which Higgs concedes was "a step in the right direction." *Id.* What Higgs apparently contends was deficient on counsel's part is that the experts were not provided "access to relevant records or lay witnesses"-*523 presumably the school records, Alphonso Higgs, Nancy Lee Riley, and Richard Bennett. *Id.* The short answer to that argument, of course, is that since counsel were not deficient in not accessing the records or witnesses themselves, they would not be deficient for failing to transmit them to the mental health experts.

Higgs also appears to fault counsel for not calling either of these experts to testify-they were not in fact called-but this argument is not carried forward in his Brief in Support of his Motion or his Memorandum in Reply to the Government's Opposition. But, again, the failure to call argument, insofar as it has not been abandoned, is still premised on the fact that the experts were not provided with information that counsel cannot be faulted for not obtaining.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

**6.**

[35] As for the suggestion that counsel made an unsound decision to limit Higgs' mitigating evidence to events before his eighteenth birthday, that clearly was a matter of tactical choice. Certainly evidence of Higgs' wayward life after age eighteen was already in the mix, but counsel could fairly have decided to minimize emphasis on the multiple bad acts of Higgs adulthood, especially in recognition of the fact that future dangerousness would not be pursued as aggravation. Counsel's decision in this regard did not constitute ineffective assistance.

### Claim 7: Racial Discrimination in the Administration of the Death Penalty

[36] Higgs's seventh claim is that trial counsel were ineffective for failing to raise equal protection and Eighth Amendment challenges to the Federal Government's decision to pursue the death penalty against him. In support of this claim, he cites statistics maintained by the Federal Death Penalty Resource Counsel which, he maintains, suggest that the Department of Justice has sought the death penalty in a racially discriminatory manner during the years since its reintroduction.

The Court finds the equal protection and Eighth Amendment claims to be procedurally defaulted. As he concedes, until now Higgs has never argued that the Federal Government's decision to pursue the death penalty against him violated these rights. Though a procedural default can be excused upon a demonstration of cause and prejudice, *see Massaro,* 538 U.S. at 504, 123 S.Ct. 1690, no such relief is warranted here. Higgs has shown neither cause nor prejudice.

Statistics alone do not support a finding of discriminatory intent sufficient to strike down a death penalty scheme on equal protection grounds. *McCleskey v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987); *see also United States v. Bin Laden,* 126 F.Supp.2d 256, 261 (S.D.N.Y.2000) ("At its core, therefore, *McCleskey* stands for the notion that, by themselves, systemic statistics cannot prove racially discriminatory intent in support of an equal protection claim by a particular capital defendant.").

Since petitioner has offered no proof that the Government actually decided to pursue the death penalty *in this case* for biased reasons, he may not show that his attorneys were ineffective for choosing not to raise the issue.

Nor is there the slightest basis for concluding that discovery would reveal any racial bias on the part of prosecutors. Accordingly, Higgs' request for discovery on Claim 7 is denied.

### Claim 8: Admissibility of Portions of Co-Defendant Haynes' Statements During Penalty Phase

Higgs next says that trial counsel rendered ineffective assistance during the *524 penalty phase when they failed to raise Fifth Amendment Due Process and Sixth Amendment Confrontation Clause objections to testimony with respect to several statements made by his Co-Defendant Haynes.

Specifically, United States Park Police Captain Robert Rule testified that, according to Haynes, "[a]fter they returned to Mr. Higgs' apartment at the end of the evening ... they went into the apartment, began cleaning up the apartment and throwing out various items." TT 10/18/00, 150. As to the "murder weapon ... Mr. Higgs drove the van down to Anticostia [sic] Park and pulled over on a spot on Anticostia [sic] Drive not far from the Anticostia [sic] Rec Center pool, and [Mr. Haynes] ran and threw the gun into the river." *Id.* at 150-151. Captain Rule thus supplied critical evidence concerning the aggravating factor of obstruction of justice eventually found by the jury.

Higgs continues:

Haynes' statements were made to a law enforcement officer in the midst of a custodial interrogation and accordingly fall within the core class of statements deemed "testimonial" by the Supreme Court under *Crawford,* 541 U.S. at 68, 124 S.Ct. 1354. Because he had no opportunity to cross-examine Haynes, the admission of Haynes' statements violated Higgs' right to confrontation under the Sixth Amendment. Moreover, since Haynes had a strong

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

motive to place blame on Higgs rather than himself, his testimony implicating Higgs was presumptively unreliable.

While trial counsel objected to this evidence, unsuccessfully as it turned out, arguing that it was more prejudicial than probative, it is true that they did not specifically base their objections on Fifth or Sixth Amendment grounds. Appellate counsel, for the first time, attempted to argue that the evidence violated Higgs' Sixth Amendment Confrontation Clause right, but the Fourth Circuit deemed the argument waived because it was not raised at trial. The Fourth Circuit, in any event, rejected the claim under the plain-error doctrine, finding that the evidence was harmless. *See Higgs I,* 353 F.3d at 323-25.

Higgs now argues that trial counsel were ineffective for failing to raise the Fifth and Sixth Amendment objections at trial.

Of the two, he appears to rely principally on his Sixth Amendment Confrontation Clause argument. While he concedes that the Federal Rules of Evidence do not ordinarily apply at sentencing, he suggests that this does not mean that the Confrontation Clause is inapplicable at sentencing, especially the sentencing phase of a capital case when the proffered statements inculpate the defendant. Such evidence, says Higgs, is "presumptively unreliable," citing *Lee v. Illinois,* 476 U.S. 530, 545, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986), and, as such, it also violated his due process rights. Because Haynes' statement clearly inculpated Higgs, and was an important piece of evidence establishing the obstruction of justice aggravator, Higgs submits that trial counsel's failure to object to the admission of the testimony on Fifth and Sixth Amendment grounds fell below an objective standard of reasonableness.

Higgs concedes, as he must, that the Fourth Circuit considered the Confrontation Clause argument on direct appeal, and found, given other overwhelming evidence of Higgs' guilt, that Officer Rule's testimony did not affect Higgs' substantial rights. But he argues here that that determination should be reconsidered in light of the Supreme Court's holding in *Crawford v. Washington,* issued post Higgs' trial, where the Court found that the

Constitution\*525 demands that "testimonial" statements trigger a right to confrontation. According to Higgs, because Haynes' confession fell within the core class of statements deemed "testimonial" by the Supreme Court, it should have been subject to confrontation.

Finally, Higgs argues that even if counsel's failure to object on Fifth and Sixth Amendment grounds is found not to be prejudicial, he is still entitled to relief because of the cumulative prejudicial impact of counsel's errors. In support of this proposition he cites *Williams,* 529 U.S. at 398-99, 120 S.Ct. 1495 (finding ineffective assistance where the entire postconviction record, viewed as a whole including the mitigation evidence, demonstrated prejudice with respect to a sentencing proceeding).

In response, the Government argues that counsel's failure to make an evidentiary objection on constitutional grounds is procedurally barred. In any event, the Government argues that the Fourth Circuit's holding that Higgs' substantial rights were not affected by the admission of Officer Rule's testimony forecloses the question of prejudice as a matter of law. The Government also argues that the Fourth Circuit has expressly rejected the cumulative impact argument in ineffective assistance cases. *Fisher v. Angelone,* 163 F.3d 835, 852 (4th Cir.1998). In sum, the Government submits that the claim of ineffective assistance lacks merit because Higgs has failed to demonstrate that his attorneys provided constitutionally deficient, much less prejudicial, representation.

**A.**

Higgs is procedurally barred from relitigating the question of counsel's failure to object to the testimony regarding Haynes' statement. Because he effectively litigated the prejudicial effect of the Haynes confession on direct appeal, he may not revisit the issue by way of collateral attack. *Boeckenhaupt v. United States,* 537 F.2d 1182, 1183 (4th Cir.1976).

**B.**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

That said, on the merits the claim fails in any event. Higgs must establish that counsel's performance "fell below an objective standard of reasonableness," and that in the absence of the alleged error a reasonable probability exists that "the result of the proceeding would have been different." *See Strickland,* 466 U.S. at 687-88, 104 S.Ct. 2052.

The Court agrees that the Fourth Circuit's rationale on direct appeal has answered the fundamental question of the reasonable probability *vel non* that Rule's testimony affected the trial's outcome: "Given the cumulative nature of the precise evidence challenged, and the overwhelming evidence otherwise proffered in support of the obstruction aggravator, we cannot say that Rule's limited testimony regarding Haynes' statements affected Higgs' substantial rights." *Higgs I,* 353 F.3d at 324-325. Substantial rights are affected only where there is "a reasonable probability that, but for [the error claimed], the result of the proceeding would have been different." *United States v. Dominguez Benitez,* 542 U.S. 74, 83, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004) (quoting *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375). In agreement with the Fourth Circuit, this Court is unable to find it reasonably probable that the testimony regarding Haynes' statement prejudiced the outcome of this case. *See Strickland,* 466 U.S. at 697, 104 S.Ct. 2052 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that *526 course should be followed."). [FN22]

> FN22. The lack of prejudice finding also definitively puts to rest any due process argument under the Fifth Amendment that Haynes' testimony was presumptively unreliable.

## C.

[37][38] Higgs has not, in any case, shown that his attorneys' conduct in omitting a Confrontation Clause objection to Haynes' confession fell below an objective standard of reasonableness. The Court "judge[s] the reasonableness of counsel's challenged conduct on the facts of a particular case, viewed as of the time of counsel's conduct." *Roe v. Flores-Ortega,* 528 U.S. 470,

477, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000) (citing *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052). Courts are obliged to defer to counsel's tactical decisions at trial. *See Gardner v. Ozmint,* 511 F.3d 420 (4th Cir.2007).

Given the uncertainty of the state of the law at the time of trial as to whether the Confrontation Clause applies to capital sentencing proceedings, trial counsel were under no obligation to make such an objection. *See Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. Indeed, the Fourth Circuit stated on direct appeal in this case that "[I]t is far from clear that the Confrontation Clause applies to a capital sentencing proceeding." *Higgs I,* 353 F.3d at 325. While the Fourth Circuit has yet to conclusively rule on the issue, two years after Higgs' trial the Seventh Circuit did, holding that while the Confrontation Clause applies to the guilt phase of trial, it does *not* apply to the sentencing phase, even when a death penalty proceeding is involved. *Szabo v. Walls,* 313 F.3d 392, 398 (7th Cir.2002).

Nor is Higgs persuasive in his argument that his lawyers had a duty to anticipate *Crawford* and object to Haynes' statement. *Crawford,* decided four years after Higgs' trial, broke new ground by distinguishing "testimonial" statements as a species of evidence particularly offensive to the Confrontation Clause. *Crawford,* 541 U.S. at 71-72, 124 S.Ct. 1354 (Rehnquist, C.J., concurring) (noting that the Court had never drawn a distinction between testimonial and nontestimonial statements). As a result, the Supreme Court held that *Crawford* is not to be applied retroactively to cases on collateral review. *Whorton v. Bockting,* 549 U.S. 406, 417-21, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007).[FN23] Trial counsel cannot therefore be found ineffective for failing to foresee this subsequent change in the law. *See United States v. Davies,* 394 F.3d 182, 189-91 (3d Cir.2005) (finding counsel had no duty to predict that arguments in an earlier case would become law and did not act unreasonably in failing to rely on its teachings); *See also United States v. Smith,* 241 F.3d 546, 548 (7th Cir.2001); *Parker v. Bowersox,* 188 F.3d 923, 929 (8th Cir.1999); *Pitts v. Cook,* 923 F.2d 1568, 1573 (11th Cir.1991).

> FN23. The cases relied upon by Higgs in support of the proposition that counsel should have foreseen the *Crawford* doctrine are unpersuasive.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

Though noting a need for greater reliability in capital sentencing proceedings, the Supreme Court gave no indication prior to Higgs' trial that its opinion in *Crawford* was in the offing; hence counsel had no reason to anticipate its arrival. *See Monge v. California,* 524 U.S. 721, 727-28, 118 S.Ct. 2246, 141 L.Ed.2d 615 (1998); *California v. Ramos,* 463 U.S. 992, 1013-14, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983).

### D.

[39] Higgs' final claim in this regard is that trial counsel provided ineffective assistance during the penalty hearing by limiting their mitigating evidence in response to the Government's decision to drop future dangerousness as an aggravating circumstance.*527 He says, for example, that his counsel's closing argument barely addressed the influence of Higgs' childhood experiences on the direction of his life, as a result of which none of the jurors found that to be a mitigating factor.

The Fourth Circuit has been "highly deferential" to strategy decisions of lawyers, even indulging a presumption that "counsel's conduct falls within the wide range of reasonable professional assistance." *Byram,* 339 F.3d at 209 (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052). Here, trial counsel's strategic decision to limit mitigation evidence so as not to open the door to bad act rebuttal evidence was not unreasonable. The decision was made after counsel conducted a reasonable investigation into Higgs' admittedly traumatic childhood, then weighed the other negatives of his serious adult misconduct. Counsel's choice was strategic; in no sense was it substandard.

Higgs has also failed to demonstrate prejudice. No reasonable probability exists that further emphasis on Higgs' troubled childhood would have persuaded the jury to find it as a mitigating factor or that it would have persuaded a juror to vote for other than the death penalty.

### Claim 9: Victim Impact Evidence

As a ninth claim, Higgs asserts that defense counsel was ineffective for failing to object to the admission of victim impact evidence that he contends violated his Eighth Amendment rights. Specifically, he maintains that: (1) the victim impact testimony, statements, photographs, and videotapes presented to the jury during the sentencing phase were highly emotional, rendering the sentencing proceedings inflammatory and fundamentally unfair; (2) the prosecutor's use of imagery and metaphor during closing argument was inflammatory and rendered trivial and meaningless any mitigating evidence submitted by the defendants; (3) the prosecutor improperly and unconstitutionally alluded to the sentencing preferences of family members; and (4) the Court failed to provide the jury with guidance as to how they should weigh the victim impact evidence among other aggravating and mitigating factors, which resulted in an unreliable death verdict in violation of the Eighth Amendment.

### A.

The Court finds no deficiency in counsel's actions in the cited respects. In consequence, any objection by counsel to the victim impact evidence would have been futile.

### B.

[40][41] The law concerning victim impact evidence is well settled. In a capital case, victim impact statements that identify the extent and scope of the injury and loss suffered by the victim and the victim's family members are admissible. *See* 18 U.S.C. § 3593(a); *see also Payne v. Tennessee,* 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (holding that the Eighth Amendment erects no *per se* bar to the admission of victim impact testimony during the sentencing phase of a defendant's capital trial). Moreover, the Eighth Amendment does not prohibit prosecutorial argument on the subject of victim impact. *Payne,* 501 U.S. at 827, 111 S.Ct. 2597. Only where victim impact evidence would be so unduly prejudicial as to render the defendant's trial unfair does due process mandate its exclusion. *See id.* at 825, 111 S.Ct. 2597. However, the bar for demonstrating undue prejudice is quite high. *See, e.g., United States v. Barnette,* 211 F.3d 803, 818-19 (4th Cir.2000) (allowing family members to present stories of victims' childhoods, family

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

experiences, and trauma resulting from victims' deaths, as *528 well as poems reflecting deep sadness and regret); _United States v. McVeigh,_ 153 F.3d 1166, 1218-22 (10th Cir.1998), _overruled on other grounds by_ 184 F.3d 1206 (10th Cir.1999) (permitting a total of 38 witnesses to recount, among other things: last contacts with victims, efforts to discover victims' fates, discovery of body parts months after victims' deaths, uncontrollable screaming and crying upon hearing of victims' deaths, victims' life histories and personal accomplishments, and innocence and unconditional love manifested by child victims).

[42] Here, the testimony of the victims' family members, though unquestionably emotional, was highly relevant to the impact that the murders had on the families. Several of the victims' relatives testified that they had suffered severe emotional anguish as a result of the murders. The mother of one victim testified that her marriage nearly dissolved in the wake of her daughter's murder. Another testified that she "fell to the ground and ... screamed" when the police informed her of her daughter's death. Some witnesses presented photographs and videotapes that chronicled the lives of the victims. The evidence in this case was wholly consistent with that found proper in _Barnette_ and _McVeigh,_ where family members recounted stories of the victims' lives, past family experiences, and the anguish they suffered after the victims' deaths. _Barnette,_ 211 F.3d at 818; _McVeigh,_ 153 F.3d at 1218-22. The Court concludes that the victim impact testimony and exhibits in this case were well within bounds. Counsel cannot be faulted for failing to object to them.

The Court also rejects the argument that the prosecutor's use of imagery and metaphor during closing argument-specifically, comparing the family members' anguish to the weight of a heavy rock-rendered trivial and meaningless any mitigating evidence submitted by the defendants. The use of poetic license by a prosecutor in a closing argument is not _per se_ impermissible. _See, e.g., United States v. Fields,_ 483 F.3d 313, 340-41 (5th Cir.2007) (permitting the use of a "picture in picture" metaphor in a capital sentencing closing, whereby the prosecutor invited the jury to imagine the victim's murder displayed on one "screen," and the actions of the defendant before, during, and after the murder on the other); _Bussard v. Lockhart,_ 32 F.3d 322, 324 (8th Cir.1994) (permitting the poetic, metaphoric use of a

Biblical quote in a closing argument); _United States v. Canales,_ 744 F.2d 413, 429-30 (5th Cir.1984) (finding no grounds for reversal where the prosecution implored the jury to "cut out" the "cancer" of vote buying in Duval County, where the larger matter of widespread vote buying was not at issue in the case). Indeed, the use of a simple rock metaphor while displaying an actual rock is hardly an inflammatory image. It does not begin to approach the level of egregiousness required to create undue prejudice. Counsel had no reasonable cause to object to the prosecution's argument.

The Court also finds groundless Higgs's argument that the prosecutor unconstitutionally alluded to the sentencing preferences of family members during sentencing. To be sure, the Eighth Amendment precludes the admission of a victim's family members' characterizations and opinions regarding the crime, the defendant, or the appropriate sentence, because such evidence could "inflame the jury and divert it from deciding the case on the relevant evidence concerning the crime and the defendant." _Booth v. Maryland,_ 482 U.S. 496, 508, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), _overruled on other grounds by_ 501 U.S. 808, 830, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Similarly, a prosecutor must *529 refrain from presenting family member opinions regarding the crime or the defendant. _See South Carolina v. Gathers,_ 490 U.S. 805, 811, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), _overruled on other grounds by_ 501 U.S. 808, 830, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (holding that assertions that would violate _Booth_ are not a permissible subject of prosecutorial argument). Here, however, Higgs's effort to construe the prosecutor's statement-"you ask each one of those family members here what they wouldn't give for their daughters to be in Lewisburg Penitentiary rather than where they are"-as a statement of the victims' family members' sentencing preferences is simply inaccurate. The prosecutor did not state or imply that the family members had any opinions with respect to an appropriate punishment for Higgs. Rather, she made the statement to counter defense counsel's assertion that life imprisonment would harshly and adequately punish the defendant for his crimes. To construe the statement as Higgs does, as an allusion to the sentencing preferences of the family members, calls for an inference that logic does not justify. Defense counsel had no reason to interpose an objection on these grounds.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

Finally, Higgs's assertion that the Court's instructions failed to provide the jury with guidance as to how it should weigh the victim impact evidence among other aggravating and mitigating factors has no basis in fact. True, in a capital sentencing proceeding, the judge's instructions to the jury should make it clear that the jurors must consider both mitigating and aggravating factors and in no event should a judge give the impression that the two need not be considered in tandem. *See Mills v. Maryland, 486 U.S. 367, 384, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988).* However, the record shows that the Court gave the appropriate instructions with respect to the weighing of aggravating and mitigating factors:

> In carefully weighing the various factors at issue in this case, you are called upon to make a unique individualized judgment about the appropriateness of imposing either the death penalty or life imprisonment without the possibility of parole or release on the defendant for each count.... [Y]ou must consider the weight and the value of each factor in making your decision. Any one aggravating factor ... may outweigh several mitigating factors.... On the other hand, you must also recognize that a single mitigating factor ... may outweigh several aggravating factors.... At this final weighing stage in the process you are not called upon simply to find relevant factors. You are called upon to make a reasoned moral judgment based on all the evidence before you as to whether the death penalty is justified for the defendant and for the offense. After consideration of the aggravating and mitigating factors, you must unanimously determine [the penalty].

TT. Oct. 24, 2000 at 177-79. This instruction properly provided the jury with sufficient guidance as to the weighing of aggravating and mitigating factors.

Counsel were in no sense deficient in not objecting to the prosecution's use of victim impact evidence or the Court's jury instructions.

### Claim 10: Previous Conviction of a Violent Felony Involving a Firearm

#### A.

[43] Higgs contends that during the sentencing phase, when considering the aggravating factor of previous conviction for a violent felony involving a firearm, the jury improperly considered his involvement in the Cherry Lane shooting.

*530 In the Cherry Lane case, Higgs pleaded guilty to reckless endangerment and assault, neither crime necessarily involving the use of a firearm. Accordingly, he argues that the Cherry Lane event could not have formed the basis for the previous-firearm-conviction aggravating factor, according to the "categorical approach" adopted by the Fourth Circuit in *United States v. Washington* 404 F.3d 834 (4th Cir.2005), decided after its opinion on Higgs's direct appeal.[FN24]

> FN24. Higgs' direct appeal was denied by the Fourth Circuit on December 22, 2003. *See Higgs I,* 353 F.3d at 316. *Washington* was decided on April 15, 2005.

In *Washington,* the Fourth Circuit reversed a sentence that had been based on the defendant's prior conviction for breaking and entering, a crime which does not necessarily involve violence. *Id.* at 843. The court determined that, in order to comply with *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the judge must determine a sentence using a "categorical approach;" he can only consider whether the elements of a defendant's previous crime, and not the facts behind the actual incident, meet the statutory requirements for a sentence enhancement. *See Washington,* 404 F.3d at 843.

There is no need to delve into the merits of this claim for two reasons. First, Higgs' claim fails because, as he concedes, he previously litigated this issue on direct appeal. *See Boeckenhaupt,* 537 F.2d at 1183. Second, the rule enunciated in *Washington* came into existence *after* his conviction became final and, as an evidentiary or procedural rule, it cannot be applied retroactively.

While Higgs relies on *Davis v. United States,* 417 U.S.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

333, 346, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974), *Davis* considered retroactivity in the context of new *substantive* laws only. Thus, in *Davis* the court allowed retroactive application of an intervening law that decriminalized the conduct for which the defendant had been convicted and sentenced. *Davis v. United States,* 417 U.S. 333, 346, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974). In so doing, the court reasoned that the "there can be no room for doubt that such a circumstance inherently results in a complete miscarriage of justice and presents exceptional circumstances that justify collateral relief under § 2255." *Id.* Generally, *Davis* ' holding that intervening law can be applied retroactively covers only substantive, not procedural laws. *See Schriro v. Summerlin,* 542 U.S. 348, 352, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004) (holding that substantive laws warrant retroactive application due to the "significant risk that a defendant stands convicted of an act that the law does not make criminal or faces a punishment that the law cannot impose").[FN25] However, in *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), in which the Supreme Court invalidated the retroactive application of a procedural rule, the Supreme Court held that procedural rules can be applied retroactively on collateral review, but only in "exceptional circumstances." *See also Schriro,* 542 U.S. at 351, 124 S.Ct. 2519 ("when a decision ... results in a 'new rule', that rule applies to all criminal cases still pending on direct review. As to convictions that are already final, however, the rule applies only in limited circumstances").

> FN25. A procedural law "regulate[s] only the manner of determining the defendant's culpability," while a substantive law "alters the range of conduct or the class of persons that the law punishes." *Schriro,* 542 U.S. at 353, 124 S.Ct. 2519.

[44] *Teague* establishes a three-step analysis to determine whether a new rule *531 of criminal procedure should apply retroactively: first, the conviction for which the petitioner filed a § 2255 motion must have been final when the new law was enunciated; second, the new law must in fact be "new"; and third, the new rule must be of watershed magnitude. *United States v. Morris,* 429 F.3d 65, 69-70 (4th Cir.2005) (citing *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989)).

[45] Proceeding directly to the third factor, the "categorical approach" rule of *Washington* fails to satisfy the *Teague* analysis because it was not a watershed decision. *See id.* at 71. To qualify as a watershed decision, the new rule must seriously diminish the likelihood of obtaining an accurate conviction and must alter one's understanding of the bedrock procedural elements essential to the fairness of a proceeding. *Id.* The possibility that *Washington* was a watershed decision is foreclosed by the Fourth Circuit's decision in *United States v. Morris. See Morris,* 429 F.3d at 71-72. There, the court held that the *Booker* decision, which required that a sentence be based on the facts found by the jury alone, was not watershed because it did not implicate the "fundamental fairness that require [s] retroactive application on collateral attack." *Id.* The *Washington* rule-a close relative of the one announced in *Booker* and an extension of *Apprendi,* which the Fourth Circuit has also decided was not of watershed magnitude, *United States v. Sanders,* 247 F.3d 139, 146 (4th Cir.2001)-leads to a similar conclusion. The new rule limiting the ability of a court to stray from the bare elements of a previous conviction during sentencing did not alter the bedrock principles of fairness in criminal procedure. *See id.; United States v. Sanders,* 247 F.3d 139, 148 (4th Cir.2001). Accordingly, the *Washington* rule does not apply retroactively and does not support Higgs's § 2255 motion.

**B.**

[46] Higgs also submits that he is entitled to relief because counsel provided ineffective representation in failing to object when the Government submitted to the jury the previous-firearm-conviction aggravating factor based on his guilty plea to the Cherry Lane shooting.

Section 3592(c)(2) of Title 18 allows a jury to consider, as an aggravating factor, whether "the defendant has *previously* been convicted of a Federal or State offense punishable by a term of imprisonment of more than 1 year, involving the use or attempted or threatened use of a firearm (as defined in Section 921) against another person" when sentencing a defendant to death. 18 U.S.C. § 3592(c) (2004) (emphasis added). Higgs contends that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

counsel should have argued that the word "previously" refers only to convictions occurring before commission of the *crime* which is the subject of this prosecution, not convictions occurring before *sentencing* for that crime. Although the Cherry Lane shooting took place on December 10, 1995, approximately six weeks before the January 1996 murders in this case, Higgs was not convicted of assault and reckless endangerment for the Cherry Lane shooting until April 1997, over a year after the January, 1996 murders. Again, the jury returned its death sentence verdict in this case on October 26, 2000.

As a preliminary matter, Higgs is procedurally defaulted on this claim because he did not raise it before trial, at trial, or on direct appeal. *See Massaro,* 538 U.S. at 504, 123 S.Ct. 1690. Nor has he avoided the procedural bar, since his claim of ineffective assistance of counsel ultimately fails the *Strickland* test.

For counsel's failure to object to purportedly objectionable material to be constitutionally ineffective, the objection must *532 have been so obvious that it would have "struck those learned in the law like a bucket of ice water." *Humphries v. Ozmint,* 366 F.3d 266, 276 (4th Cir.2004). Here, arguing that the word "previously" referred only to convictions occurring prior to the pending capital offense (as opposed to prior to sentencing) was not an obvious choice for Higgs' counsel because, at the time, the law supporting that argument was not clear and obvious.[FN26]

> FN26. During the penalty phase of the trial, defense counsel did raise an objection to the use of Higgs's May 12, 1997, guilty plea to federal drug offenses to support a finding under 18 U.S.C. § 3592(c)(12) (2004), pertinent to the following aggravating factor: "The defendant had previously been convicted of violating title II or III of the Controlled Substances Act for which a sentence of 5 or more years may be imposed...." *Id.* Defense counsel argued that "had previously" meant previous to the murders and not the sentencing. However, counsel's decision to object to using the drug convictions has no bearing on the reasonableness of his failure to object to using the Cherry Lane shooting. The ineffective assistance reasonableness standard is

an objective, not a subjective, one. *See Strickland,* 466 U.S. at 688, 104 S.Ct. 2052 ("[T]he defendant must show that counsel's representation fell below an *objective* standard of reasonableness." (Emphasis added)); *United States v. Little,* 14 Fed.Appx. 200, 205 (4th Cir.2001) (holding that the subjective beliefs behind counsel's strategic decisions at trial are irrelevant to an ineffective assistance claim). It makes no difference if the objection should have occurred to Higgs's defense attorney. The proper question is whether it should have occurred to a reasonably able attorney.

Indeed, by the time of trial, the Fourth Circuit had issued two seemingly contradictory statements as to the meaning of the word "previously" for purposes of sentencing enhancement: in *United States v. Hobbs,* 136 F.3d 384, 387, n. 3 (4th Cir.1998), the court, in *dicta,* stated that the word "previous" in a § 922 sentencing provision referred only to convictions occurring prior to the subject offense. In contrast, in an unpublished opinion, *United States v. Hamilton,* No. 93-5393, 30 F.3d 131, 1994 WL 381735 (4th Cir. July 22, 1994), a separate Fourth Circuit panel had interpreted the same provision as including all previous convictions, regardless of when they were incurred.

But, says Higgs, using the post-dated Cherry Lane conviction to support the prior-firearm-conviction as an aggravating factor contradicted the established meaning of "previously," as set forth in decisions from other Circuits, albeit decisions establishing that the word "previously" in a different sentencing statute, 18 U.S.C. § 924(e), referred only to convictions occurring prior to the subject offense.[FN27] However, it is clear even if the other circuits had interpreted the specific statute at issue here, which was not the case, counsel was under no obligation to follow the law of other circuits, especially when the Fourth Circuit had yet to clarify its own position on the matter. *See United States v. Roane,* 378 F.3d 382, 397 (4th Cir.2004) (failing to follow another Circuit's law, when that law had not been adopted in the applicable Circuit was not unreasonable); *United States v. McNamara,* 74 F.3d 514, 517 (4th Cir.1996) (not ineffective assistance when counsel followed controlling circuit law at the time). Although the Fourth Circuit has since issued decisions that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

arguably bring into question the continuing validity of a firearm conviction post-crime but pre-sentence as an aggravating*533 factor, *see United States v. Pressley*, 359 F.3d 347, 350 (4th Cir.2004); *United States v. Ryan*, 187 Fed.Appx. 287 (4th Cir.2006), counsel's failure to anticipate this new law did not constitute ineffective assistance. *See United States v. Stewart*, 36 Fed.Appx. 520, 521 (4th Cir.2002); *Honeycutt v. Mahoney*, 698 F.2d 213, 217 (4th Cir.1983). Nor was appellate counsel's failure to object to this aggravating factor on direct appeal objectively unreasonable. To constitute ineffective assistance of counsel for failing to raise an issue on appeal, counsel must have "omitted significant and obvious issues, while pursuing issues that were clearly and significantly weaker." *United States v. Fox*, No. 94-6710, 1996 WL 359574 at *2 (4th Cir. June 28, 1996) (quoting *Mayo v. Henderson*, 13 F.3d 528 (2nd Cir.1994)).

> FN27. The Armed Career Criminal Act, provides for enhancement of the sentence of a defendant who "has three *previous* convictions ... for a violent felony or a serious drug offense, or both." 18 U.S.C. § 924(e) (emphasis added). Under 18 U.S.C. § 3592(c), the statute in question here, a defendant is eligible for the death penalty if he "*has previously* been convicted of a Federal or state offense ... involving the use ... of a firearm." Emphasis added.

Given the Fourth Circuit's conflicting interpretations of the statute and the factual dissimilarities between the death penalty statute at issue here and the sentencing statute addressed in the other circuits' decisions, the prior firearm conviction issue was not "significant and obvious." *See Fox*, 1996 WL 359574 at *3 (holding that counsel did not provide ineffective assistance when he chose not to raise an issue on appeal because the law on the topic was unclear in a relevant circuit and decisions in the other circuits were factually dissimilar). Nor can it be said that counsel, especially appellate counsel, failed to pursue this issue in deference to, and significantly weaker, issues. Even granting that the issue had substance, counsel's failure to pursue it was not tantamount to ineffective assistance. *See Fox*, 1996 WL 359574 at *2 ("failure to raise all non-frivolous issues on appeal is not ineffective assistance").

## Claim 11: Previous Conviction of a Federal Drug Offense

Apart from raising it in the context of ineffective assistance, Higgs argues that the Fourth Circuit's decision in *Pressley* defining the word "previous" under the Armed Career Criminal statute constituted a relevant new rule which should apply retroactively to his case, vitiating one of the aggravating factors that led the jury to vote for the death penalty.

Since *Pressley* was decided while Higgs' conviction was on direct appeal, [FN28] Higgs is entitled to raise the issue at this time and no *Teague* analysis is required. *See Linkletter v. Walker*, 381 U.S. 618, 627, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), *overruled on other grounds by* 479 U.S. 314, 320, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987) ("a change in law will be given effect while a case is on direct review"). But there are at least two reasons why the Court declines to embrace this argument.

> FN28. *Pressley* was decided on February 27, 2004, but Higgs' conviction did not become final until the Supreme Court denied his writ of certiorari on November 29, 2004. *See Clay v. United States*, 537 U.S. 522, 527, 123 S.Ct. 1072, 155 L.Ed.2d 88 (2003) (finding that a conviction becomes final when the Supreme Court affirms a conviction on the merits on direct review, denies a petition for a writ of certiorari, or the time for filing certiorari expires).

First, *Pressley* interprets a discrete provision of a *non-capital* sentencing statute, not the *death penalty* statute at issue here. *See Pressley*, 359 F.3d at 348. The fact that both statutes contain similar language is not dispositive, since the Fourth Circuit in *Pressley* was interpreting the issue there based on the specific Congressional intent embodied in the statute itself. *Id.* at 349. Arguably, then, the holding in *Pressley* is limited to the unique circumstances surrounding that statute, and cannot be extended to the death penalty context. Second, this Court has no authority *534 to overrule the Fourth Circuit's decision in *Higgs I*, 353 F.3d 281, 318 (4th Cir.2003), that relied on a different interpretation of "previous" to uphold the previous-drug-conviction

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

aggravating factor. *See* *Doe v. Charleston Area Medical Center, Inc.,* 529 F.2d 638, 642. (4th Cir.1975) (holding that findings by the Court of Appeals are binding upon a district court until they are considered *en banc* ). That decision, and not *Pressley,* remains the controlling authority on this issue. *Id.*

### Claim 12: Multiple Killings

Higgs argues that the Fourth Circuit erred in *Higgs I* when it chose not to overturn his death sentence despite the erroneous submission to the jury of the statutory aggravating factor alleging his involvement in multiple killings. *See* 18 U.S.C.A. § 3592(c)(16)

In *Higgs I,* the Fourth Circuit acknowledged that " 'multiple killings' was not added to the [Federal Death Penalty Act] as a statutory aggravating factor until April 1996, three months after the murders were committed." *Higgs I,* 353 F.3d at 300. Accordingly, it determined that "the 'multiple killings' aggravator was improperly submitted to the jury as a statutory aggravating factor." *Id.* at 319. Nevertheless, the court decided that the error was harmless and did not invalidate his death sentence because the jury had found additional aggravating factors beyond a reasonable doubt. *Id.*

Higgs challenges the Fourth Circuit's analysis as being inconsistent with *Stringer v. Black,* 503 U.S. 222, 237, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992), which held that a sentencer's reliance on an invalid aggravating factor in a "weighing" jurisdiction, such as the federal system, "invalidates the sentence and at the very least requires constitutional harmless-error analysis or reweighing...." In *Higgs I,* he claims, the Fourth Circuit improperly assumed that the invalid "multiple killings" aggravator made no difference to the weighing process.

Higgs also argues that the decision in *Higgs I* runs afoul of the Supreme Court's decision in *Brown v. Sanders,* 546 U.S. 212, 126 S.Ct. 884, 163 L.Ed.2d 723 (2006), which eliminated the distinction between "weighing" and "non-weighing" jurisdictions and held that in any jurisdiction "(a)n invalidated sentencing factor ... will render the sentence unconstitutional by reason of its

adding an improper element to the aggravation scale in the weighing process *unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances." *Brown v. Sanders,* 546 U.S. 212, 220, 126 S.Ct. 884, 163 L.Ed.2d 723 (2006). Higgs submits that none of the other five sentencing factors found by the jury in his case would have permitted aggravating weight to be given to the evidence of multiple killings, and urges the Court to invalidate his sentence under Sanders, if not under Stringer.

### A.

The Court begins by noting once again that it does not have the authority to review the Fourth Circuit's decision in *Higgs I. See* *Charleston Area Medical Center, Inc.,* 529 F.2d at 642. Higgs cannot raise an issue already litigated on direct appeal under the guise of a collateral attack. *See* *Withrow v. Williams,* 507 U.S. 680, 720-21, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993) (Scalia, J., concurring). Since the Fourth Circuit has already rejected the claim that the jury improperly relied upon the multiple murder aggravator, Higgs is not permitted to revisit the issue.

### B.

[47] Even so, analyzing Higgs' claim under *Sanders* (which has substantially *535 superceded *Stringer* ) the Court would nonetheless find Higgs's death sentence constitutional. So long as some other sentencing factor enabled the jury to give aggravating weight to the multiple killings, the death sentence will stand. *Sanders,* 546 U.S. at 220, 126 S.Ct. 884. The nonstatutory aggravating factor of "victim impact" did just that, allowing the jury to consider the number of deaths in this case.

The penalty phase jury instructions framed the victim impact factor as follows:

"The defendant caused injury, harm, and loss to the victim and the victim's family because of the effect of the offense on the victim, the victim's personal characteristics as an individual human being and the impact of the death upon the victim and the victim's family." In proving this factor,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

the prosecution introduced testimony during the penalty phase from family members of each of the three victims-Tamika Black, Mishann Chinn, and Tanji Jackson. From this evidence alone, the jury could infer the existence of multiple killings, to say nothing of the evidence of multiple murders presented during the guilt phase of the trial. *See generally United States v. Flaharty, 295 F.3d 182, 196 (2nd Cir.2002)* (in determining facts material to sentencing, district court may rely on evidence admitted at trial); *United States v. Dailey, 918 F.2d 747, 748 (8th Cir.1990)* (same). Since, the victim impact factor alone "enable[d] the sentencer to give aggravating weight to the same facts and circumstances" as the arguably invalid multiple killings factor, Higgs' *Sanders* claim must fail. *Brown v. Sanders, 546 U.S. 212, 220, 126 S.Ct. 884, 163 L.Ed.2d 723 (2006).*

### Claim 13: Failure to Interview & Call Witnesses Gerald Vaughn and Kevin Anderson

Higgs argues that counsel were ineffective for failing to interview and call Kevin Darnell Anderson and Gerald Vaughn as witnesses during both the guilt and penalty phases of the trial. Both individuals were incarcerated with Haynes at the Charles County Detention Center and both claimed to have had conversations with him regarding the murders.[FN29]

> FN29. At Haynes' trial, which took place before Higgs' trial, Vaughn gave live testimony and the defense submitted written statements from the Government's May 2000 interview of Anderson.

Higgs suggests that the potential testimony of these witnesses would have supported the defense theory that Haynes shot the victims for his own reasons, not at the command of Higgs. According to Higgs, Anderson would have testified that Haynes told him he killed one of the women because she "set him up." Anderson would purportedly have said that he witnessed a confrontation between Haynes and another inmate, in which the inmate commented "you think [you're] big stuff because you killed [three] women" and Haynes responded "I'll kill whoever the f--- I want to kill." As for Vaughn, Higgs contends his testimony would have demonstrated that Haynes never accused Higgs of forcing him to kill the

victims. *See United States v. Haynes, 26 Fed.Appx. 123, 128 (4th Cir.2001)* (summarizing testimony of Vaughn at Haynes' trial). In fact, Higgs says, Vaughn's testimony would have shown that Haynes bragged about the murders, that Haynes told Vaughn he killed the women because one of them owed Haynes $250,000, and that Haynes later told Vaughn that he killed the women because they cheated on him. *See id.*

Higgs argues that during the guilt phase the Vaughn-Anderson testimony would have shown that Haynes, the actual triggerman, *536 was responsible for the murders. During the penalty phase, Higgs says, the evidence would have provided "powerful support for the mitigating factor advanced by the defense that an equally culpable co-defendant had received a life sentence." According to Higgs, counsel's failure to interview or call these witnesses amounted to ineffective assistance.

#### A.

To demonstrate ineffective assistance of counsel, a defendant must demonstrate both that (1) "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense." *See Strickland, 466 U.S. at 687, 104 S.Ct. 2052 (1984).* A criminal defendant is prejudiced by counsel's performance when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. Under this standard, Higgs' claim fails.

#### B.

[48] Higgs is procedurally barred from relitigating the issue of whether the absence of Anderson's statements prejudiced his case. A litigant cannot, under the guise of a collateral attack, raise an issue already litigated. *See Withrow, 507 U.S. at 720-21, 113 S.Ct. 1745* (Scalia, J., concurring) ("prior opportunity to litigate an issue should be an important equitable consideration in *any* habeas case, and should ordinarily preclude the court from reaching the merits of a claim, unless it goes to the fairness of the trial process or to the accuracy of the ultimate result"); *see also Boeckenhaupt, 537 F.2d at 1183*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

(affirming that the petitioner may not "recast, under the guise of collateral attack, questions fully considered by [the] Court").

On direct appeal, Higgs' counsel argued for a new trial and sentencing based on the Government's failure to identify Anderson as a potential witness and to provide Higgs with a copy of the Government's notes of its May 2000 interview with Anderson. The Fourth Circuit found that Anderson's absence from the witness stand had no prejudicial effect on the outcome because Haynes' comments regarding the murders were unreliable. *Higgs II*, 95 Fed.Appx. at 43. The Fourth Circuit also stated that there was "no reasonable probability that the jury would not have convicted Higgs of the kidnappings and murders had they been aware of the undisclosed statements made by Haynes to Anderson," *id.*, since "the evidence set forth at Higgs's trial provides 'strong support for the conclusion that [Higgs] would have been convicted of capital murder and sentenced to death, even if Haynes' statement to Anderson had been introduced into evidence." *Id.* at 44 (citation omitted).

Though the Fourth Circuit's ruling was in the context of an alleged *Brady* violation, the relevance of its analysis in the current context is obvious because the same prejudice standard applies in a *Strickland* analysis. *See Strickland, 466 U.S. at 687, 104 S.Ct. 2052.* Anderson's statements cannot be relitigated here.

### C.

Procedural bar aside, counsel's decision not to call Anderson and Vaughn as witnesses at trial did not amount to ineffective assistance.

### 1.

With respect to Anderson, even if counsel knew of his existence, they would not have been deficient for failing to interview or call him as a witness. Whatever Higgs might make of Anderson's statements to suggest Haynes may have had his own motive for the murders, the Court agrees with the Fourth Circuit that Haynes' *537 statements were

thoroughly unreliable. *See Higgs II, 95 Fed.Appx. at 43.* At different times, Haynes gave multiple and inconsistent reasons for the killings,[FN30] such that anything he might have said to Anderson added nothing to his credibility. Counsel could reasonably have concluded that offering further evidence of Haynes' conflicting statements, subject as they would have been to strong impeachment, would have served no useful purpose. Moreover, as the Fourth Circuit recognized, Anderson's statements do not necessarily suggest that "Haynes acted alone or that Higgs was not involved" because they leave open the possibility that Haynes and Higgs shared a "joint motive" to kill the women. *See id. at 43.* Further, counsels' reference to Haynes' statement that he "will kill whoever the f--- [he] want[s] to kill" does not clearly relate to Haynes motive in the present case because the "tough guy" statements were made in the context of a blustery altercation with another inmate. *See id. at 41.*

> FN30. Haynes confessed to the police that he killed the women because he believed that had he not, Higgs would have done so. However, he apparently told Anderson that he killed one of the victims because she may have "set him up," then told Vaughn that he either killed the women because one owed him money or because they cheated on him.

Higgs also fails to demonstrate prejudice as a result of counsel's decision not to interview or call Anderson. As the Fourth Circuit noted, "the evidence of Higgs's involvement in the pursuit, kidnapping, and murders of the three women is overwhelming, as is the evidence of his predominant role in the events that took place that evening and early morning." *See Higgs II, 95 Fed.Appx. at 44.* There is no "reasonable probability" that the result of his trial would have been different had Anderson been called as a witness. *See Strickland, 466 U.S. at 694, 104 S.Ct. 2052.*

### 2.

With respect to Vaughn, Higgs' claim fails for similar reasons. Counsel's decision not to interview or call him was reasonable. His potential testimony-that Haynes killed the women either because one of them owed him money

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

(as Vaughn had testified in the Haynes trial) or because they cheated on Haynes (as Vaughn apparently told a defense investigator)-was of equally doubtful reliability. As with Anderson's statements, Vaughn's purported testimony would simply have multiplied the inconsistent explanations Haynes gave for why he supposedly committed the killings. See *Higgs II*, 95 Fed.Appx. at 43 (holding that the absence of Anderson's testimony did not prejudice the defense because it was unreliable). Vaughn's potential testimony would not necessarily have shown that Higgs did not coerce Haynes to commit the murders. It is entirely plausible, indeed highly probable, that it was Higgs who directed Haynes to murder the women, but, to impress his fellow inmates, Haynes subsequently took credit for them.

Regardless, Higgs cannot demonstrate prejudice as a result of counsel's decision not to interview or call Vaughn. The evidence against Higgs was overwhelming. Vaughn's testimony had no reasonable probability of changing the result of the trial. See *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052.

### Claim 14: Insufficiency of the Indictment

[49] Higgs contends that *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) should be applied retroactively to invalidate his conviction on the grounds that his indictment failed to allege any of the intent or aggravating factors that were considered during the sentencing phase of his trial. He submits *538 that *Blakely* calls into question the Fourth Circuit's denial of this precise objection in *Higgs I* and therefore compels this Court to vacate his conviction and sentence.

On appeal, the Fourth Circuit found that the indictment in this case was constitutionally adequate, *Higgs I*, 353 F.3d at 295-304, and that the claimed defects with respect to it were harmless. *Id.* at 304-07. Because Higgs has previously litigated this claim, he is procedurally barred from relitigating it at this time. *Boeckenhaupt*, 537 F.2d at 1183.

On the merits, the claim also fails. Despite *Blakely*, *Higgs*

*I* remains the controlling authority on the matter, obliging the Court to accept the decision that Higgs' indictment is constitutionally sound. *Etheridge v. Norfolk & Western Ry. Co.*, 9 F.3d 1087, 1090 (1993) ("a decision of a panel of [the Fourth Circuit] becomes the law of the circuit ... unless it is overruled"). But *Blakely* may be distinguishable in any event, since it addresses Sixth Amendment sentencing requirements, whereas here Higgs raises the issue in the context of Fifth Amendment indictment requirements. It may be doubted that *Blakely* established new law relevant to the present issue that would overrule *Higgs I*. But insofar as *United States v. Green*, 372 F.Supp.2d 168 (D.Mass.2005) holds to the contrary, the Court rejects that holding.

### Claim 15: Reasonable Doubt Error in Jury Instructions

Higgs next challenges the omission of any jury instruction in the penalty phase to the effect that it could recommend a death sentence only in the event that it found the aggravating factors to outweigh the mitigating factors *beyond a reasonable doubt*.[FN31] He claims that the lack of a reasonable doubt instruction ran afoul of the Sixth Amendment as interpreted by the Supreme Court's decisions in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

> FN31. In pertinent part, the jury was instructed to decide "whether all the aggravating factor or factors found to exist *sufficiently outweigh* all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are *sufficient* to justify a sentence of death." (Emphasis added)

Higgs challenges the omitted jury instruction by framing it as a § 2255 ineffective assistance of counsel claim, which triggers analysis under the *Strickland* test. However, Higgs submits that the alleged mistake amounts to a serious structural error that "necessarily render[ed] the trial fundamentally unfair," *Rose v. Clark*, 478 U.S. 570, 577, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986); *Sullivan v. Louisiana*, 508 U.S. 275, 281, 113 S.Ct. 2078, 124

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

L.Ed.2d 182 (1993), in consequence of which the Court should presume that his claim satisfies *Strickland's* prejudice requirement, leaving only *Strickland's* reasonableness inquiry to be pursued. *See Bell v. Jarvis, 236 F.3d 149, 180 (4th Cir.2000)* (holding that a structural error cannot be dismissed as harmless and therefore presumptively satisfies *Strickland's* prejudice requirement and requires scrutiny only under *Strickland's* reasonableness prong).

**A.**

This claim is procedurally defaulted. As Higgs concedes, he has never before argued that his death sentence was obtained in violation of his constitutional rights by reason of the Court's failure to instruct the jury that it had to find that the aggravating factors outweighed the mitigating factors beyond a reasonable doubt before \*539 they could return a death penalty verdict. Though a procedural default can be excused upon a demonstration of cause and prejudice, *see Massaro, 538 U.S. at 504, 123 S.Ct. 1690,* no such relief is warranted here. He has shown neither cause nor prejudice, nor is prejudice to be presumed.

**B.**

[50] Beyond procedural default, Higgs' claim fails on the merits. Although the Supreme Court has stated that a faulty reasonable doubt instruction during the guilt phase of an ordinary criminal trial amounts to a structural error, *see Sullivan v. Louisiana, 508 U.S. 275, 281, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993),* it is by no means clear that that pronouncement applies to the sentencing phase of a death penalty proceeding. *See, e.g., Brice v. State, 815 A.2d 314, 324-327 (Del.2003)* (noting that the Supreme Court has employed structural error analysis only when reviewing constitutional errors occurring during the guilt/innocence phase of a trial and suggesting that such analysis does not apply to the sentencing phase). But assuming without deciding that a structural error occurred and that prejudice may be presumed, *see Bell, 236 F.3d at 180,* Higgs' motion would fail under the first prong of *Strickland;* counsel did not act unreasonably by failing to raise an *Apprendi* objection to the penalty phase jury instruction.

The alleged error at issue did not involve a straightforward and obvious application of *Apprendi's* principles that would have "struck those learned in the law like a bucket of ice water." *Humphries, 366 F.3d at 276.* Even since the trial in this case courts have refused to extend the Supreme Court's decisions in *Apprendi* and *Ring* to require a jury recommending capital punishment to find that aggravating factors outweigh mitigating factors *beyond a reasonable doubt. See e.g. Ritchie v. State, 809 N.E.2d 258, 264-268 (Ind.2004)* ("[Richie] contends that the trial court should have instructed the jury that it must apply a reasonable doubt standard in finding that the State proved that the aggravating circumstances outweigh the mitigating factors.... [W]e conclude that this process is not subject to a reasonable doubt standard."); *Brice, 815 A.2d at 327* ("nothing in *Ring* suggests that the trial judge may not retain the responsibility of making the ultimate sentencing decision"); *Ex parte Waldrop, 859 So.2d 1181, 1190 (Ala.2002);* (" *Ring* and *Apprendi* do not require that a jury weigh the aggravating circumstances and the mitigating circumstances."); *but see Johnson v. State, 118 Nev. 787, 59 P.3d 450, 460 (2002)* (concluding that *Ring* requires a jury, and not a panel of judges, to find beyond a reasonable doubt that there are no mitigating circumstances sufficient to outweigh the aggravating circumstance or circumstances found).[FN32]

FN32. For post- *Apprendi* cases that do not discuss *Apprendi* or *Ring* in reaching the conclusion that the reasonable doubt standard does not apply to penalty phase weighing, *see e.g., United States v. Sampson, 335 F.Supp.2d 166, 238 (D.Mass.2004)* ("Although important to the defendant and society, the sentencing decision in a capital case is, in its most important respects, fundamentally different than any other task that a jury is called upon to perform in our criminal justice system. The jury is not acting as a finder of fact. Rather, it is exercising discretion in sentencing that is ordinarily exercised by judges. Whether a jury's sentencing decision is right or wrong is not something that is capable of proof in the traditional sense."); *State v. Rizzo, 266 Conn. 171, 833 A.2d 363, 378 (2003)* ("specific standards for balancing aggravating against mitigating circumstances are not constitutionally required" (quoting *Zant v. Stephens,* 462 U.S. 862, 875-76 n. 13, 103 S.Ct.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

2733, 77 L.Ed.2d 235 (1983) and *Jurek v. Texas,* 428 U.S. 262, 270, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976))).

For pre- *Apprendi* cases reaching the same conclusion, *see e.g. Ford v. Strickland,* 696 F.2d 804, 818 (11th Cir.1983) ("While the existence of an aggravating or mitigating circumstance is a fact susceptible to proof under a reasonable doubt or preponderance standard, the relative *weight* is not." (citations omitted)); *Fleenor v. State,* 514 N.E.2d 80, 92 (Ind.1987) ( "[T]he determination of weight to be accorded the aggravating and mitigating circumstances is not a 'fact' which must be proved beyond a reasonable doubt but is a balancing process." (citing *Daniels v. State,* 453 N.E.2d 160, 171 (Ind.1983))).

For a pre- *Apprendi* case finding that the reasonable doubt standard applies to penalty phase weighing, *see People v. Tenneson,* 788 P.2d 786, 793-94 (Colo.1990).

**\*540** In *Apprendi,* the Supreme Court held that "any *fact* that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey,* 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (emphasis added). It does not necessarily follow that this rule should extend to the weighing process that takes place during the penalty phase of a capital trial. Whether the aggravating factors presented by the prosecution outweigh the mitigating factors presented by the defense is a *normative* question rather than a *factual* one. When jurors weigh aggravating and mitigating factors, they draw upon their sense of community norms in light of the totality of circumstances surrounding the criminal and the crime to determine a just punishment. In marked contrast, in order to find a first-order fact to be true, the jurors must evaluate the evidence presented to determine whether they believe in the truth of the fact beyond any reasonable doubt. In reaching this determination, jurors rely on their deductive and inductive reasoning and not upon normative considerations. While the line between facts and norms is not always a clear one,

the process of determining a just punishment rests securely at the normative end of the fact/norm continuum. As the Eleventh Circuit put it in *Ford v. Strickland,* "[P]etitioner confuses proof of *facts* with the weighing process undertaken by the sentencing jury and judge.... [T]he latter process is not a fact susceptible of proof under any standard...." 696 F.2d 804, 818-19 (11th Cir.1983) (citations omitted).

This is not to say that a state could not require that a jury recommending the death penalty must find that aggravating factors outweigh mitigating factors beyond a reasonable doubt. *See e.g. Tenneson,* 788 P.2d at 794 ("We are persuaded that the term 'beyond reasonable doubt' serves well to communicate to the jurors the degree of certainty that they must possess that any mitigating factors do not outweigh the proven statutory aggravating factors before arriving at the ultimate judgment that death is the appropriate penalty.").[FN33] But the point is that *Apprendi* and *Ring* do not require this. The Federal Death Penalty Act, which requires a jury recommending death to find that "the aggravating factor or factors found to exist *sufficiently* outweigh all the mitigating factor or factors," 18 U.S.C. 3593(e) (emphasis added), articulates a standard (sufficiency) that satisfies constitutional reliability requirement. At least one federal court has held under the Act that a reasonable doubt instruction is not required when a death penalty jury is weighing aggravating and mitigating factors. *See U.S. v. Lawrence,* 477 F.Supp.2d 864 (S.D.Ohio 2006). This Court sees no reason to take a different view.

FN33. The Colorado death penalty statute considered in *Tenneson* did not specify any standard for weighing aggravating and mitigating factors. 788 P.2d at 789-90.

### C.

As for Higgs' claim that he was deprived of effective assistance when his counsel **\*541** failed to raise an *Apprendi* challenge to the lack of a reasonable doubt weighing instruction, the Court concludes that counsel were not ineffective. The attorney's performance must have fallen below an objective standard of reasonableness

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

and a reasonable probability must exist that Defendant was prejudiced by the deficient performance. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052 (1984). Since the propriety *vel non* of a reasonable doubt instruction in regard to the weighing of aggravating and mitigating factors during the penalty phase of a death penalty case was (and remains) highly questionable, counsel's failure to pursue it did not amount to constitutionally deficient representation.

### Claim 16: Failure to Instruct Jury Regarding Parole Ineligibility as a Mitigating Factor

Higgs next argues that the Court's failure to instruct the jury that his ineligibility for parole could be found to be a mitigating factor, as requested by counsel during the penalty phase, violated his Eight Amendment rights. Following an objection by the Government, the Court declined to give the instruction on the grounds that parole ineligibility is not a "fact about [Higgs], not a fact about the crime. It's a fact about the punishment." The Court did, however, twice instruct the jurors that they had only two options: to sentence Higgs to death or to life without the possibility of parole. [FN34]

> FN34. Specifically, the Court told the jury, "You must ... answer the question as to whether or not the defendant, Dustin John Higgs, should be sentenced to death or life imprisonment without the possibility of parole or release. No other lesser sentence is authorized under the law for the offenses of which he has been convicted." On another occasion, the Court reiterated the jury's only two options, stating "you must now decide whether the appropriate sentence for the defendant is, one, death or two, life in prison without the possibility of parole or release."

Higgs contends that this general instruction was insufficient because a sentence of life imprisonment without parole would eliminate any risk of future danger from him. Consequently, the jury should have been allowed to expressly consider parole ineligibility as a mitigating factor.

Higgs also alleges ineffective assistance of counsel of

appellate counsel for failing to raise this issue on appeal.

### A.

[51] Higgs is procedurally barred from raising this claim because he failed to raise it on appeal. *See Massaro*, 538 U.S. at 504, 123 S.Ct. 1690. His argument that the Court should consider the merits of his claim because he can establish actual innocence as well as cause and prejudice is unpersuasive. *See Schlup*, 513 U.S. at 314-15, 327-30, 115 S.Ct. 851 (holding that a procedural default can be excused upon the requisite showing of actual innocence).

To demonstrate actual innocence, a movant must establish that based on the evidence, "it is more likely than not that no reasonable juror would have convicted him." *Id.* at 327-28, 115 S.Ct. 851. This remedy, however, is reserved for extremely "extraordinary" situations, where the defendant's conviction amounts to a constitutional violation. *See Murray v. Carrier*, 477 U.S. 478, 496, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). Given the overwhelming evidence of Higgs' guilt and the fact that the Court twice instructed the jury that it might consider Higgs' parole ineligibility, Higgs falls well short of this standard.[FN35]

> FN35. As discussed previously in connection with Claims 1 and 4, *supra*, to the extent that Higgs argues that he is entitled to relief solely because he is actually innocent, the Court again notes that he has not met the "extraordinarily high" standard for such a claim, if such claim even exists. *Herrera*, 506 U.S. at 417, 113 S.Ct. 853.

*542 Higgs fails to demonstrate cause or prejudice on the basis of appellate counsel's failure to raise the issue on his parole eligibility as a mitigating factor. Appellate counsel may well have judged that the matter of whether Higgs' ineligibility for parole mitigated against the death penalty was adequately covered by the Court's instructions and/or by the arguments counsel would be making (and did make) in closing during the penalty phase. As for prejudice, Higgs offers nothing more than the assertion

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

that it is "reasonably likely that [his] death sentence would have been vacated on direct appeal."

**B.**

[52][53] The procedural bar aside, Higgs' claim also fails on the merits. A capital sentencing jury must unquestionably give effect to all relevant mitigating evidence, as required by the Eighth Amendment. *See Buchanan v. Angelone*, 522 U.S. 269, 276, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998); *see also Skipper v. South Carolina*, 476 U.S. 1, 4, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986). The Supreme Court has made clear that mitigating evidence includes "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *See Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). It remains doubtful, however, that parole ineligibility meets the criteria for being a mitigating factor, since it relates to neither to the defendant's character or record or any of the circumstances of the offense in question. *See id.*

Higgs is correct to argue that a court must inform a capital jury of a defendant's parole ineligibility if his future dangerousness is raised as an issue. *See Simmons v. South Carolina*, 512 U.S. 154, 168-69, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (holding that when the Government points to defendant's future dangerousness, due process requires that the defendant should have an opportunity to raise the fact that the alternative sentence is life without parole); *see also Townes v. Murray*, 68 F.3d 840, 850 (4th Cir.1995). But that requirement was satisfied here. When the Government raised the prospect of Higgs' future dangerousness in its closing statement, the Court satisfied the requirement articulated in *Simmons* when it twice told the jury that the only alternative sentence to death was life imprisonment without parole. *See Simmons*, 512 U.S. at 168-69, 114 S.Ct. 2187.

But Higgs claims that the Court should have specifically told the jury to list parole ineligibility as a mitigating factor on the verdict form and, in support of his argument, he cites two cases from state courts. *See Turner v. State*, 645 So.2d 444, 448 (Fla.1994) (reversing death sentence where the court overrode the jury's life sentence

recommendation because defendant's fifty-year minimum sentence was a mitigating issue upon which the jury "could have relied" when imposing a life sentence) *and State v. Henderson*, 109 N.M. 655, 789 P.2d 603, 606-07 (1990), *overruled on other grounds by* 118 N.M. 486, 882 P.2d 527 (1994) (finding error in the court's refusal to instruct the jury that the defendant would only be parole eligible after he served thirty years).

A close reading of *Turner* and *Henderson*, however, indicates that neither case addresses the specific issue of whether parole ineligibility must be listed on the verdict form as a mitigating factor. The Florida court in *Turner* found that there was ample mitigation evidence that the jury could have relied on when sentencing *543 the defendant to life imprisonment, including, among the factors, the defendant's parole ineligibility. 645 So.2d at 448. It did not, however, specifically instruct the jury to consider his parole ineligibility as a mitigating *factor*. *See id. Henderson* dealt only with the issue of whether an instruction regarding parole ineligibility is required. 789 P.2d at 607. The Court, moreover, is not persuaded that *Skipper*, cited by Higgs for the proposition that parole ineligibility must be specifically identified as a mitigating factor, actually stands for that proposition. There the Supreme Court held only that "evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating." *See Skipper*, 476 U.S. at 5, 106 S.Ct. 1669. None of the cases he cites teaches that parole ineligibility must be expressly *listed* as a mitigating factor. At most, they stand for the proposition that the jury must be made aware of this fact, which in this case they clearly and repeatedly were.

The Court finds that the jury received an appropriate instruction regarding Higgs' ineligibility for parole. He is not entitled to collateral relief based on this claim.

**C.**

Given that there was no error in the Court's ruling as to the requested instruction, appellate counsel cannot be faulted for failing to raise the issue.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

### Claim 17: Materiality under *Brady*

Higgs argues that the Fourth Circuit erred in its analysis of whether, under *Brady v. Maryland,* the Government's failure to turn over the names of certain witnesses was material to the outcome of his trial.

Apparently appellate counsel, while preparing Higgs' direct appeal to the Fourth Circuit, became aware of the existence of two witnesses the Government knew of, but had not disclosed during trial-Gerald Vaughn and Kevin Anderson. As discussed in connection with Claim 13, *supra,* both witnesses purportedly heard Co-Defendant Haynes make statements suggesting that Haynes' involvement in the murders was more extensive than indicated by the testimony of key Government witness Victor Gloria, who portrayed Higgs in the more culpable light. Arguing a violation of *Brady v. Maryland,* counsel filed motion for a new trial and new sentencing hearing. The Court denied the motion and the Fourth Circuit affirmed.

Higgs submits that the Fourth Circuit incorrectly applied *Brady* as it relates to the sentencing phase of trial when it wrote,

> [T]o establish materiality, Higgs was required to demonstrate a reasonable probability that the evidence would have persuaded a juror to reach the conclusion that Haynes was "equally culpable" to Higgs in the murders, *and* that this mitigating factor, combined with the others, would have tipped the balance and led the juror to also conclude that the mitigating factors outweighed the aggravating factors so as to foreclose the sentence of death.

*Higgs II,* 95 Fed.Appx. 37, 43 (4th Cir.2004) (emphasis in original). Focusing on the word "outweighed," Higgs submits that the Fourth Circuit deviated from the statute, which requires the jury, in order to impose a death judgment, to determine whether all the aggravating "factors found to exist *sufficiently* outweigh all the mitigating ... factors found to exist." 18 U.S.C. § 3593(e) (emphasis added). Higgs argues that it is reasonably probable that the introduction of evidence casting Haynes

in a light equally culpable with Higgs would have resulted in at least one *544 juror finding that the aggravating factors did not *sufficiently* outweigh the mitigating factors, causing the juror to oppose the death penalty. Higgs thus reasons that the Fourth Circuit erred in affirming this Court's denial of his motion for a new sentencing hearing.

### A.

As stated previously, a habeas court does not ordinarily consider issues that have already been resolved and decided on direct review. *Boeckenhaupt,* 537 F.2d at 1183.

Higgs raised this *Brady* violation claim in the course of his direct appeal to the Fourth Circuit. *Higgs II,* 95 Fed.Appx. at 43. Therefore, this Court need not reach the merits of the claim.

### B.

Still, lest there be any doubt, the Court accepts that the Fourth Circuit applied the correct legal standard. As the Fourth Circuit opined, the Supreme Court has held that "[e]vidence is 'material' for purposes of the *Brady* inquiry 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Higgs II,* 95 Fed.Appx. at 41 (quoting *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375).[FN36] In the present case, the Fourth Circuit did not simply find that the mitigating factors would not have outweighed the aggravating factors. It referred to the necessity of the mitigating factors "tipp[ing] the balance ... so as to foreclose the sentence of death." *Higgs II,* 95 Fed.Appx. at 43. This additional language is in accord with the statutory standard for imposition of a death sentence, i.e., that the aggravation must "sufficiently" outweigh" the mitigation.

> FN36. At one point, the Government, citing Higgs' Brief, characterizes his claim to be that "the materiality test does not require a showing that it is reasonably probable that the result of the proceeding would have been different, had the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

evidence been disclosed to the defense." This characterization of Higgs' claim seems to be inconsistent with other parts of Higgs' Brief, which correctly state that the "*Brady* materiality analysis does require a showing that it is reasonably probable that the result of the proceeding would have been different, had the evidence been disclosed to the defense."

As for this Court's denial of Higgs' request for a new sentencing and the Fourth Circuit's affirmance of that decision, the appellate court found that this Court did not abuse its discretion because, as is true throughout, "the evidence set forth at Higgs' trial provides 'strong support for the conclusion that [Higgs] would have been convicted of capital murder and sentenced to death even if' " the witness statements had been introduced into evidence. *Higgs II*, 95 Fed.Appx. at 44 (citing *Strickler v. Greene*, 527 U.S. 263, 294, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)).[FN37] There is no basis for disturbing this ruling.

FN37. There is obviously no basis for an ineffective assistance of counsel claim in this regard since counsel raised and the Fourth Circuit decided the issue.

**Claim 18: Post-Arrest Silence**

Higgs next contends that the testimony of Government witness Domenick Williams regarding Higgs' post-arrest silence during a police interview violated Higgs' rights under the Fifth and Sixth Amendments.

Williams, facing charges of his own, was incarcerated with Higgs prior to Higgs' trial. At trial, Williams testified that Higgs told him of an instance in which police officers approached Higgs, who was at the time incarcerated, in an attempt to get Higgs to cooperate against Haynes. *545 Higgs told Williams that he refused to discuss the case with the officers.

Higgs argues that Williams' testimony about Higgs' silence when questioned by the police violated Higgs' Fifth

Amendment right to remain silent and his Sixth Amendment right to counsel. Higgs says that the use of his post-arrest silence against him, following the administration of *Miranda* warnings by the police, violated his right against self-incrimination and his right to due process. *Doyle v. Ohio*, 426 U.S. 610, 619, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *United States v. Quinn*, 359 F.3d 666, 677 (4th Cir.2004) (" *Doyle* forbids the government to use a defendant's silence against him at trial where the government implicitly or explicitly advised the defendant upon arrest that he should keep silent."). Higgs also claims his trial and appellate counsel were ineffective for failing to raise this issue.

**A.**

Both the Fifth and Sixth Amendment claims are procedurally defaulted. Higgs concedes that he has not previously argued that Williams' testimony violated these rights. As recognized throughout, though a procedural default can be excused upon a demonstration of cause and prejudice, *see Massaro*, 538 U.S. at 504, 123 S.Ct. 1690, Higgs merely posits that his counsel's ineffective assistance constitutes "cause." *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986) (noting that ineffective assistance is "cause" for a procedural default), and submits that he was prejudiced as a result. He has demonstrated neither.

**B.**

[54] Procedural default aside, Higgs' claims fail on the merits. In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that the privilege against self-incrimination protects individuals from "informal compulsion exerted by law-enforcement officers during in-custody questioning." In *Doyle*, the Court extended the privilege to preclude admission of evidence that a defendant exercised his right to remain silent during an interrogation, as defined by *Miranda*. *Doyle*, 426 U.S. at 618, 96 S.Ct. 2240. "Interrogation" is defined as actual "questioning initiated by law enforcement officers," *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602, or "its functional equivalent." *Arizona v. Mauro*, 481 U.S. 520, 526, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987) (citing *Rhode Island v. Innis*, 446 U.S. 291, 301,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)). Courts have interpreted the "functional equivalent" to include "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis,* 446 U.S. at 301, 100 S.Ct. 1682; *see also Illinois v. Perkins,* 496 U.S. 292, 296, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990); *United States v. Wright,* 991 F.2d 1182, 1186 (4th Cir.1993) ( *Miranda* only applies while "the defendant is being interrogated"). On the other hand, "[v]olunteered statements of any kind are not barred by the Fifth Amendment." *Innis,* 446 U.S. at 300, 100 S.Ct. 1682 (citing *Miranda,* 384 U.S. at 478, 86 S.Ct. 1602).

Insofar as his statements to Williams were concerned, Higgs was not in police custody at the time. *See Doyle,* 426 U.S. at 618, 96 S.Ct. 2240. Williams was neither a police officer nor a person that police were using to elicit an incriminating response from Higgs. In fact, Williams had not even asked Higgs a question; Higgs volunteered the information about his silence. Thus, even if Williams had been a police officer, this volunteered *546 statement would not have been barred by the Fifth Amendment. *See Innis,* 446 U.S. at 300, 100 S.Ct. 1682.

**C.**

Higgs submits that trial and appellate counsel's failure to object to or otherwise litigate these issues violated his Sixth Amendment right to effective counsel because, he says, there could have been no strategy behind the failure to object. The Court disagrees. Where an objection to evidence would have been futile, counsel is not constitutionally ineffective for failing to make the objection. *See Harris v. United States,* 204 F.3d 681, 683 (6th Cir.2000). Because, as demonstrated above, any Fifth and Sixth Amendment objections on this point would have failed, counsel's failure not to make them did not violate Higgs' Sixth Amendment right to effective representation.[FN38]

FN38. It is not clear whether Higgs is also arguing that, when approached by the police officers, he was denied a Sixth Amendment right to counsel. To the extent that he is, the point is

academic because Higgs made no statement to the officers.

**Claim 19: Jury Instruction Challenge**

Higgs argues that his Fifth Amendment rights were violated when the Court failed *sua sponte* to instruct the jurors at the close of the penalty phase that they were not permitted to draw adverse inferences of guilt based on Higgs' decision not to testify. While he concedes that the Court gave a no-adverse inference instruction during the guilt phase, he believes the risk of a juror drawing an improper inference from the Court's failure to provide this instruction in the penalty phase was heightened. He argues that trial counsel's failure to request this instruction during the penalty phase, as well as appellate counsel's failure to raise the issue on appeal, constituted ineffective assistance.

**A.**

This claim is procedurally barred. Higgs concedes that counsel failed to timely raise it at either the trial level or on appeal which, unless excused, precludes its subsequent litigation. *See United States v. Frady,* 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). Again, a procedural default may be excused where the defendant establishes a cause for the omission and prejudice. *Massaro,* 538 U.S. at 504, 123 S.Ct. 1690. Higgs has shown neither.

He argues that counsel's ineffectiveness constitutes cause but, as discussed below, the Court finds counsel's performance to have been adequate. *See Murray,* 477 U.S. at 488, 106 S.Ct. 2639 ("So long as a defendant is represented by counsel whose performance is not constitutionally ineffective under the standard established in *Strickland v. Washington, supra,* we discern no inequity in requiring him to bear the risk of attorney error that results in procedural default.") In any event, Higgs has not shown a "substantial likelihood" that the Court's failure to provide a non-adverse-inference instruction during the penalty phase, after having given the instruction in the guilt phase, prejudiced the outcome. *Frady,* 456 U.S. at 174, 102 S.Ct. 1584.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

**B.**

On the merits, this claim fails.

**1.**

[55] The Court had no obligation to *sua sponte* provide a cautionary jury instruction regarding Higgs' failure to testify during the penalty phase.

To be sure, under the Fifth Amendment, a defendant's silence at trial cannot be used as evidence of his guilt. U.S.C.A. **\*547** Const. Amend. V; *see also Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) (the Fifth Amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt"); *Malloy v. Hogan*, 378 U.S. 1, 8, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) (the Fifth Amendment protects a defendant's right to remain silent "unless he chooses to speak in the unfettered exercise of his own will") The right to remain silent extends to the sentencing phase. *Mitchell v. United States*, 526 U.S. 314, 327, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999) (a defendant may assert the privilege against self-incrimination in sentencing proceedings); *Estelle v. Smith*, 451 U.S. 454, 462-63, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (there is no basis for distinguishing "between the guilt and penalty phases of respondent's trial so far as the protection of the Fifth Amendment privilege is concerned"). To protect this right, a defendant may request that the court instruct the jury not to draw any adverse inference from his silence. *United States v. Francis*, 82 F.3d 77, 78 (4th Cir.1996) (upon request the court gave the customary instruction regarding defendant's right not to testify and that no adverse inference could be drawn from the exercise of that right). However, in the absence of such a request, the court has no obligation to provide such an instruction. *See Carter v. Kentucky*, 450 U.S. 288, 305, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981) (state trial judge was required to give the jury an adverse inference instruction only "upon proper request")

Higgs admits that counsel failed to request a no-adverse-inference instruction during the penalty phase. Accordingly, the Court had no duty to provide one. *See*

*Carter*, 450 U.S. at 305, 101 S.Ct. 1112. Beyond that, however, a cautionary instruction during the penalty phase was wholly unnecessary because the Court made clear to the jury during the penalty phase that its instructions during the guilt phase carried over into the penalty phase and such an instruction had been given during the guilt phase. *See Wilson v. State*, 271 Ga. 811, 525 S.E.2d 339, 347 (1999), *overruled on other grounds by* 284 Ga. 758, 670 S.E.2d 388, 398 (2008) (holding that the jury understands continuing applicability of jury instructions throughout the duration of the trial); *See also People v. Wharton*, 53 Cal.3d 522, 280 Cal.Rptr. 631, 809 P.2d 290, 339 (1991) (a reasonable jury would correctly assume "generic" instructions continued to apply); *State v. Wessinger*, 736 So.2d 162, 193-194 (La.1999) (finding no error in failure to repeat cautionary guilt phase instruction during sentencing phase); *People v. Sanders*, 11 Cal.4th 475, 46 Cal.Rptr.2d 751, 905 P.2d 420, 469 (1995) (court was not required to repeat at penalty phase instruction on credibility of witnesses and circumstantial evidence which were given at guilt phase).

Thus, during the guilt phase, the Court instructed the jury as follows:

The defendant did not testify in this case. Under the United States Constitution he has no obligation to testify or to present any other evidence because it is the Government's burden to prove the defendant guilty beyond a reasonable doubt. [¶] The burden remains with the prosecution throughout the entire trial. It never shifts to the defendant. Any defendant is never required to prove that he is innocent, and you may not attach any significance to the fact that the defendant did not testify. No adverse inference against him may be drawn by you because he did not take the witness stand. You may not consider this against the defendant in any way in your deliberations in the jury room.

**\*548** During the penalty phase the Court informed the jury:

The instructions that I gave you earlier in the case about witness credibility and so on and so forth still apply, so keep those in mind. But there are some specific

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

instructions that I now direct to you in this phase of the case.

Since the Court made clear that the penalty phase instructions were *in addition* to those provided at the guilt phase, it strains credulity to suggest that the jurors might infer that they were now free to draw inferences of guilt from Higgs' silence during the penalty phase. A redundant jury instruction would have served no purpose. *See United States v. Soria*, 959 F.2d 855, 857 (10th Cir.1992) (finding no general requirement for redundant instructions).

**2.**

As for the ineffective assistance of counsel claim relative to this issue, counsel's failure to request a cautionary instruction did not constitute ineffective assistance. For a conviction to be reversed on the grounds of ineffective assistance, a defendant must show that (1) the attorney's representation fell below an objective standard of reasonableness, and (2) the deficient performance prejudiced him. *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. There is no basis to criticize trial counsel for not requesting a redundant instruction or appellate counsel for deciding not to raise the issue on appeal.

**Claim 20: Occurrence of the Offenses Within the Special Maritime and Territorial Jurisdiction of the United States**

Higgs claims that the Government failed to establish federal jurisdiction over the Patuxent Wildlife Refuge where the killings occurred; that the Court improperly instructed the jury regarding the matter of jurisdiction; and that counsel's failure to object to these alleged errors constituted ineffective assistance.

**A.**

Higgs begins by arguing that the Government failed to provide sufficient evidence that the Wildlife Refuge falls "within the special maritime and territorial jurisdiction of the United States," as required by 18 U.S.C. § 1111(b).

The term "special maritime and territorial jurisdiction of the United States" includes land "under the exclusive or concurrent jurisdiction of the United States." 18 U.S.C. § 7(3). To prove jurisdiction in this case, the Government offered the testimony of Douglas Vandergraft, Chief Cartographer for the United States Fish and Wildlife Service. Vandergraft's testimony, says Higgs, was objectionable because he was never qualified as an expert, but was permitted to render a number of expert opinions with respect to jurisdiction. *See* Fed.R.Evid. 701 (barring lay opinions based on "scientific, technical or other specialized knowledge"). Higgs takes particular issue with Vandergraft's reliance on Fish and Wildlife maps of the Refuge. Those maps, according to Higgs, showed *ownership* of the Refuge, but not *jurisdiction*. Higgs contends that Vandergraft's reliance on the maps was improper because he never testified that the maps were accurate, stating only that the maps were "hopefully" up-to-date.

The Government rejects Higgs' arguments in every respect and the Court does as well. Higgs' challenge to Vandergraft's testimony qua expert is procedurally barred since it could have been raised on direct appeal. *United States v. Frady*, 456 U.S. 152, 165, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). While this procedurally barred claim may be considered if Higgs can show "cause" for the default and "prejudice" as a result, again he has shown neither.

*549 [56] A court considering the sufficiency of evidence underlying a conviction will uphold a guilty verdict and deny habeas relief if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *see also Williams v. Ozmint*, 494 F.3d 478, 489 (4th Cir.2007) (applying *Jackson* standard to habeas petition to determine sufficiency of evidence sustaining state court conviction); *Arigbede v. United States*, 732 F.Supp. 615, 621-22 (D.Md.1990) (applying *Jackson* standard to habeas petition to determine sufficiency of evidence sustaining district court conviction). Courts defer to the jury's determination of credibility and view the record "in the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

light most favorable to the prosecution." *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781.

[57] Assuming Vandergraft's testimony was offered as lay testimony, it was properly admitted. A lay witness may testify about information from records of which he has personal knowledge and over which he maintains personal control. *MCI Telecomms. Corp. v. Wanzer,* 897 F.2d 703, 706 (4th Cir.1990) (holding that a lay witness may testify to conclusions about "records ... predicated on her personal knowledge and perception" and is not required to be identified as an "expert" witness). Vandergraft stated that he had worked in the Cartography Office of Fish and Wildlife for 15 years and that he personally maintained the Fish and Wildlife maps. Referring to those maps, he testified that the crime scene was within the Government's territorial ownership and jurisdiction. Indeed, Vandergraft specifically affirmed that the maps "accurately reflect the ownership, as well as the jurisdiction" of the Patuxent Wildlife Research Center as of January 1996, which directly refutes Higgs' argument that Vandergraft testified only to Government ownership, as opposed to jurisdiction.

Nor is it accurate to state that Vandergraft failed to authenticate the maps. While Vandergraft did state that Fish and Wildlife maps were "hopefully" up-to-date, he later testified that he had conducted a search to ensure that the particular maps he relied on with respect to the Refuge were accurate. [FN39]

> FN39. As properly authenticated public records, the maps themselves were admissible on the issue of Government ownership of the land, *see* Fed.R.Evid. 803(8).

Under the *Ozmint* and *Jackson* standards, Vandergraft's testimony, buttressed by the maps themselves, sufficed to establish that the Refuge was within the "special maritime and territorial jurisdiction of the United States." 18 U.S.C. § 1111(b).

**B.**

Higgs nonetheless maintains that the Court's instructions

regarding jurisdiction confused the jury. This is what the Court told the jury:

The second element with regard to the first degree murder charge that the Government must prove beyond a reasonable doubt is that the killings occurred within the maritime and territorial jurisdiction of the Untied States. The Government has offered evidence that the killings occurred on the grounds of the Patuxent National Wildlife Refuge and that the Patuxent National Wildlife Refuge is owned by the federal government and is within its special maritime and territorial jurisdiction.

Thus, if you find that the killing occurred in the Patuxent National Wildlife Refuge, then you should consider the remaining elements. If, however, you find that the killing did not occur, killings, the killings [sic] did not occur in *550 the Patuxent National Wildlife Refuge, or if you have a reasonable doubt as to this element, then it is your duty to find the defendant not guilty.

According to Higgs, this language on the one hand instructed the jury to find that the offenses occurred within the special maritime and territorial jurisdiction of the United States, but on the other hand merely required that the jury find the offenses occurred within the Refuge.

This argument lacks merit. To begin, the claim is procedurally defaulted for the same reason that the claim with respect to Vandergraft's testimony is procedurally defaulted; it could have been raised on direct appeal. Apart from the default, the claim is still deficient. While the jury is obliged to make the factual determination of whether the crime at issue occurred on a particular piece of property, the court, as a matter of law, has the authority to determine whether federal jurisdiction extends to a particular piece of property. *United States v. Bridges,* No. 94-5130, 1994 WL 687301, at *1 (4th Cir. Dec. 9, 1994) (finding that it is "well established that a court may determine, as a matter of law, the existence of federal jurisdiction over the geographic area, but the locus of the offense within that area is for the trier of fact"); *United States v. Roberts,* 185 F.3d 1125, 1139 (10th Cir.1999)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

(finding that it is the role of the trial court to decide jurisdiction of a specific area).

Accordingly, the Court in this case had the authority to determine, and did in fact determine, that the Refuge was "within the special maritime and territorial jurisdiction of the United States," 18 U.S.C. § 1111(b), while leaving the jury to decide whether "the killing[s] occurred in the Patuxent National Wildlife Refuge." There was no jury confusion with respect to the Court's instructions.

## C.

Finally, Higgs claims trial counsel were ineffective for failing to object to Vandergraft's testimony and the jury instruction, and for failing to move for judgment of acquittal pursuant to Fed.R.Crim.P. 29. He also claims that appellate counsel were ineffective for failing to challenge the jury instruction.

Higgs must show both that (1) his attorney's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that he was prejudiced by that performance. Strickland, 466 U.S. at 687, 104 S.Ct. 2052. Where an objection would have been futile, counsel is not constitutionally ineffective for failing to make such an objection. See Harris, 204 F.3d at 683. Since any objection to Vandergraft's testimony or the Court's instruction on jurisdiction would have been futile, it follows that Higgs' counsel-trial and appellate-were not constitutionally ineffective.

## Claim 21: Government's Failure to Provide All Park Police and FBI Witness Statements and Reports

Higgs contends that, in violation of his Fifth Amendment due process rights, the Government withheld evidence in the form of witness statements and reports collected by the Park Police and FBI. While he concedes that he is not making any "specific allegation that the Government failed to disclose particular law enforcement reports or witness statements," he suggests that somewhere there may be some undisclosed documents that would have materially affected his guilt and mitigated his punishment. He warns

against prosecutors who "tack too close to the wind" by disclosing less material evidence than required. Kyles, 514 U.S. at 439, 115 S.Ct. 1555 (finding that prudent prosecutors who are uncertain regarding how much evidence*551 to disclose should disclose more information rather than less). He therefore requests that the Court order the Government to review its evidence for any relevant documents that might have been Brady or Giglio in nature, but which were not disclosed.[FN40]

> FN40. Higgs states that at a later time he will move for discovery of all witness statements and reports generated during the investigation of these murders.

## A.

Higgs is procedurally barred from litigating this issue since it was not preserved at trial or raised on direct appeal. See Massaro, 538 U.S. at 504, 123 S.Ct. 1690. Again, while Higgs may bypass procedural default upon a showing of either actual innocence or cause and prejudice, he has failed to demonstrate either. See Bousley v. United States, 523 U.S. 614, 622, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998).

## B.

[58] Higgs' argument is devoid of merit. Under Brady, the Government is only required to disclose evidence that would be "material" to the defense. 373 U.S. at 87, 83 S.Ct. 1194. The Supreme Court has defined as material evidence that would create a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Here Higgs offers absolutely no facts, not even a slight suspicion, that the Government failed to turn over material evidence.

[59] As the Government correctly notes, a petitioner making § 2255 claims must set forth specific facts in support of each ground of relief asserted. See Blackledge v. Allison, 431 U.S. 63, 74, 97 S.Ct. 1621, 52 L.Ed.2d 136

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

(1977) (holding that a habeas petitioner must make specific allegations; "conclusory allegations unsupported by specifics," or "contentions that in the face of the record are wholly incredible" will not entitle one to discovery or a hearing); *see also Taylor v. United States*, 287 F.3d 658, 661 (7th Cir.2002) (finding that a mere impression of what happened, rather than specific allegations, does not satisfy the requirements for a collateral attack).

The "belief" of Higgs' habeas attorneys that trial counsel may not have been furnished with all exculpatory evidence that was available and their supposition that an error may have occurred finds no anchor in fact or law. Absent facts tending to show that relevant information was not turned over, the Court cannot possibly conclude that undisclosed "evidence" may have been material to his defense or that he was prejudiced as a result of the withholding.

### Claim 22: Cumulative Errors

Nearing the finish, Higgs argues that the cumulative effect of counsels' errors, as well as the alleged prosecutorial and Court errors, marred the fairness of his trial and sentencing proceedings. As a result, he says, his conviction and sentence should be overturned or, alternatively, that his sentence should be vacated. The Court rejects this claim.

In the first place, the Court has found no errors of counsel, the prosecution, or the Court in this case.

But the cumulative error argument itself is not recognized in this Circuit.

As for ineffective assistance of counsel claims, the Fourth Circuit has emphasized that it evaluates such claims on an individual rather than cumulative basis. *Compare* **\*552**_Fisher v. Angelone_, 163 F.3d 835, 852 (4th Cir.1998) (finding that "ineffective assistance of counsel claims, like claims of trial court error, must be reviewed individually, rather than collectively"), *with Kubat v. Thieret*, 867 F.2d 351, 370 (7th Cir.1989) (finding the consideration of combined errors to be appropriate). The same goes for alleged cumulative errors of the trial court. *See Arnold v.*

*Evatt*, 113 F.3d 1352, 1364 (4th Cir.1997) (rejecting a claim of cumulative effect of trial court's errors based on rejection of each of the individual court error claims), *cert. denied*, 522 U.S. 1058, 118 S.Ct. 715, 139 L.Ed.2d 655 (1998); *Mohr v. United States*, No. 03-2893, 2007 WL 2903235, at *10 (D.Md. Sept. 30, 2007) (holding that once the court found no attorney error, there could be no cumulative error); *Robinson v. Conroy*, No. 01-1671, 2002 WL 32785545, at *4 (D.Md. Jan. 16, 2002) ("Because none of the issues raised by Robinson could be considered error, he cannot string them together in hopes of forming a constitutional violation.") Here, because Higgs has failed to prove individual constitutional errors by counsel, his claim of cumulative error would fail, even if the law of this Circuit recognized the cumulative error argument. *See Fisher*, 163 F.3d at 852 ("Having just determined that none of counsel's actions could be considered constitutional error ... it would be odd ... to conclude that those same actions, when considered collectively, deprived [the defendant] of a fair trial."). The same goes for alleged cumulative errors of the Court.

The Supreme Court cases Higgs cites do not require a contrary conclusion. In *Kyles v. Whitley*, 514 U.S. 419, 436-37, 441, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), the Court held that, on habeas review, when evaluating whether the evidence is material in violation of *Brady v. Maryland*, suppressed evidence should be considered cumulatively. But the materiality of suppressed evidence is not the issue here. Moreover, in *Taylor v. Kentucky*, 436 U.S. 478, 487-88, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978), the Court found reversible error on a *direct appeal* based on the cumulative effect of trial court and prosecutorial errors that might otherwise be individually harmless. *See also United States v. Martinez*, 277 F.3d 517, 532-33 (4th Cir.2002) (recognizing that under "cumulative error doctrine," defendant could establish reversible error on direct appeal through the combined effect of otherwise harmless errors). *Taylor* and *Martinez* are therefore distinguishable. Higgs' has already exhausted his direct appeals and is now seeking collateral relief. But, as noted, in the context of collateral relief the Fourth Circuit has clearly stated that individual constitutional errors must exist before a court can consider cumulative relief. *Fisher*, 163 F.3d at 852; *see also Greene v. Hoke*, No. 08-294, 2009 WL 774491, at *6 (S.D.W.Va. Mar. 20, 2009) (adopting magistrate judge's holding that petitioner was not entitled to cumulative relief where petitioner failed to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

establish individual errors committed by either trial court or counsel); *Aldridge v. Ballard,* No. 05-827, 2009 WL 772933, at *6 (S.D.W.Va. Mar. 18, 2009) (confirming magistrate judge's finding that cumulative error cannot be found where there are "no error[s] of federal law, constitutional or otherwise"). Higgs' claim of cumulative error in this habeas proceeding is without merit.

### Claim 23: Request for Evidentiary Hearing

[60] Higgs argues that because he has alleged a multitude of facts supportive of his request for relief, he is entitled to an opportunity to prove them in an evidentiary hearing. The Court thinks not. A court may grant a motion for an evidentiary hearing when the defendant has pled facts that, if established, entitle him to relief, and there is a material dispute regarding*553 those facts. *See Townsend v. Sain,* 372 U.S. 293, 312, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), *overruled on other grounds by* 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992) (holding that a federal court has the power to try facts anew if the petitioner "alleges facts, which if proved, would entitle him to relief"). Higgs acknowledges the wide discretion vested in courts during § 2255 proceedings in respect of matters involving disputed material facts. However, as the Government correctly argues, most of Higgs' claims "suffer from some procedural flaw that should prove fatal" and those that survive procedural challenge do not allege any facts which are "either potentially credible or, if taken as true, would merit relief." *See Engelen v. United States,* 68 F.3d 238, 240 (8th Cir.1995) (holding that a habeas "petition can be dismissed without a hearing if (1) the petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact"). The Court finds no reason to hold an evidentiary hearing and the request for such a hearing is denied.

### Claim 24: Juror Misconduct

Higgs contends that his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated based on juror misconduct during trial.

He argues that this misconduct included, but was not limited to, improper consideration of matters extraneous to the trial, improper exposure to publicity and community sentiment, improper exposure to witnesses and others who claimed to have knowledge or opinions about Higgs and the case, false or misleading responses of jurors on the voir dire, improper biases which infected the jury's deliberations, improper exposure to the prejudicial opinions of third parties, improper communications with third parties and/or the trial judge, and improper prejudging of the guilt/innocence and penalty phases of Higgs' trial. Higgs also argues that his rights to a fair trial and due process were violated when the jury was not sequestered to avoid contact with the public. He claims that trial and appellate counsel were ineffective for failing to raise these issues. He asks for leave to interview jurors to prove the basis for these claims, arguing that his request is justified by the need for heightened standards for reliability in death penalty cases.

#### A.

These juror misconduct claims are procedurally defaulted. As Higgs concedes, until now he has never argued that juror misconduct violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. He has shown neither cause nor prejudice to excuse the default.

#### B.

[61] Nor is the claim valid on the merits. While due process requires that a jury consider only the evidence developed before it at trial, and not information received from outside sources, *see Davis v. Zahradnick,* 432 F.Supp. 444, 447 (W.D.Va.), *aff'd en banc on other grounds,* 601 F.2d 153 (4th Cir.1979), and 646 F.2d 123 (4th Cir.1981), Higgs alleges no specific incident to support his assertion that there was juror misconduct, sending up trial balloons of unsupported claims of misconduct. Given this lack of specificity, including a total failure to demonstrate how the lack of a sequestration order prejudiced him, there is no basis to grant him relief or discovery. *See Taylor v. United States,* 287 F.3d 658, 661 (7th Cir.2002) ( "[A § 2255] motion 'shall specify all the *554 grounds for relief which are available to the movant and of which he has or, by the exercise of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

reasonable diligence, should have knowledge and shall set forth in summary form the facts supporting each of the grounds thus specified.' ").

Higgs would apparently have the Court find that, because of the severity and irreversibility of the death penalty, the Eighth Amendment requires a heightened standard for determining that death is the appropriate punishment, and for that reason it should permit him to conduct juror interviews. This theory finds no support in the law. While courts have surely required a heightened standard for determining that death is the appropriate punishment for certain crimes, *see Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), no authority supports the proposition that juror interviews may be undertaken post-trial in death-penalty cases in a hunt for facts that might demonstrate juror misconduct.

Higgs argues that, under the American Bar Association Guidelines, "it is clear that, *where permitted,* post-conviction counsel have a duty to interview jurors." ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, 10.15.1, commentary, pg. 123 (rev. ed.2003) (emphasis added). For good reason, however, post-trial interviews of jurors are highly restricted in this District pursuant to Local Rule 107.16, which states, "[u]nless *permitted* by the presiding judge, no attorney or party shall directly or through an agent interview or question any juror, alternate juror, or prospective juror, with respect to that juror's service." L.R. 107.16 (emphasis added). This District takes the position that jurors should not have to account to interested parties, especially those who may be disposed to challenge the verdict and press the jurors to explain how and why they decided as they did. The Court, finding that the underlying claim is factually baseless, denied the request to interview jurors once before; it has no reason to modify its decision at this time.

**C.**

While Higgs submits that trial and appellate counsel's failure to litigate these issues violated his Sixth Amendment right to effective counsel, he has not and cannot show that counsel's performance fell below an objective standard of reasonableness or that a reasonable

probability exists that he was prejudiced by their allegedly deficient performance. *See Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. Because the underlying claims would have failed, counsel's decision not to litigate the issues in the trial court or raise them on direct appeal did not amount to ineffective assistance.

### Claim 25: Lethal Injection as Cruel and Unusual Punishment

Higgs' final argument is that execution by lethal injection, which he faces in Maryland, violates the Eighth Amendment prohibition against cruel and unusual punishment, and that both the U.S. Government Execution Protocol and the Maryland Execution Protocol exceed their respective statutory authorities.

**A.**

With respect to the Eighth Amendment argument, Higgs argues that the potentially insufficient administration of the anesthetizing agent during the execution process, combined with the administration of a muscle paralyzing agent, may lead him to suffer an agonizing death without the ability to communicate any consciousness or feeling. He further argues that the procedures used to administer the lethal injection, including the lack of expertise of the personnel performing the procedure, substantially*555 increase the risk of painful death.

**1.**

[62] This claim is not yet ripe for review because the instant Petition and appeals from it remain and Higgs has not yet been given an execution date. U.S. Const. art. III, § 2; *see Kennedy v. Block,* 784 F.2d 1220, 1222 (4th Cir.1986). Moreover, litigation may modify the Maryland Protocol prior to Higgs' actual execution. Accordingly, there is no "direct and immediate dilemma for the parties" that compels judicial resolution of the issue at this time. *See New Mexicans for Bill Richardson v. Gonzales,* 64 F.3d 1495, 1500 (10th Cir.1995).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

This claim also fails because it is improperly brought as a § 2255 claim. Under § 2255, federal courts have jurisdiction to consider errors leading to a criminal conviction and those committed at sentencing, but they do not have the jurisdiction to determine the legality of the rules for implementing that judgment. *United States v. Addonizio,* 442 U.S. 178, 185, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979). Higgs is not contesting the validity of his conviction or sentence; he only attacks the method of imposing his sentence. Such a challenge, when timely, would properly be brought pursuant to 28 U.S.C. § 2241, *United States v. Little,* 392 F.3d 671, 679 (4th Cir.2004).

**2.**

Even if the present claim were properly before the Court, it is of highly doubtful prospect. The Supreme Court has decided that capital punishment is constitutional, *Gregg v. Georgia,* 428 U.S. 153, 177, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), and, since Higgs' trial, that the three-drug protocol for execution used by the Federal Government and the State of Maryland does not constitute cruel and unusual punishment. *Baze v. Rees,* 553 U.S. 35, 128 S.Ct. 1520, 1532-34, 170 L.Ed.2d 420 (2008). As explained in *Baze,* to prevail on an Eighth Amendment claim, a defendant must show that there is a " 'substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.' " *Id.* at 1531 (citing *Farmer v. Brennan,* 511 U.S. 825, 842, 846, and n. 9, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). Although the risk of future harm can qualify as cruel and unusual punishment, the Constitution "does not demand the avoidance of all risk of pain in carrying out executions." *Baze,* 128 S.Ct. at 1529, 1530.

Referring specifically to the three-drug protocol, the Supreme Court observed that "it is difficult to regard a practice as 'objectively intolerable' when it is in fact widely tolerated." *Baze,* 128 S.Ct. at 1532 (recognizing that thirty-six states that sanction capital punishment have adopted lethal injection as the means and that thirty of those states as well as the Federal Government use the same three-drug protocol).

The Supreme Court explicitly rejected Higgs' argument as

to speculative dangers, such as the possibility that the drug will not achieve its intended effect or that human error may occur during administration of the procedure. *Baze,* 128 S.Ct. at 1533-34. It held that the potential of the execution to cause pain due to an accident, without the suggestion of malevolence, "does not establish the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual." *Id.* at 1531; *see also Walker v. Johnson,* 448 F.Supp.2d 719, 723 (E.D.Va.2006) (citing *Louisiana ex rel. Francis v. Resweber,* 329 U.S. 459, 464, 67 S.Ct. 374, 91 L.Ed. 422 (1947) (holding that the possibility of an accident in the process of execution cannot constitute substantial *556 risk of harm)). Thus, although definitive resolution of the issue must await imminent application of the challenged procedure, the Government and Maryland Execution Protocols do not appear to present an Eighth Amendment problem. *See Baze,* 128 S.Ct. at 1532-34.

**B.**

Higgs also argues that the U.S. Government Execution Protocol is not statutorily authorized. He reasons thus: Pursuant to 18 U.S.C. § 3596(a), a death sentence should be implemented "in the manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. § 3596(a) (2006). The Department of Justice has violated this provision by delegating to the Director of the Bureau of Prisons responsibility for promulgating the Bureau's own Protocol for the execution of federal prisoners, *see* 28 C.F.R. § 26.3(a)(4), instead of following procedures prescribed by Maryland law. Indeed, says Higgs, Congress specifically rejected an amendment to 18 U.S.C. § 3596(a) that would have authorized the Attorney General to prescribe a uniform method of execution for federal prisoners. *See* H.R. Rep. 104-879 at 204 (1997). Higgs suggests that the Government Protocol is a "rule" that should have been, but was not subject to the notice and comment provisions of the Administrative Procedure Act. *See* 5 U.S.C. § 553 (2006).

As with the challenge to the method of execution, this claim is improperly raised in a § 2255 action and should, when timely, be brought under 28 U.S.C. § 2241. *See United States v. Little,* 392 F.3d 671, 679 (4th Cir.2004).[FN41]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

FN41. Whether a *Bivens* action or a federal civil rights claim pursuant to 42 U.S.C. § 1983 are alternative avenues of challenge, is not before the Court. *See Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 397, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); *Hill v. McDonough,* 547 U.S. 573, 580, 126 S.Ct. 2096, 165 L.Ed.2d 44 (2006).

Here too, the challenge to the Government would ultimately seem to be weak on the merits. Article 18 U.S.C. § 3596 requires that execution be implemented in the "manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. § 3596(a) (2006). Significantly, the statute only speaks to the "manner" of implementing the sentence without reference to "procedure." The *manner* of execution authorized by Maryland law is lethal injection. Md.Code Ann., Correctional Services, § 3-905. Because lethal injection has been deemed permissible, *see Baze,* 128 S.Ct. at 1532-34, the Government appears to be in compliance with the authorizing statute.

## C.

Higgs' final contention is that the Maryland Protocol, which he says should be implemented in place of the Government Protocol pursuant to 18 U.S.C. § 3596(a), goes beyond what the underlying Maryland statute, Md. Corr. Serv. section 3-905, authorizes. But again he travels beyond the bounds of a proper federal *habeas* petition, which does not extend to claims that state rules violate state statutes. *See* 28 U.S.C. § 2255(a) (2006) (a petitioner in a *habeas corpus* proceeding must allege that "his sentence was imposed in violation of the Constitution or laws of the United States"); *see also Carrizales v. Wainwright,* 699 F.2d 1053, 1055 (11th Cir.1983) (citing *Bronstein v. Wainwright,* 646 F.2d 1048, 1050 (5th Cir.1981) (holding a state's interpretation of its rules provides no basis for federal *habeas corpus* relief because no constitutional question is involved)). Accordingly, Higgs challenge to the Maryland Protocol is also rejected.

## *557 CONCLUSION

Having considered Higgs' various challenges to his conviction and sentence and finding merit in none of them, the Court **DENIES** his Motion for Relief, as well as his Motion for Discovery.

A separate Order will issue.

### *FINAL ORDER OF JUDGMENT*

For the reasons set forth in the accompanying Opinion, it is, this 6th day of April, 2010,

**ORDERED**

1. The Government's Motion to Strike Procedurally Defective Claims [Paper No. 519] is **DENIED;**

2. Petitioner Higgs' Motion for Discovery [Paper No. 509] is **DENIED;**

3. Petitioner Higgs' Motion for Relief Pursuant to 28 U.S.C. § 2255 or in the Alternative Pursuant to 28 U.S.C. § 2241 [Paper No. 492] is **DENIED;**

4. Final Judgment is **ENTERED** in favor of the Government and against Petitioner Higgs; and

5. The Clerk of the Court is directed to **CLOSE** the case.

D.Md.,2010.
Higgs v. U.S.
711 F.Supp.2d 479

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

Ⱨ

United States Court of Appeals,

Fourth Circuit.
UNITED STATES of America,
Plaintiff–Appellee,
v.
Dustin John HIGGS, Defendant–Appellant.
No. 10–7.

Argued: Sept. 21, 2011.
Decided: Nov. 23, 2011.

**Background:** Defendant was convicted in the United States District Court for the District of Maryland, Peter J. Messitte, Senior District Judge, of first-degree premeditated murder, first-degree murder committed in the perpetration or attempted perpetration of a kidnapping, and kidnapping resulting in death, and was sentenced to death. Defendant appealed. The Court of Appeals, 353 F.3d 281, affirmed. Defendant moved for new trial. The District Court denied motion. Defendant appealed. The Court of Appeals, 95 Fed.Appx. 37, affirmed. Defendant filed motion to vacate. The District Court, Messitte, Senior District Judge, 711 F.Supp.2d 479, denied motion. Defendant appealed.

**Holdings:** The Court of Appeals, Traxler, Chief Judge, held that:

(1) government was not required, under *Brady*,

to disclose two internal reports concerning validity of comparative bullet lead analysis (CBLA) evidence;

(2) defense counsel's handling of CBLA evidence did not rise to level of constitutionally deficient performance supporting claim of ineffective assistance of counsel;

(3) government's failure to produce CBLA reports, assuming it was required to do so, did not violate defendant's due process rights;

(4) defense counsel's handling of CBLA issue, even if deficient, did not result in prejudice required to establish ineffective assistance of counsel;

(5) defense counsel's failure to file motion for new trial based on post-trial CBLA studies did not establish constitutionally deficient performance; and

(6) defense counsel's failure to file motion for new trial based on post-trial CBLA studies did not prejudice defendant.

Affirmed.

West Headnotes

**[1] Constitutional Law 92 ⬿4594(1)**

92 Constitutional Law

   92XXVII Due Process
      92XXVII(H) Criminal Law
         92XXVII(H)4 Proceedings and Trial
            92k4592 Disclosure and Discovery

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

92k4594 Evidence
92k4594(1) k. In general.
Most Cited Cases

Under the Due Process Clause, the prosecution is required to disclose evidence favorable to an accused upon request where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. U.S.C.A. Const.Amend. 6.

**[2] Criminal Law 110 ☞1991**

110 Criminal Law

110XXXI Counsel
110XXXI(D) Duties and Obligations of Prosecuting Attorneys
110XXXI(D)2 Disclosure of Information
110k1991 k. Constitutional obligations regarding disclosure. Most Cited Cases

To prevail on *Brady* disclosure claim, defendant must demonstrate (1) that evidence is favorable, either because it is exculpatory or impeaching, (2) that the government suppressed the evidence, and (3) that the evidence was material to the defense. U.S.C.A. Const.Amend. 6.

**[3] Criminal Law 110 ☞1991**

110 Criminal Law

110XXXI Counsel
110XXXI(D) Duties and Obligations of Prosecuting Attorneys
110XXXI(D)2 Disclosure of Information
110k1991 k. Constitutional obligations regarding disclosure. Most Cited Cases

Government's *Brady* duty to disclose favorable evidence to defendant does not require government to make available all evidence in its possession or within its reach. U.S.C.A. Const.Amend. 6.

**[4] Criminal Law 110 ☞2008**

110 Criminal Law

110XXXI Counsel
110XXXI(D) Duties and Obligations of Prosecuting Attorneys
110XXXI(D)2 Disclosure of Information
110k2008 k. Sanctions for failure to disclose. Most Cited Cases

Mere suppression of favorable evidence does not entitle defendant to relief based on violation of government's *Brady* disclosure obligation. U.S.C.A. Const.Amend. 6.

**[5] Criminal Law 110 ☞1995**

110 Criminal Law

110XXXI Counsel
110XXXI(D) Duties and Obligations of Prosecuting Attorneys
110XXXI(D)2 Disclosure of Information

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

110k1993 Particular Types of Information Subject to Disclosure

110k1995 k. Diligence on part of accused; availability of information. Most Cited Cases

There is no *Brady* violation, due to government's failure to disclose evidence favorable to defendant, if the evidence is available to the defense from other sources or the defense already possesses the evidence. U.S.C.A. Const.Amend. 6.

[6] Criminal Law 110 ☞1992

110 Criminal Law

110XXXI Counsel

110XXXI(D) Duties and Obligations of Prosecuting Attorneys

110XXXI(D)2 Disclosure of Information

110k1992 k. Materiality and probable effect of information in general. Most Cited Cases

No real violation of government's *Brady* disclosure obligation occurs unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict. U.S.C.A. Const.Amend. 6.

[7] Criminal Law 110 ☞1992

110 Criminal Law

110XXXI Counsel

110XXXI(D) Duties and Obligations of Prosecuting Attorneys

110XXXI(D)2 Disclosure of Information

110k1992 k. Materiality and probable effect of information in general. Most Cited Cases

A "reasonable probability" of a different result is shown, as required for relief due to violation of government's *Brady* disclosure obligation, when government's evidentiary suppression undermines confidence in the outcome of the trial. U.S.C.A. Const.Amend. 6.

[8] Criminal Law 110 ☞1881

110 Criminal Law

110XXXI Counsel

110XXXI(C) Adequacy of Representation

110XXXI(C)1 In General

110k1879 Standard of Effective Assistance in General

110k1881 k. Deficient representation and prejudice in general. Most Cited Cases

To succeed on a Sixth Amendment claim of ineffective assistance of counsel, defendant must demonstrate that defense counsel's performance fell below an objective standard of reasonableness measured by prevailing professional norms, and that counsel's deficient performance prejudiced his defense. U.S.C.A. Const.Amend. 6.

[9] Criminal Law 110 ☞1883

663 F.3d 726

(Cite as: 663 F.3d 726)

110 Criminal Law

110XXXI Counsel
110XXXI(C) Adequacy of Representation
110XXXI(C)1 In General
110k1879 Standard of Effective Assistance in General
110k1883 k. Prejudice in general. Most Cited Cases

To establish prejudice prong of claim of ineffective assistance of counsel, defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, or that counsel's errors were so serious as to deprive defendant of a fair trial, meaning a trial the result of which is reliable. U.S.C.A. Const.Amend. 6.

**[10] Criminal Law 110 ⬅2001**

110 Criminal Law

110XXXI Counsel
110XXXI(D) Duties and Obligations of Prosecuting Attorneys
110XXXI(D)2 Disclosure of Information
110k1993 Particular Types of Information Subject to Disclosure
110k2001 k. Other particular issues. Most Cited Cases

Government had no *Brady* obligation to disclose two internal FBI reports concerning validity of comparative bullet lead analysis (CBLA) evidence in existence at time of capital murder trial; reports represented early attempts by FBI to quantify conclusions that could be drawn from lead analysis to counter criticisms then in existence and ultimately did little more than advise FBI that further study was warranted, and criticisms of CBLA were available to trial counsel prior to trial. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. §§ 1111(a), 1201(a)(2).

**[11] Criminal Law 110 ⬅1931**

110 Criminal Law

110XXXI Counsel
110XXXI(C) Adequacy of Representation
110XXXI(C)2 Particular Cases and Issues
110k1921 Introduction of and Objections to Evidence at Trial
110k1931 k. Experts; opinion testimony. Most Cited Cases

Defense counsel's handling of comparative bullet lead analysis (CBLA) evidence during capital murder trial did not rise to level of constitutionally deficient performance supporting claim of ineffective assistance of counsel, even though counsel did not ferret out two preliminary studies that were then available or present defense expert armed with same information; defense counsel conducted thorough and effective cross-examination of government's expert, demonstrating that they were well acquainted with criticisms of CBLA evidence, and went a long way toward impeaching uniqueness and homogeneity of lead

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

melts, as well as overall probative value of CBLA evidence, without unduly calling attention to evidence or making it appear to be of more importance than was warranted. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. §§ 1111(a), 1201(a)(2).

**[12] Criminal Law 110 ⟻1870**

110 Criminal Law

 110XXXI Counsel
  110XXXI(C) Adequacy of Representation
   110XXXI(C)1 In General
    110k1870 k. In general. Most Cited Cases

When considering a claim of deficient performance as part of claim alleging ineffective assistance of counsel, court must evaluate the conduct from counsel's perspective at the time. U.S.C.A. Const.Amend. 6.

**[13] Criminal Law 110 ⟻1871**

110 Criminal Law

 110XXXI Counsel
  110XXXI(C) Adequacy of Representation
   110XXXI(C)1 In General
    110k1871 k. Presumptions and burden of proof in general. Most Cited Cases

In deciding whether counsel who allegedly provided ineffective assistance of counsel rendered constitutionally deficient performance, court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance and that, under the circumstances, the challenged action might be considered sound trial strategy. U.S.C.A. Const.Amend. 6.

**[14] Criminal Law 110 ⟻1882**

110 Criminal Law

 110XXXI Counsel
  110XXXI(C) Adequacy of Representation
   110XXXI(C)1 In General
    110k1879 Standard of Effective Assistance in General
     110k1882 k. Deficient representation in general. Most Cited Cases

In addressing deficient performance prong of claim of ineffective assistance of counsel, question is whether attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom. U.S.C.A. Const.Amend. 6.

**[15] Constitutional Law 92 ⟻4594(3)**

92 Constitutional Law

 92XXVII Due Process
  92XXVII(H) Criminal Law
   92XXVII(H)4 Proceedings and Trial
    92k4592 Disclosure and Discovery
     92k4594 Evidence
      92k4594(2) Particular Items or Information, Disclosure of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

92k4594(3) k. In general. Most Cited Cases
**Criminal Law 110 ☞1931**

110 Criminal Law

110XXXI Counsel
110XXXI(C) Adequacy of Representation
110XXXI(C)2 Particular Cases and Issues
110k1921 Introduction of and Objections to Evidence at Trial
110k1931 k. Experts; opinion testimony. Most Cited Cases
**Criminal Law 110 ☞2001**

110 Criminal Law

110XXXI Counsel
110XXXI(D) Duties and Obligations of Prosecuting Attorneys
110XXXI(D)2 Disclosure of Information
110k1993 Particular Types of Information Subject to Disclosure
110k2001 k. Other particular issues. Most Cited Cases

Evidence other than comparative bullet lead analysis (CBLA) evidence enabled government's introduction of evidence of capital murder defendant's involvement in other shootings, and therefore neither government's failure to produce two internal reports raising questions about CBLA evidence, assuming it had *Brady* obligation to do so, nor counsel's alleged deficient performance in failing to obtain exclusion of CBLA evidence or further challenge it caused defendant prejudice required to establish either *Brady* due process violation or ineffective assistance of counsel under theory that, had CBLA evidence been excluded or discredited, other acts evidence would not have been admitted. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. §§ 1111(a), 1201(a)(2); Fed.Rules Evid.Rule 404(b), 28 U.S.C.A.

**[16] Constitutional Law 92 ☞4594(3)**

92 Constitutional Law

92XXVII Due Process
92XXVII(H) Criminal Law
92XXVII(H)4 Proceedings and Trial
92k4592 Disclosure and Discovery
92k4594 Evidence
92k4594(2) Particular Items or Information, Disclosure of
92k4594(3) k. In general. Most Cited Cases
**Constitutional Law 92 ☞4745**

92 Constitutional Law

92XXVII Due Process
92XXVII(H) Criminal Law
92XXVII(H)6 Judgment and Sentence
92k4741 Capital Punishment; Death Penalty
92k4745 k. Proceedings. Most Cited Cases
**Criminal Law 110 ☞2001**

110 Criminal Law

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

110XXXI Counsel

110XXXI(D) Duties and Obligations of Prosecuting Attorneys

110XXXI(D)2 Disclosure of Information

110k1993 Particular Types of Information Subject to Disclosure

110k2001 k. Other particular issues. Most Cited Cases

There was no reasonable probability that trial court would have excluded comparative bullet lead analysis (CBLA) evidence had exclusion been sought, or that result in either guilt or penalty phase of capital murder trial would have been different had such evidence been excluded or further challenged, given the overwhelming evidence of guilt and defendant's predominant role in kidnappings and murders of three women, and therefore, assuming that government had *Brady* obligation to produce two internal reports raising issues about CBLA evidence, its failure to do so did not establish due process violation. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. §§ 1111(a), 1201(a)(2).

**[17] Criminal Law 110 ☞1931**

110 Criminal Law

110XXXI Counsel

110XXXI(C) Adequacy of Representation

110XXXI(C)2 Particular Cases and Issues

110k1921 Introduction of and Objections to Evidence at Trial

110k1931 k. Experts; opinion testimony. Most Cited Cases

**Criminal Law 110 ☞1961**

110 Criminal Law

110XXXI Counsel

110XXXI(C) Adequacy of Representation

110XXXI(C)2 Particular Cases and Issues

110k1958 Death Penalty

110k1961 k. Presentation of evidence in sentencing phase. Most Cited Cases

No reasonable probability existed that district court would have excluded comparative bullet lead analysis (CBLA) evidence had exclusion been sought in capital murder trial, or that outcome of either guilt or penalty phase of trial would have been different had such evidence been excluded or expert testimony concerning that evidence been subjected to additional cross-examination, given overwhelming evidence of defendant's guilt and his predominant role in kidnappings and murders of three women, and therefore defense counsel's performance with respect to CBLA evidence, even if deficient, did not prejudice defendant, as required to establish ineffective assistance of counsel. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. §§ 1111(a), 1201(a)(2).

**[18] Criminal Law 110 ☞1965**

110 Criminal Law

110XXXI Counsel

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

110XXXI(C) Adequacy of Representation

110XXXI(C)2 Particular Cases and Issues

110k1965 k. New trial motion. Most Cited Cases

Defense counsel's failure to file motion for new trial in capital murder case based on post-trial studies regarding comparative bullet lead analysis (CBLA) evidence was not constitutionally deficient, as required to establish ineffective assistance of counsel; post-trial studies were largely cumulative of criticisms of CBLA evidence known at time of trial and were at best impeachment evidence, and CBLA evidence played minor role during trial. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. §§ 1111(a), 1201(a)(2); Fed.Rules Cr.Proc.Rule 33, 18 U.S.C.A.

**[19] Criminal Law 110 ☞938(1)**

110 Criminal Law

110XXI Motions for New Trial
110k937 Newly Discovered Evidence
110k938 In General
110k938(1) k. In general. Most Cited Cases

To receive a new trial based on newly discovered evidence, defendant must show (1) that the evidence is newly discovered, (2) that he has been diligent in uncovering it, (3) that the evidence is not merely cumulative or impeaching, (4) that the evidence is material to the issues involved, and (5) that the evidence would probably produce an acquittal. Fed.Rules

Cr.Proc.Rule 33, 18 U.S.C.A.

**[20] Criminal Law 110 ☞1965**

110 Criminal Law

110XXXI Counsel
110XXXI(C) Adequacy of Representation
110XXXI(C)2 Particular Cases and Issues
110k1965 k. New trial motion. Most Cited Cases

Defense counsel's failure to file motion for new trial in capital murder case based on post-trial studies regarding comparative bullet lead analysis (CBLA) evidence did not prejudice defendant, as required to establish ineffective assistance of counsel, given overwhelming evidence of defendant's guilt, which precluded reasonable probability that post-trial studies or new trial would have produced different outcome in proceedings. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. §§ 1111(a), 1201(a)(2); Fed.Rules Cr.Proc.Rule 33, 18 U.S.C.A.

**\*729 ARGUED:** Angela Elleman, Federal Community Defender Office, Philadelphia, Pennsylvania, for Appellant. Sandra Wilkinson, Office of the United States Attorney, Baltimore, Maryland, for Appellee. **ON BRIEF:** Leigh Skipper, Chief Federal Defender, Matthew Lawry, Michael Wiseman, Assistant Federal Defenders, Federal Community Defender Office, Philadelphia, Pennsylvania; Stephen H. Sachs, Wilmer Cutler Pickering Hale & Dorr,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

Baltimore, Maryland, for Appellant. Rod J. Rosenstein, United States Attorney, Deborah Johnston, Assistant United States Attorney, Office of the United States Attorney, Baltimore, Maryland, for Appellee.

Before TRAXLER, Chief Judge, and SHEDD and KEENAN, Circuit Judges.

Affirmed by published opinion. Chief Judge TRAXLER wrote the opinion, in which Judge SHEDD and Judge KEENAN joined.

**OPINION**

TRAXLER, Chief Judge:

Petitioner Dustin John Higgs was convicted of three counts each of first-degree premeditated murder, *see* 18 U.S.C. § 1111(a), first-degree murder committed in the perpetration or attempted perpetration of a kidnapping, *see id.,* and kidnapping resulting in death, *see* 18 U.S.C. § 1201(a)(2), arising out of the January 27, 1996, murders of three young women in the Patuxent National Wildlife Refuge. He received nine death sentences. We affirmed his convictions and sentences. *See* *730*United States v. Higgs,* 353 F.3d 281 (4th Cir.2003) (" *Higgs I* "). Higgs also filed a motion for a new trial, which was denied by the district court and affirmed on appeal. *See United States v. Higgs,* 95 Fed.Appx. 37 (4th Cir.2004) (" *Higgs II* ").

Presently before us is Higgs's motion for relief under 28 U.S.C. § 2255, which was denied by the district court. *See Higgs v. United States,* 711 F.Supp.2d 479 (D.Md.2010). We granted a certificate of appealability to consider Higgs's claim that his constitutional rights to due process of law and effective assistance of counsel were violated by the introduction of Comparative Bullet Lead Analysis ("CBLA") evidence at trial. We now affirm.

I.

The facts in this case have been well-documented in the two prior opinions of this court, from which we borrow heavily.

At approximately 4:30 a.m., on January 27, 1996, Tanji Jackson, Tamika Black, and Mishann Chinn were found dead in a roadway in the Patuxent National Wildlife Refuge in Prince George's County, Maryland. Jackson and Black had each been shot once in the chest and once in the back. Chinn had been shot once in the back of her head. A .38 caliber wadcutter bullet was found at the scene. Jackson's day planner was also found, in which she had written Higgs's nickname and telephone number. On a separate page, Jackson had also recorded the notation "13801 'MAZDA' 769GRY," which matched Higgs's address number on Briarwood Drive in Laurel, Maryland, and the license tag number for Higgs's blue Mazda MPV van. *Higgs I,* 353 F.3d at 291 (internal quotation marks omitted). Chinn's mother and a friend of the Jackson family each confirmed that the girls had been picked up for dates the previous evening by a man or men in a blue Mazda MPV van. There were additional witnesses who saw the women at Higgs's apartment complex during the early morning hours of the murders.

On March 21, 1996, Park Police Officers

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

interviewed Higgs at his apartment. Higgs admitted that he knew Jackson and that he may have spoken to her on the night before her murder but denied that she had ever been at his apartment and denied knowing where she lived. Higgs claimed that he first heard about the murders on January 27, 1996, while watching the ten o'clock news at the home of his girlfriend, Phyllis Smith, and that he commented to a guest at Smith's home that evening that he thought he knew " 'that Tanji girl.' " *Id.* The names and photographs of the victims, however, had not yet been released. During the search of Higgs's apartment, the police found cash, crack cocaine, a .380 semiautomatic firearm, and ammunition for .380, .45, and .38 caliber weapons. Higgs was arrested on federal drug charges, pled guilty, and was sentenced to seventeen years in prison.

In the fall of 1998, Victor Gloria was arrested on federal drug charges. Gloria admitted to authorities that he was with Higgs and Willis Mark Haynes on the night of the murders and agreed to cooperate with the authorities in the murder prosecutions. At trial, he provided a detailed, eyewitness account of the kidnappings and murders, which we summarized as follows:

On Friday evening, January 26, 1996, Higgs, Willie Mark Haynes and Victor Gloria drove from Higgs's apartment at 13801 Briarwood Drive in Laurel, Maryland, to Washington D.C. to pick up [Jackson, Black, and Chinn]. Higgs knew Jackson and they had arranged dates for Haynes and Gloria with Black and Chinn. They were traveling in Higgs's blue Mazda MPV van. After stopping at a liquor store, the three *731 couples returned to Higgs's apartment to drink alcohol and listen to music. While there, the men also smoked marijuana.

At some point during the early morning hours of January 27, Higgs and Jackson began to argue. Jackson retrieved a knife from the kitchen and Haynes, who had been in the bedroom with Black, heard the commotion and came out to break up the fight. Haynes talked to Jackson and got the knife away from her. However, Jackson was still angry and the three women left the apartment. According to Gloria, as Jackson was walking out, "[s]he stopped at the door and said something like I am going to get you all f——ed up or robbed" or made "some kind of threat." In response, Higgs commented to the other two men that Jackson "do know a lot of n——s." As Higgs was watching the women leave, he saw Jackson stop and appear to write down the license plate number of his van. This angered Higgs, who commented to Haynes and Gloria that Jackson was "writing down [his] sh——." Gloria interpreted Higgs's comments as concern that Jackson intended to retaliate against Higgs.

At that point, "Higgs said f—— that, and grabbed his coat and said come on." He also retrieved a silver .38 caliber firearm from the end table drawer and put it in his pocket. The three men got into Higgs's van, with Higgs driving, Haynes in the front passenger seat, and Gloria sitting behind Higgs. Higgs drove

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

the van to where the three women were walking on the side of the road and told Haynes to get them in the vehicle. After Haynes spoke to them, the three women got into the back seat of the vehicle and Higgs started driving towards Washington, D.C. Neighbors in the area heard and saw the three girls laughing and talking around 3:30 that morning.

According to Gloria, while en route to Washington, D.C., Higgs and Haynes leaned towards each other and engaged in a quiet conversation that Gloria could not hear. The women were whispering in the back of the van and apparently believed they were being taken home. Higgs, however, drove past the Baltimore—Washington Parkway exit, which would have taken them directly into Washington, D.C., and instead drove the van into the Patuxent National Wildlife Refuge, a federal property within the jurisdiction of the United States Park Police. Eventually, Higgs pulled over at a secluded location. One of the girls asked if they were trying to "make [them] walk from [t]here," and Higgs responded, "something like that." After the women got out of the van, Higgs pulled out the pistol and handed it to Haynes, who put it behind his back and also exited the van. Within moments, Gloria heard a gunshot and wiped the mist off the back window in time to see Haynes shoot one of the women in the chest. Gloria turned to ask Higgs what he was doing, but saw Higgs holding the steering wheel and watching the shootings from the rearview mirror. Gloria put his head down, heard more shots, and

heard a woman screaming.

After firing a few more shots, Haynes got into the van and closed the door. According to Gloria, either Higgs or Haynes then commented that they had to "get rid of the gun," and Higgs drove to the Anacostia River where, according to Gloria, either Higgs or Haynes got out and threw the gun into the water. Higgs then drove back to his apartment where the three men began to clean up. Among other things, they wiped down the patio doors and "everything else, the bathroom, the doorknobs, the stereo," *732 and threw away any items the women might have touched, such as liquor bottles, CDs, and rented videotapes. The men then left the apartment and dropped the trash by a dumpster. Higgs and Haynes dropped Gloria off at a fast food restaurant, where he was told by Higgs to "keep [his] mouth shut."

*Higgs I*, 353 F.3d at 289–90 (footnote and citations omitted).

At trial, Higgs's counsel did not challenge the government's evidence that Higgs knew Jackson prior to the murders, that the women were present at Higgs's apartment complex that evening, or that Haynes was the triggerman. Rather, Higgs's counsel argued that the government had failed to prove that Higgs was a principal in the kidnappings and murders. *See* 18 U.S.C. § 2 ("Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission," or who "willfully causes an act to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."). In particular, Higgs challenged the government's evidence that he had been in prior possession of a .38 caliber weapon and that he handed the .38 caliber murder weapon to Haynes that night to carry out the murders.[FN1]

> FN1. Higgs and Haynes were jointly indicted for the kidnappings and murders in December 1998. Haynes was convicted of the murders several months before Higgs's trial, but the jury did not recommend the death penalty for Haynes. At Haynes's trial, defense counsel also admitted that Haynes was the triggerman but argued "that Haynes' actions were not truly voluntary because he was effectively controlled by his older, dominant co-defendant, Dustin John Higgs." *Haynes v. United States,* 451 F.Supp.2d 713, 717 (D.Md.2006).

The government presented overwhelming evidence of Higgs's guilt, as well as of his predominant role in the murders. Although Gloria was an important witness for the government, substantial additional testimony and evidence corroborated Gloria's testimony. Of particular note was Jackson's day planner and its references to Higgs's identifying information, which corroborated Gloria's testimony that Higgs commented that Jackson was " 'writing down [his] sh—,' " just after his violent argument with Jackson and just prior to his retrieving his gun and pursuing the women.

*Higgs I,* 353 F.3d at 290 (alteration in original).

In addition, Higgs made a number of incriminating statements after the murders. Phyllis Smith testified that Higgs had her tell the authorities that he was with her at the time of the murders; however, she recanted when she learned that the alibi was for the murders instead of drug charges. Similarly, Ednisia Darby, the mother of Higgs's child, testified that when she asked Higgs about the murders, he made an effort to remind her that they were together at the hospital that evening, which was not true. Darby testified that Higgs later admitted that he was with Haynes when the women were murdered. He also told Darby that Jackson had been invited over to his apartment that night because she had been " 'snitching on one of them,' " and that " 'the other two girls ... were just for his friends.' " *Id.* at 292.

Higgs also discussed matters with Domenick Williams, a fellow inmate and jailhouse lawyer who was housed with Higgs at the D.C. jail between August 1998 and January 1999. When Higgs told Williams that he had refused to cooperate against Haynes in the murder investigation, Williams told Higgs that the authorities would likely offer Haynes the same deal. In response, "Higgs told Williams 'that his youngan would hold up,' and 'that the government wouldn't offer a deal to the trigger man.' " *Id.* at 293 (citation omitted). *733 Williams also related conversations that he had with Higgs about Gloria. Higgs asked Williams what his chances of defeating the murder charges "would be 'if the witness after the fact

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

wasn't there.' " *Id.* Williams told Higgs "that 'his chances would be good.' " *Id.* Higgs later told Williams " 'that he wasn't worrying about the [murder] case' " because two of the former inmates at the jail, Melvin Grayson and T, " 'would be out there,' " and " '[t]hat Mel would be out there to handle anything that he needed and that he could rely on him.' " *Id.* (alteration in original). Concerned that a conspiracy to harm Gloria might be in the works and that he might be implicated, Williams reported these conversations to the authorities. Williams also produced letters that Higgs had written to him, which stated "that Higgs had not heard from 'T', but that 'Mel has been in my corner.' " *Id.* Visitation records confirmed that Grayson visited Higgs in the D.C. jail in February and March of 1999.

The government also introduced evidence of a taped telephone conversation between Higgs and Grayson in May 2000. During the conversation, Higgs and Grayson discussed Haynes's conviction for the murders and Higgs told Grayson that the attorney had " 'got[ten] the whole joint twisted.' " *Id.* at 309. When Grayson subsequently read Higgs a newspaper article reporting that Haynes had claimed that he shot the women only because he was afraid of Higgs, Higgs made no response at all. Later, Higgs told Grayson that the lawyers were trying to make it seem like the murders were over something petty. Thus, Higgs made no attempt to refute his involvement in the crimes during his conversation with Grayson and instead implied that the authorities were mistaken about the motive.

As noted above, Gloria testified that either Higgs or Haynes disposed of the murder weapon in a nearby river while en route back to Higgs's apartment. The authorities never found the .38 caliber murder weapon.[FN2] However, the government presented evidence that Higgs was involved in two other shootings during the two-month period leading up to the murders, both of which involved a .38 caliber handgun.

> FN2. During the sentencing phase, portions of Haynes's statements to the authorities were admitted, further corroborating Gloria's account of the events that occurred that evening. Haynes confirmed that Higgs was driving the van that night. In addition, Haynes advised the authorities that he threw the gun in the river.

The first shooting was on November 20, 1995, at the Chaconia Nightclub in Washington, D.C. Wondwossen Kabtamu testified that Higgs got into an argument outside the club, and that Higgs shot out the windows of a vehicle in a drive-by shooting while Kabtamu drove Higgs's Mazda MPV van. Kabtamu threw the gun out of the window shortly afterwards, but Higgs insisted that they return to get it. A .38 caliber bullet was recovered by the police from the vehicle targeted by Higgs. Williams testified that Higgs also discussed the Chaconia shooting with him, and that Higgs said that he could not plead guilty to the Chaconia charge because the authorities would try to use the gun in another case. When Williams learned that Higgs was

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

being indicted for the triple murders, "Higgs commented to Williams, " 'you see why I can't plead guilty to that charge?' " " *Id.* at 293.

The second shooting was on December 10, 1995, on Cherry Lane in Laurel, Maryland. This shooting involved both Higgs and Haynes. Rodney Simms testified that Haynes came to his home and began arguing with him. During the argument, Haynes pulled a gun and began shooting *734 at Simms from the front of the house. Higgs came out from a nearby shed and also began shooting. Police recovered 9mm bullet casings from the front of the house, where the eyewitnesses placed Haynes, and a .38 caliber bullet from inside the house. In April 1997, Higgs pled guilty to his involvement in the Cherry Lane shooting. During the plea proceedings, the prosecutor stated that Haynes had fired the 9mm handgun and that Higgs had fired the .38 caliber handgun. Higgs offered no contest to his involvement in the shooting but claimed that he had fired the 9mm handgun and that Haynes had fired the .38 caliber handgun.

Finally, the government presented two categories of forensic evidence to corroborate the eyewitness testimony and crime scene evidence from the murder scene and the two prior shootings. The government presented experts in the area of firearms examination, comparison, and identification, who testified that the .38 caliber bullets recovered from the Chaconia shooting, the Cherry Lane shooting, and the murders all shared the same rifling characteristics. As we previously explained in *Higgs I,*

"lands and grooves" refer to the rifling marks that are "pressed onto a bullet when it travels down a barrel of a firearm." Because "[d]ifferent manufacturers will have different numbers of lands and grooves, different directions of twist, right or left, and different sizes," the marks allow forensic investigators to compare firearms with fired bullets and cartridge cases, and to compare fired bullets and cartridge cases from different crime scenes to one another.

*Id.* (citations omitted, alteration in original). The .38 caliber bullets recovered from the three crime scenes were all fired from a firearm with five lands and grooves with a right twist.

The government also presented CBLA evidence through the testimony of Kathleen Lundy, an examiner with the Elemental Analysis Group of the FBI laboratory. Lundy compared the elemental composition of the .38 caliber bullets recovered from the three crime scenes and from Higgs's apartment. According to Lundy, the lead composition of the .38 caliber bullet recovered from the Chaconia shooting matched the lead composition of eighteen of the .38 caliber bullets found at Higgs's apartment. In addition, the lead composition of the .38 caliber bullet recovered from the Cherry Lane crime scene matched the lead composition of the .38 caliber bullet recovered from the murder scene.

II.

Higgs contends that his due process rights

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), were violated by the government's failure to produce two reports that he asserts could have been used to either exclude or further impeach the CBLA evidence presented by Lundy. In the alternative, Higgs contends that his trial counsel were constitutionally ineffective under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), because they failed to discover the reports on their own or present comparable and available expert testimony to challenge the CBLA evidence. He contends that his post-trial counsel were also ineffective because they failed to file a motion for a new trial on the basis of newly discovered studies on CBLA evidence.

A.

[1][2] Under the Due Process Clause, the prosecution is required to disclose evidence favorable to an accused upon request, "where the evidence is material either*735 to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady,* 373 U.S. at 87, 83 S.Ct. 1194. To prevail on a *Brady* claim, the defendant must demonstrate (1) that the evidence is favorable, either because it is exculpatory or impeaching; (2) that the government suppressed the evidence; and (3) that the evidence was material to the defense. *See Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); *Giglio v. United States,* 405 U.S. 150, 154–55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (including impeachment evidence within the scope of materials that the prosecution must disclose).

[3][4][5][6][7] The duty to disclose favorable evidence, however, does not require the government to make available all evidence in its possession or within its reach. Nor does the mere suppression of favorable evidence entitle the defendant to relief. *See Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). There is no *Brady* violation if the evidence is available to the defense from other sources or the defense already possesses the evidence. *See United States v. Roane,* 378 F.3d 382, 402 (4th Cir.2004); *Fullwood v. Lee,* 290 F.3d 663, 686 (4th Cir.2002) ("The *Brady* rule does not compel the disclosure of evidence available to the defendant from other sources, including diligent investigation by the defense." (internal quotation marks omitted)). And, while "the term ' *Brady* violation' is sometimes used to refer to any breach of the broad obligation to disclose exculpatory [or impeachment] evidence ..., strictly speaking, there is never a real ' *Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler,* 527 U.S. at 281, 119 S.Ct. 1936; *see also United States v. Bagley,* 473 U.S. 667, 677, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (Supreme Court precedent does not "automatically require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict." (internal quotation marks omitted)). A "reasonable probability" of a different result is shown "when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' " *Kyles,* 514 U.S. at 434,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

115 S.Ct. 1555 (quoting *Bagley*, 473 U.S. at 678, 105 S.Ct. 3375).

## B.

[8][9] To succeed on a Sixth Amendment claim of ineffective assistance of counsel, the defendant must satisfy the two-prong test set forth in *Strickland*. The defendant must demonstrate that defense counsel's performance "fell below an objective standard of reasonableness" measured by "prevailing professional norms," *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052, and that the "deficient performance prejudiced [his] defense," *id.* at 687, 104 S.Ct. 2052. The standard for *Strickland* prejudice is the same as for *Brady* materiality. *See id.; Kyles*, 514 U.S. at 434, 115 S.Ct. 1555; *Tice v. Johnson*, 647 F.3d 87, 110 (4th Cir.2011). The defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052, or "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable," *id.* at 687, 104 S.Ct. 2052.

## III.

In order to properly evaluate Higgs's challenges to the CBLA evidence in the context of his *Brady* and *Strickland* *736 claims, we begin with some background on CBLA evidence and the developments that took place before and after Higgs's trial.

### A. *The Pre–Trial Reports*

From the late 1960s until at least 2004, CBLA was performed by the FBI to compare bullets found at or associated with a crime scene to bullets associated with a defendant, usually in cases where a fired bullet could not be matched to a particular firearm because the firearm was not recovered or the fired bullets were too mutilated for comparison of physical markings. CBLA evidence, when introduced at trial, generally consisted of two components: (1) the scientific test used to measure the elemental composition of the lead in bullets; and (2) the conclusions drawn by the examiner based upon the similarities or differences in the elemental compositions of the compared bullets.

The primary source of bullet lead is recycled car batteries. Secondary lead smelters melt and mix the lead with smaller lead sources and other chemicals in large vats, and these smelters then harden the lead into a solid form suitable for sale to bullet manufacturers. The manufacturers, in turn, process the lead into bullets. Due to impurities in the source material and the changes that are made to it, the elemental composition of lead melts varies. Bullets that share the same elemental composition were deemed by CBLA examiners to be analytically indistinguishable, creating the inference that the compared bullets originated from the same lead melt.

The first document at issue in this case derives from a presentation at an FBI conference in 1991 (the "FBI Report"), reporting that CBLA matches had been found in bullets taken from boxes manufactured seven months apart and fifteen months apart. Higgs claims that this report should have been disclosed to him

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

because it raised a question as to whether lead melts are unique in their elemental compositions.

The second document at issue is a May 2000 study performed by the Iowa State University Department of Statistics and Ames Laboratory (the "Iowa State Study"). This study was performed at the request of the FBI, with the goal of "develop[ing] a means for assessing bullet evidence, especially to be able to quantify the significance of matching bullet lead." J.A. 522. The available data necessary to do so, however, was felt to be insufficient and additional study was deemed necessary. The study specifically suggested that further research be done on bullet manufacturing, distribution, and usage, noting that "[b]ullets manufactured from different batches of raw material may end up in the same box of bullets; similarly bullets manufactured from the same batch can end up in different boxes" and that it had "been difficult from the limited data available to estimate the relative frequency of these events." J.A. 522. Higgs contends that this study should also have been disclosed to him because it called into question the premise that lead melts are unique and homogeneous in their elemental compositions.

### B. *The Post-trial Reports*

Higgs's trial was completed in October 2000. In the ensuing years, the FBI and the scientific community collaborated their efforts to quantify the significance of bullet lead matches from CBLA. *See Clemons v. Maryland,* 392 Md. 339, 896 A.2d 1059, 1076–78 (2006) (discussing the various studies released in 2002 that questioned the value of CBLA evidence and recommended further study of the issue). At the request of the FBI, the National Research Council ("NRC") of the National *737 Academy of Sciences undertook a study of the issue and, in 2004, released its recommendations in a report entitled "Forensic Analysis: Weighing Bullet Lead Evidence." J.A. 491 (internal quotation marks omitted). The NRC reported that "the FBI Laboratory's analytical instrumentation is appropriate and the best available technology with respect to precision and accuracy for the elements analyzed" and "that the elements selected by the FBI for this analysis are appropriate." J.A. 491. However, "[t]he NRC expressed concerns ... relating to the interpretation of the results of bullet lead examinations." J.A. 491. "Although the NRC stated that the FBI Laboratory did not need to suspend bullet lead examinations while undertaking [its] review [of the recommendations], the FBI elected to do so while the review was pending." J.A. 491. On September 1, 2005, the FBI announced that it would no longer perform CBLA because "neither scientists nor bullet manufacturers [had been] able to definitively attest to the significance of an association made between bullets in the course of a bullet lead examination." J.A. 491. Prior to doing so, however, "the FBI Laboratory ha[d] not determined that previously issued bullet lead reports were in error." J.A. 492.

Because Higgs's convictions and sentences were imposed prior to these additional studies and the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

FBI's response, Higgs claims that his defense counsel were also ineffective post-trial for failing to investigate and present the ongoing developments in a motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure.

## IV.

Higgs claims that the FBI Study and Iowa State Study, both of which were in existence at the time of his trial, were internal studies performed by or at the request of the FBI and, therefore, were not reasonably available to trial counsel. Accordingly, he asserts that the government violated its *Brady* obligations by failing to produce them. In the alternative, Higgs contends that his trial counsel were constitutionally ineffective for failing to independently discover the studies, or present comparable impeachment material that was reasonably available in the public domain through an expert. *See* Brief of Appellant at 41 (arguing that "[e]ven without the information withheld by the [g]overnment, reasonable counsel would still have had much at their disposal to exclude CBLA, impeach Lundy or persuade the jury that her testimony lacked probative value").

The district court rejected the *Brady* claim, holding that the government was not required to disclose the studies because:

(1) the studies' strongest critiques of CBLA were available in at least one published study which was publicly available at the time of Higgs' trial, strongly suggesting that, through the exercise of reasonable diligence, Higgs could have obtained identical or nearly identical information; (2) the studies' remaining critiques do not consist of strong, definitive conclusions, but at most suggest areas for possible additional study; (3) by his own admission, Higgs could have called live witnesses capable of offering conclusions nearly identical to those offered in the Government's studies; and (4) other evidence presented at trial provided a firm link between Higgs and the bullets found at the murder scene.

*Higgs*, 711 F.Supp.2d at 498. With regard to Higgs's *Strickland* claim, the district court assumed that counsel's performance was deficient, but "conclude[d] that there was no reasonable probability that, absent **\*738** counsel's alleged errors, the result of the proceeding would have been different. The multiplicity and the strength of the evidence ... establish that proposition beyond peradventure." *Id.* at 502.

### A.

As the government correctly observes, CBLA evidence was widely admitted into evidence in various courts in this country at the time of Higgs's trial and up until at least 2003, when the NRC began its review of the issue and ultimately recommended further study. *See, e.g., United States v. Davis,* 103 F.3d 660, 673–74 (8th Cir.1996); *Haynes v. United States,* 451 F.Supp.2d 713, 720 (D.Md.2006); *State v. Noel,* 157 N.J. 141, 723 A.2d 602, 605–06 (1999). [FN3]

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

However, it seems equally clear, as Higgs has acknowledged, that the criticisms of CBLA were already present in the public domain at the time of Higgs's trial, even if the FBI Study and the Iowa State Study might not have been.

> FN3. In the wake of the scientific community's more recent reports about CBLA evidence, courts have, in appropriate cases, granted new trials or reversed convictions that hinged upon it. *Compare Ragland v. Commonwealth,* 191 S.W.3d 569, 582 (Ky.2006); (overturning murder conviction where CBLA was the only conclusive evidence linking defendant to the murder bullet), *Clemons v. State,* 392 Md. 339, 896 A.2d 1059, 1078 (2006) (reversing the trial court's denial of defendant's motion to exclude CBLA evidence because "a genuine controversy exists within the relevant scientific community about the reliability and validity of CBLA" and "[t]he only consensus that can be derived from [the scientific studies] is that more studies must be conducted"), and *New Jersey v. Behn,* 375 N.J.Super. 409, 868 A.2d 329, 345 (App.Div.2005) (granting new trial where the proof was "far from overwhelming" and the CBLA evidence was not cumulative or merely impeaching), *with United States v. Berry,* 624 F.3d 1031, 1041 (9th Cir.2010) (rejecting § 2255 claim based upon CBLA evidence because "while ... the studies may caution against widespread usage of [CBLA] evidence," they did not "establish that [CBLA] evidence is so fundamentally unreliable that its introduction at [defendant's] trial violated his due process rights"), and *In re Berkley,* 375 Fed.Appx. 413, 415 (5th Cir.2010) (denying request to file successive application for habeas relief from capital conviction based upon CBLA criticism because, even assuming that the petitioner could not have discovered the flaws in the CBLA evidence through the exercise of reasonable diligence, he failed to "show [ ] that but for the flawed bullet analysis, no reasonable factfinder would have found him guilty of capital murder").

[10] Having reviewed the record presented by Higgs on this issue, we cannot conclude that the government violated its *Brady* obligations by failing to disclose the two internal reports in existence at the time of Higgs's trial. The reports represent early attempts by the FBI to quantify the conclusions that could be drawn from lead analysis to counter the criticisms that were in existence at the time and ultimately did little more than advise the FBI that further study was warranted. Additionally, the criticisms of CBLA appear to have been available to trial counsel prior to trial.

[11] Higgs also failed to demonstrate that his trial counsels' handling of the CBLA issue rose to the level of constitutionally deficient performance under *Strickland.* Defense counsel conducted a thorough and effective cross-examination of Lundy, demonstrating that Higgs's counsel were well acquainted with the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

criticisms of CBLA, and we see little that could have been gained by calling a defense expert to offer comparable criticisms. For example, Lundy admitted that CBLA evidence is far different from fingerprint analysis and DNA analysis, which provide narrow or unique identifiers. She testified that all bullets come from the same six secondary smelters, that they all share some similarities in elemental composition,*739 that an exact replication of elemental compositions can never be achieved, and that there is always uncertainty in measurements. She testified that Remington, the bullet manufacturer in this case, would have manufactured approximately five million bullets in 1995, and that there would be many, many other bullets with the same elemental composition as those matched in this case. She also testified that bullets within the same box of ammunition may be found to have different elemental compositions.

[12][13][14] When considering a claim of deficient performance, courts must evaluate the conduct from counsel's perspective at the time. *See Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. We "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Roach v. Martin,* 757 F.2d 1463, 1476 (4th Cir.1985), and "that, under the circumstances, the challenged action, might be considered sound trial strategy," *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052 (internal quotation marks omitted). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom."

*Harrington v. Richter,* —— U.S. ——, 131 S.Ct. 770, 788, 178 L.Ed.2d 624 (2011).

Here, Higgs has failed to demonstrate that defense counsel's handling of the CBLA evidence at trial was constitutionally ineffective simply because counsel did not ferret out the two preliminary studies or present a defense expert armed with the same information. On the contrary, counsel went a long way towards impeaching the uniqueness and homogeneity of lead melts, as well as the overall probative value of the CBLA evidence, demonstrating that counsel was well-versed in the subject and able to obtain important concessions. And counsel did so without unduly calling attention to the evidence, or making it appear to be of more importance than was warranted. Such decisions by experienced, capital defense counsel fall squarely within the class of those to which we give deference.

B.

Nevertheless, even if we were to assume that the government violated its *Brady* obligation by failing to produce the two reports to Higgs's counsel, or that the performance of Higgs's counsel was constitutionally deficient, Higgs is not entitled to relief because he has also failed to demonstrate that he was prejudiced by the government's failure to disclose the reports to him prior to trial or by the admission of the CBLA evidence at trial.

1.

In this appeal, Higgs's counsel attempts to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

establish prejudice in two ways: (1) by claiming that the CBLA evidence provided the crucial link between "Higgs ['s] bullets taken from the [murder] scene" and the bullets taken from "Higgs's apartment"; and (2) by claiming that it was the CBLA evidence that "enabled the [g]overnment to introduce prejudicial Rule 404(b) evidence" of Higgs's involvement in the Chaconia and the Cherry Lane shootings. Brief of Appellant at 45; *see* Fed.R.Evid. 404(b). Neither assertion, however, is accurate.

First, Higgs asserts that the CBLA evidence permitted the government "to put the .38 caliber handgun in Higgs's possession" prior to the murders by "showing that a bullet recovered from the Chaconia incident matched the chemical composition of the bullets recovered from Cherry Lane and the capital killings." Brief of Appellant at 45. In the absence of the CBLA evidence, Higgs claims, "there would have *740 been no unimpeached evidence linking Higgs's bullets taken from the crime scene to Higgs's apartment." *Id.; see also* Reply Brief at 1 (arguing that "Higgs's convictions and death sentences are tainted" by the CBLA evidence because it "purport[s] to 'match' bullets taken from Higgs's apartment with those found at the scene of the homicide, and two unrelated shooting incidents"); *id.* at 21 (contending that "*only* the CBLA evidence purported to draw a connection between the bullets Higgs owned and those fired at the homicide scene and the other shooting incidents") (emphasis added).

However, the CBLA evidence did not match the bullets from Higgs's apartment or the Chaconia shooting to the murder bullet; it only linked the Cherry Lane bullet to the murder bullet. In fact, Lundy did not even bother to test the Chaconia bullet or the majority of the bullets found in Higgs's apartment for comparison to the murder bullets because they were of a different type, and the only .38 caliber wadcutter bullet that was found in Higgs's apartment did not match the wadcutter bullets found at the murder scene or at Cherry Lane.

[15] Higgs's claim that it was the CBLA evidence that enabled the government to introduce the 404(b) evidence of the Cherry Lane and Chaconia shootings is also inaccurate. On direct appeal, Higgs challenged the district court's admission of the Chaconia shooting under Rule 404(b), which, in contrast to the Cherry Lane shooting, involved a different type of bullet than the murder bullet and a crime to which Higgs had not pled guilty. We held as follows:

The bullet recovered from the Chaconia shooting was forensically similar to those recovered from the Patuxent murder scene and the victims, in that they shared the same *rifling* characteristics—five lands and grooves with a right twist. Thus, the evidence of Higgs's participation in the Chaconia Nightclub shooting was properly introduced by the government as a means to link Higgs to the same caliber weapon that Gloria testified Higgs owned and retrieved from the drawer on the night of the murders, and one which shared the same rifling characteristics as did the murder weapon.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

*Higgs I,* 353 F.3d at 311–12 (emphasis added). In doing so, we made no mention of the CBLA evidence, which is unsurprising given that the CBLA evidence did not match the Chaconia bullet to the murder bullet at all. Rather, the testimony and forensic evidence of rifling characteristics alone demonstrated the relevance and admissibility of the prior shootings under Rule 404(b). The district court's admission of the Chaconia shooting did not rest upon the CBLA evidence, and while the CBLA evidence could have provided an additional basis upon which to admit the Cherry Lane shooting had it been challenged, it was neither critical nor necessary.

2.

[16][17] Finally, we have carefully considered the materiality of the CBLA evidence that was introduced, and the question of whether there is a reasonable probability that the result of the proceedings would have been different had the government produced the studies at issue or had trial counsel handled the CBLA issue in different way. We are satisfied that there is not.

> FN4. We may summarily dispose of Higgs's claim that the production of the preliminary studies or the presentation of comparable information would have resulted in the district court's exclusion of CBLA evidence at trial. Higgs's counsel has conflated the criticisms of CBLA that were present at the time of trial with the criticisms that followed. We evaluate the obligations of the

government and the conduct of defense counsel at the time of trial and have no difficulty concluding that there is no reasonable probability that the trial court would have excluded the CBLA evidence in October of 2000.

**\*741** As we have twice concluded, the evidence of Higgs's guilt and of his predominant role in the brutal kidnappings and murders of the three women was overwhelming, as was the evidence, irrespective of the CBLA evidence, that linked Higgs to the .38 caliber weapon and to .38 caliber ammunition.

Gloria's eyewitness testimony provided compelling and convincing details of the events of that evening and of Higgs's involvement in them. Jackson's day planner, containing Higgs's name, telephone number, address and vehicle license tag number, corroborated Gloria's testimony regarding Higgs's words and actions in the wake of his violent argument with Jackson and the threat she made as she was leaving his apartment. And, as the government pointed out in closing arguments, Gloria's inability to recall every precise detail, such as who disposed of the gun, could well have bolstered his credibility.

For his part, Higgs admitted to the authorities that he knew Tanji Jackson and claimed that he commented to a guest at his girlfriend's house the following evening that he knew "that Tanji girl," even though the names of the victims had not yet been released to the press. *Id.* at 291 (internal quotation marks omitted). And after unsuccessfully attempting to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

establish an alibi through Smith and Darby, Higgs admitted to Darby that he was with Haynes on the night of the murder, that the women were killed because Jackson was "snitching" on one of them, and that the other two women were just along "for his friends." *Id.* at 292 (internal quotation marks omitted).

As we previously summarized, there was overwhelming evidence confirming that:

> it was Higgs who set up the "dates" with the girls, Higgs who got into the violent argument with Jackson, Higgs who observed Jackson writing down his license plate number, Higgs who retrieved the .38 caliber murder weapon (which he owned) and told the other two men to come along, Higgs who told Haynes to "trick" the women into getting into the van, Higgs who drove the van past the route back to their homes and into the Patuxent National Wildlife Refuge, Higgs who handed the murder weapon to Haynes moments before Haynes shot and killed the women, and Higgs who orchestrated the destruction of the physical evidence at his apartment after the murders.

*Higgs II,* 95 Fed.Appx. at 44.

With regard to the Chaconia and Cherry Lane shootings, the eyewitness testimony and forensic evidence, irrespective of the CBLA, easily place a .38 caliber weapon in Higgs's possession in the two months prior to the murders. The rifling evidence alone, unlike CBLA evidence, demonstrated a consistency in the bullets fired at all three crime scenes and corroborated the eyewitness testimony that Higgs possessed, used, or directed the use of a .38 caliber weapon in connection with all three crimes. Higgs's incriminating statements made in connection with the two prior shootings are particularly significant. Higgs conveyed to Williams that he could not plead guilty to the Chaconia shooting (in which Haynes was *not* involved) because the authorities might use the gun in connection with the murder case. And Higgs gratuitously advised the court during his plea to the Cherry Lane shooting *742 (in which Haynes *was* involved) that Haynes had fired the .38 caliber weapon and that Higgs had fired the 9mm weapon. Finally, Higgs's reference to Haynes as his "youngan," who would "hold up" if offered a deal to turn on him, revealed much about how Higgs viewed his relationship with his younger companion. *Higgs I,* 353 F.3d at 293 (internal quotation marks omitted).

Given this overwhelming evidence of Higgs's role in the murders, we are satisfied that the CBLA evidence did not affect the outcome of the verdicts. The CBLA evidence matching the Chaconia bullet to the bullets in Higgs's apartment merely corroborated the eyewitness testimony of Kabtamu, the crime scene evidence from the Chaconia shooting, including the rifling evidence, and Higgs's statements to Williams, all of which placed the .38 caliber weapon in Higgs's hands on the night of that shooting. Unlike the rifling evidence, however, there was no CBLA match between the ammunition used in the Chaconia shooting or the ammunition at Higgs's home and the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

ammunition used in the murders. Similarly, the CBLA evidence matching the Cherry Lane bullet to the murder bullet merely corroborated the eyewitness testimony of Simms and others at Cherry Lane and the crime scene evidence from that shooting, including the rifling evidence that also matched the Cherry Lane bullet and the murder bullet. However, there was no match between the Cherry Lane bullet and the bullets associated with Higgs's apartment, and Higgs and Haynes were both involved in the Cherry Lane shooting and in the murders. Higgs did not contest that Haynes was the triggerman, or that Haynes used a .38 caliber weapon to murder the women. And, as defense counsel pointed out to the jury, there was substantial evidence that Haynes had equal if not more access to Higgs's apartment. Thus, while the CBLA evidence matched the bullet from Cherry Lane with the murder bullet, it was cumulative to other evidence but not inconsistent with Higgs's defense.

Having reviewed the challenged evidence in the context of the entire case, we conclude there is no reasonable probability that the district court would have excluded the CBLA testimony at Higgs's trial had it been challenged, or that the outcome of the guilt or sentencing phase would have been different had the CBLA evidence been excluded or subjected to additional cross-examination.

## V.

[18] Higgs's final claim is that his defense counsel were ineffective because they failed to file a motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure within three years of the verdict, based upon the CBLA studies that were published thereafter.

After his trial was concluded, Higgs requested and was granted a substitution of counsel for one of his two defense attorneys for the purpose of pursuing an appeal and other post-conviction relief. Higgs's counsel did not challenge the admission of the CBLA evidence on direct appeal, and although defense counsel did file a new trial motion based upon other evidence discovered in connection with a fresh review of the case, they did not file a similar motion on the basis of the more recent CBLA studies. Higgs contends that defense counsels' failure to also challenge the CBLA evidence in a motion for a new trial amounted to constitutionally deficient performance, and that he was prejudiced as a result.

[19] To receive a new trial based on newly discovered evidence, a defendant must show that the evidence is newly discovered; that he has been diligent in uncovering it; that the evidence is not merely cumulative or impeaching; that the evidence is material to the issues involved; and that the evidence would probably*743 produce an acquittal. See United States v. Chavis, 880 F.2d 788, 793 (4th Cir.1989). Unless the defendant demonstrates all five of these factors, the motion should be denied. See id. To obtain relief in this proceeding, Higgs must demonstrate that counsel's failure to file the motion constituted deficient performance and that he was prejudiced as a result. See Strickland, 466 U.S. at 687–88, 104 S.Ct. 2052.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

[20] Higgs has failed to demonstrate that defense counsel were constitutionally ineffective for failing to file a motion for a new trial based upon the post-trial studies. The post-trial studies published in 2002 and 2003 were largely cumulative of the criticisms known at the time of trial and were at best merely impeachment evidence. *Cf. Berry,* 624 F.3d at 1043 (concluding that even "the [NRC] report and the FBI's discontinued use of [CBLA] evidence were no more than impeaching evidence of the [CBLA] testimony introduced at [defendant's] trial"). And, as discussed above, there is no reasonable probability that the post-trial studies or a new trial would have resulted in a different verdict. We cannot say that the post-trial defense counsel team was constitutionally ineffective simply because they did not pursue a new trial motion on the basis of the CBLA developments, particularly in view of the cross-examination that was conducted and the minor role that the evidence played during the trial, or that Higgs was prejudiced as a result.

VI.

For the foregoing reasons, we affirm the district court's order denying Higgs's motion under 28 U.S.C. § 2255.

*AFFIRMED*

C.A.4 (Md.),2011.

U.S. v. Higgs
663 F.3d 726
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT 4

663 F.3d 726

(Cite as: 663 F.3d 726)

H

United States Court of Appeals,

Fourth Circuit.
UNITED STATES of America,
Plaintiff–Appellee,
v.
Dustin John HIGGS, Defendant–Appellant.
No. 10–7.

Argued: Sept. 21, 2011.
Decided: Nov. 23, 2011.

**Background:** Defendant was convicted in the United States District Court for the District of Maryland, Peter J. Messitte, Senior District Judge, of first-degree premeditated murder, first-degree murder committed in the perpetration or attempted perpetration of a kidnapping, and kidnapping resulting in death, and was sentenced to death. Defendant appealed. The Court of Appeals, 353 F.3d 281, affirmed. Defendant moved for new trial. The District Court denied motion. Defendant appealed. The Court of Appeals, 95 Fed.Appx. 37, affirmed. Defendant filed motion to vacate. The District Court, Messitte, Senior District Judge, 711 F.Supp.2d 479, denied motion. Defendant appealed.

**Holdings:** The Court of Appeals, Traxler, Chief Judge, held that:

(1) government was not required, under *Brady*, to disclose two internal reports concerning validity of comparative bullet lead analysis (CBLA) evidence;

(2) defense counsel's handling of CBLA evidence did not rise to level of constitutionally deficient performance supporting claim of ineffective assistance of counsel;

(3) government's failure to produce CBLA reports, assuming it was required to do so, did not violate defendant's due process rights;

(4) defense counsel's handling of CBLA issue, even if deficient, did not result in prejudice required to establish ineffective assistance of counsel;

(5) defense counsel's failure to file motion for new trial based on post-trial CBLA studies did not establish constitutionally deficient performance; and

(6) defense counsel's failure to file motion for new trial based on post-trial CBLA studies did not prejudice defendant.

Affirmed.

West Headnotes

**[1] Constitutional Law 92 ⟜4594(1)**

92 Constitutional Law

    92XXVII Due Process
        92XXVII(H) Criminal Law
            92XXVII(H)4 Proceedings and Trial
                92k4592 Disclosure and Discovery

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

92k4594 Evidence
92k4594(1) k. In general. Most Cited Cases

Under the Due Process Clause, the prosecution is required to disclose evidence favorable to an accused upon request where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. U.S.C.A. Const.Amend. 6.

**[2] Criminal Law 110 ☞1991**

110 Criminal Law

110XXXI Counsel
110XXXI(D) Duties and Obligations of Prosecuting Attorneys
110XXXI(D)2 Disclosure of Information
110k1991 k. Constitutional obligations regarding disclosure. Most Cited Cases

To prevail on *Brady* disclosure claim, defendant must demonstrate (1) that evidence is favorable, either because it is exculpatory or impeaching, (2) that the government suppressed the evidence, and (3) that the evidence was material to the defense. U.S.C.A. Const.Amend. 6.

**[3] Criminal Law 110 ☞1991**

110 Criminal Law

110XXXI Counsel
110XXXI(D) Duties and Obligations of Prosecuting Attorneys
110XXXI(D)2 Disclosure of Information
110k1991 k. Constitutional obligations regarding disclosure. Most Cited Cases

Government's *Brady* duty to disclose favorable evidence to defendant does not require government to make available all evidence in its possession or within its reach. U.S.C.A. Const.Amend. 6.

**[4] Criminal Law 110 ☞2008**

110 Criminal Law

110XXXI Counsel
110XXXI(D) Duties and Obligations of Prosecuting Attorneys
110XXXI(D)2 Disclosure of Information
110k2008 k. Sanctions for failure to disclose. Most Cited Cases

Mere suppression of favorable evidence does not entitle defendant to relief based on violation of government's *Brady* disclosure obligation. U.S.C.A. Const.Amend. 6.

**[5] Criminal Law 110 ☞1995**

110 Criminal Law

110XXXI Counsel
110XXXI(D) Duties and Obligations of Prosecuting Attorneys
110XXXI(D)2 Disclosure of Information

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

110k1993 Particular Types of Information Subject to Disclosure

110k1995 k. Diligence on part of accused; availability of information. Most Cited Cases

There is no *Brady* violation, due to government's failure to disclose evidence favorable to defendant, if the evidence is available to the defense from other sources or the defense already possesses the evidence. U.S.C.A. Const.Amend. 6.

**[6] Criminal Law 110 ☞1992**

110 Criminal Law

    110XXXI Counsel

        110XXXI(D) Duties and Obligations of Prosecuting Attorneys

            110XXXI(D)2 Disclosure of Information

            110k1992 k. Materiality and probable effect of information in general. Most Cited Cases

No real violation of government's *Brady* disclosure obligation occurs unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict. U.S.C.A. Const.Amend. 6.

**[7] Criminal Law 110 ☞1992**

110 Criminal Law

    110XXXI Counsel

        110XXXI(D) Duties and Obligations of

Prosecuting Attorneys

            110XXXI(D)2 Disclosure of Information

            110k1992 k. Materiality and probable effect of information in general. Most Cited Cases

A "reasonable probability" of a different result is shown, as required for relief due to violation of government's *Brady* disclosure obligation, when government's evidentiary suppression undermines confidence in the outcome of the trial. U.S.C.A. Const.Amend. 6.

**[8] Criminal Law 110 ☞1881**

110 Criminal Law

    110XXXI Counsel

        110XXXI(C) Adequacy of Representation

        110XXXI(C)1 In General

        110k1879 Standard of Effective Assistance in General

        110k1881 k. Deficient representation and prejudice in general. Most Cited Cases

To succeed on a Sixth Amendment claim of ineffective assistance of counsel, defendant must demonstrate that defense counsel's performance fell below an objective standard of reasonableness measured by prevailing professional norms, and that counsel's deficient performance prejudiced his defense. U.S.C.A. Const.Amend. 6.

**[9] Criminal Law 110 ☞1883**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

110 Criminal Law

110XXXI Counsel
110XXXI(C) Adequacy of Representation
110XXXI(C)1 In General
110k1879 Standard of Effective Assistance in General
110k1883 k. Prejudice in general. Most Cited Cases

To establish prejudice prong of claim of ineffective assistance of counsel, defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, or that counsel's errors were so serious as to deprive defendant of a fair trial, meaning a trial the result of which is reliable. U.S.C.A. Const.Amend. 6.

**[10] Criminal Law 110 ⟋2001**

110 Criminal Law

110XXXI Counsel
110XXXI(D) Duties and Obligations of Prosecuting Attorneys
110XXXI(D)2 Disclosure of Information
110k1993 Particular Types of Information Subject to Disclosure
110k2001 k. Other particular issues. Most Cited Cases

Government had no *Brady* obligation to disclose two internal FBI reports concerning validity of comparative bullet lead analysis (CBLA) evidence in existence at time of capital murder trial; reports represented early attempts by FBI to quantify conclusions that could be drawn from lead analysis to counter criticisms then in existence and ultimately did little more than advise FBI that further study was warranted, and criticisms of CBLA were available to trial counsel prior to trial. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. §§ 1111(a), 1201(a)(2).

**[11] Criminal Law 110 ⟋1931**

110 Criminal Law

110XXXI Counsel
110XXXI(C) Adequacy of Representation
110XXXI(C)2 Particular Cases and Issues
110k1921 Introduction of and Objections to Evidence at Trial
110k1931 k. Experts; opinion testimony. Most Cited Cases

Defense counsel's handling of comparative bullet lead analysis (CBLA) evidence during capital murder trial did not rise to level of constitutionally deficient performance supporting claim of ineffective assistance of counsel, even though counsel did not ferret out two preliminary studies that were then available or present defense expert armed with same information; defense counsel conducted thorough and effective cross-examination of government's expert, demonstrating that they were well acquainted with criticisms of CBLA evidence, and went a long way toward impeaching uniqueness and homogeneity of lead

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

melts, as well as overall probative value of CBLA evidence, without unduly calling attention to evidence or making it appear to be of more importance than was warranted. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. §§ 1111(a), 1201(a)(2).

[12] Criminal Law 110 1870

110 Criminal Law

110XXXI Counsel
110XXXI(C) Adequacy of Representation
110XXXI(C)1 In General
110k1870 k. In general. Most Cited Cases

When considering a claim of deficient performance as part of claim alleging ineffective assistance of counsel, court must evaluate the conduct from counsel's perspective at the time. U.S.C.A. Const.Amend. 6.

[13] Criminal Law 110 1871

110 Criminal Law

110XXXI Counsel
110XXXI(C) Adequacy of Representation
110XXXI(C)1 In General
110k1871 k. Presumptions and burden of proof in general. Most Cited Cases

In deciding whether counsel who allegedly provided ineffective assistance of counsel rendered constitutionally deficient performance, court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance and that, under the circumstances, the challenged action might be considered sound trial strategy. U.S.C.A. Const.Amend. 6.

[14] Criminal Law 110 1882

110 Criminal Law

110XXXI Counsel
110XXXI(C) Adequacy of Representation
110XXXI(C)1 In General
110k1879 Standard of Effective Assistance in General
110k1882 k. Deficient representation in general. Most Cited Cases

In addressing deficient performance prong of claim of ineffective assistance of counsel, question is whether attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom. U.S.C.A. Const.Amend. 6.

[15] Constitutional Law 92 4594(3)

92 Constitutional Law

92XXVII Due Process
92XXVII(H) Criminal Law
92XXVII(H)4 Proceedings and Trial
92k4592 Disclosure and Discovery
92k4594 Evidence
92k4594(2) Particular Items or Information, Disclosure of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

92k4594(3) k. In general. Most Cited Cases

**Criminal Law 110 ☞1931**

110 Criminal Law

110XXXI Counsel
110XXXI(C) Adequacy of Representation
110XXXI(C)2 Particular Cases and Issues
110k1921 Introduction of and Objections to Evidence at Trial
110k1931 k. Experts; opinion testimony. Most Cited Cases

**Criminal Law 110 ☞2001**

110 Criminal Law

110XXXI Counsel
110XXXI(D) Duties and Obligations of Prosecuting Attorneys
110XXXI(D)2 Disclosure of Information
110k1993 Particular Types of Information Subject to Disclosure
110k2001 k. Other particular issues. Most Cited Cases

Evidence other than comparative bullet lead analysis (CBLA) evidence enabled government's introduction of evidence of capital murder defendant's involvement in other shootings, and therefore neither government's failure to produce two internal reports raising questions about CBLA evidence, assuming it had *Brady* obligation to do so, nor counsel's alleged deficient performance in failing to obtain

exclusion of CBLA evidence or further challenge it caused defendant prejudice required to establish either *Brady* due process violation or ineffective assistance of counsel under theory that, had CBLA evidence been excluded or discredited, other acts evidence would not have been admitted. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. §§ 1111(a), 1201(a)(2); Fed.Rules Evid.Rule 404(b), 28 U.S.C.A.

**[16] Constitutional Law 92 ☞4594(3)**

92 Constitutional Law

92XXVII Due Process
92XXVII(H) Criminal Law
92XXVII(H)4 Proceedings and Trial
92k4592 Disclosure and Discovery
92k4594 Evidence
92k4594(2) Particular Items or Information, Disclosure of
92k4594(3) k. In general. Most Cited Cases

**Constitutional Law 92 ☞4745**

92 Constitutional Law

92XXVII Due Process
92XXVII(H) Criminal Law
92XXVII(H)6 Judgment and Sentence
92k4741 Capital Punishment; Death Penalty
92k4745 k. Proceedings. Most Cited Cases

**Criminal Law 110 ☞2001**

110 Criminal Law

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

110XXXI Counsel

   110XXXI(D) Duties and Obligations of Prosecuting Attorneys

      110XXXI(D)2 Disclosure of Information

         110k1993 Particular Types of Information Subject to Disclosure

         110k2001 k. Other particular issues. Most Cited Cases

There was no reasonable probability that trial court would have excluded comparative bullet lead analysis (CBLA) evidence had exclusion been sought, or that result in either guilt or penalty phase of capital murder trial would have been different had such evidence been excluded or further challenged, given the overwhelming evidence of guilt and defendant's predominant role in kidnappings and murders of three women, and therefore, assuming that government had *Brady* obligation to produce two internal reports raising issues about CBLA evidence, its failure to do so did not establish due process violation. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. §§ 1111(a), 1201(a)(2).

**[17] Criminal Law 110 ☞1931**

110 Criminal Law

   110XXXI Counsel

      110XXXI(C) Adequacy of Representation

      110XXXI(C)2 Particular Cases and Issues

         110k1921 Introduction of and Objections to Evidence at Trial

         110k1931 k. Experts; opinion testimony. Most Cited Cases

**Criminal Law 110 ☞1961**

110 Criminal Law

   110XXXI Counsel

      110XXXI(C) Adequacy of Representation

      110XXXI(C)2 Particular Cases and Issues

         110k1958 Death Penalty

         110k1961 k. Presentation of evidence in sentencing phase. Most Cited Cases

No reasonable probability existed that district court would have excluded comparative bullet lead analysis (CBLA) evidence had exclusion been sought in capital murder trial, or that outcome of either guilt or penalty phase of trial would have been different had such evidence been excluded or expert testimony concerning that evidence been subjected to additional cross-examination, given overwhelming evidence of defendant's guilt and his predominant role in kidnappings and murders of three women, and therefore defense counsel's performance with respect to CBLA evidence, even if deficient, did not prejudice defendant, as required to establish ineffective assistance of counsel. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. §§ 1111(a), 1201(a)(2).

**[18] Criminal Law 110 ☞1965**

110 Criminal Law

   110XXXI Counsel

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

110XXXI(C) Adequacy of Representation

110XXXI(C)2 Particular Cases and Issues

110k1965 k. New trial motion. Most Cited Cases

Defense counsel's failure to file motion for new trial in capital murder case based on post-trial studies regarding comparative bullet lead analysis (CBLA) evidence was not constitutionally deficient, as required to establish ineffective assistance of counsel; post-trial studies were largely cumulative of criticisms of CBLA evidence known at time of trial and were at best impeachment evidence, and CBLA evidence played minor role during trial. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. §§ 1111(a), 1201(a)(2); Fed.Rules Cr.Proc.Rule 33, 18 U.S.C.A.

**[19] Criminal Law 110 ⬅938(1)**

110 Criminal Law

110XXI Motions for New Trial
    110k937 Newly Discovered Evidence
      110k938 In General
        110k938(1) k. In general. Most Cited Cases

To receive a new trial based on newly discovered evidence, defendant must show (1) that the evidence is newly discovered, (2) that he has been diligent in uncovering it, (3) that the evidence is not merely cumulative or impeaching, (4) that the evidence is material to the issues involved, and (5) that the evidence would probably produce an acquittal. Fed.Rules

Cr.Proc.Rule 33, 18 U.S.C.A.

**[20] Criminal Law 110 ⬅1965**

110 Criminal Law

110XXXI Counsel
    110XXXI(C) Adequacy of Representation
      110XXXI(C)2 Particular Cases and Issues
        110k1965 k. New trial motion. Most Cited Cases

Defense counsel's failure to file motion for new trial in capital murder case based on post-trial studies regarding comparative bullet lead analysis (CBLA) evidence did not prejudice defendant, as required to establish ineffective assistance of counsel, given overwhelming evidence of defendant's guilt, which precluded reasonable probability that post-trial studies or new trial would have produced different outcome in proceedings. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. §§ 1111(a), 1201(a)(2); Fed.Rules Cr.Proc.Rule 33, 18 U.S.C.A.

*729 **ARGUED:** Angela Elleman, Federal Community Defender Office, Philadelphia, Pennsylvania, for Appellant. Sandra Wilkinson, Office of the United States Attorney, Baltimore, Maryland, for Appellee. **ON BRIEF:** Leigh Skipper, Chief Federal Defender, Matthew Lawry, Michael Wiseman, Assistant Federal Defenders, Federal Community Defender Office, Philadelphia, Pennsylvania; Stephen H. Sachs, Wilmer Cutler Pickering Hale & Dorr,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

Baltimore, Maryland, for Appellant. Rod J. Rosenstein, United States Attorney, Deborah Johnston, Assistant United States Attorney, Office of the United States Attorney, Baltimore, Maryland, for Appellee.

Before TRAXLER, Chief Judge, and SHEDD and KEENAN, Circuit Judges.

Affirmed by published opinion. Chief Judge TRAXLER wrote the opinion, in which Judge SHEDD and Judge KEENAN joined.

## OPINION

TRAXLER, Chief Judge:

Petitioner Dustin John Higgs was convicted of three counts each of first-degree premeditated murder, *see* 18 U.S.C. § 1111(a), first-degree murder committed in the perpetration or attempted perpetration of a kidnapping, *see id.,* and kidnapping resulting in death, *see* 18 U.S.C. § 1201(a)(2), arising out of the January 27, 1996, murders of three young women in the Patuxent National Wildlife Refuge. He received nine death sentences. We affirmed his convictions and sentences. *See* *730*United States v. Higgs,* 353 F.3d 281 (4th Cir.2003) (" *Higgs I* "). Higgs also filed a motion for a new trial, which was denied by the district court and affirmed on appeal. *See United States v. Higgs,* 95 Fed.Appx. 37 (4th Cir.2004) (" *Higgs II* ").

Presently before us is Higgs's motion for relief under 28 U.S.C. § 2255, which was denied by the district court. *See Higgs v. United States,* 711 F.Supp.2d 479 (D.Md.2010). We granted a certificate of appealability to consider Higgs's claim that his constitutional rights to due process of law and effective assistance of counsel were violated by the introduction of Comparative Bullet Lead Analysis ("CBLA") evidence at trial. We now affirm.

### I.

The facts in this case have been well-documented in the two prior opinions of this court, from which we borrow heavily.

At approximately 4:30 a.m., on January 27, 1996, Tanji Jackson, Tamika Black, and Mishann Chinn were found dead in a roadway in the Patuxent National Wildlife Refuge in Prince George's County, Maryland. Jackson and Black had each been shot once in the chest and once in the back. Chinn had been shot once in the back of her head. A .38 caliber wadcutter bullet was found at the scene. Jackson's day planner was also found, in which she had written Higgs's nickname and telephone number. On a separate page, Jackson had also recorded the notation "13801 'MAZDA' 769GRY," which matched Higgs's address number on Briarwood Drive in Laurel, Maryland, and the license tag number for Higgs's blue Mazda MPV van. *Higgs I,* 353 F.3d at 291 (internal quotation marks omitted). Chinn's mother and a friend of the Jackson family each confirmed that the girls had been picked up for dates the previous evening by a man or men in a blue Mazda MPV van. There were additional witnesses who saw the women at Higgs's apartment complex during the early morning hours of the murders.

On March 21, 1996, Park Police Officers

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

interviewed Higgs at his apartment. Higgs admitted that he knew Jackson and that he may have spoken to her on the night before her murder but denied that she had ever been at his apartment and denied knowing where she lived. Higgs claimed that he first heard about the murders on January 27, 1996, while watching the ten o'clock news at the home of his girlfriend, Phyllis Smith, and that he commented to a guest at Smith's home that evening that he thought he knew " 'that Tanji girl.' " *Id.* The names and photographs of the victims, however, had not yet been released. During the search of Higgs's apartment, the police found cash, crack cocaine, a .380 semiautomatic firearm, and ammunition for .380, .45, and .38 caliber weapons. Higgs was arrested on federal drug charges, pled guilty, and was sentenced to seventeen years in prison.

In the fall of 1998, Victor Gloria was arrested on federal drug charges. Gloria admitted to authorities that he was with Higgs and Willis Mark Haynes on the night of the murders and agreed to cooperate with the authorities in the murder prosecutions. At trial, he provided a detailed, eyewitness account of the kidnappings and murders, which we summarized as follows:

On Friday evening, January 26, 1996, Higgs, Willie Mark Haynes and Victor Gloria drove from Higgs's apartment at 13801 Briarwood Drive in Laurel, Maryland, to Washington D.C. to pick up [Jackson, Black, and Chinn]. Higgs knew Jackson and they had arranged dates for Haynes and Gloria with Black and Chinn. They were traveling in Higgs's blue Mazda MPV van. After stopping at a liquor store, the three *731 couples returned to Higgs's apartment to drink alcohol and listen to music. While there, the men also smoked marijuana.

At some point during the early morning hours of January 27, Higgs and Jackson began to argue. Jackson retrieved a knife from the kitchen and Haynes, who had been in the bedroom with Black, heard the commotion and came out to break up the fight. Haynes talked to Jackson and got the knife away from her. However, Jackson was still angry and the three women left the apartment. According to Gloria, as Jackson was walking out, "[s]he stopped at the door and said something like I am going to get you all f——ed up or robbed" or made "some kind of threat." In response, Higgs commented to the other two men that Jackson "do know a lot of n——s." As Higgs was watching the women leave, he saw Jackson stop and appear to write down the license plate number of his van. This angered Higgs, who commented to Haynes and Gloria that Jackson was "writing down [his] sh——." Gloria interpreted Higgs's comments as concern that Jackson intended to retaliate against Higgs.

At that point, "Higgs said f—— that, and grabbed his coat and said come on." He also retrieved a silver .38 caliber firearm from the end table drawer and put it in his pocket. The three men got into Higgs's van, with Higgs driving, Haynes in the front passenger seat, and Gloria sitting behind Higgs. Higgs drove

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

the van to where the three women were walking on the side of the road and told Haynes to get them in the vehicle. After Haynes spoke to them, the three women got into the back seat of the vehicle and Higgs started driving towards Washington, D.C. Neighbors in the area heard and saw the three girls laughing and talking around 3:30 that morning.

According to Gloria, while en route to Washington, D.C., Higgs and Haynes leaned towards each other and engaged in a quiet conversation that Gloria could not hear. The women were whispering in the back of the van and apparently believed they were being taken home. Higgs, however, drove past the Baltimore—Washington Parkway exit, which would have taken them directly into Washington, D.C., and instead drove the van into the Patuxent National Wildlife Refuge, a federal property within the jurisdiction of the United States Park Police. Eventually, Higgs pulled over at a secluded location. One of the girls asked if they were trying to "make [them] walk from [t]here," and Higgs responded, "something like that." After the women got out of the van, Higgs pulled out the pistol and handed it to Haynes, who put it behind his back and also exited the van. Within moments, Gloria heard a gunshot and wiped the mist off the back window in time to see Haynes shoot one of the women in the chest. Gloria turned to ask Higgs what he was doing, but saw Higgs holding the steering wheel and watching the shootings from the rearview mirror. Gloria put his head down, heard more shots, and

heard a woman screaming.

After firing a few more shots, Haynes got into the van and closed the door. According to Gloria, either Higgs or Haynes then commented that they had to "get rid of the gun," and Higgs drove to the Anacostia River where, according to Gloria, either Higgs or Haynes got out and threw the gun into the water. Higgs then drove back to his apartment where the three men began to clean up. Among other things, they wiped down the patio doors and "everything else, the bathroom, the doorknobs, the stereo," *732 and threw away any items the women might have touched, such as liquor bottles, CDs, and rented videotapes. The men then left the apartment and dropped the trash by a dumpster. Higgs and Haynes dropped Gloria off at a fast food restaurant, where he was told by Higgs to "keep [his] mouth shut."

*Higgs I,* 353 F.3d at 289–90 (footnote and citations omitted).

At trial, Higgs's counsel did not challenge the government's evidence that Higgs knew Jackson prior to the murders, that the women were present at Higgs's apartment complex that evening, or that Haynes was the triggerman. Rather, Higgs's counsel argued that the government had failed to prove that Higgs was a principal in the kidnappings and murders. *See* 18 U.S.C. § 2 ("Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission," or who "willfully causes an act to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."). In particular, Higgs challenged the government's evidence that he had been in prior possession of a .38 caliber weapon and that he handed the .38 caliber murder weapon to Haynes that night to carry out the murders.[FN1]

> FN1. Higgs and Haynes were jointly indicted for the kidnappings and murders in December 1998. Haynes was convicted of the murders several months before Higgs's trial, but the jury did not recommend the death penalty for Haynes. At Haynes's trial, defense counsel also admitted that Haynes was the triggerman but argued "that Haynes' actions were not truly voluntary because he was effectively controlled by his older, dominant co-defendant, Dustin John Higgs." *Haynes v. United States, 451 F.Supp.2d 713, 717 (D.Md.2006).*

The government presented overwhelming evidence of Higgs's guilt, as well as of his predominant role in the murders. Although Gloria was an important witness for the government, substantial additional testimony and evidence corroborated Gloria's testimony. Of particular note was Jackson's day planner and its references to Higgs's identifying information, which corroborated Gloria's testimony that Higgs commented that Jackson was " 'writing down [his] sh—,' " just after his violent argument with Jackson and just prior to his retrieving his gun and pursuing the women.

*Higgs I,* 353 F.3d at 290 (alteration in original).

In addition, Higgs made a number of incriminating statements after the murders. Phyllis Smith testified that Higgs had her tell the authorities that he was with her at the time of the murders; however, she recanted when she learned that the alibi was for the murders instead of drug charges. Similarly, Ednisia Darby, the mother of Higgs's child, testified that when she asked Higgs about the murders, he made an effort to remind her that they were together at the hospital that evening, which was not true. Darby testified that Higgs later admitted that he was with Haynes when the women were murdered. He also told Darby that Jackson had been invited over to his apartment that night because she had been " 'snitching on one of them,' " and that " 'the other two girls ... were just for his friends.' " *Id.* at 292.

Higgs also discussed matters with Domenick Williams, a fellow inmate and jailhouse lawyer who was housed with Higgs at the D.C. jail between August 1998 and January 1999. When Higgs told Williams that he had refused to cooperate against Haynes in the murder investigation, Williams told Higgs that the authorities would likely offer Haynes the same deal. In response, "Higgs told Williams 'that his youngan would hold up,' and 'that the government wouldn't offer a deal to the trigger man.' " *Id.* at 293 (citation omitted). *733 Williams also related conversations that he had with Higgs about Gloria. Higgs asked Williams what his chances of defeating the murder charges "would be 'if the witness after the fact

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

wasn't there.' " *Id.* Williams told Higgs "that 'his chances would be good.' " *Id.* Higgs later told Williams " 'that he wasn't worrying about the [murder] case' " because two of the former inmates at the jail, Melvin Grayson and T, " 'would be out there,' " and " '[t]hat Mel would be out there to handle anything that he needed and that he could rely on him.' " *Id.* (alteration in original). Concerned that a conspiracy to harm Gloria might be in the works and that he might be implicated, Williams reported these conversations to the authorities. Williams also produced letters that Higgs had written to him, which stated "that Higgs had not heard from 'T', but that 'Mel has been in my corner.' " *Id.* Visitation records confirmed that Grayson visited Higgs in the D.C. jail in February and March of 1999.

The government also introduced evidence of a taped telephone conversation between Higgs and Grayson in May 2000. During the conversation, Higgs and Grayson discussed Haynes's conviction for the murders and Higgs told Grayson that the attorney had " 'got[ten] the whole joint twisted.' " *Id.* at 309. When Grayson subsequently read Higgs a newspaper article reporting that Haynes had claimed that he shot the women only because he was afraid of Higgs, Higgs made no response at all. Later, Higgs told Grayson that the lawyers were trying to make it seem like the murders were over something petty. Thus, Higgs made no attempt to refute his involvement in the crimes during his conversation with Grayson and instead implied that the authorities were mistaken about the motive.

As noted above, Gloria testified that either Higgs or Haynes disposed of the murder weapon in a nearby river while en route back to Higgs's apartment. The authorities never found the .38 caliber murder weapon.[FN2] However, the government presented evidence that Higgs was involved in two other shootings during the two-month period leading up to the murders, both of which involved a .38 caliber handgun.

> FN2. During the sentencing phase, portions of Haynes's statements to the authorities were admitted, further corroborating Gloria's account of the events that occurred that evening. Haynes confirmed that Higgs was driving the van that night. In addition, Haynes advised the authorities that he threw the gun in the river.

The first shooting was on November 20, 1995, at the Chaconia Nightclub in Washington, D.C. Wondwossen Kabtamu testified that Higgs got into an argument outside the club, and that Higgs shot out the windows of a vehicle in a drive-by shooting while Kabtamu drove Higgs's Mazda MPV van. Kabtamu threw the gun out of the window shortly afterwards, but Higgs insisted that they return to get it. A .38 caliber bullet was recovered by the police from the vehicle targeted by Higgs. Williams testified that Higgs also discussed the Chaconia shooting with him, and that Higgs said that he could not plead guilty to the Chaconia charge because the authorities would try to use the gun in another case. When Williams learned that Higgs was

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

being indicted for the triple murders, "Higgs commented to Williams, " 'you see why I can't plead guilty to that charge?' " " *Id.* at 293.

The second shooting was on December 10, 1995, on Cherry Lane in Laurel, Maryland. This shooting involved both Higgs and Haynes. Rodney Simms testified that Haynes came to his home and began arguing with him. During the argument, Haynes pulled a gun and began shooting *734 at Simms from the front of the house. Higgs came out from a nearby shed and also began shooting. Police recovered 9mm bullet casings from the front of the house, where the eyewitnesses placed Haynes, and a .38 caliber bullet from inside the house. In April 1997, Higgs pled guilty to his involvement in the Cherry Lane shooting. During the plea proceedings, the prosecutor stated that Haynes had fired the 9mm handgun and that Higgs had fired the .38 caliber handgun. Higgs offered no contest to his involvement in the shooting but claimed that he had fired the 9mm handgun and that Haynes had fired the .38 caliber handgun.

Finally, the government presented two categories of forensic evidence to corroborate the eyewitness testimony and crime scene evidence from the murder scene and the two prior shootings. The government presented experts in the area of firearms examination, comparison, and identification, who testified that the .38 caliber bullets recovered from the Chaconia shooting, the Cherry Lane shooting, and the murders all shared the same rifling characteristics. As we previously explained in *Higgs I,*

"lands and grooves" refer to the rifling marks that are "pressed onto a bullet when it travels down a barrel of a firearm." Because "[d]ifferent manufacturers will have different numbers of lands and grooves, different directions of twist, right or left, and different sizes," the marks allow forensic investigators to compare firearms with fired bullets and cartridge cases, and to compare fired bullets and cartridge cases from different crime scenes to one another.

*Id.* (citations omitted, alteration in original). The .38 caliber bullets recovered from the three crime scenes were all fired from a firearm with five lands and grooves with a right twist.

The government also presented CBLA evidence through the testimony of Kathleen Lundy, an examiner with the Elemental Analysis Group of the FBI laboratory. Lundy compared the elemental composition of the .38 caliber bullets recovered from the three crime scenes and from Higgs's apartment. According to Lundy, the lead composition of the .38 caliber bullet recovered from the Chaconia shooting matched the lead composition of eighteen of the .38 caliber bullets found at Higgs's apartment. In addition, the lead composition of the .38 caliber bullet recovered from the Cherry Lane crime scene matched the lead composition of the .38 caliber bullet recovered from the murder scene.

II.

Higgs contends that his due process rights

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), were violated by the government's failure to produce two reports that he asserts could have been used to either exclude or further impeach the CBLA evidence presented by Lundy. In the alternative, Higgs contends that his trial counsel were constitutionally ineffective under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), because they failed to discover the reports on their own or present comparable and available expert testimony to challenge the CBLA evidence. He contends that his post-trial counsel were also ineffective because they failed to file a motion for a new trial on the basis of newly discovered studies on CBLA evidence.

### A.

[1][2] Under the Due Process Clause, the prosecution is required to disclose evidence favorable to an accused upon request, "where the evidence is material either*735 to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady,* 373 U.S. at 87, 83 S.Ct. 1194. To prevail on a *Brady* claim, the defendant must demonstrate (1) that the evidence is favorable, either because it is exculpatory or impeaching; (2) that the government suppressed the evidence; and (3) that the evidence was material to the defense. *See Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); *Giglio v. United States,* 405 U.S. 150, 154–55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (including impeachment evidence within the scope of materials that the prosecution must disclose).

[3][4][5][6][7] The duty to disclose favorable evidence, however, does not require the government to make available all evidence in its possession or within its reach. Nor does the mere suppression of favorable evidence entitle the defendant to relief. *See Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). There is no *Brady* violation if the evidence is available to the defense from other sources or the defense already possesses the evidence. *See United States v. Roane,* 378 F.3d 382, 402 (4th Cir.2004); *Fullwood v. Lee,* 290 F.3d 663, 686 (4th Cir.2002) ("The *Brady* rule does not compel the disclosure of evidence available to the defendant from other sources, including diligent investigation by the defense." (internal quotation marks omitted)). And, while "the term ' *Brady* violation' is sometimes used to refer to any breach of the broad obligation to disclose exculpatory [or impeachment] evidence ..., strictly speaking, there is never a real ' *Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler,* 527 U.S. at 281, 119 S.Ct. 1936; *see also United States v. Bagley,* 473 U.S. 667, 677, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (Supreme Court precedent does not "automatically require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict." (internal quotation marks omitted)). A "reasonable probability" of a different result is shown "when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' " *Kyles,* 514 U.S. at 434,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

115 S.Ct. 1555 (quoting *Bagley,* 473 U.S. at 678, 105 S.Ct. 3375).

B.

[8][9] To succeed on a Sixth Amendment claim of ineffective assistance of counsel, the defendant must satisfy the two-prong test set forth in *Strickland.* The defendant must demonstrate that defense counsel's performance "fell below an objective standard of reasonableness" measured by "prevailing professional norms," *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052, and that the "deficient performance prejudiced [his] defense," *id.* at 687, 104 S.Ct. 2052. The standard for *Strickland* prejudice is the same as for *Brady* materiality. *See id.; Kyles,* 514 U.S. at 434, 115 S.Ct. 1555; *Tice v. Johnson,* 647 F.3d 87, 110 (4th Cir.2011). The defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052, or "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable," *id.* at 687, 104 S.Ct. 2052.

III.

In order to properly evaluate Higgs's challenges to the CBLA evidence in the context of his *Brady* and *Strickland* *736 claims, we begin with some background on CBLA evidence and the developments that took place before and after Higgs's trial.

A. *The Pre–Trial Reports*

From the late 1960s until at least 2004, CBLA was performed by the FBI to compare bullets found at or associated with a crime scene to bullets associated with a defendant, usually in cases where a fired bullet could not be matched to a particular firearm because the firearm was not recovered or the fired bullets were too mutilated for comparison of physical markings. CBLA evidence, when introduced at trial, generally consisted of two components: (1) the scientific test used to measure the elemental composition of the lead in bullets; and (2) the conclusions drawn by the examiner based upon the similarities or differences in the elemental compositions of the compared bullets.

The primary source of bullet lead is recycled car batteries. Secondary lead smelters melt and mix the lead with smaller lead sources and other chemicals in large vats, and these smelters then harden the lead into a solid form suitable for sale to bullet manufacturers. The manufacturers, in turn, process the lead into bullets. Due to impurities in the source material and the changes that are made to it, the elemental composition of lead melts varies. Bullets that share the same elemental composition were deemed by CBLA examiners to be analytically indistinguishable, creating the inference that the compared bullets originated from the same lead melt.

The first document at issue in this case derives from a presentation at an FBI conference in 1991 (the "FBI Report"), reporting that CBLA matches had been found in bullets taken from boxes manufactured seven months apart and fifteen months apart. Higgs claims that this report should have been disclosed to him

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

because it raised a question as to whether lead melts are unique in their elemental compositions.

The second document at issue is a May 2000 study performed by the Iowa State University Department of Statistics and Ames Laboratory (the "Iowa State Study"). This study was performed at the request of the FBI, with the goal of "develop[ing] a means for assessing bullet evidence, especially to be able to quantify the significance of matching bullet lead." J.A. 522. The available data necessary to do so, however, was felt to be insufficient and additional study was deemed necessary. The study specifically suggested that further research be done on bullet manufacturing, distribution, and usage, noting that "[b]ullets manufactured from different batches of raw material may end up in the same box of bullets; similarly bullets manufactured from the same batch can end up in different boxes" and that it had "been difficult from the limited data available to estimate the relative frequency of these events." J.A. 522. Higgs contends that this study should also have been disclosed to him because it called into question the premise that lead melts are unique and homogeneous in their elemental compositions.

### B. *The Post-trial Reports*

Higgs's trial was completed in October 2000. In the ensuing years, the FBI and the scientific community collaborated their efforts to quantify the significance of bullet lead matches from CBLA. *See Clemons v. Maryland,* 392 Md. 339, 896 A.2d 1059, 1076–78 (2006) (discussing the various studies released in 2002 that questioned the value of CBLA evidence and recommended further study of the issue). At the request of the FBI, the National Research Council ("NRC") of the National *737 Academy of Sciences undertook a study of the issue and, in 2004, released its recommendations in a report entitled "Forensic Analysis: Weighing Bullet Lead Evidence." J.A. 491 (internal quotation marks omitted). The NRC reported that "the FBI Laboratory's analytical instrumentation is appropriate and the best available technology with respect to precision and accuracy for the elements analyzed" and "that the elements selected by the FBI for this analysis are appropriate." J.A. 491. However, "[t]he NRC expressed concerns ... relating to the interpretation of the results of bullet lead examinations." J.A. 491. "Although the NRC stated that the FBI Laboratory did not need to suspend bullet lead examinations while undertaking [its] review [of the recommendations], the FBI elected to do so while the review was pending." J.A. 491. On September 1, 2005, the FBI announced that it would no longer perform CBLA because "neither scientists nor bullet manufacturers [had been] able to definitively attest to the significance of an association made between bullets in the course of a bullet lead examination." J.A. 491. Prior to doing so, however, "the FBI Laboratory ha[d] not determined that previously issued bullet lead reports were in error." J.A. 492.

Because Higgs's convictions and sentences were imposed prior to these additional studies and the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

FBI's response, Higgs claims that his defense counsel were also ineffective post-trial for failing to investigate and present the ongoing developments in a motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure.

## IV.

Higgs claims that the FBI Study and Iowa State Study, both of which were in existence at the time of his trial, were internal studies performed by or at the request of the FBI and, therefore, were not reasonably available to trial counsel. Accordingly, he asserts that the government violated its *Brady* obligations by failing to produce them. In the alternative, Higgs contends that his trial counsel were constitutionally ineffective for failing to independently discover the studies, or present comparable impeachment material that was reasonably available in the public domain through an expert. *See* Brief of Appellant at 41 (arguing that "[e]ven without the information withheld by the [g]overnment, reasonable counsel would still have had much at their disposal to exclude CBLA, impeach Lundy or persuade the jury that her testimony lacked probative value").

The district court rejected the *Brady* claim, holding that the government was not required to disclose the studies because:

(1) the studies' strongest critiques of CBLA were available in at least one published study which was publicly available at the time of Higgs' trial, strongly suggesting that, through the exercise of reasonable diligence, Higgs could have obtained identical or nearly identical information; (2) the studies' remaining critiques do not consist of strong, definitive conclusions, but at most suggest areas for possible additional study; (3) by his own admission, Higgs could have called live witnesses capable of offering conclusions nearly identical to those offered in the Government's studies; and (4) other evidence presented at trial provided a firm link between Higgs and the bullets found at the murder scene.

*Higgs,* 711 F.Supp.2d at 498. With regard to Higgs's *Strickland* claim, the district court assumed that counsel's performance was deficient, but "conclude[d] that there was no reasonable probability that, absent **\*738** counsel's alleged errors, the result of the proceeding would have been different. The multiplicity and the strength of the evidence ... establish that proposition beyond peradventure." *Id.* at 502.

## A.

As the government correctly observes, CBLA evidence was widely admitted into evidence in various courts in this country at the time of Higgs's trial and up until at least 2003, when the NRC began its review of the issue and ultimately recommended further study. *See, e.g., United States v. Davis,* 103 F.3d 660, 673–74 (8th Cir.1996); *Haynes v. United States,* 451 F.Supp.2d 713, 720 (D.Md.2006); *State v. Noel,* 157 N.J. 141, 723 A.2d 602, 605–06 (1999).[FN3]

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

However, it seems equally clear, as Higgs has acknowledged, that the criticisms of CBLA were already present in the public domain at the time of Higgs's trial, even if the FBI Study and the Iowa State Study might not have been.

> FN3. In the wake of the scientific community's more recent reports about CBLA evidence, courts have, in appropriate cases, granted new trials or reversed convictions that hinged upon it. *Compare Ragland v. Commonwealth,* 191 S.W.3d 569, 582 (Ky.2006); (overturning murder conviction where CBLA was the only conclusive evidence linking defendant to the murder bullet), *Clemons v. State,* 392 Md. 339, 896 A.2d 1059, 1078 (2006) (reversing the trial court's denial of defendant's motion to exclude CBLA evidence because "a genuine controversy exists within the relevant scientific community about the reliability and validity of CBLA" and "[t]he only consensus that can be derived from [the scientific studies] is that more studies must be conducted"), and *New Jersey v. Behn,* 375 N.J.Super. 409, 868 A.2d 329, 345 (App.Div.2005) (granting new trial where the proof was "far from overwhelming" and the CBLA evidence was not cumulative or merely impeaching), *with United States v. Berry,* 624 F.3d 1031, 1041 (9th Cir.2010) (rejecting § 2255 claim based upon CBLA evidence because "while ... the studies may caution against widespread usage of [CBLA] evidence," they did not "establish that [CBLA]

evidence is so fundamentally unreliable that its introduction at [defendant's] trial violated his due process rights"), and *In re Berkley,* 375 Fed.Appx. 413, 415 (5th Cir.2010) (denying request to file successive application for habeas relief from capital conviction based upon CBLA criticism because, even assuming that the petitioner could not have discovered the flaws in the CBLA evidence through the exercise of reasonable diligence, he failed to "show [ ] that but for the flawed bullet analysis, no reasonable factfinder would have found him guilty of capital murder").

[10] Having reviewed the record presented by Higgs on this issue, we cannot conclude that the government violated its *Brady* obligations by failing to disclose the two internal reports in existence at the time of Higgs's trial. The reports represent early attempts by the FBI to quantify the conclusions that could be drawn from lead analysis to counter the criticisms that were in existence at the time and ultimately did little more than advise the FBI that further study was warranted. Additionally, the criticisms of CBLA appear to have been available to trial counsel prior to trial.

[11] Higgs also failed to demonstrate that his trial counsels' handling of the CBLA issue rose to the level of constitutionally deficient performance under *Strickland.* Defense counsel conducted a thorough and effective cross-examination of Lundy, demonstrating that Higgs's counsel were well acquainted with the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

criticisms of CBLA, and we see little that could have been gained by calling a defense expert to offer comparable criticisms. For example, Lundy admitted that CBLA evidence is far different from fingerprint analysis and DNA analysis, which provide narrow or unique identifiers. She testified that all bullets come from the same six secondary smelters, that they all share some similarities in elemental composition,*739 that an exact replication of elemental compositions can never be achieved, and that there is always uncertainty in measurements. She testified that Remington, the bullet manufacturer in this case, would have manufactured approximately five million bullets in 1995, and that there would be many, many other bullets with the same elemental composition as those matched in this case. She also testified that bullets within the same box of ammunition may be found to have different elemental compositions.

[12][13][14] When considering a claim of deficient performance, courts must evaluate the conduct from counsel's perspective at the time. *See Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. We "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Roach v. Martin,* 757 F.2d 1463, 1476 (4th Cir.1985), and "that, under the circumstances, the challenged action, might be considered sound trial strategy," *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052 (internal quotation marks omitted). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom."

*Harrington v. Richter,* —— U.S. ——, 131 S.Ct. 770, 788, 178 L.Ed.2d 624 (2011).

Here, Higgs has failed to demonstrate that defense counsel's handling of the CBLA evidence at trial was constitutionally ineffective simply because counsel did not ferret out the two preliminary studies or present a defense expert armed with the same information. On the contrary, counsel went a long way towards impeaching the uniqueness and homogeneity of lead melts, as well as the overall probative value of the CBLA evidence, demonstrating that counsel was well-versed in the subject and able to obtain important concessions. And counsel did so without unduly calling attention to the evidence, or making it appear to be of more importance than was warranted. Such decisions by experienced, capital defense counsel fall squarely within the class of those to which we give deference.

B.

Nevertheless, even if we were to assume that the government violated its *Brady* obligation by failing to produce the two reports to Higgs's counsel, or that the performance of Higgs's counsel was constitutionally deficient, Higgs is not entitled to relief because he has also failed to demonstrate that he was prejudiced by the government's failure to disclose the reports to him prior to trial or by the admission of the CBLA evidence at trial.

1.

In this appeal, Higgs's counsel attempts to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

establish prejudice in two ways: (1) by claiming that the CBLA evidence provided the crucial link between "Higgs ['s] bullets taken from the [murder] scene" and the bullets taken from "Higgs's apartment"; and (2) by claiming that it was the CBLA evidence that "enabled the [g]overnment to introduce prejudicial Rule 404(b) evidence" of Higgs's involvement in the Chaconia and the Cherry Lane shootings. Brief of Appellant at 45; *see* Fed.R.Evid. 404(b). Neither assertion, however, is accurate.

First, Higgs asserts that the CBLA evidence permitted the government "to put the .38 caliber handgun in Higgs's possession" prior to the murders by "showing that a bullet recovered from the Chaconia incident matched the chemical composition of the bullets recovered from Cherry Lane and the capital killings." Brief of Appellant at 45. In the absence of the CBLA evidence, Higgs claims, "there would have \***740** been no unimpeached evidence linking Higgs's bullets taken from the crime scene to Higgs's apartment." *Id.; see also* Reply Brief at 1 (arguing that "Higgs's convictions and death sentences are tainted" by the CBLA evidence because it "purport[s] to 'match' bullets taken from Higgs's apartment with those found at the scene of the homicide, and two unrelated shooting incidents"); *id.* at 21 (contending that "*only* the CBLA evidence purported to draw a connection between the bullets Higgs owned and those fired at the homicide scene and the other shooting incidents") (emphasis added).

However, the CBLA evidence did not match the bullets from Higgs's apartment or the Chaconia shooting to the murder bullet; it only linked the Cherry Lane bullet to the murder bullet. In fact, Lundy did not even bother to test the Chaconia bullet or the majority of the bullets found in Higgs's apartment for comparison to the murder bullets because they were of a different type, and the only .38 caliber wadcutter bullet that was found in Higgs's apartment did not match the wadcutter bullets found at the murder scene or at Cherry Lane.

[15] Higgs's claim that it was the CBLA evidence that enabled the government to introduce the 404(b) evidence of the Cherry Lane and Chaconia shootings is also inaccurate. On direct appeal, Higgs challenged the district court's admission of the Chaconia shooting under Rule 404(b), which, in contrast to the Cherry Lane shooting, involved a different type of bullet than the murder bullet and a crime to which Higgs had not pled guilty. We held as follows:

> The bullet recovered from the Chaconia shooting was forensically similar to those recovered from the Patuxent murder scene and the victims, in that they shared the same *rifling* characteristics—five lands and grooves with a right twist. Thus, the evidence of Higgs's participation in the Chaconia Nightclub shooting was properly introduced by the government as a means to link Higgs to the same caliber weapon that Gloria testified Higgs owned and retrieved from the drawer on the night of the murders, and one which shared the same rifling characteristics as did the murder weapon.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

*Higgs I,* 353 F.3d at 311–12 (emphasis added). In doing so, we made no mention of the CBLA evidence, which is unsurprising given that the CBLA evidence did not match the Chaconia bullet to the murder bullet at all. Rather, the testimony and forensic evidence of rifling characteristics alone demonstrated the relevance and admissibility of the prior shootings under Rule 404(b). The district court's admission of the Chaconia shooting did not rest upon the CBLA evidence, and while the CBLA evidence could have provided an additional basis upon which to admit the Cherry Lane shooting had it been challenged, it was neither critical nor necessary.

2.

[16][17] Finally, we have carefully considered the materiality of the CBLA evidence that was introduced, and the question of whether there is a reasonable probability that the result of the proceedings would have been different had the government produced the studies at issue or had trial counsel handled the CBLA issue in different way. We are satisfied that there is not.[FN4]

> FN4. We may summarily dispose of Higgs's claim that the production of the preliminary studies or the presentation of comparable information would have resulted in the district court's exclusion of CBLA evidence at trial. Higgs's counsel has conflated the criticisms of CBLA that were present at the time of trial with the criticisms that followed. We evaluate the obligations of the government and the conduct of defense counsel at the time of trial and have no difficulty concluding that there is no reasonable probability that the trial court would have excluded the CBLA evidence in October of 2000.

*741 As we have twice concluded, the evidence of Higgs's guilt and of his predominant role in the brutal kidnappings and murders of the three women was overwhelming, as was the evidence, irrespective of the CBLA evidence, that linked Higgs to the .38 caliber weapon and to .38 caliber ammunition.

Gloria's eyewitness testimony provided compelling and convincing details of the events of that evening and of Higgs's involvement in them. Jackson's day planner, containing Higgs's name, telephone number, address and vehicle license tag number, corroborated Gloria's testimony regarding Higgs's words and actions in the wake of his violent argument with Jackson and the threat she made as she was leaving his apartment. And, as the government pointed out in closing arguments, Gloria's inability to recall every precise detail, such as who disposed of the gun, could well have bolstered his credibility.

For his part, Higgs admitted to the authorities that he knew Tanji Jackson and claimed that he commented to a guest at his girlfriend's house the following evening that he knew "that Tanji girl," even though the names of the victims had not yet been released to the press. *Id.* at 291 (internal quotation marks omitted). And after unsuccessfully attempting to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

establish an alibi through Smith and Darby, Higgs admitted to Darby that he was with Haynes on the night of the murder, that the women were killed because Jackson was "snitching" on one of them, and that the other two women were just along "for his friends." *Id.* at 292 (internal quotation marks omitted).

As we previously summarized, there was overwhelming evidence confirming that:

> it was Higgs who set up the "dates" with the girls, Higgs who got into the violent argument with Jackson, Higgs who observed Jackson writing down his license plate number, Higgs who retrieved the .38 caliber murder weapon (which he owned) and told the other two men to come along, Higgs who told Haynes to "trick" the women into getting into the van, Higgs who drove the van past the route back to their homes and into the Patuxent National Wildlife Refuge, Higgs who handed the murder weapon to Haynes moments before Haynes shot and killed the women, and Higgs who orchestrated the destruction of the physical evidence at his apartment after the murders.

*Higgs II,* 95 Fed.Appx. at 44.

With regard to the Chaconia and Cherry Lane shootings, the eyewitness testimony and forensic evidence, irrespective of the CBLA, easily place a .38 caliber weapon in Higgs's possession in the two months prior to the murders. The rifling evidence alone, unlike CBLA evidence, demonstrated a consistency in the bullets fired at all three crime scenes and corroborated the eyewitness testimony that Higgs possessed, used, or directed the use of a .38 caliber weapon in connection with all three crimes. Higgs's incriminating statements made in connection with the two prior shootings are particularly significant. Higgs conveyed to Williams that he could not plead guilty to the Chaconia shooting (in which Haynes was *not* involved) because the authorities might use the gun in connection with the murder case. And Higgs gratuitously advised the court during his plea to the Cherry Lane shooting *742 (in which Haynes *was* involved) that Haynes had fired the .38 caliber weapon and that Higgs had fired the 9mm weapon. Finally, Higgs's reference to Haynes as his "youngan," who would "hold up" if offered a deal to turn on him, revealed much about how Higgs viewed his relationship with his younger companion. *Higgs I,* 353 F.3d at 293 (internal quotation marks omitted).

Given this overwhelming evidence of Higgs's role in the murders, we are satisfied that the CBLA evidence did not affect the outcome of the verdicts. The CBLA evidence matching the Chaconia bullet to the bullets in Higgs's apartment merely corroborated the eyewitness testimony of Kabtamu, the crime scene evidence from the Chaconia shooting, including the rifling evidence, and Higgs's statements to Williams, all of which placed the .38 caliber weapon in Higgs's hands on the night of that shooting. Unlike the rifling evidence, however, there was no CBLA match between the ammunition used in the Chaconia shooting or the ammunition at Higgs's home and the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

ammunition used in the murders. Similarly, the CBLA evidence matching the Cherry Lane bullet to the murder bullet merely corroborated the eyewitness testimony of Simms and others at Cherry Lane and the crime scene evidence from that shooting, including the rifling evidence that also matched the Cherry Lane bullet and the murder bullet. However, there was no match between the Cherry Lane bullet and the bullets associated with Higgs's apartment, and Higgs and Haynes were both involved in the Cherry Lane shooting and in the murders. Higgs did not contest that Haynes was the triggerman, or that Haynes used a .38 caliber weapon to murder the women. And, as defense counsel pointed out to the jury, there was substantial evidence that Haynes had equal if not more access to Higgs's apartment. Thus, while the CBLA evidence matched the bullet from Cherry Lane with the murder bullet, it was cumulative to other evidence but not inconsistent with Higgs's defense.

Having reviewed the challenged evidence in the context of the entire case, we conclude there is no reasonable probability that the district court would have excluded the CBLA testimony at Higgs's trial had it been challenged, or that the outcome of the guilt or sentencing phase would have been different had the CBLA evidence been excluded or subjected to additional cross-examination.

V.

[18] Higgs's final claim is that his defense counsel were ineffective because they failed to file a motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure within three years of the verdict, based upon the CBLA studies that were published thereafter.

After his trial was concluded, Higgs requested and was granted a substitution of counsel for one of his two defense attorneys for the purpose of pursuing an appeal and other post-conviction relief. Higgs's counsel did not challenge the admission of the CBLA evidence on direct appeal, and although defense counsel did file a new trial motion based upon other evidence discovered in connection with a fresh review of the case, they did not file a similar motion on the basis of the more recent CBLA studies. Higgs contends that defense counsels' failure to also challenge the CBLA evidence in a motion for a new trial amounted to constitutionally deficient performance, and that he was prejudiced as a result.

[19] To receive a new trial based on newly discovered evidence, a defendant must show that the evidence is newly discovered; that he has been diligent in uncovering it; that the evidence is not merely cumulative or impeaching; that the evidence is material to the issues involved; and that the evidence would probably*743 produce an acquittal. *See United States v. Chavis*, 880 F.2d 788, 793 (4th Cir.1989). Unless the defendant demonstrates all five of these factors, the motion should be denied. *See id.* To obtain relief in this proceeding, Higgs must demonstrate that counsel's failure to file the motion constituted deficient performance and that he was prejudiced as a result. *See Strickland*, 466 U.S. at 687–88, 104 S.Ct. 2052.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

[20] Higgs has failed to demonstrate that defense counsel were constitutionally ineffective for failing to file a motion for a new trial based upon the post-trial studies. The post-trial studies published in 2002 and 2003 were largely cumulative of the criticisms known at the time of trial and were at best merely impeachment evidence. *Cf. Berry,* 624 F.3d at 1043 (concluding that even "the [NRC] report and the FBI's discontinued use of [CBLA] evidence were no more than impeaching evidence of the [CBLA] testimony introduced at [defendant's] trial"). And, as discussed above, there is no reasonable probability that the post-trial studies or a new trial would have resulted in a different verdict. We cannot say that the post-trial defense counsel team was constitutionally ineffective simply because they did not pursue a new trial motion on the basis of the CBLA developments, particularly in view of the cross-examination that was conducted and the minor role that the evidence played during the trial, or that Higgs was prejudiced as a result.

## VI.

For the foregoing reasons, we affirm the district court's order denying Higgs's motion under 28 U.S.C. § 2255.

*AFFIRMED*

C.A.4 (Md.),2011.

U.S. v. Higgs
663 F.3d 726
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT 5

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Respondent, | : | Criminal No. PJM-98-0520 |
| | : | |
| v. | : | Peter J. Messitte, U.S.D.J. |
| | : | |
| DUSTIN JOHN HIGGS, | : | Greenbelt Division |
| | : | |
| Petitioner. | : | |

**PETITIONER'S MOTION FOR RELIEF FROM FINAL JUDGMENT
PURSUANT TO *HAZEL-ATLAS GLASS CO. v. HARTFORD-EMPIRE CO.* AND
FEDERAL RULE OF CIVIL PROCEDURE 60(d)**

Petitioner, Dustin John Higgs, hereby moves for relief from this Court's final judgments

denying him relief pursuant to 28 U.S.C. § 2255 or in the alternative pursuant to 28 U.S.C. §

2241 (Doc. 548); denying discovery (*id.*); denying a certificate of appealability (Doc. 560); and

denying his motion to alter or amend the judgment pursuant to Federal Rule of Civil Procedure

59(e) (Doc. 561). Mr. Higgs makes this motion pursuant to *Hazel-Atlas Glass Co. v. Hartford-*

*Empire Co.*, 322 U.S. 238 (1944), and Federal Rule of Civil Procedure 60(d). In support of this

motion, Mr. Higgs states the following:

**INTRODUCTION**

Dustin Higgs is currently on death row, having been convicted and sentenced to death for

murder and related charges in this Court. Victor Gloria was the most important witness at Mr.

Higgs's trial. Indeed, in the opinion of the trial prosecutor, "the government could not have

proceeded and obtain[ed] a conviction against Mr. Higgs certainly without the assistance of Mr.

1

Gloria." Exhibit 1 at 4 (argument of AUSA Deborah Johnston during Mr. Gloria's sentencing hearing in support of a motion for downward departure due to Mr. Gloria's "substantial assistance to the government").

As part of the § 2255 proceedings in this Court challenging Mr. Higgs's convictions and sentences, Mr. Higgs alleged that the government did not turn over all of the material relating to Mr. Gloria that it was required to under *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny.  Specifically, Mr. Higgs alleged that Mr. Gloria was a suspect, but was never charged, in an unrelated homicide in Baltimore that was committed prior to the time of Mr. Higgs's trial.  Doc. 492 at 33.  Mr. Higgs further alleged that Mr. Gloria was not charged with this homicide at the behest of the government "in an effort to preserve his status as a testifying witness in this federal capital triple homicide case." *Id.*  Mr. Higgs alleged that the government's failure to disclose this favorable treatment of Mr. Gloria violated Mr. Higgs's due process rights.  *Id.*

The government responded to Mr. Higgs's § 2255 allegation regarding Mr. Gloria by denying that federal officials had any knowledge of or ability to influence any benefits conferred on Mr. Gloria by local authorities in Baltimore, dismissing the allegation as speculative, and urging the denial of relief.  Doc. 520 at 85-88.  This Court denied Mr. Higgs's claim, adopting the government's line of argument.  The Court ruled that "pure speculation about supposed benefits cannot substitute for hard facts," and that "Higgs, quite simply, has failed to demonstrate any causal connection between Gloria's testimony in this federal case and whatever treatment he may have received in the state jurisdictions." *United States v. Higgs*, 711 F. Supp. 2d 479, 508 (D. Md. 2010).

2

Mr. Higgs has now obtained the Baltimore City Police file for the homicide in which he alleged Mr. Gloria was an uncharged suspect. The contents of the file reveal that: 1) Mr. Gloria was indeed a suspect in the Baltimore murder, having been identified as the killer by multiple eyewitnesses; 2) at least as early as February 2, 1999, Detective Joseph Green of the United States Park Police was aware that Mr. Gloria was a suspect in the murder; 3) on April 12, 1999, Assistant United States Attorney Deborah Johnston spoke with Mark Cohen, then the chief of the homicide division of the Baltimore City State's Attorney's Office, about the fact that Mr. Gloria was a suspect in the Baltimore homicide; 4) during this conversation, AUSA Johnston suggested to Mr. Cohen that it was possible Mr. Gloria did not commit the killing because, in her estimation, the eyewitnesses who identified him had a motive to lie; 5) the Baltimore City Police embraced AUSA Johnston's proffered theory of Mr. Gloria's innocence of the murder and declined to charge Mr. Gloria with any crime; and 6) the Baltimore City State's Attorney's Office would have charged Mr. Gloria with the murder absent the intervention of federal officials, including AUSA Johnston, Detective Green, Detective Rydi Abt of the Park Police, and Agent Bradlee Sheafe of the FBI. In sum, the government knew that Mr. Higgs's allegation was supported by "hard facts," but made false representations to this Court during the § 2255 litigation in order to prevail.

The government's representations during the course of the § 2255 proceedings therefore constitute fraud on the Court, and merit relief from the Court's final judgment denying discovery and post-conviction relief under *Hazel-Atlas* and Federal Rule of Civil Procedure 60(d)(3). Not only has the government now been engaged in a years-long *Brady* violation, but officers of this Court representing the government have made materially false statements in their continuing

3

attempt to cover up the violation.  AUSA Johnston signed the government's pleading that faulted

Mr. Higgs for failing to demonstrate any connection to federal officials regarding the "supposed"

benefits obtained by Mr. Gloria.  It is now clear that multiple federal officials, including AUSA

Johnston, had intimate involvement in the conferring of these benefits, which were directly

related to Mr. Gloria's testimony in this case.  The government's misrepresentations to this Court

in a death penalty case, which formed the basis for the Court's denial of relief, merit relief from

the final judgments.

Mr. Higgs submits that this motion, and the exhibits thereto, demonstrate his entitlement

to relief under Fourth Circuit and United States Supreme Court precedent.  At a minimum, Mr.

Higgs requests that he be granted an evidentiary hearing at which he will prove these serious

allegations.  Further, a probing inquiry is necessary into what additional undisclosed *Brady*

and/or *Giglio* material remains in the hands of the government.  Mr. Higgs therefore also requests

to be heard on the renewed *Brady*/*Giglio* discovery request that he has filed contemporaneously

with this motion.

## PROCEDURAL HISTORY

On December 21, 1998, Mr. Higgs, along with co-defendant Willis Haynes, was indicted

on charges connected with the January 27, 1996, shooting deaths of Tanji Jackson, Tamika

Black, and Mishann Chinn.  On October 22, 1999, the government filed a notice of its intent to

seek the death penalty against Mr. Higgs.  On December 20, 1999, the grand jury returned a

second superseding indictment, and the government thereafter filed an amended death notice.

The cases against Mr. Haynes and Mr. Higgs were severed for trial.  Mr. Haynes – by all

accounts the person who actually killed Ms. Jackson, Ms. Black, and Ms. Chinn[1] – was tried first and sentenced to life in prison without release. Mr. Higgs was tried next, and on October 11, 2000, was found guilty of firearms charges and three counts each of first-degree premeditated murder, first-degree murder committed during a kidnapping, and kidnapping resulting in death. Following a sentencing hearing, the jury recommended death sentences on the nine death-eligible counts.

The Fourth Circuit upheld the convictions and sentences on direct appeal. *United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003) (*Higgs-1*). While the direct appeal was pending, Mr. Higgs filed a motion for a new trial, alleging that the government had withheld *Brady* material relating to two witnesses. This Court denied the motion for new trial, and the Fourth Circuit again affirmed. *United States v. Higgs*, 95 Fed. Appx. 37 (4th Cir. 2004) (*Higgs-2*). Certiorari was denied with respect to each appeal. *Higgs v. United States*, 542 U.S. 999 (2004); *Higgs v. United States*, 543 U.S. 1004 (2004).

Mr. Higgs then filed his *Motion for Relief Pursuant to 28 U.S.C. Section 2255 or in the Alternative Pursuant to 28 U.S.C. 2241* on November 28, 2005. Doc. 492. He also moved for discovery and a hearing on several of his claims. *Id.*; *see also* Doc. 509. On April 7, 2010, this Court denied the § 2255 motion without argument, discovery, or a hearing. *United States v. Higgs*, 711 F. Supp. 2d 479 (D. Md. 2010) (*Higgs-3*); *see also* Doc. 548 (Final Judgment Order). The Court denied Mr. Higgs's motions for reconsideration and for a certificate of appealability (COA) on July 20, 2010. Docs. 560, 561.

---

[1] *See, e.g., United States v. Haynes*, 26 Fed. Appx. 123, 127 (4th Cir. 2001) (unpub.) (describing how "Haynes exited the vehicle and fired five shots, killing all three women").

5

Mr. Higgs then sought a COA from the Fourth Circuit on numerous issues, including that the government improperly suppressed the benefit Mr. Gloria received in avoiding a first degree murder charge in Baltimore. The Fourth Circuit denied a COA on all but one issue, regarding the government's withholding of exculpatory material relating to comparative bullet lead analysis and counsel's ineffectiveness in handling the issue, and subsequently denied relief. *United States v. Higgs*, 663 F.3d 726 (4th Cir. 2011) (*Higgs-4*). The United States Supreme Court denied certiorari on December 10, 2012. *Higgs v. United States*, 133 S.Ct. 787 (2012).

## STATEMENT OF FACTS

### A.   Victor Gloria's Trial Testimony

During the early morning hours of January 27, 1996, Ms. Jackson, Ms. Black, and Ms. Chinn were found murdered along Route 197 in the Patuxent National Wildlife Refuge in Prince George's County, Maryland. Victor Gloria was the most significant witness at Mr. Higgs's trial on the charges arising from these murders. According to AUSA Johnston, the government "could not have proceeded and obtain[ed] a conviction against Mr. Higgs" without Mr. Gloria's testimony. Exhibit 1 at 4 (Gloria sentencing hearing). This Court concurred in that assessment. *Id.* at 16 (describing Mr. Gloria as "the critical link in the conviction of these two men," and finding that "[t]hat is the most important thing about [Gloria] at this point in the sentencing, and it overrides everything else"); *see also Higgs-1*, 353 F.3d at 289 (noting that "[m]ost of the facts surrounding the murders of the three women were obtained from [Gloria's] eyewitness testimony"); *Higgs-4*, 663 F.3d at 730 ("At trial, [Gloria] provided a detailed, eyewitness account of the kidnappings and murders"); *id.* at 741 ("Gloria's eyewitness testimony provided compelling and convincing details of the events of that evening and of Higgs's involvement in

6

them").

Mr. Gloria testified to a number of highly damaging facts relating to Mr. Higgs's involvement in the killings. Mr. Gloria testified, for example, that the three victims were socializing at Mr. Higgs's apartment on the night of the killings with Mr. Haynes, Mr. Gloria, and Mr. Higgs, when Mr. Higgs got into an argument with Ms. Jackson. *Higgs-1*, 353 F.3d at 289-90. According to Mr. Gloria, this argument led Mr. Higgs to want to have the victims killed. *Id.* Mr. Gloria testified that after the three women left the apartment following the fight, Mr. Higgs got a gun and told Mr. Haynes to get the three women into Mr. Higgs's vehicle. *Id.* at 290. Finally, Mr. Gloria testified that he then got in the back seat of Mr. Higgs's vehicle and observed Mr. Higgs drive the three women to a secluded location along Route 197 while having whispered conversations with Mr. Haynes, pull over, and hand Mr. Haynes the gun with which to carry out the killings. *Id.* Mr. Gloria was the only source of this direct, highly damaging testimony.

**B.    The Murder of Martrelle Creighton**

On July 18, 1998, approximately two and a half months prior to Mr. Gloria's arrest in this federal case, a man named Martrelle Creighton was murdered in the Inner Harbor area of Baltimore.[2] Exhibit 2 (Report of Baltimore Police Detective Robert L. Patton, 7/18/98). At approximately 2:00 a.m. on July 18, Mr. Creighton was found by police lying on the sidewalk near 301 Light Street, suffering from a single stab wound to the neck. *Id.*

As discussed below, the fatal wound was consistent with having been inflicted by a single

---

[2]Although law enforcement suspected the involvement of Mr. Gloria in the federal case early on in their investigation, Mr. Gloria was not arrested until almost three years after the Route 197 murders, on October 5, 1998. Thus, on the date of Mr. Creighton's murder, Mr. Gloria was not yet in custody.

7

blow, which could have appeared to onlookers to be a punch. Witnesses told police that both Victor Gloria and Kevin Miller swung at the decedent during an altercation, and several said that Mr. Gloria was the first to run away. Thus, either Mr. Gloria or Mr. Miller could have been the person who stabbed Mr. Creighton.

Mr. Creighton was immediately transported to the University of Maryland Shock Trauma Center for treatment, but was pronounced dead at approximately 2:30 a.m. Exhibit 2.

Baltimore Police soon learned that Mr. Creighton's murder was precipitated by two groups of young men arguing over a group of young women. *Id.* One of the groups of men was comprised of Mr. Creighton and his friends. *Id.* The other group of men was comprised of Kevin Miller, twin brothers Keith and Kevin Scott, and Victor Gloria. Exhibit 3 (Report of Report of Baltimore Police Detective Robert L. Patton, 2/2/99).

The trouble in the Inner Harbor began when Mr. Creighton's group attempted to strike up a conversation with the group of young women. Exhibit 2. The young women, who did not previously know anyone in Mr. Creighton's group, were not interested. *Id.* Shortly thereafter, the young women began talking with Mr. Gloria's group, who they also had not known previously. *Id.* Mr. Creighton apparently then became angry that the young women were talking to members of Mr. Gloria's group given that they had been uninterested in talking with Mr. Creighton's group. *Id.* As a result, Mr. Creighton began yelling at the young women as well as at Mr. Gloria's group. *Id.* With minor variations, every witness interviewed by Baltimore Police, which included members of Mr. Creighton's group, members of the group of young women, and Mr. Miller and the Scott twins, gave essentially the same account of the lead up to the stabbing.

At that point, however, the accounts began to differ somewhat. Clarence White, a friend of Mr. Creighton's, was interviewed by Baltimore Police on the night of the stabbing. Exhibit 4 (information sheet regarding interview of Clarence White, 7/18/98). Handwritten police notes from this unrecorded interview indicate that Mr. White described how once the altercation began, a man with "light skin" – a description consistent with Mr. Gloria – swung at Mr. Creighton, at which point Mr. Creighton "grabbed his neck and was bleeding bad." Exhibit 5 (handwritten notes from interview of Clarence White).[3] Mr. White also stated that there were three or four members of the stabber's group, who all ran away together after the stabbing. *Id.* Mr. White was reinterviewed nearly a year later, on June 11, 1999, at which point he changed his account to indicate that the stabber was "brown skinned," a description more consistent with Mr. Miller. Exhibit 6 (transcript of interview with Clarence White, 6/11/99). Mr. White also stated in the second interview that he definitely saw three people involved in the altercation with Mr. Creighton. *Id.* Mr. White identified the three individuals involved as the Scott twins and Mr. Miller at that time. *Id.*

David Bishop, another friend of Mr. Creighton's, was also interviewed on the night of the stabbing and said that he saw both a man matching the description of Mr. Miller and a man matching the description of Mr. Gloria punch Mr. Creighton. Exhibit 7 (transcript of interview with David Bishop, 7/18/98). Mr. Bishop did not initially realize that Mr. Creighton had been stabbed, although Mr. Bishop assumed once he realized that Mr. Creighton had been stabbed that it was Mr. Miller who did the stabbing. *Id.*

---

[3] Mr. White's description must refer to Mr. Gloria. While the Scott twins are also light skinned, none of the witnesses asserted that either of them punched Mr. Creighton.

9

Sisters Barbara and Charnetta Bailey, who were in the group of young women, were initially interviewed by police on July 29th, 1998, and August 12th, 1998, respectively. Exhibit 8 (transcript of interview with Barbara Bailey, 7/29/98); Exhibit 9 (transcript of interview with Charnetta Bailey, 8/12/98). Both women said that around the time the confrontation between the two groups of men started, they started to walk away. *Id.* Both women also stated that at the beginning of the altercation they saw Mr. Gloria run away and Mr. Creighton and Mr. Miller then engaged in a brief fistfight in which Mr. Miller punched Mr. Creighton. *Id.* Neither Bailey sister realized that Mr. Creighton had been stabbed. *Id.*

The Scott twins were first interviewed by police on February 2, 1999, when they were arrested in connection with the stabbing. The Scott twins each said that it was Mr. Gloria who stabbed Mr. Creighton, although they, too, did not initially realize that Mr. Creighton had been stabbed. Exhibit 10 (transcript of interview with Keith Scott, 2/2/99); Exhibit 11 (transcript of interview with Kevin Scott, 2/2/99). The Scott twins both said that Mr. Gloria punched Mr. Creighton and then ran away, and that they did not see Mr. Miller fighting with Mr. Creighton at all. *Id.*

Mr. Miller was arrested and interviewed by police on April 7, 1999. Mr. Miller also said that Mr. Gloria punched Mr. Creighton and then ran away. Exhibit 12 (transcript of interview with Kevin Miller, 4/7/99). Mr. Miller said that he himself then threw a punch at one of Mr. Creighton's friends, but never hit Mr. Creighton. *Id.* Mr. Miller denied stabbing Mr. Creighton and stated that he did not realize when he began fighting that Mr. Creighton had been stabbed. *Id.*

There is no indication that Baltimore Police ever interviewed or attempted to interview

Mr. Gloria, despite the fact that he had previously pled guilty to threatening a different individual with a knife during a fight. Exhibit 13 (Application for Statement of Charges, 9/28/96).

Baltimore Police were thus left with conflicting accounts of who stabbed Mr. Creighton. Some of the accounts tended to suggest that it was Mr. Gloria, and some of the accounts tended to suggest it was Mr. Miller. All of the accounts described a chaotic atmosphere, with almost no one initially having realized that Mr. Creighton had been stabbed.

**C.      The Involvement of Federal Authorities in the Investigation into Mr. Creighton's Murder**

The first indication in the Baltimore Police file of federal authorities' knowledge of and involvement in the investigation into the Creighton murder is a handwritten note dated February 2, 1999 – the same day the Scott twins identified Mr. Gloria as the killer. Exhibit 14 (handwritten note, 2/2/99). That note lists the names of Detectives Rydi Abt and Joseph Green of the United States Park Police, along with Detective Green's office and pager numbers. *Id.* It also lists the number for the Park Police Criminal Investigations Bureau. *Id.* Immediately under the names and telephone numbers is the following notation: "JAN '96 – 3/B/F victims shot to death on BW Pkwy." *Id.* Under that notation is the notation "Dec '98 – 3 arrest made," followed by the names of Mr. Haynes, Mr. Higgs, and Mr. Gloria, along with certain other identifying information. *Id.* In other words, the very day that Mr. Gloria was named as the killer of Mr. Creighton, Baltimore authorities were in contact with the federal authorities responsible for Mr. Higgs's prosecution.

Detective Green had further contact with Baltimore Police the following day, February 3, 1999. On that date, Detective Green retrieved a photographic lineup previously created by the

11

Park Police, which included Mr. Gloria, and provided it to the Baltimore Police. Exhibit 15 (envelope, request form, and photo lineup provided by Detective Green, 2/3/99).

The Baltimore Police file also contains a handwritten note dated one week later, February 10, 1999, which includes the notation: "Case Agent for Victor Gloria S/A Brad Sheafe FBI Calverton Office." Exhibit 16 (collection of handwritten notes). Under this notation are two different telephone numbers. *Id.* Several additional, undated, handwritten notes also contain the names of Detective Green and Detective Abt, along with telephone numbers and information relating to the murders on Route 197. Exhibit 17 (undated handwritten note); Exhibit 18 (undated handwritten note); Exhibit 19 (undated handwritten to-do list).

At some point, a member of the Baltimore Police Department traveled, or at least planned to travel, to the physical office of the United States Park Police, presumably in order to meet with a Park Police officer regarding Mr. Gloria. Exhibit 20 (undated handwritten note with the words "Directions to U.S. Park Police" written across the top, underneath which are directions from Baltimore to the Park Police office).

The Creighton file further reveals that, not only were members of the Baltimore Police Department in contact with federal law enforcement agents, but the chief homicide prosecutor in the Baltimore City State's Attorney's Office, Mark Cohen, was in direct communication with AUSA Deborah Johnston, who prosecuted Mr. Higgs at trial and represented the government during Mr. Higgs's § 2255 proceedings. Exhibit 21 (handwritten note from Mark Cohen, 4/12/99). The note recounting the Johnson-Cohen conversation, authored by Mr. Cohen on April 12, 1999, reveals that Ms. Johnston on that date suggested to Mr. Cohen that Mr. Miller and the Scott twins might be falsely implicating Mr. Gloria. *Id.* The note also reveals that Mr. Cohen,

12

the person with the authority to bring charges against Mr. Gloria for the Baltimore homicide, was

inclined to charge Mr. Gloria, but deferred his decision until after he received "background"

information from federal agents regarding the unrelated investigation into the Route 197

homicides. *Id.* Mr. Cohen's note is reproduced here in full:

Bobby

Re Victor Gloria

1   I spoke to AUSA Deborah Johnston concerning Victor Gloria on 4/12/99.  She
told me that Gloria pled guilty to AAF in triple murder case + that his plea
agreement is sealed.  The two Co-Δ's Willis Haynes + Dustin Higgs have trial
date of 2-7-2000.  Because plea agreement is sealed, she could not tell me if
Gloria is going to testify agt. Co-Δ.

2   AUSA Johnston stated that it is possible that Co-Δ's - Scott, Scott + Miller are
blaming Gloria because they are friends of Δ's in her case especially Haynes.  She
suggested we talk to

&#9312;   Joe Green Park Police
         B - [phone number]

&#9313;   Brad Sheafe - FBI
         B - [phone number]

         -they could give us background on case

3   After we talk to these officers, we will decide on next course of action, that is,
either writ Gloria + charge him or talk to his lawyer about the case.

4   Please call me

Mark Cohen

*Id.*

While Mr. Cohen reported in his memo that the United States Attorney's Office could not

share whether Mr. Gloria was going to testify against Mr. Higgs and Mr. Haynes because his plea

agreement was sealed, the reluctance to share this information was apparently short-lived. In a report dated April 21, 1999, Baltimore Police Detective Robert Patton noted that "[p]er the U.S. Attorney's office Victor Gloria had plead guilty and is slatted to testify against his co-defendants, Willis Haymes and Dustin Higgs who are reportedly are close friends with the Scott brothers and Kevin Miller." Exhibit 22 (Report of Detective Patton, 4/21/99) (text reproduced as it appears in original). Detective Patton's report continues by noting that the United States Attorney's Office conveyed to Baltimore authorities its belief, ostensibly based on the unrelated federal investigation, that all three eyewitnesses who identified Mr. Gloria as the murderer were falsely implicating him as a form of retaliation due to their friendship with Mr. Haynes and Mr. Higgs:

> The U.S. Attorney's Office was advised by A.S.A. Cohen that Kevin Miller and the Scott brothers had implicated Victor Gloria in the captioned Homicide. The U.S. Attorney reported that during course of their Investigation they received information that the Scott brothers and Kevin Miller were close friends with Victor Gloria's co-defendant, Willis Haymes and Dustin Higgs and were aware that Victor Gloria was a Federal witnesses and planed to testify against Hymes and Higgs. The U.S. Attorney believes that the implication of Victor Gloria by Kevin Miller and the Scott brothers is their form of retaliation against Gloria.

*Id.* (text reproduced as it appears in original).

The report then notes that:

> Your Investigators along A.S.A. Cohen believes that the A.U.S.A. is on track with their assumption. Your Investigators support is based on eyewitness information that Victor Gloria ran from the scene prior to the stabbing. The eyewitnesses identified Kevin Anthony Miller via photographic line up as the stabber and the only person seen engaging the victim in physical altercation.

> In an effort to finally discern who of the four listed suspects actually stabbed the victim. Your Investigator in concert with A.S.A. Cohen believe by aggressively re-interviewing the Scott brothers we could ultimately convince them to tell the complete truth. This would clear up the apparent inconsistencies in their statements and ultimately discern from them who the actual stabber was which would corroborate the other eyewitnesses.

14

*Id.* (text reproduced as it appears in original).

In sum, the intervention of federal officials had a direct impact on Mr. Gloria not being charged with first degree murder in the death of Mr. Creighton. Federal officials' only interest in intervening in the investigation of this quintessentially local crime was Mr. Gloria's status as a witness in a federal capital case.[4]

**D.     The Resolution of the Case Arising from Mr. Creighton's Murder**

As a result of the Baltimore Police Department's investigation of Mr. Creighton's murder, Mr. Miller and each of the Scott twins were charged with first degree murder. Exhibit 23 (Scott indictment); Exhibit 24 (Miller indictment). Mr. Gloria was the only member of this group not charged with first degree murder; he received no charges at all arising from this incident.

Each of the Scott twins entered pleas to second degree assault and were sentenced to time served. Exhibit 25 (Keith Scott docket); Exhibit 26 (Kevin Scott docket). They were released from custody on August 30, 1999, having served approximately seven months in jail. *Id.* Mr.

---

[4]Further, it is not clear what aspect of the federal investigation would have shed any light on the supposed friendships between Mr. Miller, the Scott twins, and either Mr. Haynes or Mr. Higgs. Neither the Scott twins nor Mr. Miller had any involvement in the Route 197 homicides. Mr. Higgs proffers, and will prove at a hearing if necessary, that Mr. Gloria was the source of this self-serving information, as federal officials specifically questioned Mr. Gloria about his involvement in the Baltimore homicide during the course of his cooperation with them.

Moreover, Mr. Higgs submits that the representations that AUSA Johnston made to Mr. Cohen about the supposed friendships were largely inaccurate. Mr. Higgs hereby represents to the Court that he was not, in fact, friends with either the Scott twins or Mr. Miller. And while it does appear that Mr. Miller was friends with Willis Haynes, the same cannot be said for the Scott twins. As such, AUSA Johnston's representations to Mr. Cohen do not provide a reasonable basis on which to conclude that the Scott twins and Mr. Miller went out of their way to falsely implicate Mr. Gloria as a form of retaliation.

Miller pled guilty to second degree murder, however pursuant to a negotiated plea agreement he received an extraordinarily low sentence given that he supposedly killed a man in the middle of downtown by stabbing him in the neck: twenty years, with all but five years suspended. Exhibit 27 (Kevin Miller docket). This five-year sentence was made concurrent to any other sentence, with credit for time already served. *Id.*; Exhibit 28 (Kevin Miller sentencing worksheet); Exhibit 29 (Kevin Miller commitment record). Mr. Miller also received three years of probation upon release. *Id.* The judge who sentenced Mr. Miller, Judge Quarles (then a judge for the Circuit Court for Baltimore City), justified his extreme downward departure from the guidelines range as follows: "muddled factual statement leaves few things clear: someone died and the Def. was involved." Exhibit 28.

Mr. Miller did not serve his full five-year term; he was released from prison in July, 2002, three years and three months after he was first arrested. Exhibit 30 (Memorandum from Maryland Department of Public Safety and Correctional Services).

**E.     Mr. Higgs's Discovery and *Brady* Requests at Trial and During § 2255 Proceedings**

Mr. Higgs made his first *Brady* request at the time of trial, by entering into a joint written agreement with the government. In that agreement, which is signed by both of Mr. Higgs's defense attorneys and by AUSAs Deborah Johnston and Sandra Wilkinson, the government agreed to provide *Jencks* and *Giglio* material no later than one week prior to trial. The government further agreed to provide *Brady* material not otherwise covered by Fed. R. Crim. P. 16, *Jencks*, or *Giglio*, "if and when discovered." Exhibit 31 (Discovery agreement, 1/21/99).[5]

---

[5]Immediately prior to trial, AUSA Johnston acknowledged the importance of each party making timely and full disclosures in discovery:

During § 2255 proceedings, Mr. Higgs made another request for discovery and for *Brady* material. Doc. 509. In that motion, Mr. Higgs specifically referenced Mr. Gloria's involvement in the Baltimore homicide. *Id.* at 11-12. Mr. Higgs requested any information in the possession of the Baltimore City State's Attorney's Office "regarding Mr. Gloria's participation in and/or non-prosecution for the above described homicide." *Id.* at 12. Mr. Higgs also made a more general request for "all relevant and exculpatory witness and law enforcement statements" not previously provided. *Id.* at 17.

At no point, either at trial or during § 2255 proceedings, did the government disclose the fact that Mr. Gloria had been identified by multiple eyewitnesses as the killer of Mr. Creighton, that federal authorities had been in contact with state authorities responsible for the Baltimore murder investigation, or that Mr. Gloria was not charged in the Baltimore homicide, almost certainly as a result of federal authorities' intervention.

## F.    Mr. Higgs's Allegations During § 2255 Proceedings

During the course of Mr. Higgs's initial investigation during § 2255 proceedings, Mr. Higgs's counsel learned that Mr. Gloria had been a suspect in a Baltimore murder, but was not

---

The other issue is in regard to discovery, and there are two issues. Yesterday Mr. Sullivan delivered to us after the close of court a letter saying that they were compiling their evidence, the documents and tangible objects that they are required to provide to the government under the reciprocal rule, 16(b)(1)(A).

We have not gotten anything. The whole purpose of these rules and reciprocal discovery is so that no one should go into trial without having that discovery provided to them. Here we are Friday and the trial is scheduled to begin on Tuesday and we have not received any of those materials.

I mentioned this to Mr. Sullivan this morning while the Court was conducting its sentencing hearing. So Mr. Sullivan is aware of our concerns. Like a defendant should not be tried by ambush, neither should the government.

Tr. 9/22/00 at 136-37.

prosecuted because he was to be the star witness in two federal capital cases. In light of this information, Mr. Higgs alleged that the government did not turn over all of the material relating to Mr. Gloria that it was required to under *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny. Specifically, Mr. Higgs alleged that Mr. Gloria was a suspect, but was never charged, in an unrelated homicide in Baltimore. Doc. 492 at 33. Mr. Higgs further alleged that Mr. Gloria was not charged with this homicide at the behest of the government, "in an effort to preserve his status as a testifying witness in this federal capital triple homicide case," and that the government's failure to disclose this consideration violated Mr. Higgs's due process rights. *Id.*

## G.   The Government's Representations to This Court in Response to Mr. Higgs's Claim

In its response to Mr. Higgs's § 2255 motion, the government made several materially false and/or misleading representations. The government argued that Mr. Higgs's "vague descriptions of the supposed benefits conferred on Gloria largely fail to demonstrate any connection to this trial or federal officials." Doc. 520 at 88. The government described Mr. Higgs's allegations regarding the undisclosed leniency afforded to Mr. Gloria as mere "speculation about the Government's knowledge or actions." *Id.* The government further argued that "[c]ertainly, the Constitution required the prosecutors to disclose any consideration promised to Gloria in exchange for his testimony; the prosecutors, however, had no duty or ability to predict, much less inform Higgs of benefits, or acts of grace, that coincidentally flowed to the witness after this trial." *Id.* at 86. The government also resisted Mr. Higgs's discovery and *Brady/Giglio* requests pertaining to Mr. Gloria, arguing that "there is no evidence that [Gloria] was promised anything other than that which he admitted at trial." Doc. 513 at 5.

Each of the above statements in the government's pleadings faulted Mr. Higgs for his failure to prove his *Brady* claim, when the government all the while was in possession of the evidence that, in all likelihood, would have proved it. Given that the government has a constitutional and ethical duty to disclose *Brady* and *Giglio* material, the government's representations created the false impression that federal authorities had no knowledge of or involvement in Baltimore authorities' investigation into or treatment of Mr. Gloria for an unrelated crime. AUSA Johnston, who, as noted, was in direct contact with the Baltimore authorities prior to Mr. Higgs's trial, signed her name to the government's opposition to the § 2255 motion, as well as to the government's opposition to the discovery motion. Doc. 520 at 1; Doc. 513 at 8.

## H.   Mr. Higgs's Attempts to Obtain and Ultimate Acquisition of the Baltimore Police File

Mr. Higgs's post-conviction counsel first learned of Mr. Gloria's involvement in the Baltimore homicide during their investigation in advance of filing Mr. Higgs's § 2255 motion. While Mr. Higgs possessed some information about Mr. Gloria's involvement and the federal government's intervention, he did not at the time of the § 2255 proceedings have documentary evidence to confirm the federal government's direct involvement in the investigation into Mr. Creighton's murder. As such, Mr. Higgs sought to obtain documentary evidence to confirm the information he had. Mr. Higgs sought to do so both through his own investigative efforts and via specific discovery requests in this post-conviction litigation. Mr. Higgs sent a written request for the complete investigation file to the Baltimore Police and filed a discovery motion in the § 2255 litigation. Mr. Higgs was unsuccessful, however, as the Baltimore Police only turned over a one-

page summary report and the government opposed Mr. Higgs's § 2255 discovery requests, which this Court denied.

In the spring of 2012, Mr. Higgs attempted, a second time, to obtain the Baltimore Police file via written request. Whereas the Baltimore Police responded to Mr. Higgs's first written request by turning over a one-page summary report, they responded to his second written request by turning over their entire investigative file, with some information redacted.[6] Mr. Higgs came into possession of the file in September, 2012.

Mr. Higgs has simultaneously been attempting to obtain – also since 2012 – a copy of the United States Park Police file relating to the murders on Route 197 via the Freedom of Information Act (FOIA). Given the seriousness of the accusations Mr. Higgs is now leveling against the government, and the lack of a time restriction for filing motions under Rule 60(d)(3), Mr. Higgs has endeavored to exhaust his attempts to obtain the Park Police file (and thereby confirm the full extent of the government's knowledge and actions) prior to filing this motion. Mr. Higgs submits that, given the contents of the Baltimore Police file, the Park Police file will almost certainly contain confirmation of the connection between federal and local officials in the investigation into Mr. Creighton's murder and will likely provide additional evidence of government misconduct.

The Park Police have been extraordinarily dilatory in their response to the FOIA request. It has now been almost 3 years since Mr. Higgs made his request. The Park Police initially responded by seeking to charge over $11,000 to copy and produce the investigative file. When

---

[6]There is no apparent reason why the two requests were handled so differently by the Baltimore Police.

counsel for Mr. Higgs protested that such fees were excessive and clearly precluded by the FOIA statute, the Park Police refused to reconsider and directed Mr. Higgs to file an administrative appeal if he was unhappy with the fees. Mr. Higgs did so, and given that the law clearly precluded the Park Police from attempting to charge such extreme fees, he succeeded in his initial appeal.

Upon remand to the Park Police, Mr. Higgs paid the much lower fee that the Park Police was legally entitled to charge. The Park Police then took over a year to respond to the substance of the request, despite numerous follow-up attempts by counsel in the interim. In its brief eventual response, the Park Police informed Mr. Higgs that it would be withholding its investigative file *in toto*. Mr. Higgs yet again filed an administrative appeal challenging this determination. The FOIA appeals officer took an additional ten months before finally ruling on the appeal in September, 2014. The most recent appeal ruling indicated that, not only had the Park Police failed to fully review the contents of its file during the year-plus in which it was supposedly considering Mr. Higgs's request, they had also substantially miscalculated the number of documents that were responsive to the request. The FOIA appeals office yet again remanded to the Park Police to conduct an appropriate review.

In light of the extreme delay in responding that has characterized the Park Police's activities to date, the most recent appeal opinion directed that the Park Police would have twenty (20) workdays in which to offer its initial response to Mr. Higgs regarding the FOIA request. The Park Police have completely ignored that deadline. Despite further follow-up from counsel, it has become apparent at this point that the Park Police simply are not going to respond to the FOIA request in a remotely timely fashion. While Mr. Higgs would prefer to obtain the Park

Police file before filing this motion, thereby permitting him to create a full record of the government's misconduct, such an eventuality is extraordinarily unlikely given the Park Police's conduct. As such, Mr. Higgs is filing this motion based on the information known to him at this moment. As noted above, Mr. Higgs is simultaneously filing a renewed *Brady*/discovery motion to enlist the Court's assistance in obtaining additional documents related to this violation.

## ARGUMENT

I.  **RELIEF IS APPROPRIATE UNDER *HAZEL-ATLAS* AND RULE 60(D)(3) AS A RESULT OF THE GOVERNMENT'S FRAUD ON THIS COURT.**

Federal Rule of Civil Procedure 60(d)(3) vests in courts the power to "set aside a judgment for fraud on the court." The fraud on the court doctrine derives from the United States Supreme Court's decision in *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944). In *Hazel-Atlas*, the Court set aside a fraudulently obtained ruling that was the product of one party's procurement and presentation of false evidence and misrepresentations to the court. *Id.* at 239-43. As the Court described it, the fraud was the product of a "deliberately planned and carefully executed scheme" that severely undermined the "integrity of the judicial process." *Id.* at 245-46. The Court set aside the ruling where the fraud perpetuated "a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society." *Hazel-Atlas*, 322 U.S. at 246.

The Fourth Circuit has discussed the fraud on the court doctrine in additional depth. The Fourth Circuit recently made clear that fraud on the court within the meaning of *Hazel-Atlas* "is not your 'garden-variety fraud.'" *Fox v. Elk Run Coal Co.*, 739 F.3d 131, 135 (4th Cir. 2014)

22

(quoting *George P. Reintjes Co. v. Riley Stoker Corp.*, 71 F.3d 44, 48 (1st Cir. 1995)). Instead, it applies to situations "in which the integrity of the court and its ability to function impartially is directly impinged." *Id.* at 136 (quoting *Great Coastal Express, Inc. v. International Brotherhood of Teamsters*, 675 F.2d 1349, 1356 (4th Cir. 1982)). A party that alleges "ordinary" fraud as a basis for setting aside a final judgment typically must move for relief under Fed. R. Civ. P. 60(b)(3), which requires that a motion be filed within one year of the entry of the final judgment. *Id.*; *see also* Fed. R. Civ. P. 60(c)(1). But, "as often happens with a rule, there is an exception." *Fox*, 739 F.3d at 135. The "savings clause in Rule 60(d)(3) permits a court to exercise its inherent equitable powers to obviate a final judgment after one year for 'fraud on the court.'" *Id.* at 135-36. Rule 60(d)(3) fraud is the type of fraud with which *Hazel-Atlas* is concerned.

The government's conduct during these § 2255 proceedings meets the stringent standard for fraud on the court set forth in *Hazel-Atlas* and *Fox*. In response to Mr. Higgs's very specific *Brady* claim, the government offered misrepresentations intended to cover up its own past misconduct and persuade this Court to uphold a death sentence. That represents a "deliberately planned and carefully executed scheme" to defraud this Court. The government was not faced merely with a vague allegation that they failed to turn over all available *Brady* evidence; it was faced with a highly specific claim that Victor Gloria was a suspect in a homicide in Baltimore, but was not charged due to his status as a federal witness and the intervention of the federal government. It is now virtually certain that these allegations are accurate. The government, knowing that the allegations were accurate, denied them in written pleadings. Thus, the government's conduct caused a "subversion of the legal process . . . that we cannot necessarily expect to be exposed by the normal adversary process." *Great Coastal*, 675 F.2d at 1357.

23

This gambit was successful. The government's misrepresentations induced this Court to rule that Mr. Higgs's constitutional claim failed because "pure speculation about supposed benefits cannot substitute for hard facts," and because "Higgs, quite simply, has failed to demonstrate any causal connection between Gloria's testimony in this federal case and whatever treatment he may have received in the state jurisdictions." *Higgs-3*, 711 F. Supp. 2d at 508. It certainly is difficult to envision the Court making such rulings had it been presented with the arguments and evidence contained in this motion during the pendency of the § 2255 proceedings. In other words, "[p]roof of the scheme, and of its complete success up to this date, is conclusive." *Hazel-Atlas*, 322 U.S. at 246.[7]

The law of other circuits regarding the fraud on the court doctrine is both consistent with Fourth Circuit law and instructive here. In an opinion joined by then-Judge Alito, the Third Circuit set forth a four-factor test for establishing fraud on the court. In the Third Circuit's formulation, a Rule 60(d)(3) movant must establish: "(1) an intentional fraud; (2) by an officer of the court; (3) which is directed at the court itself; and (4) in fact deceives the court." *Herring v.*

---

[7]In addition to holding that Mr. Higgs could not establish a causal connection between federal authorities and the decision not to prosecute Mr. Gloria for the murder, the Court also held that Mr. Higgs could not demonstrate prejudice. *Higgs-3*, 711 F. Supp. 2d at 508-09. The Court should revisit this determination as well, given that it was also influenced by the government's fraud.

At this juncture, the full extent of the government's misconduct is not yet known. As noted above however, the government has conceded that it could not have prosecuted Mr. Higgs, let alone secured a conviction or death sentence, without the testimony of Mr. Gloria. This Court agreed in that assessment, describing Mr. Gloria as the "critical link" in the conviction of Mr. Higgs. Tr. 11/22/00 at 4. If evidence demonstrating that the keystone witness literally got away with murder due to the intervention of the prosecution does not rise to the level of a reasonable probability of a different outcome, then *Giglio* is a dead letter.

Moreover, undersigned counsel have provided the information gleaned from the Baltimore Police file to trial counsel, who confirms that counsel would have used this information to impeach Mr. Gloria at trial. Exhibit 32 (Affidavit/Declaration of Harry Trainor).

*United States*, 424 F.3d 384, 386 (3d Cir. 2005); *see also Demjanjuk v. Petrovsky*, 10 F.3d 338, 348 (6th Cir. 1993) (five-factor test requiring conduct: "1. On the part of an officer of the court; 2. That is directed to the 'judicial machinery' itself; 3. That is intentionally false, willfully blind to the truth, or is in reckless disregard for the truth; 4. That is a positive averment or is concealment when one is under a duty to disclose; 5. That deceives the court.").

Without specifically setting forth multi-factor tests, several other courts of appeals also require misdeeds on the part of an officer of the court to establish fraud within the meaning of *Hazel-Atlas*. *See, e.g.*, *Reintjes* 71 F.3d at 47-48 ("*Hazel-Atlas Glass* thus expanded the range of the fraud exception for untimely requests for relief . . . to include fraud committed by 'officers of the court'"); *Pumphrey v. Thompson Tool Co.*, 62 F.3d 1128, 1130 (9th Cir. 1995) ("one species of fraud upon the court occurs when an 'officer of the court' perpetrates fraud affecting the ability of the court of jury to impartially judge a case"); *Weese v. Schukman*, 98 F.3d 542, 553 (10th Cir. 1996) ("fraud on the court should embrace only that species of fraud which does or attempts to, subvert the integrity of the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication"); *Kerwit Med. Prods., Inc., v. N. & H. Instruments, Inc.*, 616 F.2d 833, 837 (11th Cir. 1980) (same).

The fraud at issue here thus meets both the Fourth Circuit's more general formulation and its sister circuits' more specific tests. During Mr. Higgs's § 2255 proceedings, (1) an Assistant United States Attorney; (2) made intentional misstatements; (3) directed to the Court itself; (4) that in fact deceived the Court in its adjudication of Mr. Higgs's claim.

Moreover, as in *Hazel-Atlas*, the government's misdeeds here "involve[d] far more than

25

an injury to a single litigant." *Hazel-Atlas*, 322 U.S. at 246. First, the federal government's intrusion into the business of the Baltimore City State's Attorney's Office has affected numerous individuals involved with Mr. Creighton's murder. The Baltimore Police, without the outside pressure applied to it by federal authorities, may well have come to the conclusion that Mr. Gloria was in fact the person who murdered Mr. Creighton. As such, not only did Mr. Miller and the Scott twins unfairly take the blame for the killing, but Mr. Creighton's friends and family members were deprived of justice for their loved one.

More globally, however, the fraud here constitutes "a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society." *Hazel-Atlas*, 322 U.S. at 246. The "United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). The United States Attorney "is in a peculiar and very definite sense the servant of the law." *Id.* While "[s]he may strike hard blows, [s]he is not at liberty to strike foul ones." *Id.*

The attempt by an officer of the United States government to secure a citizen's execution by deception certainly "touch[es] on the public interest in a way that fraud between individual parties generally does not." *Fox*, 739 F.3d at 136. As such, the "public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud," and the Court should remedy the injustice. *Hazel-Atlas*, 322 U.S. at 246.

II.   **This Motion is Properly Brought under *Hazel-Atlas* and Rule 60(d)(3); It is Not Subject to the "Second or Successive" Petition Restrictions of 28 U.S.C. § 2244(b).**

In *Gonzalez v. Crosby*, 545 U.S. 524, 526 (2005), the Supreme Court granted certiorari to decide "whether, in a habeas case, [Rule 60] motions are subject to the additional restrictions that apply to 'second or successive' habeas corpus petitions under the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." After considering the relevant language of the Federal Rules of Civil Procedure and AEDPA, the Court held that some Rule 60 motions should be treated as "second or successive" habeas petitions under AEDPA, but others should not. The Court concluded that "a Rule 60(b)(6) motion in a § 2254 case is not to be treated as a successive habeas petition if it does not assert, or reassert, claims of error in the movant's state conviction." *Id.* at 538.[8]

The Court made plain that a Rule 60 motion that "attacks, not the substance of the federal court's resolution of a claim on the merits, but some defect in the integrity of the federal habeas proceedings," is not barred from review by the second or successive prohibition in AEDPA. The Court specifically ruled that "[f]raud on the federal habeas court is one example of such a defect." *Id.* at 532 n.5 (citing *Rodriguez v. Mitchell*, 252 F.3d 191, 199 (2d Cir. 2001) (a witness's allegedly fraudulent basis for refusing to appear at a federal habeas hearing "relate[d] to the integrity of the federal habeas proceeding, not to the integrity of the state criminal trial.")).

Here, the fraud being alleged represents a defect in the § 2255 proceedings themselves,

---

[8]The *Gonzalez* decision addressed only motions under Rule 60(b), rather than 60(d), and specifically noted that it was limiting its consideration to § 2254, rather than § 2255, cases. *Gonzalez*, 545 U.S. at 529 n.3. It is thus unclear whether the decision impacts motions brought under *Hazel-Atlas* and Rule 60(d)(3) in a § 2255 case. Mr. Higgs includes this discussion in the event that this Court should find that it does.

27

not in the substance of this Court's prior merits ruling.  As such, the fraud falls squarely within the ambit of footnote 5 in *Gonzalez*.  The Assistant United States Attorney's knowing misrepresentations in her habeas filings caused this Court to issue a § 2255 ruling based on inaccurate information.  *Gonzalez* therefore does not bar consideration of this motion.

## CONCLUSION AND PRAYER FOR RELIEF

As one prominent Court of Appeals judge recently observed in a case involving a *Brady* violation due to the government's failure to provide impeachment material regarding its star witness: "When a public official behaves with such casual disregard for his constitutional obligations and the rights of the accused, it erodes the public's trust in our justice system, and chips away at the foundational premises of the rule of law. When such transgressions are acknowledged yet forgiven by the courts, we endorse and invite their repetition." *United States v. Olsen*, 737 F.3d 625, 632 (9th Cir. 2013) (Kozinski, C.J., dissenting from the denial of en banc review).

The government's conduct in this litigation was egregious. It committed a serious *Brady* violation at trial by concealing devastating impeachment material regarding its star witness and then deliberately covered up the violation during post-conviction proceedings. This is not an attenuated violation where one hand did not realize what the other was doing; where the prosecutor, for example, was not aware of the actions of some other law enforcement agency even though she had a duty to learn of them. This is a case where *the trial prosecutor* spoke directly to *the person with the authority and inclination to charge her star witness with first degree murder* and talked him out of it.

When confronted with this allegation during § 2255 proceedings, she perpetrated a fraud on this Court. She signed her name to two different documents, denying in each that any such machinations had taken place. The fraud was successful, as these misrepresentations formed the basis for this Court's decision denying relief.

Mr. Higgs respectfully submits that the allegations and evidence contained in this motion

and the exhibits demonstrate his entitlement to relief. At a minimum, however, he requests that the Court grant him leave to fully uncover the extent of the government's misconduct and that the Court provide the opportunity to present argument and evidence at a hearing on the matter.

WHEREFORE, Petitioner, Dustin Higgs, hereby requests that this Court:

A.      Direct the government to respond to this motion;

B.      Permit Petitioner to submit a reply to the government's response;

C.      Schedule oral argument and a hearing;

D.      Set aside the judgment in these proceedings under Fed. R. Civ. P. 60; and

E.      Grant all other and further relief that the Court might deem just, proper, and equitable.


Respectfully Submitted,


/s/ Matthew C. Lawry                          /s/ Stephen H. Sachs
Matthew C. Lawry                              Stephen H. Sachs
Federal Community Defender Office             WilmerHale LLP
   for the Eastern District of Pennsylvania   Five Roland Mews
Curtis Center, Suite 545-West                 Baltimore, MD 21210
601 Walnut Street                             (410) 532-8405
Philadelphia, PA 19106                        Steve.Sachs@wilmerhale.com
215-928-0520
Matthew_Lawry@fd.org


Dated: December 4, 2014

## CERTIFICATE OF SERVICE

I, Matthew C. Lawry, hereby certify that on this 4th day of December, 2014, I

electronically filed the foregoing motion using the Court's CM/ECF system.  Electronic notice

will be provided to the following individuals:

> Deborah A. Johnston
> Sandra Wilkinson
> Assistant United States Attorneys
> Office of the United States Attorney
> 6500 Cherrywood Lane, Suite 400
> Greenbelt, MD 20770-1249

> /s/ Matthew C. Lawry
> Matthew C. Lawry

# Exhibit 1[1]

---

[1]Many of the exhibits included herein originated in the Baltimore Police file pertaining to the murder of Martrelle Creighton. Counsel for Mr. Higgs received the file in partially redacted format. Counsel have made further redactions of their own in order to comply with the Court's privacy policy. Should the Court wish to view the documents in the state in which they were originally received, counsel for Mr. Higgs will gladly file another set of exhibits under seal.

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

SOUTHERN DIVISION

UNITED STATES OF AMERICA

VS.                          CRIMINAL NO. PJM-98-482

VICTOR GLORIA

DEFENDANT

Greenbelt, Maryland

November 22, 2000

The above-entitled case came on for sentencing

before the Honorable Peter J. Messitte, United States

District Judge

A P P E A R A N C E S

For the Government:

Deborah A. Johnston, AUSA
Sandra Wilkinson, AUSA

For the Defendant:

Paul Kemp, Esquire

Gail A. Simpkins, RPR
Official Court Reporter

2

P R O C E E D I N G S

THE CLERK: The matter now pending before this Court is Criminal Action Number PJM-98-0482, United States of America versus Victor Gloria. The matter now comes before this Court for sentencing.

THE COURT: All right. Counsel for the government identify yourselves and then defendant.

MS. JOHNSTON: Your Honor, Deborah Johnston and Sandra Wilkinson for the government. Seated with us at counsel table is Captain Robert Rule.

MR. KEMP: And Paul Kemp for Mr. Gloria, who is present in Court, Your Honor.

THE COURT: All right. We are here for sentencing this morning. Are there any issues with the presentence report, other than a possible 5K1.1 motion?

All right. The --

MR. KEMP: Not by the defendant, Your Honor.

THE COURT: All right. The Court then adopts the factual findings and Guideline application in the presentence report. The total adjusted offense level would be 30, a Criminal History Category IV. The custody range is 100 to 125 months. The fine range is 12,500 to $125,000.

All right. Ms. Johnston.

3

MS. JOHNSTON: Yes, Your Honor. Pursuant to the terms of the plea agreement, the government is moving under the Sentencing Guidelines, 5K1.1, for a downward departure for substantial assistance to the government. We are asking the Court to reduce Mr. Gloria's offense level by two, resulting in a criminal offense level of 25, with a sentencing range of 84 to 105 months.

The Court has seen Mr. Gloria testify in both the trials of Mr. Haynes and Mr. Higgs. The government cannot emphasize enough to the Court that Mr. Gloria came forward -- didn't come forward with this information and didn't act as quickly as he should have after the events of January 1996 and, in fact, initially was not cooperative with authorities and lied in terms of where he was the night of the crime.

But in October of 1998, when law enforcement officers confronted him about his involvement, he provided them with a statement acknowledging that he was there, acknowledging what he saw happen that night, and he made that acknowledgment to law enforcement officers when he was not facing any charges in this case, although he had been arrested on a state drug offense, that drug offense being his

4

acting as a lookout for Mr. Haynes' approximately two gram sale of crack cocaine to undercover Officer Mark Coulter.

After being -- after making that statement and being released on the state charges, he was then arrested on a federal charge, came in and immediately agreed to cooperate with the government.

As the Court knows from seeing Mr. Gloria's testimony here in court, and hearing the evidence in this case, the government could not have proceeded and obtain a conviction against Mr. Higgs certainly without the assistance of Mr. Gloria. Of course with Mr. Haynes' case we did have Mr. Haynes' confession, but Mr. Gloria's testimony was instrumental there as well.

For those reasons we believe that he has provided substantial assistance and is entitled, or the government believes it's justified that he receive some reduction in his criminal offense level, and we believe that a two-level reduction is appropriate. We would move the Court to reduce his Guideline range by two levels.

THE COURT: Mr. Kemp.

MR. KEMP: Your Honor, obviously we certainly don't oppose that motion, and I would like to talk at

5

the appropriate time about the sentence within the range.

THE COURT: All right. Let's hold off one moment.

Does the custody range change at all -- not the custody range. Does the supervised release range change at all? It's still three?

MS. JOHNSTON: I don't believe -- the supervised release doesn't change. The fine range does.

THE COURT: The fine range does, though?

MS. JOHNSTON: Yes, Your Honor. I believe the fine range becomes 10,000 to 100,000.

THE COURT: The government has moved for a two-level downward departure pursuant to Sentencing Guideline 5K1.1 based on defendant's substantial assistance to authorities.

The Court considers the factors that are set out in that Sentencing Guideline, evaluating the significance and usefulness of the defendant's assistance and particularly, the government's evaluation of that assistance, also the truthfulness, completeness and reliability of any information or testimony provided by the defendant and the extent of his assistance, any injury or risk of injury or danger resulting from his assistance, and the timeliness of

6

the defendant's assistance.

Obviously the Court sat through the two death penalty proceedings involving Mr. Haynes and Mr. Higgs, and there is no question that Mr. Gloria's assistance in that regard was critical to their convictions, which was important, and that he was in these proceedings truthful, complete and reliable in regard to what he said.

Obviously there was some risk involved. That became apparent in the course of the trials. Even though there might have not been immediately timeliness, it was timely enough for purposes of this testimony given.

So the Court finds that there is full and adequate reasons to grant the two-level downward departure, which would then, with a total offense level of 25 and a criminal history category of four, result in a custody range of 84 to 105 months, a supervised release range of still the two to three years, and a fine range of 10,000 to $100,000.

All right. On disposition?

MS. JOHNSTON: Thank you, Your Honor.

Under the terms of the plea agreement, the government has reserved the right to recommend any sentence within the Sentencing Guideline range. I'm

7

not really going to talk about Mr. Gloria's testimony because I think the Court, in granting that two-level downward departure, has taken into account the assistance he has provided to the government, but I would like to share with the Court the government's experience in terms of Mr. Gloria.

He has been incarcerated since October of 1998. Since that time we have had occasion to meet with Mr. Gloria initially a couple of times in 1998, and then again this past year in getting him ready to testify in those two trials.

Between the time that Mr. Gloria was arrested in October of 1998 until his testimony in the Haynes trial, he was in the general population over in the Montgomery County Detention Center. And in preparation for the Haynes trial and anticipating possible cross-examination of him, we did obtain his detention, his records from the Montgomery County Detention Center.

While I don't have them here today, in reviewing them I noted that he had successfully completed a number of programs there, that he in fact was a representative in his dorm and served in that capacity for those individuals.

Since his testimony in the Haynes case, he has

8

been in protective custody.  As a result of his testimony, as a result of the publicity concerning his testimony, he has been in protective custody.  And in meeting with him after that --

Some inmates might resent, some defendants, cooperators might resent the fact that they were being put in protective custody, thinking of it as punishment when they have done something for the government.

But Mr. Gloria's attitude was not of that sort.  Instead, he said that he in essence didn't mind being in protective custody.  It gave him an opportunity to read and do some other things that he hadn't had a chance to do before.

In addition to that, between the time that the government first met with Mr. Gloria in, I believe it was November of 1998, late October of 1998, up until his testimony in the Higgs case, which was the last time we had occasion to meet with him, it is appropriate to say that Mr. Gloria has matured significantly during these two years that he spent in jail.  My observations of him were that indeed, he has an appreciation for what had occurred.

I will tell the Court that Mr. Gloria sat in our office at one point and cried over what had happened.

9

He expressed remorse for what had happened to these three young ladies, acknowledged the fact that at least one of them would not have been there if he hadn't been there that night and feels directly responsible in that regard.

Mr. Gloria has a criminal history. There is no disputing that. The government hopes that with this time in prison Mr. Gloria will develop the trades, some trades and some skills so that when he gets out of prison, he will find a way to support himself without being involved in criminal conduct again.

For all of those reasons, the government is going to recommend that he receive a sentence at the low end.

THE COURT:  Mr. Kemp.

MR. KEMP:  Thank you, Your Honor.

Obviously I will join with the government in that and feel very strongly about it.

First of all, insofar as the fine is concerned, I think based on paragraphs 94 and 95 of the presentence investigative report, the Court make a finding that he is not capable or not able to make, pay any kind of a fine under the circumstances. I just want to deal with that more as a housekeeping issue than anything else.

10

But in line with what the government proffered, at the time he had to be placed in protective custody, he was in several programs which had to be terminated. One of those was a self-awareness program known as More Recognition Therapy. He was in the anger management program, and was taking a spousal abuse seminar, not that he had ever been involved in anything of that ilk, but it was a program that was available to him and he had begun taking it. That all had to be terminated when he was moved to the PC wing of the Montgomery County Detention Center.

In addition to the normal taunts I think that go along with any person cooperating with the government and then word gets out, and then it hits the press and the TV's, which are on constantly over at the detention center or any of the detention centers, resulting in Mr. Gloria receiving inmate taunts, there were even some taunts that came from jail guards that I'm going to take issue with after Mr. Gloria has left that institution because it's very upsetting to me that someone who would set out to do this is receiving trash talk not just from inmates, but from jail guards. That is the kind of thing that I just think should not occur, and I'm going to bring it to the attention of the Internal Affairs Division of the

Montgomery County Police and/or the Marshal's Division, Marshal's Department, whoever is the more appropriate agency.

The remorse which he has shown throughout this from my involvement in this case, beginning I guess in late October of 1998, after I was appointed. There was never any story, there was no game playing. By that point he had given a statement to one of the government agents involved in this case that admitted his involvement it in.

I think it's important to point out that he never tried to soft sell his presence, his attempt to, in his drunken state, help them wipe the apartment clean after the time of the commission of this horrible crime, and insofar as his participation was concerned, just was very forthcoming with that.

So there wasn't that normal wall that I have to break through or that defense attorneys commonly have to break through at the very outset of a case, well, how is this going to help me, how is this going to help me? He was much more concerned at that point with the enormity of the crime and his remorse, insofar as I can tell, is very genuine, even though he was not obviously the primary actor in any of the horrible events which took place on that night.

12

Because he has been in protective custody, he may only have visitation after 9 p.m. at night and as a result of that, he has not been able to see his two children. He has one child who is eight and another child who is much younger, and they cannot come to the detention center at that hour. And so because of protective custody, that is something that he has sorely missed.

His eight year old child, whose name is Aja, A J A, after he was arrested in this case essentially shut down and became uncommunicative. I spoke with the mother of that child, whose name is Katrina Haviland. There have been significant problems, and for that he feels particularly guilty. This is a situation, as he knows, of his own making and yet, it's being visited upon his eight year old child.

He is a very sensitive young man and I think his honestly is his leading characteristic. It is rare that somebody just in the middle of a conference thanks a court-appointed attorney but for no reason other than I think he genuinely felt it.

He thanked me a couple of weeks ago when we were getting ready for today and appreciated all the efforts that I had made, which have been, frankly, with a defendant like him, minimal. He's just an easy

13

client to represent.

He was concerned, unlike so many people, with doing the right thing, given the horrible facts of this case, to try and show his remorse in connection with it.

I would implore the Court to impose a sentence at the lowest end of the Guidelines under the circumstances of this case.

He knows -- he has had a prior record, obviously nothing like this, much more of a record that bespeaks either a drug user, a drug seller at a certain point.

He was involved in the fight down in Marion, Virginia, which had a lot of mitigating circumstances, but nevertheless stands as a conviction.

THE COURT: There are a number of detainers out, though, as I see.

MR. KEMP: There is really only one operative detainer. Well, there is a violation of probation from Marion, Virginia that I think he is going to have to go back and answer for at some point. That may serve as a detainer.

He has the detainer -- there should be a detainer from Prince George's County for the pending drug charge, and I think that's the totality of it, if I'm not mistaken.

14

It's going to interrupt the time he would have normally in a Bureau of Prisons installation, which has already -- for 25 months he has been kept in local incarceration as part of his preparation for trial on these cases, and that's a long period of time, as long as any that I have seen for somebody who is incarcerated pretrial, Your Honor.

I am going to ask the Court to consider a recommendation both for boot camp -- he would like that. He has heard about it, and I would like that recommendation to be made. I know that the Bureau of Prisons will make that consistent with his security needs insofar as this case is concerned and with the problems that he has had in this case that the Court has already alluded to potentially from other defendants.

Then the Intensive Drug Confinement Program I think would have particular application. The people at Annapolis Junction tell me he would qualify for that, that this offense does not in his case involve use of a weapon. So he is not precluded from entering into that. So I am going to ask the Court to make that recommendation.

I've already mentioned the fine, and I would ask the Court to make a specific finding that he is not

15

capable of paying a fine under the circumstances of this case. Other than that, I would submit it to the Court's discretion.

THE COURT: Mr. Gloria, you have an opportunity to address the Court at this time, and I'll hear from you.

THE DEFENDANT: At first my intentions was to come in and tell you how much I love my family and how much I feel they need me, but I mean even the government is aware of that.

So I just want to right now just apologize to the victims and their families and apologize for being a coward. I mean maybe if I had done anything, we wouldn't all be here right now.

I want to apologize for not jumping in front of the gun or not walking away, I mean anything, something that could have changed it. I just want to say I'm sorry. I never, I never meant for anything like this to happen, you know. I just pray they can get through it. That's it.

THE COURT: All right. Mr. Gloria, obviously yours is a typical case. You've got a criminal record, and I can't congratulate you for that obviously. I mean you come to a very sorry point in your life where, as a young man, you have done enough.

16

You went right to the brink in this case.

I understand you were not a participant as far as conceiving this idea or executing it. You were there and maybe you could have done something, but you ran with some pretty bad people, and they have contributed significantly to some real loss in your own life.

Maybe you will get straight. It sounds to me like in the last couple of years some things have gone right for you. They sure weren't going right up to that point and, as I say, it got worse and worse, until you found yourself in this truly terrible situation.

Having said that, I mean the fact is you were the critical link in the conviction of these two men, who deserved to be convicted. I understand that's at some sacrifice to yourself, and I cannot ignore that. That is the most important thing about you at this point in the sentencing, and it overrides everything else.

I'm going to sentence you to 84 months incarceration and recommend boot camp and the Intensive Drug Confinement Program, and then place you on supervised release for a period of three years thereafter, subject to the standard terms and

conditions of supervised release.

You are to commit no crimes, federal, state or local, possess no firearm or dangerous weapon, and you shall satisfactorily participate in any treatment program approved by your probation officer during your supervised release period relating to substance and/or alcohol abuse.  This may include evaluation, counseling and testing, as deemed necessary by your probation officer.

I will impose no fine by reason of inability to pay, but there is a $100 --

MS. JOHNSTON:  Your Honor, I believe it is $50 because of when the crime occurred.

THE COURT:  All right.  I will impose no fine by reason of inability to pay, but the special assessment, I'm advised, is $50, which is due and payable immediately.

You are obviously in custody and continue to be. You've waived your right of appeal in this case.  Any further matters in that regard, you can take up with Mr. Kemp.

Is there anything more to be said, Ms. Johnston?

MS. JOHNSTON:  Your Honor, no.  I think this was a single count --

MR. KEMP:  It was.

18

MS. JOHNSTON:  -- indictment that the defendant pled guilty to.  There is another pending criminal case, but that's not before the Court, and we will resolve that by documentation.

THE COURT:  All right.  Mr. Gloria, you will have to live with yourself now.  Maybe your life will take a turn for the better.  A small beginning.  Many years ahead.  See what happens.  All right.

(The proceedings concluded.)

- - - - - - - - - -

REPORTER'S CERTIFICATE

I hereby certify that the foregoing transcript in the matter of United States of America vs. Victor Gloria, Defendant, Criminal No. PJM-98-482, before the Honorable Peter J. Messitte, United States District Judge, on November 22, 2000 is true and accurate.

_____

Gail A. Simpkins
Official Court Reporter

# Exhibit 2

POLICE DEPARTMENT
BALTIMORE, MARYLAND
18 JULY 1998

TO:       Major Kathleen T. Patek
          Commanding Officer
          Crimes Against Persons Section

FROM:     Detective Robert L. Patton
          Detective Kirk Hastings
          Homicide Unit

SUBJECT:  HOMICIDE BY STABBING
          MARTRELLE LAMAR CREIGHTON
          M/B/20 DOB ███████
          ███ ████████████ ▰ ███████████████
          OCC: 18 JULY 1998 @ 0200 HOURS
          301 LIGHT STREET ( SIDE WALK AREA)
          CC# 98-1G13258 H-98-172

SIR:

## SYNOPSIS OF INCIDENT:

On the captioned date at 0206 hours Officer Moore was dispatched to the listed location for a reported stabbing. Upon arrival the Officer found the listed victim laying on the side walk suffering from an apparent stab wound to right neck area. Emergency medical Units arrived on the scene and the victim was ultimately transported to University of Maryland Shock Trauma Center by Medic # 12 Unit. Once at the trauma center the victim received emergency medical treatment and ultimately expired from his wound and was pronounced dead at 0230 hours.

Officer Moore in concert with backup Units secured the crime scene, made the appropriate notifications and were able to locate witnesses who were ultimately transported to the Homicide office for interview. Your Investigators ultimately found that the listed victim had been engaged in a argument and altercation with three unidentified black males and was stabbed once in the right neck area. The unidentified males then ran from the scene and were last seen running in the direction of Pratt Street. The victim next of kin, Ms. Judy Creighton of ████ ██████████ was notified and given the appropriate information.

## NOTIFICATION OF INCIDENT:

On the 18th of July 1998 at approximately 0215 hours Officer Kevin Moore Unit 7629 contacted the Homicide Units and reported the following information . Officer Moore reported that he was currently investigating a serious stabbing incident that occurred on the side walk area in front of Phillips Inn harbor restaurant located at 301 Light Street and requested assistance from the Homicide Unit.

**PAGE # 2**
**OFFICE REPORT**
**18 JULY 1998**
**H-98-172**

Based on this request your Investigators responded to the scene and initiated a preliminary investigation and ultimately interviewed the primary Officers and witnesses at the scene.

**CASE STATUS:**    Open.

**MOTIVE:**    Argument / Altercation.

**VICTIM:**    **MARTRELLE LAMAR CREIGHTON**
**M/B/20 DOB** ████████ ████████ ███ ████████████

       On the captioned date and time the above victim is found suffering from an apparent stab wound to the right front neck area. The victim is transported to University of Maryland Shock trauma Center where he received emergency medical treatment and ultimately expired from his wound and was pronounced dead at 0230 hours. On this same date the victims body was transported to the O.C.M.E. where a post mortem examination was performed by Doctor David Fowler . Doctor Fowler reported at the conclusion of his examination that the victim sustained a single stab wound to the right front neck area. He added that the single wound lacerated the victims artery which was the cause of death. Doctor Fowler ruled the manner of death was Homicide by stabbing. One vial of the victims blood was recovered and submitted to E.C.S.

**FIRST OFFICERS REPORT:**

       Officer Kevin W. Moore, Tactical Unit 7629 reported that on the captioned date and time he was dispatched to the captioned location for a reported stabbing. Upon arrival he found the listed victim suffering from an apparent single stab wound to the neck. Emergency medical assistance was requested and the victim was ultimately transported to university of Maryland Shock Trauma Center by Medic # 12 Unit. Officer Moore reported that he secured the crime scene , located and retained witnesses and made the appropriate notifications and requested assistance from the Homicide Unit.

**PAGE # 3**
**OFFICE REPORT**
**18 JULY 1998**
**H-98-172**

### CRIME SCENE EXAMINATION:

The crime scene in reference to the captioned incident is confined to the side walk area in front of Phillips Inn harbor restaurant located at 301 Light Street. In this area your Investigators observed several small pools of blood and the victims red baseball cap. The aforementioned area was photographed by the crime lad Unit and the victim baseball cap was recovered and submitted to E.C.S.

### WITNESSES:

DAVID BISHOP
M/B/24 DOB ████████

410-███

KEVIN SMITH
M/B/23 DOB ████

NO HOME TELEPHONE

CLARENCE FREDERICK WHITE
M/B/15 DOB ████

410-████

The above listed witnesses are located at the crime scene and all indicated that they were friends with the listed victim and witnessed the captioned stabbing. All three witnesses stated that they were all at the Inner harbor and in concert with the listed victim had been talking to three unidentified black females. The witnesses indicated that the victim became upset when the unidentified females began talking to another group of black males who the witnesses believe were from the Washington D. C. area . The witnesses indicated that they bases their assumption that the unidentified males were from the Washington D.C. area Solly based on the way they were dressed. The witnesses indicated that the listed victim approached the unidentified males and engaged them in a argument which ultimately lead to a physical altercation. The witnesses indicated that during the altercation the victim was stabbed once in the neck . The witnesses stated that after the victim was stabbed the unidentified males ran from the area in the direction of Pratt. The witnesses indicated that they remained on the scene until emergency medical personnel and Police arrived on the scene.

**PAGE # 4**
**OFFICE REPORT**
**18 JULY 1998**
**H-98-172**

## SUSPECTS:

**(1)** BLACK MALE, 20'S
MEDIUM TO DARK COMPLEXION
THIN BUILD, TALL, LAST SEEN
WEARING ,A WHITE TEE-SHIRT AND
SHORTS, REPORTEDLY FROM
WASHINGTON DC, NFD.

**(2)** BLACK MALE, 20'S
LIGHT BROWN COMPLEXION, 5'7"
MEDIUM BUILD, ONE GOLD TOOTH,
SILVER OR HAZEL CONTACT LENSES,
BLACK HAIR THAT IS CUT CLOSE,
ALMOST BALLED. REPORTEDLY FROM
WASHINGTON DC, LAST SEEN
WEARING ,A WHITE TEE-SHIRT AND
SHORTS, NFD.

**(3)** MIXED RACE BLACK MALE, 20'S,  VERY
LIGHT COMPLEXION, MEDIUM HEIGHT,
MEDIUM BUILD, CURLEY SANDY BLOND
HAIR, AND POSSIBLY A PORTO RICAN ,
SAME IS THE TWIN BROTHER OF SUSPECT
# 4. REPORTEDLY FROM WASHINGTON DC,
LAST SEEN
WEARING ,A WHITE TEE-SHIRT AND
SHORTS, NFD.

**(4)** MIXED RACE BLACK MALE, THE TWIN
BOTHER OF SUSPECT # 3, VERY LIGHT
COMPLEXION, CURLEY SANDY BLOND
HAIR BREADED TO THE BACK, MEDIUM
BUILD, MEDIUM HEIGHT , POSSIBLY
PORTO RICAN REPORTEDLY FROM
WASHINGTON DC, LAST SEEN
WEARING ,A WHITE TEE-SHIRT AND
SHORTS, NFD.

## FOLLOW UP INVESTIGATION:

In reference to the follow up investigation your Investigators will attempt to identify the unidentified females and attempt to identify the listed suspects, see follow up reports.

**PAGE # 5**
**OFFICE REPORT**
**18 JULY 1998**
**H-98-172**

INVESTIGATION TO CONTINUE

SUPERVISOR

DETECTIVE ROBERT PATTON
C.I.B. HOMICIDE UNIT

# Exhibit 3

POLICE DEPARTMENT
BALTIMORE, MARYLAND

2 FEBRUARY 1999

TO:        Major Jeffrey Rosen
           Commanding Officer
           Crimes Against Persons Section

FROM:      Detective Robert L. Patton
           Detective Kirk Hastings
           Homicide Unit

SUBJECT:   HOMICIDE BY STABBING
           MARTRELLE LAMAR CREIGHTON
           M/B/20 DOB ████████████

           ████ ██████████████ ██ █████████████

           OCC: 18 JULY 1998 @ 0200 HOURS
           301 LIGHT STREET ( SIDE WALK AREA)
           CC# 98-1G13258 H-98-172

SIR:

## FOLLOW UP INVESTIGATION/ ARREST OF SUSPECTS

SUSPECTS:        **KEITH MICHAEL SCOTT**
                 M/B/23 DOB████████

                 ████████████████

                 ( ARRESTED)

                 **KEVIN LEE SCOTT**
                 M/B/23 DOB ████████

                 ████████████████

                 (ARRESTED)

                 **KEVIN ANTHONY MILLER**
                 AKA "KEVIN"
                 B/M/22 DOB ████████

                 ████████████████

                 S.I.D # 1628168

**PAGE TWO**
**FOLLOW UP INVESTIGATION/**
**ARREST OF SUSPECTS**
**2 FEBRUARY 1999**
**H-98-172**

**VICTOR GLORIA**
AKA "VIC."
B/M/24

S.I.D. # 1565443

On the 2nd of February 1999 at 1515 hours Detective Daza of the F.B.I. Fugitive Task Force, Calverton Office contacted the Homicide office and reported the following information. Detective Daza reported on this date at 1500 hours the listed suspects were and arrested in the 200 block of Red Clay Road, Anne Arundel County Maryland. Detective Daza said that the listed suspects were currently being detained at the M.S.P. Waterloo Barracks awaiting transport to Baltimore City.

Based on this information Detective John Thanner in concert with Detective Kirk Hastings responded to the Waterloo Barracks where they took custody of the listed suspects and ultimately transported them to the Baltimore City Homicide office for interview. Once at the Homicide office both suspects waived their rights to counsel and provided statements in which the following information concerning the captioned investigation was gleaned.

Concerning **Keith Michael Scott** he said during his taped interview. That he and his twin brother, Kevin Lee Scott and a third individual identified as **Kevin Anthony Miller, SID # 1628168** left Laurel Maryland together and drove to the Inner Harbor area on the date in question. He stated that his brother Kevin Scott was driving and that they were operating a white late model Chrysler or Plymouth four door vehicle that Kevin Scott had purchased from an individual known as "Paul." Keith Scott continued and stated when they arrived they parked their vehicle within blocks of the Inner Harbor and walked the rest of the way on foot. He said that they arrived sometime after 2100 hours and they walked to several drinking establishments in the vicinity.

Keith Scott continued and stated that several hours later they were walking down the promenade in the direction of where their vehicle was parked. He stated it was during this time they meet and individual known as "Vic.", **Victor Gloria S.I.D. # 1565443** , a friend from Laurel Maryland who was walking in the opposite direction.

# EXHIBIT
# 6

FILED:  February 23, 2017

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

No. 16-15
(8:98-cr-00520-PJM-2)
(8:05-cv-03180-PJM)

_____

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

DUSTIN JOHN HIGGS

Defendant - Appellant

_____

O R D E R

_____

Upon consideration of the appellant's motion for certificate of appealability

and preliminary brief filed pursuant to this Court's Local Rule 22(a), the Court

denies a certificate of appealability and dismisses the appeal.

Entered at the direction of Judge Traxler with the concurrence of Judge

Shedd and Judge Keenan.

For the Court

/s/ Patricia S. Connor, Clerk

# EXHIBIT
# 7

No. _____

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

## IN RE DUSTIN JOHN HIGGS,

### Movant.

---

## APPLICATION FOR LEAVE TO FILE
## A SUCCESSIVE MOTION
## UNDER 28 U.S.C. § 2255

---

Matthew C. Lawry
Federal Community Defender Office
   for the Eastern District of Pennsylvania
Curtis Center, Suite 545-West
601 Walnut Street
Philadelphia, PA 19106
215-928-0520
Matthew_Lawry@fd.org

Stephen H. Sachs
WilmerHale LLP
Five Roland Mews
Baltimore, MD 21210
(410) 532-8405
Steve.Sachs@wilmerhale.com

Movant, Dustin John Higgs, through undersigned counsel, respectfully requests that this Court, pursuant to 28 U.S.C. § 2244(b)(3), authorize him to file a successive motion under 28 U.S.C. § 2255(h)(2).  Mr. Higgs makes this request so that he may immediately assert a challenge to his convictions for using a firearm during and in relation to a "crime of violence" in violation of 18 U.S.C. § 924(c).  Specifically, Mr. Higgs seeks to challenge his § 924(c) convictions based on *Johnson v. United States*, 135 S. Ct. 2551 (2015).  *Johnson* held that the residual clause in the Armed Career Criminal Act (ACCA) (18 U.S.C. § 924(e)) is unconstitutionally vague.  From *Johnson*, it follows that 18 U.S.C. § 924(c)(3)(B), which defines the "crime of violence" element for purposes of a § 924(c) offense, is also unconstitutionally vague.  Therefore, Mr. Higgs's § 924(c) convictions and the resulting death sentences cannot be sustained.

As explained below, Mr. Higgs can make a prima facie showing, as required by 28 U.S.C. § 2244(b)(3) and § 2255(h)(2), and this Court should allow the district court an opportunity to consider the merits of his application.

## INTRODUCTION

On October 11 2000, Mr. Higgs was convicted of three counts of using a firearm during and in relation to a "crime of violence," in violation of 18 U.S.C. § 924(c)(1)(A) (Counts 5, 10 and 15).[1]  Specifically, the § 924(c) counts alleged that the underlying "crimes of violence" for the § 924(c) charges were murder and kidnapping, in violation of 18 U.S.C. §§ 1111 and 1201.  However, post-*Johnson,* as explained in the attached 28 U.S.C. § 2255 motion, murder and

---

[1] Mr. Higgs was also convicted of three counts of premeditated murder (18 U.S.C. § 1111); three counts of felony murder (18 U.S.C. § 1111); and three counts of kidnapping resulting in death (18 U.S.C. § 1201(a)(2)).

1

kidnapping fail to categorically qualify as "crime[s] of violence." *See* Exhibit 1 (Proposed Motion to Correct Sentence under 28 U.S.C. § 2255). Therefore, Mr. Higgs's § 924(c) convictions are void.

As explained in detail in the proposed § 2255 motion, the relevant portion of § 924(c) defining a "crime of violence" has two clauses. The first clause – § 924(c)(3)(A) – is commonly referred to as the force clause. The other – § 924(c)(3)(B) – is commonly referred to as the residual clause.[1] The residual clause is now void for vagueness in light of *Johnson*, and both murder and kidnapping fail to categorically qualify as a "crime of violence" under the remaining force clause. Therefore, the "crime of violence" element cannot be satisfied here under § 924(c), and the convictions are unconstitutional.

To begin with, in *Johnson*, the Supreme Court struck down the Armed Career Criminal Act's (ACCA) residual clause (18 U.S.C. § 924(e)(2)(B)(ii)) as unconstitutionally vague. 135 S. Ct. at 2557. Under *Johnson*, § 924(c)'s materially indistinguishable residual clause (§ 924(c)(3)(B)) must similarly be stricken as unconstitutional. Indeed, the Ninth Circuit in *Dimaya v. Lynch*, 803 F.3d 1110 (9th Cir. 2015), and the Seventh Circuit in *United States v. Vivas-Ceja*, 808 F.3d 719 (7th Cir. 2015), recently struck down an identical residual clause – 18 U.S.C. § 16(b) – as unconstitutionally vague in light of *Johnson*. The rationale of *Dimaya* and *Vivas-Cejas* equally applies to the determination of whether an offense qualifies as a "crime of

---

[1] Under § 924(c)(3), "crime of violence" is defined as follows:

> (3)   For purposes of this subsection, the term "crime of violence" means an offense that is a felony and –
>
> (A)   has an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (B)   that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

2

violence" under 18 U.S.C. § 924(c).  Relying on the same reasoning of *Dimaya* and *Vivas-Ceja*, two district courts recently found that the § 924(c) residual clause was void for vagueness.  *See United States v. Lattanaphom*, ___ F.Supp.3d ___, 2016 WL 393545 (E.D. Cal. Feb. 2, 2016); *United States v. Edmundson*, ___ F.Supp.3d ___ , 2015 WL 9582736 (D. Md. Dec. 30, 2015). As further detailed in the attached § 2255 motion, these cases compel the same conclusion here.

Likewise, the murder and kidnapping charges in Mr. Higgs's case do not qualify as "crimes of violence" under § 924(c)'s remaining force clause (§ 924(c)(3)(A)).  They do not because neither murder nor kidnapping has as an element the use, attempted use, or threatened use of violent physical force, and either can be accomplished without the *intentional* use, attempted use, or threatened use of the same.  Therefore, murder and kidnapping fail to categorically qualify as "crime[s] of violence," and Mr. Higgs's § 924(c) convictions are void.

As a result, Mr. Higgs's § 924(c) convictions 1) violate due process, 2) violate the United States laws and result in a fundamental miscarriage of justice, and 3) were entered in excess of the district court's jurisdiction.

Mr. Higgs urges this Court to authorize his application for a successive petition so that he can pursue the above-described *Johnson* claim in district court.  Because Mr. Higgs has previously pursued a collateral attack on his conviction and sentence, he must first seek authorization from this Court to file a successive petition.  28 U.S.C. § 2244(b)(3).  This Court may authorize the filing of a second or successive application when the petitioner makes a "prima facing showing" that his or her proposed claim relies on a "new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable."  28 U.S.C. § 2255(h)(2).

The Court's decision in *Johnson* is a substantive rule that is retroactively applicable. *Welch v. United States*, 136 S. Ct. 1257, 1262 (2016).

Because *Johnson* announced a new substantive rule of constitutional law that has been made retroactive by the Supreme Court, Mr. Higgs can make a prima facie showing that he is entitled to pursue a successive § 2255 petition.

## PROCEDURAL HISTORY

### A.    Trial and sentencing

On October 11, 2000, Mr. Higgs was convicted following a jury trial of three counts of use of a firearm in the commission of a crime of violence (Counts 5, 10 and 15), pursuant to 18 U.S.C. § 924(c), in addition to a combined nine counts of premeditated murder, felony murder, and kidnapping resulting in murder. *United States v. Haynes et al.*, Crim. No. PJM-98-0520.

On January 5, 2001, the District Court sentenced Mr. Higgs to death on the capital counts, and to five years consecutive to the capital offenses on Count 5; 20 years consecutive to Count 5 on Count 10; and 20 years consecutive to Count 10 on Count 15.

### B.    Direct appeals

Mr. Higgs appealed to this Court, which upheld the convictions and sentences on direct appeal. *United States v. Higgs*, No. 01-3, 353 F.3d 281 (4th Cir. 2003).

While the direct appeal was pending, Mr. Higgs filed a motion for a new trial, alleging that the government had withheld *Brady* material relating to two witnesses. The District Court denied the motion for new trial, and this Court again affirmed. *United States v. Higgs*, No. 03-19, 95 F. App'x 37 (4th Cir. 2004). Certiorari was denied with respect to each appeal. *Higgs v. United States*, 542 U.S. 999 (2004); *Higgs v. United States*, 543 U.S. 1004 (2004).

### C.    **Previous 2255 petitions**

On November 28, 2005, Mr. Higgs filed a motion for relief under 28 U.S.C. § 2255

(attached as Exhibit 2).  On April 7, 2010, the District Court denied the § 2255 motion.  *United*

*States v. Higgs*, Civil No. PJM-05-3180, 711 F. Supp. 2d 479 (D. Md. 2010) (attached as Exhibit

3).  On November 23, 2011, this Court affirmed the denial of relief.  *United States v. Higgs*, No.

10-7, 663 F.3d 726 (4th Cir. 2011) (attached as Exhibit 4).  The United States Supreme Court

denied certiorari on December 10, 2012.  *Higgs v. United States*, 133 S. Ct. 787 (2012).

On December 4, 2014, Mr. Higgs moved for relief from the judgment in the § 2255

proceeding, pursuant to Fed. R Civ. P. 60(d).  *United States v. Higgs*, Crim. No. PJM-98-0520,

Civil No. PJM-05-3180 (attached as Exhibit 5).  The motion for relief from judgment is still

pending in the District Court.

### D.    *Johnson v. United States*

On June 26, 2015, the Supreme Court issued its decision in *Johnson*, 135 S. Ct. 2551.  In

*Johnson*, the Court overruled *Sykes v. United States*, 131 S. Ct. 2267 (2011), and *James v. United*

*States*, 550 U.S. 192 (2007), and invalidated the ACCA's residual clause as too vague to provide

adequate notice under the Due Process Clause.  In *Johnson*, the Court held that imposing an

increased sentence under the residual clause of the ACCA violates the Constitution's guarantee

of due process.  Specifically, the Court concluded that "the indeterminacy of the wide-ranging

inquiry required by the residual clause both denies fair notice and invites arbitrary enforcement

by judges," and "[i]ncreasing a defendant's sentence under the clause denies due process of law."

*Id.* at 2557.  Finding the residual clause "vague in all its applications[,]," the Court overruled its

contrary decisions in *Sykes* and *James.  Id.* at 2562-63.

**E.** *Welch v. United States.*

After *Johnson* was decided, federal prisoners throughout the country sought to challenge their ACCA-enhanced sentences, as well as convictions and sentences imposed under materially indistinguishable residual clauses, such as that in 18 U.S.C. § 924(c). This led to litigation over whether *Johnson* announced a new substantive rule, which would apply retroactively to cases on collateral review, or whether it only announced a new procedural rule, which would not necessarily apply retroactively.

On April 18, 2016, the Supreme Court resolved the issue, finding *Johnson*'s rule substantive and thus applicable retroactively to cases on collateral review. *Welch,* 136 S. Ct. at 1265. After *Johnson* and *Welch,* Mr. Higgs's § 924(c) convictions cannot be sustained, for the reasons stated in detail in his attached § 2255 motion. *See* Exhibit 1. Mr. Higgs now requests authorization from this Court to file a successive § 2255 petition. Should leave be granted, Mr. Higgs will ask the District Court to hold the petition in abeyance pending a ruling on the Rule 60(d) motion.

## LEGAL STANDARDS

**Mr. Higgs's petition for permission to file a successive motion in the district court under § 2255 should be granted because his petition depends on *Johnson*, and *Johnson* announced a new constitutional rule which has been made retroactive by the Supreme Court.**

> **A.     Mr. Higgs can make a sufficient showing of possible merit to warrant fuller exploration by the district court.**

The gatekeeping Antiterrorism and Effective Death Penalty Act, as set forth in § 2255(h)(2), allows a prisoner to apply for leave to file a successive § 2255 motion based on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." 28 U.S.C. § 2255(h)(2). Under this provision, a federal prisoner must make a prima facie showing that the petition to be filed is based on a (1) previously unavailable (2) new rule (3) of constitutional law that (4) has been made retroactive by the Supreme Court to cases on collateral review. *Tyler v. Cain*, 533 U.S. 656, 662 (2001).

This Court has specified that a "prima facie showing" means "simply a sufficient showing of possible merit to warrant a fuller exploration by the district court." *United States v. Williams*, 330 F.3d 277, 281 (4th Cir. 2003) (citation omitted). To be clear, the "showing of possible merit" does not refer to the merits of the claims asserted in the petition. Rather, this standard only "relates to the possibility" that the gatekeeping "requirements for the filing of a second or successive petition" under § 2255(h)(2) will be satisfied. In other words, an applicant need only make a prima facie showing that the § 2255(h)(2) standard is met – not a prima facie showing that his claim has merit. While this determination "may entail a cursory glance at the merits . . . the focus of the inquiry must always remain on the [§ 2255(h)(2)] standards." *Williams*, 330 F.3d at 282. As further detailed below, Mr. Higgs easily satisfies the gatekeeping requirements of § 2255(h)(2).

**1.**   *Johnson* announced a previously unavailable new rule of constitutional law.

First, the Supreme Court's decision in *Johnson* announced a new rule.  A case announces a new rule if the result was not "dictated by precedent existing at the time the defendant's conviction became final."  *Chaidez v. United States*, 133 S. Ct. 1103, 1107 (2013) (quoting *Teague v. Lane*, 489 U.S. 288, 301 (1989)).  Here, the rule announced in *Johnson* is new because it expressly overruled *James* and *Sykes*, which had previously found that the residual clause was not void for vagueness. *See Johnson*, 135 S. Ct. at 2563 ("Our contrary holdings in *James* and *Sykes* are overruled").  Indeed, "[t]he explicit overruling of an earlier holding no doubt creates a new rule." *Whorton v. Bockting*, 549 U.S. 406, 416 (2007) (citation omitted); *see Price v. United States*, 795 F.3d 731, 732 (7th Cir. 2015) ("*Johnson,* we conclude, announced a *new* substantive rule.") (emphasis added); *In re Watkins*, 810 F.3d 375, 383 (6th Cir. 2015) (same).

Second, there is no question that *Johnson* announced a rule "of constitutional law." *Johnson* expressly holds that "imposing an increased sentence under the residual clause of the [ACCA] violates the Constitution's guarantee of due process." *Johnson*, 135 S. Ct. at 2563; *see also In re Watkins,* 810 F.3d at 380; *Price*, 795 F.3d at 732-33.  It declares that the residual clause is unconstitutionally vague and that the Due Process Clause forbids any use of it in increasing a statutory minimum or maximum sentence. *Johnson*, 135 S. Ct. at 2563.

Further, the Supreme Court has put to rest any possible dispute on this front. In *Welch*, the Court proclaimed:  "It is undisputed that *Johnson* announced a new rule." *Welch,* 136 S. Ct. at 1264.  *Welch* also put to rest any dispute that *Johnson*'s rule is one of "constitutional law," or that this rule was previously unavailable to Mr. Higgs. *See id.*

### 2. *Johnson* is retroactive, and the Supreme Court has "made" it retroactive to cases on collateral review.

So, too, does *Welch* answer the final question this Court must consider before authorizing Mr. Higgs to file his successive § 2255 motion. In *Welch,* the Supreme Court explained that *Johnson*'s rule is substantive, because that rule means the residual clause "can no longer mandate or authorize any sentence. *Johnson* establishes, in other words, that "'even the use of impeccable factfinding procedures could not legitimate' a sentence based on that clause." 136 S. Ct. at 1265 (quoting *United States* v. *United States Coin & Currency*, 401 U. S. 715, 724 (1971)). Therefore, the Court held, "*Johnson* is thus a substantive decision and so has retroactive effect under *Teague* in cases on collateral review." *Id*.

### 3. *Johnson* invalidates § 924(c)'s residual clause.

Not only does *Johnson* narrow the scope of the ACCA's residual clause, but as relevant here, it also narrows the scope of 18 U.S.C. § 924(c), and "necessarily carr[ies] a significant risk that a defendant stands convicted of an act that the law does not make criminal." *Schriro v. Summerlin,* 542 U.S. 348, 352 (2004). Section 924(c) criminalizes using or carrying a firearm during and in relation to a "crime of violence." After *Johnson,* certain predicate offenses cannot be categorized as "crimes of violence" consistent with the Due Process Clause. *Johnson* therefore alters what conduct § 924(c) makes criminal.

Here, Mr. Higgs stands convicted of acts that the law does not make criminal, because *Johnson* establishes that the so-called "crimes of violence" underlying his § 924(c) convictions cannot constitutionally be considered crimes of violence. *See Bousley v. United States,* 523 U.S. 614, 620 (1998). Indeed, in *Freeman v. United States,* No. 15-3687 (2d Cir. Jan. 26, 2016), upon the government's concession, the Second Circuit recently granted a motion to authorize a

9

successive § 2255 motion based on a *Johnson* challenge to a § 924(c) conviction.  The Seventh

Circuit did the same in *Ruiz v. United States,* No. 16-1193 (7th Cir. Feb. 19, 2016).

**B.    Mr. Holder is entitled to authorization under 28 U.S.C. § 2255(h)(2).**

The analysis above demonstrates that Mr. Holder has made the *prima facie* showing

required under 28 U.S.C. § 2244(b)(3)(C), and his application satisfies § 2255(h)(2) because he

has made a "sufficient showing of possible merit to warrant a fuller exploration by the district

court."

WHEREFORE, because Mr. Higgs has presented a *prima facie* showing of a tenable

claim that all the requirements of § 2255(h)(2) are satisfied, he respectfully requests that his

application be granted and that he be authorized forthwith to file in the United States District

Court for the District of Maryland the attached successive motion pursuant to 28 U.S.C. § 2255.

Respectfully Submitted,


/s/ Matthew C. Lawry                                        /s/ Stephen H. Sachs
Matthew C. Lawry                                            Stephen H. Sachs
Federal Community Defender Office                           WilmerHale LLP
    for the Eastern District of Pennsylvania                Five Roland Mews
Curtis Center, Suite 545-West                               Baltimore, MD 21210
601 Walnut Street                                           (410) 532-8405
Philadelphia, PA 19106                                      Steve.Sachs@wilmerhale.com
215-928-0520
Matthew_Lawry@fd.org


Dated: May 23, 2016


10